# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

JANE C. FORRESTER WINNE, on behalf
of herself and all others similarly situated,

               Plaintiff

     v.

NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2005-1;

NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2005-3;

U.S. BANK NATIONAL ASSOCIATION;

TRANSWORLD SYSTEMS, INC.;

ABRAHAMSEN RATCHFORD, P.C.;

VCG SECURITIES, LLC;

PNC BANK, N.A.;

CHARTER ONE BANK, N.A.; and

TURNSTILE CAPITAL MANAGEMENT,

               Defendants

Civil Action Docket No.

## CLASS AND COLLECTIVE ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL AND INJUNCTIVE RELIEF

Plaintiff, Jane C. Forrester Winne, ("Winne") by and through the undersigned counsel, on

behalf of herself and all others similarly situated, complain of Defendants as follows:

## INTRODUCTION

1.      For the fourth time in two years a disabled Maine senior citizen is being unlawfully targeted by shadow bankers on alleged loans that have been bundled, securitized, bought and sold so many times and exchanged between so many shell corporations and trusts it makes one's head spin.

2.      Jane Winne represents a class of vulnerable Maine students who are being unlawfully pursued on alleged private student loan debts they do not owe, were fraudulently procured, or both.

3.      This action challenges Defendants' unlawful attempts to collect private student loan debts in violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692, *et seq*., ("FDCPA"), the Maine Fair Debt Collection Practices Act, 32 M.R.S.A. §11001, *et seq*., (MFDCPA), and the Truth in Lending Act, 15 U.S.C. §1631, *et seq*.

4.      Plaintiff alleges that debt collection activities by Defendants against her and a class of similarly situated Maine residents are being aggressively used unlawfully by Defendants who know or should know they are unfair, abusive and deceptive.

## JURISDICTION AND VENUE

5.      This Court has federal question jurisdiction over this action pursuant to 15 U.S.C. §1692k(d), 15 U.S.C.A. §1640(e) and 28 U.S.C. §§ 1331.  The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a).

6.      Venue properly lies in this Court pursuant to 28 U.S.C. §1391 because this judicial district is where a substantial part of the events or omissions giving rise to the claims occurred.

7.     This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2291 and 2202.

## JURY DEMAND

8.     Plaintiff demands trial by jury of all claims to the extent permitted by law.

## PARTIES

9.     Plaintiff Jane C. Forrester Winne is a resident of Maine and a "consumer" as defined in 15 U.S.C.A. §1692a(3) allegedly obligated to pay certain private student loan debt.

10.     Defendant National Collegiate Student Loan Trust 2005-1 ("NCSLT 2005-1") is a Delaware statutory trust created to facilitate the issuance and sale of notes to investors that are backed by bundles of private student loans.

11.     NCSLT 2005-1 is a "debt collector" as defined in 15 U.S.C. §1692a(6) and 32 M.R.S.A. §11002(6).

12.     Defendant National Collegiate Student Loan Trust 2005-3 ("NCSLT 2005-3") is a Delaware statutory trust created to facilitate the issuance and sale of notes to investors that are backed by bundles of private student loans.

13.     NCSLT 2005-5 is a "debt collector" as defined in 15 U.S.C. §1692a(6) and 32 M.R.S.A. §11002(6).

14.     Defendant U.S. Bank National Association ("US Bank") is the Indenture Trustee for the Delaware Statutory Trusts National Collegiate Student Loan Trust 2005-1 and National Collegiate Student Loan Trust 2005-3 with a principal corporate trust office in St. Paul, Minnesota.  At all times relevant to this Complaint US Bank has transacted business in this District and throughout the United States.

15.     US Bank is a "debt collector" as defined in 15 U.S.C. §1692a(6) and 32 M.R.S.A. §11002(6).

16.     Defendant Transworld Systems. Inc. ("TWS") is a California corporation with its principal place of business located in Santa Rosa, California.  At all times relevant to this Complaint, TWS has transacted business in this District and throughout the United States.

17.     TWS is a "debt collector" as defined in 15 U.S.C. §1692a(6) and 32 M.R.S.A. §11002(6).

18.     Defendant Abrahamsen Ratchford, P.C. ("Abrahamsen") is a law firm with its principal place of business in Amesbury, Massachusetts.  At all times relevant to this Complaint, Abrahamsen has transacted business in this District and throughout the United States.

19.     Abrahamsen is a "debt collector" as defined in 15 U.S.C. §1692a(6) and 32 M.R.S.A. §11002(6).

20.     Defendant VCG Securities, LLC ("VCG") is a Florida corporation that holds all of the beneficial interest in the National Collegiate Student Loan Trust 2005-1 and the National Collegiate Student Loan Trust 2005-3 by virtue of its purchase thereof on or about 2009 when all or most of the loans contained in the trusts were in default.

21.     VCG is a "debt collector" as defined in 15 U.S.C. §1692a(6) and 32 M.R.S.A. §11002(6).

22.     Defendant PNC Bank, NA ("PNC") is a Pennsylvania banking corporation that at all times relevant to this Complaint transacted business in this District and is a "creditor" pursuant to 15 U.S.C.A. §1602(g).

23.     Defendant Charter One Bank, N.A. ("Charter One") was a banking corporation that at all times relevant to this Complaint was doing business in this District and was a

"creditor" pursuant to 15 U.S.C.A. §1602(g).  Upon information and belief Charter One was acquired by RBS Citizens Financial Group, Inc., a banking corporation with its principal place of business in Providence, Rhode Island.

24.     Defendant Turnstile Capital Management, LLC ("Turnstile") is a California Corporation that at all times relevant to this Complaint was doing business in this District and throughout the United States.

25.     Turnstile is a "debt collector" as defined in 15 U.S.C. §1692a(6) and 32 M.R.S.A. §11002(6).

## STATEMENT OF FACTS

26.     Like millions of older students nationwide, Plaintiff Winne borrowed money to attend college and graduate school for the purpose of securing gainful employment, a better quality of life and income security for herself and family.

27.     From 1981 through 2008 Winne earned her Bachelor's degree and substantially all academic credits towards a doctorate degree until she became totally and permanently disabled due to complications of diabetes, including blindness.

28.     Over the course of her educational career, Winne, like students everywhere, borrowed money under several government sponsored programs under the U.S. Department of Education including William D. Ford Federal Direct Loans, Federal Family Education Loans, Federal Perkins Loans, Teacher Education Assistance for College and Education Loans, and Stafford Loans ("Public Loans").

29.     The custom and practice at all times relevant to this Complaint for securing student loans was simple:  students like Winne went in to the Financial Aid office at the University and completed the necessary paperwork.

30.     On 31 such occasions Winne went to the Financial Aid Office and completed documents to secure funding for her education expenses.  Loans were applied for and received in amounts ranging from $850 in 1980 to $20,820 in 2008, her last year.

31.     The documents were standard forms and Winne did not make changes to them.

32.     At all material times relevant to this Complaint Winne believed each and every student loan she applied for was backed by the U.S. Department of Education and part of a public program that encouraged higher learning for its intrinsic value.

33.     When Winne became totally and permanently disabled, she sought and received forbearance, deferral and then ultimately discharge of all her student loans from the U.S. Department of Education after a rigorous process that involved monitoring and reams of documents for four years.

34.     All of Winne's Public Loans were serviced by "Nelnet," a company that contracted with the U.S. Department of Education and communicated with Winne about her Public Loans, including sending her a letter confirming their complete discharge as of December 20, 2011.

35.      Winne diligently tried to comply with her financial responsibilities.  She applied for limited public assistance for heating oil, grew much of her own food, conserved resources, tutored students and took in renters at her home to support herself--all the while giving generously to the community her time and advocacy for the public good.

36.     Unrelated to the instant complaint but relevant by way of background, on or about July 2010 Winne was served with a Summons and Complaint of foreclosure on her modest home in Orono by "Bank of America, N.A., as Successor by Merger to Lasalle Bank, N.A., as Trustee

for Certificate Holders of Bear Stearns Asset Backed Securities I LLC Asset Backed Certificates, Series 2005-HE3" (the "Mortgage Backed Security").

37.     The stated amount due was wildly disproportionate to Winne's actual balance, and payments made appeared to not have been properly credited.

38.     Numerous entities that she did not recognize contacted her about the home loan, all with different demands.  It was extremely stressful and frustrating.

39.     For over three years Winne tried in good faith to resolve the foreclosure litigation by her own Herculean efforts and by engaging the services of a HUD Foreclosure counselor who tried vigorously to engage the Mortgage Backed Security to modify the loan, but nobody with authority appeared at several mediations, offers to settle and/or modify were not accepted, and the case went to trial in January 2014.

40.     At the foreclosure trial, the Mortgage Backed Security could not produce the underlying note, could not substantiate the various and complicated assignment of the instruments, could not explain Winne's payment history and could not otherwise meet its burden of proof with respect to the amount owed.  Judgement was entered against it and in favor of Winne.

41.     The Mortgage Backed Security nevertheless appealed, citing one case, and the Law Court affirmed the judgment against it.

42.     Later in 2014 Winne began receiving multiple calls from entities she did not recognize with varying phone numbers from around the country who did not identify themselves, sought personal information and aggressively threatened her about "very serious legal matters" that would result if she did not provide the personal and confidential information they sought.

43.     Winne also received correspondence from Navient, Inc., a for-profit corporation that services student loans and notorious for abusive and unlawful collection practices.  Navient stated that as a servicer of national and state guaranty agencies, it was going to consider Winne's request for discharge if she completed "several steps" and completed certain paperwork.

44.     Winne was confused since she had already been notified that her Public Loans were discharged by Nelnet on behalf of the U.S. Department of Education, but she nevertheless completed the paperwork and sent it in after making dozens of phone calls to Navient to try and understand what was going on.

45.     Upon information and belief, Navient, on behalf of Defendants, misled Winne in order to obtain information about her disability and discharge to aid in the collection of the alleged Private Loans by Abrahamsen.

46.     Abrahamsen knew or should have known Navient was fraudulently obtaining information from Winne and the Class with the intent to thwart consumer protection laws and collect debts contrary to law.

47.     Meanwhile the collection calls continued to Winne's bewilderment and dismay.

48.     Winne made it clear to the callers she did not want to be called.

49.     Winne was afraid and very anxious.  She lives alone and is wheelchair bound. Getting to the phone is difficult.  Having the phone ring constantly was very stressful.

50.     Winne never received a debt verification notice after the initial communication by any of the Defendants.

51.     On or about August 18, 2015 Winne was served with a Summons and Complaint filed by NCSLT 2005-1 alleging breach of contract and unjust enrichment purportedly in

connection with an attached "Loan Request/Credit Agreement" dated October 8, 2004, a copy of which is attached hereto as Exhibit A ("Charter One Loan Request").

52.     The Charter One Loan Request indicates the "loan amount requested" to be $25,000.

53.     The alleged Lender was Charter One.

54.     The lawsuit sought $41,609.26 as of June 25, 2015, plus interest.

55.     The law firm bringing the lawsuit was Abrahamsen.

56.     On or about September 1, 2015 Winne was served with a second Summons and Complaint, this time filed by Abrahamsen on behalf of NCSLT 2005-3, alleging breach of contract and unjust enrichment purportedly in connection with a separate "Loan Request and Agreement" dated September 2, 2005, a copy of which is attached hereto as Exhibit B ("PNC Loan Request").

57.     The PNC Loan Request states the "loan amount requested" was $20,000.

58.     This lawsuit sought $38,505.38 as of June 25, 2015, plus interest.

59.     The law firm bringing the lawsuit was Abrahamsen.

60.     The alleged Lender was PNC.

61.     Winne called Navient because she had never heard of "National Collegiate Student Loan Trust," and did not recall applying for or receiving any loans from Charter One or PNC.  She was completely perplexed by the two situations – the ambiguity around the discharge of her Public Loans and the sudden appearance of private loans she knew nothing about.

62.     Navient insisted it could not help Winne with the two lawsuits and knew nothing about the Abrahamsen firm.  Winne was passed from one Navient representative to another over

the course of several days and well in to her calling efforts, finally, a Navient representative said he would transfer her call to a "consumer advocacy manager."

63.     When the call was transferred, it went directly to the Abrahamsen firm.

64.     Winne, through counsel, answered the two lawsuits denying all material allegations, and further, responded to interrogatories and requests for admissions stating, in sum, she knew nothing about these alleged private loans, had never received any loan proceeds therefrom, had never made any payments thereon, refused to pay them presently, and until 2015 when she was served, knew absolutely nothing about them.

65.     Winne was represented by counsel in the litigation.

66.     The lawsuits brought by NCSLT 2005-1 and NCSLT 2005-3 by Abrahamsen were initiated when these debt collectors knew or reasonably should have known the collection actions were barred by the applicable limitations period.

67.     In the lawsuit discovery, Winne was also asked to admit that she "requested repayment forbearance and/or deferment" on the private loans that were subject to the lawsuit and that she was "approved for repayment forbearance and/or deferment" on the loans, which she denied and qualified, stating she had requested all of her loans – that she believed to be public loans backed by the U.S. Department of Education – to be discharged on account of her disability and to the best of knowledge they were.

68.     Under oath in response to interrogatories, Winne stated:

"I don't recall ever applying for or receiving a private loan and was discharged of all federal student loans.  I further believe this lawsuit is a fraudulent attempt to take advantage of a disabled senior citizen."

69.     Under oath in response to interrogatories, Winne stated:

"I do not believe that this claim is valid.  Not only was I unaware of the nature of this claim, in my subsequent research, I learned that the banks responsible for this

shift of federal protections for student loan to privatization were reimbursed by the federal government, and that they were resold for pennies on the dollar to "investors" and bundled.  The entire claim the "National Collegiate Student Loan" entity purports to have as claimant and owner is fraudulent.  It is the result of current effort to "refresh" these bundles as counter party risks and are an attempt to revive time barred fraudulently floated loans for the purpose of liquification by parties that have no ownership."

70.     During the course of the litigation, Abrahamsen produced a "Note Disclosure Statement" purportedly relating to the private student loan made by Charter One, a copy of which is attached hereto as Exhibit C ("Charter One Disclosure").

71.     During the course of the litigation, Abrahamsen produced a "Note Disclosure Statement" purportedly relating to the private student loan made by PNC, N.A., a copy of which is attached hereto as Exhibit D ("PNC Disclosure").

72.     Winne has no recollection of ever before receiving said Disclosure Statements.

73.     Both the alleged Charter One Loan Request and PNC Loan Request identify Winne as the "Borrower" and Chris Winne, as the "Cosigner."

74.     Both the alleged Charter One Loan Request and PNC Loan Request state, among other things, "The proceeds of this loan will be used only for my educational expenses at the school.  The Cosigner, if any, will not receive any of the loan proceeds."

75.     Both the alleged Charter One Disclosure and PNC Disclosure identify Jane Winne and Chris Winne as "Borrowers."

76.     Both the alleged Charter One Disclosure and PNC Disclosure state that $20,000 was paid to Chris Winne and nothing was paid to Jane Winne.

77.     Both the alleged Charter One Loan Request and PNC Loan Request state "This is a Consumer Transaction."

78.     Upon information and belief, the University of Maine never received any proceeds from either Charter One or PNC for Winne's educational expenses.

79.     Winne has no recollection of applying for the Charter One or PNC Loan, never received proceeds from Charter One or PNC, and never made any payments to Charter One or PNC or any servicer acting on their behalf.

80.     According to the alleged Charter One Disclosure, payments under the so-called loan were due on the 15th day of each month beginning on 12/2006.

81.     According to the alleged PNC Disclosure, payments under the so-called loan were due on the 17th day of each month beginning on 12/2007.

82.     Winne and Chris Winne dissolved their marriage in February, 2007.

83.     On December 8, 2015 both lawsuits brought by Abrahamsen on behalf of NCSLT 2005-1 and NCSLT 2005-3 were dismissed with prejudice.

84.     Thereafter and continuing to present day, Winne has nevertheless been relentlessly contacted by TWS and, upon information and belief, other Defendants about the same alleged indebtedness to National Collegiate Student Loan Trusts 2005-1 and 2005-3.

85.     The Defendants communicate with Winne for the purposes of attempting to collect alleged debts when they know or should know Winne is represented by counsel.

86.     TWS sent her a notice dated February 9, 2016 stating that NCSLTs 2005-1 and 2005-3 have placed Winne's alleged "defaulted loans" with their agency for collection and that the current balance was $82,724.21.

87.     Winne continues to receive several dozen calls per week and has had to pay the cost to have a series of phone numbers of TWS blocked at her expense.  As of approximately

April 1, 2016 more than twenty such phone numbers from around the country have been blocked, but calls from different TWS and/or other Defendants continue.

88.     The phone calls and continued collection efforts by NCSLT and its affiliated companies named as Defendants herein to Winne are harassing and abusive and causing extreme distress and emotional damages, as well as negatively impacting her credit rating.

89.     Defendants also reported falsely to credit reporting agencies that Winne was current in her payments on the alleged Private Loans through 2010 in order to create the false impression her so-called delinquency is not time barred in a deceptive and misleading way.

90.     Recently Winne received a notice in the mail from Turnstile that states it is being provided on behalf of "The National Collegiate Student Loan Trusts and its affiliate GATE Holdings, Inc."

91.     The notice from Turnstile deceptively misrepresents it is being given pursuant to "federal law" in order to comply with "federal standards."

92.     An "affiliate" of the NCSLT is defined in the notice to be "VCG Special Opportunities Master Funds Limited."

93.     The notice informs Winne that NCSLT and its affiliates intend to use and share "personal information" that can include Winne's social security number, income, account balances, payment history, transaction history and credit scores for its "everyday business purpose," its affiliates "everyday business purpose" and for nonaffiliates "to market to" Winne, unless she completes a form that includes her "account number," name and address and sends it to GSS Data Services, Inc. in San Diego, CA.

94.     Winne has never had an "account" with National Collegiate Student Loan Trusts and believes this misleading form is another act of Defendants that is a deceptive attempt to

collect or refresh a time-barred and/or fraudulent consumer debt that is unfair, deceptive and unlawful.

95. The National Collegiate Student Loan Trusts were created to facilitate the issuance and sale of notes backed by private student loans to investors, known commonly as "securitization."

96. Private lenders such as Charter One and PNC pool quantities of private student loans and sell them as bundles in order to protect against default by shifting that risk to the investors and raising cash in order to finance new loans.

97. The securitization of the private student loan business has been extremely profitable for banks and investors due to high interest rates and fees, and the inability of most student loan debt from being discharged in bankruptcy, among other things.

98. There is no evidence the alleged Private Loans NCSLT is repeatedly trying to collect on were ever disbursed or properly assigned from Charter One and PPNC to the NCSLT or other Defendants.

99. US Bank became the Special Servicer to the NCSLTs in 2012 even though it had no experience servicing student loans. At some point it hired TWS and Turnstile Capital Management ("TCM") to act as sub-servicers and collect debts.

100. The National Collegiate Student Loan Trusts have known at least since 2012 that over $1 billion of loans have become uncollectible due to the expiration of the relevant collections limitations period.

101. VCG knew or should have known when it purchased the beneficial interest in said trusts that a large percentage of loans were either in default or otherwise uncollectible due to the expiration of the relevant collections limitations period.

102.    None of the Defendants, upon information and belief, have any completed original "loan documents," as it appears a signed "Loan Application" is attached to boilerplate pages of terms.

103.    All of the so-called "loans" that were bundled, sold and put into the National Collegiate Student Loan Trusts 2005-1 and 2005-3 are substantially the same forms containing the same boilerplate language.

104.    Presently over $4 billion of private student loans held by NCSLT Trusts defaulted, and no payments were ever made on approximately three quarters of those "loans," according to statements filed by the NCSLT Trusts in United States District Court in Minnesota.

105.    Lawsuits by the National Collegiate Student Loan Trusts brought against student borrowers around the country are being dismissed due to faulty documentation and procedures, and the Trusts are being sued for what courts are determining to be illegal collection practices.

106.    Realizing its investment is at risk of losing value and being mismanaged by US Bank, VCG appointed itself Servicer of the loans within the Trusts it is the beneficial owner of and embarked on collection efforts of its own, in addition to conducting audits and other work in order to evaluate what defaulted loans might be capable of being sold.

107.    There is presently an ongoing dispute between US Bank and VCG over who is the properly appointed servicer of the loans in the NCSLT Trusts.

108.    Numerous entities purporting to act on behalf of the National Collegiate Student Loan Trusts are employing duplicitous, unfair, deceptive and unlawful attempts to refresh time-barred private student loans that were predatory and unlawful to begin with, and are time-barred and undocumented presently.

109.    Defendants do not have the original "loan" documents, cannot produce any reasonable degree of evidence of payments, cannot calculate accurately any alleged amounts due, if any, have charged usurious interest rates and fees, and have unlawfully colluded to skirt consumer protection statutes.

110.    Winne and students around the country and in Maine are being exploited, harassed, threatened, sued, called, sent misleading forms, and otherwise abused by layers and layers of interconnected corporations and trusts and other shadowy entities for the sole purpose of increasing the already staggering profits of investors, not legitimately collecting loans that are due.

111.    The Defendants are not holders in due course because the documents in question are not negotiable instruments.

## CLASS ALLEGATIONS

112.    Plaintiff, a member of the Class, seeks to bring a collective action to enjoin Defendants from violating the federal and state Fair Debt Collection Practices Acts, and for damages arising from the violation of said Acts, as well as the Truth in Lending laws, all pursuant to 15 U.S.C.A. §1692k, 15 U.S.C.A. §1640, 32 M.R.S.A. §11054 and Rule 23 of the Federal Rules of Civil Procedure.

113.    The alleged Private Loan documents do not contain arbitration clauses.

114.    The National Collegiate Student Loan Trust 2005-1 contained 52,552 private student loans with an outstanding principal balance of $549,213,652 as of December 2004.  Of these, 208 of the loans originated in Maine with an outstanding principal balance of $2,244,062.

115.    The National Collegiate Student Loan Trust 2005-3 contained 83,403 private student loans with an outstanding principal balance of $979,298,024 as of August 31, 2005.  Of these, 478 of the loans originated in Maine with an outstanding principal balance of $4,734,988.

116.    Upon information and belief, no payments were ever made on three quarters of the NCSLT 2005 -1 and 2005-3 "loans" purportedly made in Maine, and therefore are time barred pursuant to 32 M.R.S.A. §11013(8).

117.    Recent activity by Defendants against Winne and the Class described herein is being done to undermine 32 M.R.S.A. §11013(8), among other pernicious things.

118.    Most students being sued and/or harassed by National Collegiate Student Loan Trust and/ or the other Defendants on the Trusts' behalf do not have access to or resources for a private lawyer, are unaware loans they may have applied for were private at the time, and cannot get accurate or reliable information from the Defendants.

119.    Winne seeks to represent the class of plaintiffs that signed "Loan Request/Credit Agreements" in Maine that were bundled, securitized and purportedly transferred to NCSLT 2005-1 or NCSLT 2005-3 to create student-loan-asset-backed securities.

120.    Winne and the putative class members (the "Class") are similarly situated to one another insofar as:

a.  All were students in Maine on or about 2005 and signed a "Loan Request/Credit Agreement" like the ones attached hereto as Exhibits A and B;

b.  These Loan Request/Credit Agreements are standard forms;

c.  All were not given legally sufficient disclosure of the purported consumer credit terms and conditions;

d.  All have either not received any loan proceeds; received a sum they did not

apply for; and/or have no payment history whatsoever therefore collection

actions are time barred;

e.  All are now being sued, contacted or slated to be contacted by Defendants in

various deceptive and abusive ways in an attempt to collect money, solicit

information, refresh an otherwise time-barred debt and/or generate data for the

financial gain of Defendants contrary to consumer protection laws; and

f.  All have been the subject of credit reporting that is unfair and deceptive in an

attempt to collect debts contrary to law.

121.    The potential members of the Class, based on the number of potential Private

Student Loans in the NCSLT 2005-1 and NCSLT 2005-3 in question is up to 686, an amount so

numerous that joinder of all members of the class is impracticable, as required by Fed. R. Civ. P.

23(1).

122.    There are questions of law and fact common to the Class, including the following:

a.  Whether by signing a Loan Request/Credit Agreement, the Class are

"consumers" under federal and state Fair Debt Collection Practices laws;

b.  Whether the Defendants are "debt collectors" under said laws;

c.  Whether the Loan Request/Credit Agreements are "debts" under said laws;

d.  Whether by bringing collection actions against Winne and the Class when

Defendants know or should know the actions are time barred is a violation of

said laws;

e.  Whether the Defendants' actions, including but not limited to, filing lawsuits,

making multiple phone calls and/or sending deceptive notices to Winne and

the Class to generate a consumer's "last activity" in order to skirt the statute of

limitations is a violation of said laws;

f.    Whether the alleged underlying Private Student Loans were predatory, unfair,

deceptive and contrary to law;

g.    Whether the Disclosure Statements allegedly produced by Defendants after

the Loan Request/Credit Agreements were signed violate federal and state

law; and

h.    Whether equitable remedies, injunctive relief, compensatory damages and

punitive damages are warranted.

123.    Plaintiff Winne's claims are typical of the Class.  In 2005 she was a non-traditional student and the majority of Private Student Loans were made to non-traditional students.  Winne allegedly signed the Loan Request/Credit Agreement but never received loan proceeds or made any payments and yet is being pursued aggressively by multiple entities on claims that are legally time barred and already have been adjudicated in her favor.  Winne is the object of unfair, deceptive and misleading representations as to the character, amount and/or legal status of alleged debts.

124.    Winne is a member of the Class and will fairly and adequately represent and protect the interests of the Class members.

125.    Counsel who represent Winne and the Class are competent and experienced in litigating large and complicated civil actions, including participation in a class action, and have the resources, time and energy to devote to this matter.

126.    The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members as all members signed the same predatory

standard Loan Request/Credit Agreement in 2005, did not receive legally sufficient consumer protection disclosures, did not receive loan proceeds requested, have made no payments thereon, and are now being targeted by Defendants who do not possess original documents, cannot produce sufficient evidence of indebtedness, know the alleged debts are time-barred and engaging in deceptive, unfair and misleading acts to maximize investor profits contrary to law.

127.    Maintenance of this action will promote the efficient administration of justice by obviating the need of numerous individual members from seeking an injunction for relief, many of whom do not have resources to independently retain counsel and commence their own actions to fight multiple large corporate defendants.

128.    Maintenance of this action will promote the equitable administration of justice since pursuing injunctive relief and other claims on an individual basis would be disproportionality expensive.

129.    Maintenance of this action as a class action is unlikely to impose burdens upon the court other than those that would be encountered if the action proceeded as an action on behalf of individual Class members.

130.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

131.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent adjudication with respect to individual members of the Class which would establish incompatible standards of conduct for the Defendants.

132.    The prosecution of separate actions by individual members of the Class would create a risk of adjudication with respect to individual members of the Class which would substantially impair or impede their ability to protect their own interest.

133.    The Defendants and parties opposing the Class have acted or refuse to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## CAUSES OF ACTION

### I.  Federal Fair Debt Collection Practices Act

### 15 U.S.C. §1692, *et seq*.

134.    Winne and the Class incorporate all foregoing paragraphs as if fully set forth herein.

135.    Winne and the Class are "consumers" as that term is defined in 15 U.S.C. §1692, *et seq*.

136.    Defendants NCSLT 2005-1, NCSLT 2005-3, US Bank, TWS, Abrahamsen, VCG and Turnstile are "debt collectors" ("Debt Collector Defendants").

137.    The Loan Request/Credit Agreements that purportedly back securities issued by NCSLT 2005-1 and NCSLT 2005-3 are alleged debts that arise out of a transaction entered into for personal purposes.

138.    Debt Collector Defendants have unlawfully communicated with Winne and the Class at times and places known to be inconvenient, after Winne and the Class have notified the Debt Collector Defendants they refuse to pay, want the Debt Collector Defendants to cease communication, and in Winne's case have an attorney, in violation of 15 U.S.C. §1692c.

139.    Debt Collector Defendants have engaged in conduct the natural consequences of which is to harass, oppress or abuse Winne and the Class in connection with their attempts to collect debts by causing the telephone to ring repeatedly with the intent to annoy, abuse or harass in violation of 15 U.S.C. §1692d.

140.    Debt Collector Defendants have used false, deceptive or misleading representations or means in connection with the collection of alleged debts.

141.    False representations in violation of 15 U.S.C. §1692e include:

a.  the character, amount and legal status of the alleged debts;

b.  that nonpayment will result in action the Debt Collector Defendants cannot legally take;

c.  implications that the alleged Loan Request/Credit Agreements have been legally transferred or assigned;

d.  communications regarding credit information which is known to be false;

e.  written communication which creates the false impression the document is authorized by an official government agency or law as to its source, authorization and approval;

f.  deceptive means to collect or attempt to collect alleged debts or to obtain information about Winne and the Class;

g.  the failure to disclose in initial and subsequent communication that the Debt Collection Defendants are attempting to collect a debt and that any information obtained will be used for that purpose;

h.  that accounts have been turned over to innocent purchasers for value; and

i.  the use of business, company and organization names other than the true name of the Debt Collector Defendants.

142.    The Debt Collector Defendants individually and in concert have used unfair and/or unconscionable means to collect or attempt to collect debts in violation of 15 U.S.C.

§1692f by attempting to collect amounts that are not expressly authorized by the Loan Request/Credit Agreements or permitted by law, in violation of 15 U.S.C. §1692f.

143.    The Debt Collector Defendants have violated 15 U.S.C. §1692g by failing to validate alleged debts in accordance with the law.

144.    The Debt Collector Defendants have violated 15 U.S.C. §1692j by furnishing deceptive forms that are used to create the false belief that a person other than the alleged creditor is participating in the collection of the debt.

145.    The Debt Collector Defendants' acts have been and are to this day intentional, committed in bad faith, and not the result of any bona fide error.

146.    As a result of these and other actions described herein, Winne and the Class have suffered actual damages and will continue to suffer unless the Debt Collector Defendants are enjoined by this Court to stop engaging in unlawful, unfair, deceptive and misleading attempts to collect debts.

## II.  Maine Fair Debt Collection Practices Act

### 32 M.R.S.A. §11001, *et seq*.

147.    Winne and the Class incorporate all foregoing paragraphs as if fully set forth herein.

148.    Winne and the Class are "consumers" pursuant to 32 M.R.S.A. §11002(3).

149.    The Debt Collector Defendants are "debt collectors" pursuant to 32 M.R.S.A. §11002(6).

150.    The Loan Request/Credit Request forms referenced herein are alleged obligations and "debts" pursuant to 32 M.R.S.A. §1102(5).

151.    The Debt Collector Defendants have individually or in concert engaged in practices prohibited pursuant to 32 M.R.S.A. §11013, to wit, by:

a. Engaging in conduct, the natural consequence of which is to harass, oppress and abuse Winne and the Class in the collection of debts, by among other things, causing a telephone to ring repeatedly with the intent to annoy, abuse or harass any person at the called number;

b. Providing false and misleading information and documents, and otherwise engaging in false and misleading acts;

c. Providing false representations of the character, amount, and/or legal status of the debts;

d. Threatening to take legal action that may not legally be taken or that is not intended to be taken;

e. The false representation that the debts have been sold, legally transferred or assigned;

f. The false representation that Winne and the Class committed conduct in order to disgrace them;

g. Communicating to credit reporting agencies and/or persons false and misleading credit information, including the failure to indicate the debt is disputed;

h. Using or distributing written communication that falsely represents it is authorized by an agency of the United States, or creating the false impression as to its authorization;

24

    i.    Using false representations and/or deceptive means to collect or attempt to collect a debt or obtain information concerning a consumer; and

    j.    All other acts described above that relate to the federal Fair Debt Collection Practices Act that also pertain to the Maine statute.

152.    The Debt Collector Defendants violated 32 M.R.S.A. §11013 by reporting to consumer reporting agencies Winne's and Class members' credit or alleged debt information.

153.    The Debt Collector Defendants violated 32 M.R.S.A. §11013(7) by knowingly acting on time-barred debt.

154.    The Debt Collector Defendants violated Maine's Fair Debt Collection Practices Act by individually or acting in concert committing acts with the express purpose of undermining the limitations period set forth in 32 M.R.S.A. §11013.

155.    The Debt Collector Defendants' acts have been and are to this day intentional, committed in bad faith, and not the result of any bona fide error.

### III.  Truth in Lending Act

### 15 U.S.C. §1631, *et seq*.

156.    Winne and the Class incorporate all foregoing paragraphs as if fully set forth herein.

157.    Charter One, PNC and all its assignees are "creditors" (herein sometimes "TILA Creditors") as defined in the Truth and Lending Act, 15 U.S.C. §1631, *et seq*., (the "Act").

158.    The Loan Request/Credit Agreements that are the subject of this action are "consumer credit transactions" pursuant to the Act.

159.    The Debt Collector Defendants are basing their unlawful acts on debts allegedly arising from Winne and the Class signing the Loan Request/Credit Agreements.

160.     Winne and the Class allegedly signed the Loan Request/Credit Agreements before disclosure of consumer credit information required by the Act was provided, if at all, in violation thereof.

161.     In addition to violations related to the alleged provision and/or timing of the Disclosure Statements, the TILA Creditors failed to provide the legally requisite information to Winne and the Class.  For example in Winne's case, "the amount that is or will be paid directly to the consumer."

162.     Because no "first regular payment of principal" was ever due on the alleged debts, the limitations period has not expired.

163.     In the alternative, the "first regular payment of principal" became due when the Debt Collector Defendants began their unlawful attempts to collect debts they knew or should have known were time barred.

164.     Alternatively, the unlawful collection practices of the Debt Collector Defendants constitute "an action to collect a debt."

165.     The violation of the Act by the TILA Creditors and assignees caused actual damage to Winne and the Class.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court:

1.     Order the Defendants to cease and desist all unlawful debt collection practices in the State of Maine, including but not limited to, initiating collection actions Debt Collector Defendants know or should know are time barred, and otherwise engaging in unfair and deceptive acts;

2.     Declare that the acts committed by the Defendants are unlawful;

3.      Order the Defendants, jointly and severally, to pay all damages to which Winne and the Class may be entitled under the law, including actual damages, punitive damages, penalties, liquidated damages, and pre- and post-judgment interest.

4.      On all counts, order the Defendants, jointly and severally, to pay costs and reasonable attorneys' fees.

DATED at Portland, Maine this 2nd day of May, 2016.

Respectfully submitted,


_____/s/Cynthia A. Dill_____

Cynthia A. Dill
Maine Bar No. 7055
TROUBH HEISLER, PA
511 Congress Street, 7th floor
P.O. Box 9711
Portland, ME 04104-5011
Tel:  207-780-6789
Email:  cdill@troubhheisler.com


_____/s/William K. McKinley_____

William K. McKinley
Maine Bar Number 2494
TROUBH HEISLER, PA
511 Congress Street, 7th floor
P.O. Box 9711
Portland, ME 04104-5011
Tel:  207-780-6789
Email:  wmckinley@troubhheisler.com