# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| SARAH N. COFFEY;<br><br>VICKIE L. MCMULLEN;<br><br>KARIN A. HILLS;<br><br>JANE C. FORRESTER WINNE, on behalf of herself and all others similarly situated,<br><br>    Plaintiffs<br><br>    v.<br><br>NATIONAL COLLEGIATE STUDENT LOAN TRUSTS 2001-CP1, 2002-CP1, 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, 2005-3, 2006-1, 2006-2, 2006-3, 2006-4, 2007-1, 2007-2, 2007-3, 2007-4 and the NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST;<br><br>WILMINGTON TRUST COMPANY;<br><br>THE FIRST MARBLEHEAD CORPORATION;<br><br>U.S. BANK NATIONAL ASSOCIATION;<br><br>TRANSWORLD SYSTEMS, INC.;<br><br>ABRAHAMSEN RATCHFORD, P.C.;<br><br>VCG SECURITIES, LLC; and<br><br>TURNSTILE CAPITAL MANAGEMENT, LLC,<br><br>    Defendants | Civil Action Docket No.<br>1:16-cv-00229-JDL |

## SECOND AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL AND INJUNCTIVE RELIEF

## INTRODUCTION

Since 2011, the National Collegiate Student Loan Trusts have filed over 370 student loan collection cases in Maine state courts and, Plaintiffs allege, these actions and related debt collection activities are fraudulent and otherwise violate federal and state laws.

Multiple Defendants purporting to act on behalf of the National Collegiate Student Loan Trusts know or should know they have no lawful basis to collect and/or file suit on these student loans. Defendants deliberately concealed material facts related to their wrongdoing and continue to submit documents in state courts and in furtherance of related collection activities that they know or should know are misleading and false.

1.      This action challenges defendants' unlawful attempts to collect private student loan debts in violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692, *et seq*., ("FDCPA"), the Maine Fair Debt Collection Practices Act, 32 M.R.S.A. §11001, *et seq*., ("MFDCPA") and common law.

2.      Plaintiffs alleges that debt collection activities by defendants against them and a class of similarly situated Maine residents are being aggressively used unlawfully by defendants who know or should know they are unfair, abusive and deceptive.

## JURISDICTION AND VENUE

3.      This Court has federal question jurisdiction over this action pursuant to 15 U.S.C. §1692k(d), 15 U.S.C.A. §1640(e) and 28 U.S.C. §§ 1331. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a).

4.      Venue properly lies in this Court pursuant to 28 U.S.C. §1391 because this judicial district is where a substantial part of the events or omissions giving rise to the claims occurred.

5.      This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2291 and 2202.

### JURY DEMAND

6.      Plaintiffs demand trial by jury of all claims to the extent permitted by law.

### PARTIES

7.      Plaintiff Sarah N. Coffey is a 32 year-old resident of Maine and a "consumer" as defined in 15 U.S.C.A. §1692a(3) allegedly obligated to pay certain private student loan debt.

8.      Plaintiff Vickie L. McMullen is a resident of Maine and a "consumer" as defined in 15 U.S.C.A. §1692a(3) allegedly obligated to pay certain private student loan debt.

9.      Plaintiff Karin A. Hills is a resident of Maine and a "consumer" as defined in 15 U.S.C.A. §1692a(3) allegedly obligated to pay certain private student loan debt.

10.     Plaintiff Jane C. Forrester Winne is a resident of Maine and a "consumer" as defined in 15 U.S.C.A. §1692a(3) allegedly obligated to pay certain private student loan debt.

11.     Defendants National Collegiate Master Student Loan Trust and National Collegiate Student Loan Trusts 2001-CP1, 2002-CP1, 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, 2005-3, 2006-1, 2006-2, 2006-3, 2006-4, 2007-1, 2007-2, 2007-3, and 2007-4 (the "Trusts") are Delaware statutory trusts created to facilitate the issuance and sale of notes to investors that are backed by bundles of private student loans.

12.     The Trusts are "debt collectors" as defined in 15 U.S.C. §1692a(6) and 32 M.R.S.A. §11002(6).

13.     Defendant U.S. Bank National Association ("US Bank") is a national banking association with a principal place of business at One Federal Street, Boston, Massachusetts.

14.     U.S. Bank is the indenture trustee of the Trusts as well as the custodian of multiple accounts held by the Trusts that contain funds paid by Maine student borrowers, including, upon information and belief, funds paid by Plaintiffs.

15.     At all times relevant to this Complaint US Bank has transacted business in this District and throughout the United States.

16.     US Bank is a Special Servicer for all the Trust loans that are more than 30 days delinquent and provides "special services" including collection and enforcement.

17.     US Bank is a "debt collector" as defined in 15 U.S.C. §1692a(6) and 32 M.R.S.A. §11002(6).

18.     Transworld Systems, Inc. and Turnstile Capital Management, LLC are unlawfully attempting to collect debts as agents of US Bank.

19.     US Bank, Wilmington, First Marblehead and the Trusts knowingly employ people in Maine to collect debts in violation of federal and state law.

20.     US Bank and First Marblehead are agents of the Trusts and/or Wilmington.

21.     Defendant Transworld Systems. Inc. ("TWS") is a California corporation with its principal place of business located in Santa Rosa, California.  At all times relevant to this Complaint, TWS has transacted business in this District and throughout the United States.

22.     TWS is the Subservicer of the Trusts and an agent of US Bank and the Trusts.

23.     TWS is a "debt collector" as defined in 15 U.S.C. §1692a(6) and 32 M.R.S.A. §11002(6).

24.     Defendant Abrahamsen Ratchford, P.C. ("Abrahamsen") is a law firm with its principal place of business in Topsfield, Massachusetts.  At all times relevant to this Complaint, Abrahamsen has transacted business in this District and throughout the United States.

25.     Abrahamsen is a "debt collector" as defined in 15 U.S.C. §1692a(6) and 32 M.R.S.A. §11002(6).

26.     Defendant VCG Securities, LLC ("VCG") is a Florida corporation that holds all of the beneficial interest in the National Collegiate Student Loan Trusts 2003-1, 2004-1, 2004-2, 2005-1, 2005-2 and 2005-3 by virtue of its purchase thereof on or about 2009 when all or most of the loans contained in the Trusts were in default.

27.     VCG is a "debt collector" as defined in 15 U.S.C. §1692a(6) and 32 M.R.S.A. §11002(6).

28.     Defendant Turnstile Capital Management, LLC ("Turnstile") is a California Corporation that at all times relevant to this Complaint was doing business in this District and throughout the United States.

29.     Turnstile is an agent of US Bank.

30.     Turnstile is a "debt collector" as defined in 15 U.S.C. §1692a(6) and 32 M.R.S.A. §11002(6).

31.     Wilmington Trust Company ("Wilmington") is a Delaware statutory trust with a principal place of business at 1100 North Market Street, Wilmington, Delaware and is an owner trustee of the Trusts.

32.     The First Marblehead Corporation ("First Marblehead") is incorporated in the State of Delaware and has its principal place of business in Medford, Massachusetts.

33.     First Marblehead is the parent company of several affiliates, including First Marblehead Education Resources, Inc., the original Special Servicer for each of the Trusts and First Marblehead Data Services, Inc., the Administrator of each of the Trusts.

34.     Pursuant to various agreements with the Defendants First Marblehead acted as Administrator, with power of attorney, for the Trusts, and was authorized to direct some of the actions of US Bank that are the subject of this Complaint.

35.     First Marblehead was at all relevant times the custodian of student borrower data pursuant to a Database Agreement with The Education Resources Institute, Inc. ("TERI"), the guarantor of all students loans that were bundled and transferred to the Trusts.

36.     In addition to acting as the Administrator and Special Servicer for the Trusts, First Marblehead performed risk management, administrative and support functions for TERI and services in connection with loan originations and securitization of loans.

37.     Upon information and belief First Marblehead resigned as Special Servicer for the Trusts on or about 2012 but maintained rights to a data base containing material information about the Plaintiffs and all other student borrowers alleged to have defaulted on loans contained in the Trusts.

38.     First Marblehead is a "debt collector" as defined in 15 U.S.C. §1692a(6) and 32 M.R.S.A. §11002(6).

39.     On May 11, 2016 First Marblehead received a letter from the Consumer Finance Protection Bureau ("CFPB") notifying it that in accordance with the CFPB's discretionary Notice and Opportunity to Respond and Advise ("NORA") process, the CFPB's Office of Enforcement is considering recommending that the CFPB take legal action against First Marblehead.  The NORA letter relates to practices allegedly employed by First Marblehead and

6

its affiliates in connection with the collection and litigation of delinquent and defaulted private student loans held by the Trusts.

## STATEMENT OF FACTS

### Jane Forrester Winne

40.     Like millions of older students nationwide, Plaintiff Winne borrowed money to attend college and graduate school for the purpose of securing gainful employment, a better quality of life and income security for herself and family.

41.     From 1981 through 2008 Winne earned her Bachelor's degree and substantially all academic credits towards a doctorate degree until she became totally and permanently disabled due to complications of diabetes, including blindness.

42.     Over the course of her educational career, Winne, like students everywhere, borrowed money under several government sponsored programs under the U.S. Department of Education including William D. Ford Federal Direct Loans, Federal Family Education Loans, Federal Perkins Loans, Teacher Education Assistance for College and Education Loans, and Stafford Loans ("Public Loans").

43.     The custom and practice at all times relevant to this Complaint for securing student loans was simple:  students like Winne went in to the Financial Aid Office at the University and completed the necessary paperwork.

44.     On 31 such occasions Winne went to the Financial Aid Office and completed documents to secure funding for her education expenses.  Loans were applied for and received in amounts ranging from $850 in 1980 to $20,820 in 2008, her last year.

45.     The documents were standard forms and Winne did not make changes to them.

46.     At all material times relevant to this Complaint Winne believed each and every student loan she applied for was backed by the U.S. Department of Education and part of a public program that encouraged higher learning for its intrinsic value.

47.     When Winne became totally and permanently disabled, she sought and received forbearance, deferral and then ultimately discharge of all her student loans from the U.S. Department of Education after a rigorous process that involved monitoring and reams of documents for four years.

48.     All of Winne's Public Loans were serviced by "Nelnet," a company that contracted with the U.S. Department of Education and communicated with Winne about her Public Loans, including sending her a letter confirming their complete discharge as of December 20, 2011.

49.     Winne diligently tried to comply with her financial responsibilities.  She applied for limited public assistance for heating oil, grew much of her own food, conserved resources, tutored students and took in renters at her home to support herself—all the while giving generously to the community her time and advocacy for the public good.

50.     By way of background and relevant to damages, on or about July 2010 Winne was served with a Summons and Complaint of foreclosure on her modest home in Orono by "Bank of America, N.A., as Successor by Merger to Lasalle Bank, N.A., as Trustee for Certificate Holders of Bear Stearns Asset Backed Securities I LLC Asset Backed Certificates, Series 2005-HE3."  US Bank ultimately became the entity suing Winne and the case went to trial.

51.     The stated amount due in the foreclosure action was wildly disproportionate to Winne's actual balance, and payments she had made were not properly credited.

52.     Numerous entities that Winne did not recognize contacted her about the home loan, all with different demands.  It was extremely stressful and frustrating.

53.     For over three years Winne tried in good faith to resolve the foreclosure litigation with US Bank by her own Herculean efforts and by engaging the services of a HUD Foreclosure counselor who tried vigorously to engage US Bank to modify the loan, but nobody with authority appeared at several mediations, offers to settle and/or modify were not accepted, and the case went to trial in January, 2014.

54.     At the foreclosure trial, US Bank could not produce the underlying note, could not substantiate the various and complicated assignment of the instruments, could not explain Winne's payment history and could not otherwise meet its burden of proof with respect to the amount owed.  Judgement was entered against it and in favor of Winne.

55.     Later in 2014 Winne began receiving multiple calls from entities she did not recognize with varying phone numbers from around the country who did not identify themselves, sought personal information and aggressively threatened her about "very serious legal matters" that would result if she did not provide the personal and confidential information they sought.

56.     Winne also received correspondence from Navient, Inc., a for-profit corporation that services student loans and notorious for abusive and unlawful collection practices.  Navient stated that as a servicer of national and state guaranty agencies, it was going to consider Winne's request for discharge if she completed "several steps" and completed certain paperwork.

57.     Winne was confused since she had already been notified that her Public Loans were discharged by Nelnet on behalf of the U.S. Department of Education, but she nevertheless completed the paperwork and sent it in after making dozens of phone calls to Navient to try and understand what was going on.

58.     Upon information and belief, Navient misled Winne in order to obtain information about her disability and discharge to aid in the unlawful collection of the alleged Private Loans by Abrahamsen.

59.     Abrahamsen knew or should have known Navient was fraudulently obtaining information from Winne and the Class with the intent to thwart consumer protection laws and collect debts contrary to law.

60.     Meanwhile the collection calls continued to Winne's bewilderment and dismay.

61.     Winne made it clear to the callers she did not want to be called.

62.     Winne was afraid and very anxious.  She lives alone and is wheelchair bound. Getting to the phone is difficult.  Having the phone ring constantly was very stressful.

63.     Winne never received a debt verification notice after the initial communication by any debt collector.

64.     On or about August 18, 2015 Winne was served with a Summons and Complaint filed by Trust 2005-1 alleging breach of contract and unjust enrichment purportedly in connection with an attached "Loan Request/Credit Agreement" dated October 8, 2004, a copy of which was attached to the First Amended Class and Collective Action Complaint ("First Amended Complaint") and incorporated by reference herein.

65.     The Charter One Loan Request indicates the "loan amount requested" to be $20,000.

66.     The alleged Lender was Charter One.

67.     The lawsuit sought $41,609.26 as of June 25, 2015, plus interest.

68.     The law firm bringing the lawsuit was Abrahamsen.

69.     On or about September 1, 2015 Winne was served with a second Summons and Complaint, this time filed by Abrahamsen on behalf of Trust 2005-3, alleging breach of contract and unjust enrichment purportedly in connection with a separate "Loan Request and Agreement" dated September 2, 2005, a copy of which was attached to the First Amended Complaint and incorporated herein by reference.

70.     The PNC Loan Request states the "loan amount requested" was $25,000.

71.     This lawsuit sought $38,505.38 as of June 25, 2015, plus interest.

72.     The law firm bringing the lawsuit was Abrahamsen.

73.     The alleged Lender was PNC.

74.     Winne called Navient because she had never heard of "National Collegiate Student Loan Trust," and did not recall applying for or receiving any loans from Charter One or PNC.  She was completely perplexed by the two situations – the ambiguity around the discharge of her Public Loans and the sudden appearance of private loans she knew nothing about.

75.     Navient insisted it could not help Winne with the two lawsuits and knew nothing about the Abrahamsen firm.  Winne was passed from one Navient representative to another over the course of several days and well in to her calling efforts, finally, a Navient representative said he would transfer her call to a "consumer advocacy manager."

76.     When the call was transferred, it went directly to the Abrahamsen firm.

77.     Winne, through counsel, answered the two lawsuits denying all material allegations, and further, responded to interrogatories and requests for admissions stating, in sum, she knew nothing about these alleged private loans, had never received any loan proceeds therefrom, had never made any payments thereon, refused to pay them presently, and until 2015 when she was served, knew absolutely nothing about them.

78.     Winne was represented by counsel in the litigation.

79.     The lawsuits brought by Trust 2005-1 and Trust 2005-3 by Abrahamsen were initiated when these debt collectors knew or should have known the collection actions were barred by the applicable limitations period and that the Trusts did not have title to the loans among other legal deficiencies.

80.     In the lawsuit discovery, Winne was also asked to admit that she "requested repayment forbearance and/or deferment" on the private loans that were subject to the lawsuit and that she was "approved for repayment forbearance and/or deferment" on the loans, which she denied and qualified, stating she had requested all of her loans – that she believed to be public loans backed by the U.S. Department of Education – to be discharged on account of her disability and to the best of her knowledge they were.

81.     Under oath in response to interrogatories, Winne stated:

"I don't recall ever applying for or receiving a private loan and was discharged of all federal student loans.  I further believe this lawsuit is a fraudulent attempt to take advantage of a disabled senior citizen."

82.     Under oath in response to interrogatories, Winne stated:

"I do not believe that this claim is valid.  Not only was I unaware of the nature of this claim, in my subsequent research, I learned that the banks responsible for this shift of federal protections for student loan to privatization were reimbursed by the federal government, and that they were resold for pennies on the dollar to "investors" and bundled.  The entire claim the "National Collegiate Student Loan" entity purports to have as claimant and owner is fraudulent.  It is the result of current effort to "refresh" these bundles as counter party risks and are an attempt to revive time barred fraudulently floated loans for the purpose of liquification by parties that have no ownership."

83.     During the course of the litigation, Abrahamsen produced a "Note Disclosure Statement" purportedly relating to the private student loan made by Charter One ("Charter One

Disclosure"), a copy of which was attached to the First Amended Complaint and incorporated by reference herein.

84.     During the course of the litigation, Abrahamsen produced a "Note Disclosure Statement" purportedly relating to the private student loan made by PNC N.A. ("PNC Disclosure"), a copy of which was attached to the First Amended Complaint and incorporated by reference herein.

85.     Winne had never before received said Disclosure Statements.

86.     Both the alleged Charter One Loan Request and PNC Loan Request identify Winne as the "Borrower" and Chris Winne as the "Cosigner."

87.     Both the alleged Charter One Loan Request and PNC Loan Request state, among other things, "The proceeds of this loan will be used only for my educational expenses at the school.  The Cosigner, if any, will not receive any of the loan proceeds."

88.     Both the alleged Charter One Disclosure and PNC Disclosure identify Jane Winne and Chris Winne as "Borrowers."

89.     Both the alleged Charter One Disclosure and PNC Disclosure state that $20,000 was paid to Chris Winne and nothing was paid to Jane Winne.

90.     Both the alleged Charter One Loan Request and PNC Loan Request state "This is a Consumer Transaction."

91.     Upon information and belief, the University of Maine never received any proceeds from either Charter One or PNC for Winne's educational expenses.

92.     Winne has no recollection of applying for the Charter One or PNC Loan, never received proceeds from Charter One or PNC, and never made any payments to Charter One or PNC or any servicer acting on their behalf.

93.     According to the alleged Charter One Disclosure, payments under the so-called loan were due on the 15th day of each month beginning on December, 2006.

94.     According to the alleged PNC Disclosure, payments under the so-called loan were due on the 17th day of each month beginning on December, 2007.

95.     Winne and Chris Winne dissolved their marriage in February, 2007.

96.     On December 8, 2015 both lawsuits brought by Abrahamsen on behalf of Trust 2005-1 and Trust 2005-3 were dismissed with prejudice.

97.     Thereafter and continuing to present day, Winne has nevertheless been relentlessly contacted by TWS and, upon information and belief, other defendants about the same alleged indebtedness to National Collegiate Student Loan Trusts 2005-1 and 2005-3.

98.     The defendants directly or indirectly through agents communicate with Winne for the purposes of attempting to collect alleged debts when they know or should know Winne is represented by counsel.

99.     TWS sent her a notice dated February 9, 2016 stating that Trusts 2005-1 and 2005-3 have placed Winne's alleged "defaulted loans" with their agency for collection and that the current balance was $82,724.21.

100.     The interest rates and other fees demanded exceed and violate the terms of the alleged contract and applicable usury laws.

101.     Winne continues to receive several dozen calls per week and has had to pay the cost to have a series of phone numbers of TWS blocked at her expense.  As of approximately April 1, 2016 more than twenty such phone numbers from around the country have been blocked, but calls from TWS and/or other defendants continue.

102.    The phone calls and continued collection efforts by the Trusts and its affiliated companies named as defendants herein to Winne are harassing and abusive and causing extreme distress and emotional damages, as well as negatively impacting her credit rating.

103.    The Trusts, Wilmington, The First Marblehead, US Bank, Transworld, Abrahamsen and Turnstile also reported falsely to credit reporting agencies that Winne was current in her payments on the alleged Private Loans through 2010 in order to create the false impression her so-called delinquency is not time barred in a deceptive and misleading way.

104.    Recently Winne received a notice in the mail from Turnstile that states it is being provided on behalf of "The National Collegiate Student Loan Trusts and its affiliate GATE Holdings, Inc."

105.    The notice from Turnstile deceptively misrepresents it is being given pursuant to "federal law" in order to comply with "federal standards."

106.    An "affiliate" of the Trusts is defined in the notice to be "VCG Special Opportunities Master Funds Limited."

107.    The notice informs Winne that the Trusts and its affiliates intend to use and share "personal information" that can include Winne's social security number, income, account balances, payment history, transaction history and credit scores for its "everyday business purpose," its affiliates "everyday business purpose" and for nonaffiliates "to market to" Winne, unless she completes a form that includes her "account number," name and address and sends it to GSS Data Services, Inc. in San Diego, CA.

108.    Winne has never had an "account" with National Collegiate Student Loan Trusts and believes this misleading form is another act of Defendants that is a deceptive attempt to

collect or refresh a time-barred and/or fraudulent consumer debt that is unfair, deceptive and unlawful.

109.    Winne's credit reports show that on March 1, 2010 and October 1, 2010 the loans allegedly owed to the Trusts were paid off by the guarantor.

110.    The guarantor identified on the loan documents provided by Abrahamsen is The Education Resources, Inc., that filed for Chapter 11 bankruptcy protection in Massachusetts on April 7, 2008.[1]

111.    The Trusts and Abrahamsen acting on behalf and through them did not have title to the alleged loans when they sued Winne in state court and otherwise committed unlawful collection activity because TERI paid off the balance and therefore purchased the loans, at which time title thereto transferred to TERI and/or the Plan Trustee in accordance with the confirmed Modified Fourth Amended Joint Plan of Reorganization of TERI.[2]

### Sarah Coffey and Vickie L. McMullen

112.    Sarah N. Coffey, formerly Sarah Thurlow, attended two semesters at Kennebec Valley Community College in the fall of 2006 and spring of 2007.  The cost of each semester was approximately $1,500.

113.    Vickie L. McMullen is Sarah N. Coffey's mother.

114.    On or about July 19, 2006 Coffey allegedly signed and McMullen cosigned a Loan Request/Credit Agreement for a $10,000 loan from Charter One Bank, N.A., now Citizens.

115.    On or about July 27, 2006 Coffey received proceeds from a loan totaling $10,000.

---

[1] *In Re:  The Education Resources Institute, Inc.*, U.S. Bankruptcy Court, District of MA, Eastern Division, Case No. 08-12540 (HJB), which is incorporated by reference herein.
[2] *Id.,* Case 08-12540, Doc 1139 filed 08/30/10 and Findings of Fact, Doc 1170 filed 10/29/10.

116.    On December 7, 2006 Coffey signed and McMullen cosigned a Loan Request/Credit Agreement for a $7,000 loan from Charter One Bank, N.A., now Citizens.

117.    On or about December 19, 2007 Coffey received loan proceeds in the amount of $6,000.

118.    Neither before nor at the time Coffey and McMullen signed the loans did they receive a disclosure of the terms in violation of their rights under the Truth in Lending Act.

119.    In addition to the two private loans made to her by Charter One described above, Coffey borrowed small amounts using government sponsored programs that are unrelated to the present action.

120.    Coffey made several payments on what she believed were her only two private student loans from Charter One to various loan servicers, but got frustrated due to extremely poor customer service and communication and fell behind in 2011.

121.    Or about October 1, 2014 Coffey was sent a dunning letter referencing a "National Collegiate Student Loan Trust 2006-3" loan and demanding payment of a "current balance due" of $17,835.02.

122.    On October 1, 2014 Coffey also received a dunning letter regarding a "National Collegiate Student Loan Trust 2007-1" loan and demanding payment of a "current balance" of $11,142.36.

123.    On or about October 28, 2014 Coffey received in the mail an offer to settle the two student loans she reasonably believed were her only two private loans with Charter One/Citizens that had apparently been securitized and made part of Trusts 2006-3 and 2007-1, and she accepted the offer, tendering payment in full settlement of both loans for $7,576 on October 30, 2014.

124.    Coffey and McMullen relied on representations made by the Trusts and its agents that they held legal title to the two private loans at issue and were authorized to settle her outstanding debt.

125.    In order to come up with the $7,576 to settle the two private loans, Coffey took out another loan at a local credit union and is paying it off presently.  It was her intent to clean up her credit report so she could get a mortgage and buy a home.

126.    On July 21, 2015 a Complaint was filed in Portland District Court against Coffey and McMullen by National Collegiate Student Loan Trust 2006-3 by its attorney Abrahamsen seeking collection on a $10,000 student loan allegedly made in July of 2006 to Sarah Thurlow that was cosigned by Vickie McMullen[3].

127.    Also on July 21, 2015 a Complaint was filed in the Portland District Court against Coffey and McMullen by National Collegiate Student Loan Trust 2007-1 by its attorney Abrahamsen seeking collection on a $7,000 student loan allegedly made in December of 2006 to Sarah Thurlow that was cosigned by Vickie McMullen[4].

128.    The state court complaints demanded $18,639.96 on the Trust 2006-3 loan and $11,645.27 on the Trust 2007-1 loan.

129.    The interest rates and other fees demanded exceed and violate the terms of the alleged contract and applicable usury laws.

130.    Service was made on McMullen following the filing of "Plaintiff's Ex Parte Motion to for Service by Alternate Means & Retain Case on the Docket."  (sic)

131.    Two undated nearly identical summons and complaints filed in the name of the Trusts were left by a sheriff at McMullen's house.

_____

[3]  See PORDC-CV-15-324.
[4]  See PORDC-CV-15-326.

132.    Coffey was not served, but apparently waived service on November 23, 2015 when she sent a letter to the District Court stating, among other things, she was "disappointed and surprised to receive the summons regarding National Collegiate Student Loan Trusts" because she "was quite certain that this was resolved" and that she had been "fighting with student loan companies since before I stopped making payments in 2011."

133.    Abrahamsen received a copy of Coffey's letter to the District Court.

134.    The Trusts attached to the state court complaint regarding the 2006-3 loan a document purporting to be a "true and correct" copy of the Loan Request/Credit Agreement that included "page 2 of 5" stating, among other things, "In no event will the variable Rate exceed the maximum interest rate allowed by the **State of Rhode Island**."  (emphasis added)

135.    In the Trust 2006-3 state court case the Trusts and Abrahamsen filed an Affidavit and Request for Default Judgment dated February 28, 2016 stating the sum certain to be $18,639.96 and attached an "Affidavit and Verification of Account" dated January 19, 2016 and signed by James H. Cummins, an employee of Defendant TWS as "Custodian of the Records".

136.    Regarding the alleged Trust 2006-3 loan, the Cummins Affidavit states, "No payment has been made since August 22, 2011.  After all payments, credits and offsets have been applied, Defendants SARAH THURLOW and VICKIE MCMULLEN owe the principal sum of $15,786.39, together with accrued interest in the amount of $2,853.57, totaling $18,639.96 as of January 15, 2016."

137.    Regarding the Trust 2006-3 loan, Cummins attached a "file copy" of an alleged Note Disclosure Statement that purports to relate to a "Loan Note" that disbursed $10,000 on July 24, 2006.

19

138.     On March 31, 2016 Coffey emailed Abrahamsen attorney Erin Reczek and stated, among other things, "your law firm has been after payment for two student loans that I have already taken care of.  I have received a Notification of Discovery Service after submitting all of my paperwork but this is apparently for only one of the two loans, I would like to submit the same paperwork for the other loan but I am not sure if it is too late.  I also am incredibly pregnant at this time and it has been hard for me to get places to do research that I need to do.  I also cannot afford a lawyer and it's extremely difficult to decipher all of the legal jargon.  Is there any possible way to get an extension so I can continue to collect this information?  Any help would be great as I am doing my best to do my part but it has become very hard doing this alone."

139.     Coffey also made numerous calls to so-called student loan servicers that she had been dealing with but got no information explaining why she was being pursued again on debts she had settled.

140.     On May 4, 2016 Coffey gave birth and thereafter spent 9 days in the hospital due to complications.

141.     On June 15, 2016 the Trusts and Abrahamsen filed a Motion for Summary Judgment in the Trust 2006-3 state court case against Coffey and McMullen.  In the Motion, the Trusts and Abrahamsen state, among other things, "records maintained in the ordinary course of business showing the last payment processed on the loan was on February 18, 2010," referring to an alleged "Affidavit of Kayla E. Chandler" for the proposition the state court action was brought within the six year statute of limitations.

142.     There was no Affidavit of Kayla E. Chandler attached to the Summary Judgment Motion.

143.    Filed with the Summary Judgment Motion was an Affidavit and Verification of Account dated June 2, 2016 signed by Alicia L. Holiday, an employee of TWS and "Custodian of the Records" for the Trusts.

144.    Regarding the 2006-3 loan, the Holiday Affidavit at paragraph 10 states, "No payment has been made since August 22, 2011.  After all payments, credits and offsets have been applied, Defendants SARAH THURLOW and VICKIE MCMULLEN owe the principal sum of $15,786.39, together with accrued interest in the amount of $2,853.57, totaling $18,639.96 as of May 23, 2016."

145.    In the Holiday Affidavit, she states, "As an employee of TSI (herein Transworld Systems, Inc. is referred to as "TWS"), I am duly authorized by Plaintiff (Trusts) **and U.S. Bank, National Association** to make the representations contained in this Affidavit."  (emphasis added)

146.    The Holiday Affidavit also states Coffey and McMullen's loans were disbursed on July 24, 2006, and thereafter while "in good standing" said loans were transferred and assigned to the Trusts during the securitization process in order to – falsely – imply that the Trusts are not "debt collectors" as defined under federal and state law.

147.    Attached to the Holiday Affidavit also were incomplete copies of various documents the Trusts and Abrahamsen knew no longer reflected the legal relationships and status of the parties, such as the 2006-3 "Pool Supplement Agreement" and "Deposit and Sale Agreement" and other miscellaneous misleading information.

148.    Also filed as an exhibit to the Holiday Affidavit was another alleged "true copy" of the Loan Request/Credit Agreement Coffey and McMullen signed – except on this version page 2 of 5 is different than the last "true copy," that was attached to the complaint in Portland

District Court.  On page 2 of 5, it says "In no event will the Variable Rate exceed the maximum interest rate allowed by **the State of Ohio**."  (emphasis added)

149.    The interest rates charged by the Trusts and Abrahamsen in collection actions in state court are random, excessive and otherwise violate the contractual interest rates set by the non-negotiable boilerplate language of the alleged contracts as well as applicable usury laws.

150.    Another exhibit attached to the Holiday Affidavit purported to be a "true copy" of "Loan Financial Activity" showing a loan balance of $11,049.72 on July 24, 2006 to a balance of "0" after a "CR" was entered for $15,786.39 on April 4, 2012.

151.    The guarantor of the Trust 2006-3 loan was TERI.

152.    Coffey's credit reports show the last payment made on the 2006-3 Trust loan was on April 2, 2012.

153.    The "material facts" on which the Trusts, Abrahamsen and TWS relied in the Motion for Summary Judgment in state court were based on Requests for Admissions to which Coffey did not respond technically in accordance with discovery rules, although Coffey made good faith efforts to be responsive.

154.    On November 23, 2015 Coffey sent a letter to the Portland District Court explaining her disappointment and surprise at receiving the Trusts Complaint attempting to collect on student loans she had paid $7,576 to settle.

155.    On March 31, 2016 Coffey emailed Abrahamsen saying (1) she had "already taken care of" the two student loans the Trusts was chasing, and (2) she was "incredibly pregnant" and unable to afford a lawyer.

156.    Because Coffey did not file a technically compliant response, the Trusts' Motion for Summary Judgment was granted without a hearing based on documents the Trusts and

Abrahamsen knew or should have known were false and misleading – including (1) two different sets of boilerplate material terms of the Loan Request/Credit Agreement alleged to be "true copies" of the underlying Loan Request/Credit Agreements; (2) documents intended to deceive about the transfer of title of the defaulted student loans from the lenders to the Trusts: Transworld, the Trusts and Abrahamsen knew the securitization transaction they presented to the Portland District Court giving the Trusts title to the loans was superseded by transactions that occurred after and pursuant to TERI's Chapter 11 bankruptcy; and (3) so-called "evidence" of indebtedness that is wholly unreliable unsubstantiated hearsay.

157.    Judgment was entered on August 11, 2016 for the Trusts against Coffey on the 2006-3 loan in the amount of $18,639.96 plus costs of court in the amount of $423 and interest at the statutory rate of 6.65% APR.

158.    Default Judgment by the Court was entered separately against McMullen on the 2006-3 loan on August 23, 2016 for the sum of $18,639.96 with post judgment interest at 6.65%.

159.    In the state court case brought by the Trusts against Coffey and McMullen on the 2007-1 loan, the Trusts and Abrahamsen separately sought and obtained a default judgement against both for $11,645.27 with post-judgment interest at the statutory rate and costs based on representations to the Court that Coffey and McMullen did not appear and the amount allegedly owed on the 2007-1 loan was a sum certain.

160.    The Trusts, Abrahamsen and TWS attached to its affidavits documents they knew or should have known were false and misleading, including the boiler plate pages 2 – 5 of the so-called Loan Request/Credit Agreement, documents purporting to show the amount due, payments made and interest rates charged.

161.    The Trusts' assertions and the assertions through the Trusts by Abrahamsen and Transworld that the Trusts own the private student debt and possesses legal standing to bring collection actions is a stunning masquerade and mockery of the justice system resulting in huge windfalls to defendants.

162.    When Coffey and McMullen were able to retain counsel, motions to set aside the judgments issued in state court were filed and granted.

163.    US Bank, VCG, Wilmington and First Marblehead, among others, knew when they hired Transworld, Abrahamsen and Turnstile, among others, to collect the post-TERI petition Trusts loans that those loans had been paid off during the pendency of the TERI Chapter 11 Plan and that the Trusts no longer held right, title or interest in them.

164.    Further, the Trusts, Wilmington, First Marblehead, US Bank, Transworld, Abrahamsen and Turnstile knew or should have known that multiple entities in possession of electronic student borrower data – also the subject of the TERI Chapter 11 Plan – are using it simultaneously to collect on the same loans causing extreme anxiety, confusion, distress and economic damages.

165.    After making several years' worth of payments on the $10,000 loan and the $6,000 loan, Coffey paid a lump sum of $7,576 to settle them both; however, now Coffey and McMullen **combined** have judgments against them personally totaling over $60,000.

166.    The attempts to collect in excess of $67,500, plus interest and court costs on an original student debt of $16,000, is unconscionable and apparently unrelenting.

167.    False and misleading reports to credit rating agencies about the status of the student loan debt continue to cause damage to Plaintiffs' reputations and economic harm.

168.     As recently as October 17, 2016 McMullen received a dunning letter from "Central Credit Services, LLC" stating its apparent attempt to collect on the 2006-3 and/or 2007-1 Trust loans.

169.     Interest rates charged on the loans are in violation of the terms of the Loan Request/Credit Agreements and payments made not properly credited.

170.     Coffey and McMullen were never given disclosures about the Trusts loans they were entitled to receive before consummation of the loans under the Truth in Lending Act.

171.     The two loans Coffey signed and McMullen cosigned that through the securitization process ended up in the Trusts were not "rehabilitated" as that term is defined or generally understood in the TERI bankruptcy proceeding.

### Karin A. Hills

172.     Karin A. Hills, an artist, is 83 years old and lives alone in Hancock County, Maine.

173.     On or about 2006 Hills cosigned two private Loan Request/Credit Agreements for her granddaughter, on information and belief, each in the amount of $5,000.

174.     Hills was not given disclosures she was entitled to receive under the Truth in Lending Act on or before consummation of the two loans, nor was she provided pages 2 – 5 of the loans that set forth the various terms, including interest rates.

175.     Hills and/or her granddaughter made several payments on the loans that have not been properly credited.

176.     Interest rates charged on the loans are in violation of the terms of the Loan Request/Credit Agreements.

177.     Out of the blue in the fall of 2015 Hills began getting harassed about two alleged debts she was informed she owed to National Collegiate Student Loan Trusts.

178.     Hills only cosigned two private loans for her granddaughter that, on information and belief, are time barred.

179.     Hundreds of threatening phone calls were made to Hill's home by the Trusts and entities acting on their behalf, including, upon information and belief, Transworld, US Bank and Turnstile – so much so that Hills stopped answering her phone and became isolated from her family and sometimes afraid.

180.     In order to stop the threats and harassment, Hills borrowed $6,000 from her brother to settle the alleged debts to the Trusts and agents of the Trusts accepted this amount allegedly in satisfaction of all claims.

181.     Hills tendered the $6,000 in good faith to settle both loans in reliance on the Trusts' representations they were legally owed the money and were authorized to settle the debts.

182.     On or about November 19, 2015 Hills received letters from Weltman, Weinberg & Reis Co., LPA, on behalf of National Collegiate Student Loan Trust 2006-3, stating that the two referenced Trusts loans were settled.

183.     Thereafter and continuing until this day, Hills is nevertheless harassed daily by debt collectors including "Navient Private Credit" and others who continue to attempt to collect the same two private loans Hills settled by paying the Trusts $6,000.

184.     The daily barrage of phone calls and written communication from debt collectors is causing significant anxiety, fear, loneliness and frustration.

185.     Hills has made several attempts to tell the Trusts and its agents she does not owe the loans but her attempts at resolution have been unsuccessful.

186.     On April 19, 2016 Hills' previous attorney, Barry K. Mills, sent a letter to the

Trusts servicer, Navient Private Credit, that stated:

> "We are attorneys for Karin A. Hills of Sullivan, Maine concerning your effort to
> collect payment from her on the above account.
>
> Ms. Hills is aware that she co-signed two student loans, both of which have been
> paid in full.  For your reference I have enclosed copies of two letters to her from
> Weltman, Weinberg & Reis Co., LPA, both dated November 19, 2015,
> confirming payment, Ms. Hills is not aware of any other student loans on which
> she has liability.
>
> Please send us copies of all documents showing that Ms. Hills has liability on the
> above account.  We ask for a record of payments and your computation showing
> the balance owed.
>
> We ask that Navient and its agents cease telephoning Ms. Hills. She is 83 years
> old and in poor health.  All further communications should be made directly to
> me."

187.     Neither the Trusts nor any of their multiple agents has provided the information

sought by Hills' former attorney.

188.     No documents showing Hills' liability, record of payments or computation

showing the balance allegedly owed were forthcoming.

189.     Numerous entities are presently still acting as or through the Trusts in an attempt

to directly collect the same debts from Hills she has paid $6,000 to settle.

190.     By way of example, between July 22, 2016 and September 1, 2016 Hills received

over 60 calls from debt collectors attempting to collect the two Trusts loans that she paid $6,000

to settle and thereafter asked through her attorney not to be called.

191.     The harassment and unfair debt collection activity by the Trusts and its agents

include providing credit reporting agencies false and misleading information about the status of

the two private loans.

192.     The two loans Hills co-signed that were securitized and made part of Trust 2006-3 were guaranteed by TERI.

193.     On information and belief TERI purchased the two Trust 2006-3 loans Hills cosigned post the Chapter 11 bankruptcy filing; therefore, right, title and/or interest transferred to TERI and the Trusts have no legal standing to bring claims against Hills.  This contention will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

194.     The two loans Hills cosigned that through the securitization process ended up in the Trusts were not "rehabilitated' as that term is defined or generally understood in the TERI bankruptcy proceeding.

## The Trusts General Background

195.     The National Collegiate Student Loan Trusts were created between 2001 and 2007 to facilitate the issuance and sale of notes backed by private student loans to investors, known commonly as "securitization."

196.     First Marblehead and US Bank were substantially involved in the securitization of private student debt for the sole purpose of making money.

197.     Thousands of private student loans that make up the Trusts were marketed to students at public colleges and universities as "consumer credit transactions" and students reasonably believed they were in keeping with the public financing also available on campus.

198.     All of the loans that make up the Trusts are virtually identical Loan Request/Credit Agreements, with the exception of the definition of "Variable Rate" and other fine print that appears typically on pages 2 – 5.

199.    At the time Plaintiffs signed the "Loan Request/Credit Agreement" pages 2 – 5 were not attached, or were later swapped randomly and attached without regard to whether they were in fact terms agreed upon by borrowers or not.

200.    The terms of the private loans were not disclosed on or before students became obligated under the Loan Request/Credit Agreements.

201.    The Loan Request/Credit Agreements state in bold capital letters across the top of page 1, "NON-NEGOTIABLE CREDIT AGREEMENT – THIS IS A CONSUMER CREDIT TRANSACTION".

202.    Private lenders such as Charter One and PNC pooled quantities of private student loans and sold them as bundles in order to protect against default by shifting that risk to the investors and raising cash in order to finance new loans.

203.    The securitization of the private student loan business has been extremely profitable for banks and investors due to high origination fees, interest rates and other fees, and the inability of most student loan debt from being discharged in bankruptcy, among other things.

204.    In the Winne matter, there is no evidence the alleged private loans the Trusts are repeatedly trying to collect on were ever disbursed or properly assigned from Charter One and PNC to the Trusts or other Defendants.

205.    US Bank became the Special Servicer to the Trusts in 2012 when First Marblehead resigned, even though it had no experience servicing student loans.

206.    US Bank hired TWS and Turnstile Capital Management ("TCM"), among others, to act as sub-servicers and collect debts it knew or should have known the Trusts had no right to collect.

207.    The use of the Trusts to collect debts was done intentionally to mislead borrowers and courts, who reasonably relied on the representations made by defendants about the Trusts.

208.    The Trusts, Wilmington, First Marblehead, US Bank, Transworld, Abrahamsen and Turnstile have known at least since 2012 that over $1 billion of loans have become uncollectible due to the expiration of the relevant collections limitations period and therefore they are deceiving borrowers and courts by representing to credit reporting agencies among others the debts are not time barred.

209.    The Trusts, Transworld and Abrahamsen have reported falsely to Plaintiffs, credit reporting agencies and courts that recent payments were made on the loans for the purpose of deception and avoidance of the statute of limitations.

210.    VCG and Wilmington knew or should have known when they purchased any beneficial interest in any of the Trusts that a large percentage of the private student loans were either in default or otherwise uncollectible due to the expiration of the relevant collections limitations period.

211.    None of the defendants, upon information and belief, have in their possession complete and original "loan documents" or an accurate accounting of payments made, interest accrual or amounts due.

212.    All of the so-called "loans" that were bundled, sold and put into the Trusts are substantially the same forms containing the same boilerplate language.

213.    Presently over $4 billion of private student loans held by the Trusts defaulted, and no payments were ever made on approximately three quarters of those "loans," according to statements filed by the Trusts in litigation commenced in the United States District Court in Minnesota and since transferred to Delaware.

214.    Lawsuits by the National Collegiate Student Loan Trusts brought against student borrowers around the country are being dismissed due to faulty documentation and procedures, and the Trusts are being sued for what courts are determining to be illegal collection practices.

215.    Realizing its investment is at risk of losing value and being mismanaged by US Bank, VCG appointed itself Servicer of the loans within the Trusts it is the beneficial owner of and embarked on collection efforts of its own, in addition to conducting audits and other work in order to evaluate what defaulted loans might be capable of being sold.

216.    There is presently an ongoing dispute between US Bank, First Marblehead and VCG over who is the properly appointed servicer of the loans in the Trusts.

217.    Numerous entities purporting to act on behalf of the Trusts are employing duplicitous, unfair, deceptive and unlawful attempts to refresh time-barred private student loans that were predatory and unlawful to begin with, and are time-barred and undocumented presently.

218.    Neither the Trusts nor their agents have the original "loan" documents, and they cannot produce any reasonable degree of evidence of payments, cannot calculate accurately any alleged amounts due, if any, have charged usurious interest rates and fees, and have unlawfully colluded to skirt consumer protection statutes.

219.    Plaintiffs and other student borrowers in Maine are being exploited, harassed, threatened, sued, called, sent misleading forms, and otherwise abused by layers and layers of interconnected corporations and trusts and other shadowy entities for the sole purpose of increasing the already staggering profits of investors, not legitimately collecting loans that are due.

220.     None of the defendants are holders in due course because the documents in question are not negotiable instruments and/or are consumer transactions.

221.     Trusts are estopped from asserting holder in due course status.  They drafted the loan documents and represented them to be consumer transactions.

## TERI Bankruptcy

222.     At all relevant times TERI guaranteed all of the private loans that ended up in the Trusts pursuant to guaranty agreements with lenders.

223.     First Marblehead and/or US Bank administered TERI's guaranty program with the Trusts.

224.     In consideration of its obligations under the guaranty agreements, TERI received a guaranty fee on each private loan transaction originally made by lenders and later securitized and transferred to the Trusts.

225.     After deducting an amount for its compensation, TERI deposited the remaining guaranty fees into pledged accounts held at US BANK to secure TERI's guaranty obligations to the Trusts.

226.     When the economy crashed, TERI became unable to meet its financial obligations and filed a voluntary petition for relief on April 7, 2008 pursuant to Chapter 11 of the United States Code in the U.S. Bankruptcy Court for the District of Massachusetts, Case No. 08-12540.

227.     On June 23, 2008 TERI was authorized and directed by Order of the Bankruptcy Court[5] to purchase defaulted loans from the Trusts using money in its pledged accounts held by US Bank pursuant to the guaranty agreements, among other things.

---

[5]  The "Trusts Order," Case 08-12540, Doc 361 filed 06/23/08 (U.S. Bankruptcy Court, D- MA).

228.    When TERI purchased Trusts loans pursuant to its guaranty agreements, title to the loans transferred from the Trusts to TERI.

229.    TERI's Chapter 11 Plan of Reorganization was confirmed effectively on November 19, 2010 (the "Plan").

230.    The Trusts, US Bank and First Marblehead voted to confirm the Plan and are bound thereby.

231.    "Postpetition Purchased Loans" are defined in the Plan as loans purchased by TERI after April 7, 2008 (the petition date) pursuant to the Trusts Order using funds in the pledged accounts.

232.    The TERI bankruptcy case was closed on March 8, 2016.

233.    Between April 7, 2008 and March 8, 2016 TERI purchased thousands of defaulted Trusts loans pursuant to guaranty agreements.

234.    All loans that are the subject of this case are Postpetition Purchased Loans.

235.    According to the Plan, the Trusts have no claims in any Postpetition Purchased Loans **or to any recoveries on such loans**.

236.    All Postpetition Purchased Loans and postpetition recoveries on such loans, according to the Plan, were transferred by TERI to a "Plan Trust."

237.    All of the private student loans owned by the Trusts as a result of the securitization process that went in to default post petition and paid by TERI under its guaranty pursuant to the Trusts Order became Plan Trust Assets, according to the Plan, and subject to a Plan Trust Agreement.

238.    The Trusts, US Bank, First Marblehead and Wilmington are, directly or indirectly, Beneficiaries of the Plan Trust.

33

239.    The Plan Trust was established for the limited purpose of liquidating the Plan Trust Assets to pay allowable unsecured claims.

240.    The Plan Trust Agreement states, among other things, "the Beneficiaries shall not hold legal title to the Plan Trust Assets," and, the "Plan Trustee shall be authorized to prosecute and all Causes of Action **in the name of the Debtor**…for the benefit of the Beneficiaries." (emphasis added)

241.    Between November 19, 2010 and October 31, 2015 over $40 million has been paid by the Plan Trustee to the Trust towards allowed general unsecured claims.

242.    First Marblehead and TERI shared data bases about Trusts loans while First Marblehead was the Special Servicer of the Trusts.  In 2012 First Marblehead resigned and was replaced by US Bank.

243.    After reasonable opportunity for further investigation or discovery, there will be evidence that the transfer of the Trusts loan data between First Marblehead, TERI, the Plan Trusts and US Bank and among their agents and assigns has caused multiple entities to sue and otherwise attempt to collect debts in violation of the law.

## CLASS ALLEGATIONS

244.    Plaintiffs, members of the Class, seek to bring a collective action to enjoin defendants from violating the federal and state common law and Fair Debt Collection Practices Acts, and for damages, all pursuant to 15 U.S.C.A. §1692k, 32 M.R.S.A. §11054 and Rule 23 of the Federal Rules of Civil Procedure.

245.    The alleged Private Loan documents – all virtually identical to the Loan Request/Credit Agreements referred to herein – do not contain arbitration clauses.

246.    Upon information and belief, all of the Trusts contained loans that originated in Maine.

247.    The pledged accounts and other accounts maintained by US Bank contain funds paid by many Maine borrowers in good faith on their student loans.

248.    On information and belief, of the many loans on which no payments were ever made to the Trusts or their agents, these are time barred pursuant to 32 M.R.S.A. §11013(8).

249.    Recent activity by defendants against Plaintiffs described herein is being done to undermine 32 M.R.S.A. §11013(8), among other pernicious things.

250.    Most students being sued and/or harassed by National Collegiate Student Loan Trusts and/or the other defendants on the Trusts' behalf do not have access to or resources for a private lawyer, are unaware loans they may have applied for were private at the time, and cannot get accurate or reliable information from the Trusts.

251.    Coffey, McMullen, Hills and Winne seeks to represent the class of Plaintiffs that signed "Loan Request/Credit Agreements" in Maine that were bundled, securitized and purportedly transferred to the Trusts and purchased by TERI post its Chapter 11 Petition and subject to debt collection by or on behalf of the Trusts.

252.    Plaintiffs and the putative class members (the "Class") are similarly situated to one another insofar as:

a. All allegedly signed a "Loan Request/Credit Agreement" like the ones attached to the original Complaint and incorporated by reference herein;

b. These Loan Request/Credit Agreements are standard forms;

c. All of the Loan Request/Credit Agreements were purchased by TERI sometime after November 19, 2010;

d.  All were not given legally sufficient disclosure of the purported consumer

credit terms and conditions;

e.  All are now being sued, harassed, contacted or slated to be contacted by or on

behalf of the Trusts in various deceptive ways in an attempt to collect money,

solicit information, refresh an otherwise time-barred debt and/or generate data

for the financial gain of Trusts contrary to consumer protection laws; and

f.  All have been the subject of credit reporting that is unfair and deceptive in an

attempt to collect debts contrary to law.

253.    The potential members of the Class is an amount so numerous that joinder of all

members of the Class is impracticable, as required by Fed. R. Civ. P. 23(1).

254.    There are questions of law and fact common to the Class, including the following:

a.  Whether the Trusts have legal title to the debts it and those acting for and

through it are attempting to collect;

b.  Whether multiple parties including but not limited to the Trusts, Wilmington,

First Marblehead, US Bank, Transworld, Abrahamsen and/or Turnstile are

simultaneously attempting to collect debts that Plaintiffs do not owe or have

settled;

c.  Whether by representing itself as the Trusts, Transworld and Turnstile are

committing fraud;

d.  Whether US Bank, Transworld, the Trusts and Abrahamsen lack original loan

documents and are therefore attaching random pages to loan documents that

purport to contain material contract terms;

e.   Whether the manner in which Trusts are litigating its claims – separating loans that had been serviced together to create confusion and multiple default judgments, filing affidavits they know are false and misleading, failing to credit Plaintiffs with money they have paid towards the loan, "settling" claims that are thereafter pursued again, among other tactics, is an unfair debt collection practice;

f.   Whether by signing a Loan Request/Credit Agreement, the Plaintiffs and the Class are "consumers" under federal and state Fair Debt Collection Practices laws;

g.   Whether the defendants are "debt collectors" under said laws;

h.   Whether the Loan Request/Credit Agreements are "debts" under said laws;

i.   Whether by bringing collection actions against Plaintiffs and the Class when defendants know or should know the actions are time barred is a violation of said laws;

j.   Whether the Trusts and agents' actions, including but not limited to, filing lawsuits, making multiple phone calls and/or sending deceptive notices to Plaintiffs and the Class to generate a consumer's "last activity" in order to skirt the statute of limitations is a violation of said laws;

k.   Whether the alleged underlying Private Student Loans were predatory, unfair, deceptive and contrary to law;

l.   Whether making reports Trusts and agents know are false about the alleged loans is a violation of law;

m. Whether representing to state courts that the Trusts are the legal owners of loans the Trusts know they do not own is a violation of Plaintiffs' rights and must be stopped; and

n. Whether equitable remedies, injunctive relief, compensatory damages and punitive damages are warranted.

255. Plaintiffs' claims are typical of the Class. Student borrowers in Maine are being deceived and paying substantial sums of money (often borrowed).

256. Plaintiffs are members of the Class and will fairly and adequately represent and protect the interests of the Class members.

257. Counsel who represent Plaintiffs and the Class are competent and experienced in litigating large and complicated civil actions, including participation in a class action, and have the resources, time and energy to devote to this matter.

258. The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members as all members signed the same predatory standard Loan Request/Credit Agreements that were securitized and made part of the Trusts, all did not receive legally sufficient consumer protection disclosures and are now being targeted by defendants who do not possess original documents, cannot produce sufficient evidence of indebtedness, know the alleged debts are time-barred and/or settled, and engaging in deceptive, unfair and misleading acts to maximize investor profits contrary to law.

259. Maintenance of this action will promote the efficient administration of justice by obviating the need of numerous individual members from seeking an injunction for relief, many of whom do not have resources to independently retain counsel and commence their own actions to fight multiple large corporate defendants.

260.     Maintenance of this action will promote the equitable administration of justice since pursuing injunctive relief and other claims on an individual basis would be disproportionality expensive.

261.     Maintenance of this action as a class action is unlikely to impose burdens upon the court other than those that would be encountered if the action proceeded as an action on behalf of individual Class members.

262.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

263.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent adjudication with respect to individual members of the Class which would establish incompatible standards of conduct for the Trusts and entities acting as or on behalf of the Trusts.

264.     The prosecution of separate actions by individual members of the Class would create a risk of adjudication with respect to individual members of the Class which would substantially impair or impede their ability to protect their own interest.

265.     The defendants have acted on grounds that apply generally to the Class, namely, the continuation of debt collection on behalf of the Trusts, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## CAUSES OF ACTION

### I.  Federal Fair Debt Collection Practices Act

### 15 U.S.C. §1692, *et seq*.

266.     Plaintiffs and the Class incorporate all foregoing paragraphs as if fully set forth herein.

267.     Plaintiffs and the Class are "consumers" as that term is defined in 15 U.S.C. §1692, *et seq*.

268.     Defendants Trusts, US Bank, TWS, Abrahamsen, VCG, Turnstile, Wilmington and First Marblehead are "debt collectors" ("Debt Collector Defendants").

269.     The Loan Request/Credit Agreements that purportedly back securities issued by the Trusts are alleged debts that arise out of a transaction entered into for personal purposes.

270.     Debt Collector Defendants, individually or through apparent or authorized agents, have unlawfully communicated with Plaintiffs and the Class at times and places known to be inconvenient, after Plaintiffs and the Class have notified them they refuse to pay, want debt collection communications to cease, and in some cases have an attorney, in violation of 15 U.S.C. §1692c.

271.     Debt Collector Defendants have engaged in conduct knowingly and/or authorized conduct the natural consequences of which is to harass, oppress or abuse Plaintiffs and the Class in connection with attempts to collect debts by causing the telephone to ring repeatedly with the intent to annoy, abuse or harass in violation of 15 U.S.C. §1692d.

272.     Debt Collector Defendants have used false, deceptive or misleading representations or means in connection with the collection of alleged debts.

273.     False representations in violation of 15 U.S.C. §1692e include:

a.   the character, amount and legal status of the alleged debts to the Trusts;

b.   that nonpayment will result in action the Debt Collector Defendants cannot legally take;

c.   implications that the alleged Loan Request/Credit Agreements have been legally transferred or assigned;

d.   communications regarding credit information which is known to be false;

e.   written communication which creates the false impression the document is authorized by an official government agency or law as to its source, authorization and approval;

f.   deceptive means to collect or attempt to collect alleged debts or to obtain information about Winne and the Class;

g.   the failure to disclose in initial and subsequent communication that the Debt Collection Defendants are attempting to collect a debt and that any information obtained will be used for that purpose;

h.   that accounts have been turned over to innocent purchasers for value; and

i.   the use of business, company and organization names other than the true name of the Debt Collector Defendants.

274.   The Debt Collector Defendants individually and in concert have used unfair and/or unconscionable means to collect or attempt to collect debts in violation of 15 U.S.C. §1692f by attempting to collect amounts that are not expressly authorized by the Loan Request/Credit Agreements or permitted by law, in violation of 15 U.S.C. §1692f.

275.   The Debt Collector Defendants have violated 15 U.S.C. §1692g by failing to validate alleged debts in accordance with the law.

276.   The Debt Collector Defendants have violated 15 U.S.C. §1692j by furnishing deceptive forms that are used to create the false belief that a person other than the alleged creditor is participating in the collection of the debt.

277.   The Debt Collector Defendants' acts have been and are to this day intentional, committed in bad faith, and not the result of any bona fide error.

278.    As a result of these and other actions described herein, Plaintiffs and the Class have suffered actual damages and will continue to suffer unless the Debt Collector Defendants are enjoined by this Court to stop engaging in unlawful, unfair, deceptive and misleading attempts to collect debts.

## II.  Maine Fair Debt Collection Practices Act

### 32 M.R.S.A. §11001, *et seq*.

279.    Plaintiffs and the Class incorporate all foregoing paragraphs as if fully set forth herein.

280.    Plaintiffs and the Class are "consumers" pursuant to 32 M.R.S.A. §11002(3).

281.    The Debt Collector Defendants are "debt collectors" pursuant to 32 M.R.S.A. §11002(6).

282.    The Loan Request/Credit Request forms referenced herein are alleged obligations and "debts" pursuant to 32 M.R.S.A. §1102(5).

283.    The Debt Collector Defendants have individually or in concert engaged in practices prohibited pursuant to 32 M.R.S.A. §11013, to wit, by:

a.  Engaging in conduct, the natural consequence of which is to harass, oppress and abuse Winne and the Class in the collection of debts, by among other things, causing a telephone to ring repeatedly with the intent to annoy, abuse or harass any person at the called number;

b.  Providing false and misleading information and documents, and otherwise engaging in false and misleading acts;

c.  Providing false representations of the character, amount, and/or legal status of the debts;

42

d.   Threatening to take legal action that may not legally be taken or that is not intended to be taken;

e.   The false representation that the debts have been sold, legally transferred or assigned;

f.   The false representation that Plaintiffs and the Class committed conduct in order to disgrace them;

g.   Communicating to credit reporting agencies and/or persons false and misleading credit information, including the failure to indicate the debt is disputed;

h.   Using or distributing written communication that falsely represents it is authorized by an agency of the United States, or creating the false impression as to its authorization;

i.   Using false representations and/or deceptive means to collect or attempt to collect a debt or obtain information concerning a consumer; and

j.   All other acts described above that relate to the federal Fair Debt Collection Practices Act that also pertain to the Maine statute.

284.   The Debt Collector Defendants violated 32 M.R.S.A. §11013 by reporting to consumer reporting agencies Plaintiffs' and Class members' credit or alleged debt information.

285.   The Debt Collector Defendants violated 32 M.R.S.A. §11013(7) by knowingly acting on time-barred debt.

286.   The Debt Collector Defendants violated Maine's Fair Debt Collection Practices Act by individually or acting in concert committing acts with the express purpose of undermining the limitations period set forth in 32 M.R.S.A. §11013.

287.     The Debt Collector Defendants' acts have been and are to this day intentional, committed in bad faith, and not the result of any bona fide error.

### III.  Maine Unfair Trade Practices Act

288.     Plaintiffs and the Class incorporate all foregoing paragraphs as if fully set forth herein.

289.     The Trusts, First Marblehead, US Bank, Transworld, Abrahamsen and Turnstile are "persons" and engaged in "trade and commerce" as defined in 5 M.R.S.A. §207.

290.     The transactions between Plaintiffs and the Class and the defendants, identified in the preceding paragraph, not exempted from the MUTPA, and/or the alleged private student loans, were primarily for personal, family or household purpose.  The Loan Request/Credit Agreements state, "this is a consumer transaction."

291.     The acts described herein constitute unfair methods of competition and unfair or deceptive acts or practices.

292.     As a result unfair and deceptive acts or practices, Plaintiffs and the Class have lost money and property.

293.     As a result unfair and deceptive acts or practices, Plaintiffs and the Class have suffered actual harm.

294.     Winne, on behalf of herself and the Class, made a settlement demand for damages at least 30 days prior to the filing of this First Amended Complaint pursuant to 5 M.R.S.A. §213.

### IV.  Fraud

295.     Plaintiffs and the Class incorporate all foregoing paragraphs as if fully set forth herein.

296.     The Trusts, Transworld, Turnstile and Abrahamsen have made false representations of material fact, including but not limited to, that the Trusts are the legal owners of student loans.

297.     The Trusts, Transworld and Abrahamsen represented falsely that the interest rate on the alleged defaulted loans has been calculated according to terms of the contract, a true complete copy of which these defendants do not have.

298.     The Trusts, Transworld and Abrahamsen represented falsely that the assignment from the lender of the alleged loans to the Trusts at the time of securitization constitutes the chain of title.

299.     The Trusts, Transworld, Abrahamsen and Turnstile represented falsely that time barred loans were "current" to credit reporting agencies when they were not, and also that the Trusts debts are in default when they have been settled or non-existent.

300.     The Trusts, Transworld, Abrahamsen and Turnstile represented falsely that printed pages from a data base shared by multiple defendants constitute admissible records of a regularly conducted activity by somebody with knowledge.

301.     The Trusts falsely represented they and their agents had authority to settle certain debts in the case of Coffey, McMullen and Hills, and that payment to the Trusts would cause collection activity to cease.

302.     At all times when the Trusts, Transworld, Abrahamsen and Turnstile made the above described statements, they knew the statements were false or were in reckless disregard of whether they were true or false.

303.     The above-described false statements to the Plaintiffs directly and in state court pleadings were made for the purpose of inducing Plaintiffs to act by remitting money or

conceding liability, or to induce the state court to render judgment for an amount these defendants are not owed or entitled.

304.    Plaintiffs and the state court justifiably relied on the false statements as true, to their damage.

## V.  Breach of Contract

305.    Plaintiffs and the Class incorporate all foregoing paragraphs as if fully set forth herein.

306.    Neither the Trusts nor their agents have the original loan documents on which collection activity is based, and attach randomly to Loan Request/Credit Agreements three pages of boilerplate the Plaintiffs never agreed to.

307.    By enforcing terms of a contract the Trusts know to be false is a breach thereof.

308.    Charging interest rates not agreed to by the parties is a breach.

309.    Charging interest rates in excess of the stated contractual terms is a breach.

310.    Charging interest rates in excess of the maximum allowed by the express terms of the contract is a breach.

311.    Charging amounts not due and/or failing to credit payments is a breach.

312.    The terms of the Loan Request/ Credit Agreements that are the subject of this case are unconscionable and in violation of public policy, therefore, not enforceable.

313.    Plaintiffs have been damaged by the breach of their contract.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

1.    Order the defendants to cease and desist all unlawful, unfair and deceptive debt collection and trade practices in the State of Maine, including but not limited to, initiating

collection actions defendants know or should know are time barred, and otherwise engaging in unfair and deceptive acts;

2.    Declare that the acts committed by the defendants are unlawful;

3.    Order the defendants, jointly and severally, to pay all damages to which Plaintiffs and the Class may be entitled under the law, including actual damages, punitive damages, penalties, liquidated damages, and pre- and post-judgment interest; and

4.    On all counts, order the defendants, jointly and severally, to pay costs and reasonable attorneys' fees.

DATED at Portland, Maine this 20th day of January, 2017.

Respectfully submitted,

_____/s/Cynthia A. Dill_____
Cynthia A. Dill
Maine Bar No. 007055
TROUBH HEISLER, PA
511 Congress Street, 7th floor
P.O. Box 9711
Portland, ME 04104-5011
Tel:  207-780-6789
Email:  cdill@troubhheisler.com