UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FIRST MARBLEHEAD CORPORATION,  )
FIRST MARBLEHEAD EDUCATION     )
RESOURCES, INC., and FIRST     )
MARBLEHEAD DATA SERVICES,      )
INC.,                          )
                               )
            Appellants,        )   Civil Action NO.
                               )   11-10241-DPW
        v.                     )
                               )
THE EDUCATION RESOURCES        )
INSTITUTE, INC.,               )
                               )
            Appellee.          )
                               )
                               )

MEMORANDUM AND ORDER
December 8, 2011

First Marblehead Corporation, First Marblehead Education Resources, Inc., and First Marblehead Data Services, Inc. (collectively "FMC") appeal a Bankruptcy Court order interpreting an agreement between FMC and The Education Resources Institute, Inc. ("TERI"). FMC argues that the Bankruptcy Court did not have subject matter jurisdiction to decide the meaning and effect of the agreement, and that even if it did, its interpretation was erroneous. Concluding that the Bankruptcy Court properly retained jurisdiction over the dispute and that its resolution on the merits was appropriate, I affirm.

I. BACKGROUND

A. *Factual Background*

TERI is a nonprofit organization that promotes access to education. Since its inception in 1985, TERI has been in the



business of processing and guaranteeing education loans originated by private lenders.  In 2001, TERI entered into a series of transactions with FMC.  FMC offers "outsourcing services to national and regional financial institutions and educational institutions in the United States for designing and implementing private education loan programs."

Pursuant to the agreements between the parties, TERI paid FMC a fee to undertake risk management, administrative, and support functions for TERI, and to provide origination services and securitization of loans guaranteed by TERI.  The agreements between TERI and FMC included the Master Servicing Agreement, the Master Loan Guaranty Agreement, the Marketing Services Agreement, and the Database Sale and Supplemental Agreement (the "Database Agreement").

Under the Database Agreement, the only agreement at issue in this appeal, TERI agreed to transfer a database of information it had collected regarding loans and default rates to FMC and to support FMC's maintenance of the database.  Database Agreement, art. III, June 20, 2001, Record 95, Ex. 2.  In exchange, FMC agreed to tender up-front and monthly payments.  *Id.* art. IV.  The transferred information – the "Delivered Database" – is a subset of the "Loan Database," which is defined in the agreement as consisting "of any and all data now or hereafter obtained, generated, recorded, or otherwise received by TERI in connection

with its business as a loan guarantor . . . ." *Id.* art. 1, §§ 3.01, 3.02.

The Database Agreement placed restrictions on FMC's use of the Delivered Database and TERI's use of both the Delivered Database and the Loan Database. *Id.* §§ 2.02, 2.03.  Under § 2.03, TERI agreed that

> during the term of this Agreement it will use the Loan Database, and/or its retained copy of the Delivered Database only for the Retained Uses.  Specifically, but not by way of limitation, TERI will not sell, license or transfer, the Loan Database or any substantial portion thereof to any person nor will it disclose the same except in furtherance of the Retained Uses.

The "Retained Uses" are defined as "the right retained by TERI to utilize the original version of the Loan Database . . . for its own use for purposes of designing, underwriting, implementing, evaluating and managing education loan guarantee programs." *Id.* art. I.  These provisions essentially allowed TERI to use the Loan Database in furtherance of its own loan guarantee activities but prohibited it from selling or licensing it to third parties.

Under § 10.01 of the Database Agreement, the restrictions in §§ 2.02 and 2.03, as well as § 2.01 and Articles VIII, IX and X, which are defined as the "Surviving Obligations," "survive termination of [the Database] Agreement for a period of two years after the termination date." *Id.* art. I, § 10.01.  The Database Agreement was to last up to ten years, terminating June 20, 2011. *Id.* § 5.02.

3

After entering into the agreements with FMC, TERI continued to guarantee and securitize student loans and earn fees for those activities. However, by the spring of 2008, the financial crisis had dried up the market for securities backed by student loans, and TERI's revenue dropped significantly. On March 26, 2008, TERI's issuer rating was downgraded, causing a lender to demand the segregation of reserves to its loans guaranteed by TERI. *Id.* ¶ 17. TERI could not meet the reserve requirement without jeopardizing its ability to meet other obligations and decided to file a Chapter 11 petition on April 7, 2008.

### B. *Bankruptcy Proceedings and Transition Services Agreement*

Two months after initiating the bankruptcy proceeding, TERI requested an order from the Bankruptcy Court authorizing it to reject the agreements with FMC and enter into a Transition Services Agreement ("TSA"). In its motion, TERI explained that it could no longer operate under the fee structure of its various agreements for outsourcing services to FMC. In order to allow TERI to transition away from reliance on FMC, the parties negotiated the TSA, pursuant to which FMC would supply certain essential services at a reduced cost for up to four months.

On June 23, 2008, the Bankruptcy Court issued an order (the "June 2008 Order") granting the motion. The June 2008 Order provided:

> ORDERED, that the Debtor the FMC Contracts [sic] are rejected effective of May 31, 2008; and it is further

> ORDERED, that each of the FMC Entities may treat each
> of the FMC Contracts as terminated as of May 31, 2008,
> and it is further
>
> ORDERED, that the Debtor is authorized to enter into
> the Transition Services Agreement, as amended, between
> the Debtor and the FMC Entities, which Transition
> Services Agreement will govern the relationship of the
> Parties from June 1, 2008 forward, and its further
> . . .
>
> ORDERED, that this Court will retain jurisdiction to
> construe and enforce the terms of this Order.

*Id.*

In addition to providing for FMC's provision of certain transitional services, the TSA required that FMC transfer to TERI "the data comprising the Loan Database (as defined in the Loan Database)," Transition Services Agreement, § 2.1, which was still owned by TERI, but was being maintained by FMC.

The TSA authorized FMC to continue to possess and use the Delivered Database it had received pursuant to the Database Agreement and maintained the restrictions on FMC and TERI's use of data as follows:

> Notwithstanding the rejection or other termination of
> the Database Agreement, (I) FMER [an FMC entity First
> Marblehead Education Resources, Inc.] shall continue to
> possess all right, title and interest in and to the
> Delivered Database (as defined in the Database
> Agreement), including the right to use and possess the
> Delivered Database and the right to share the data with
> FMC, to disclose the data to others, to copy and
> manipulate the data and generally to exercise ownership
> of the Delivered Database and all modifications and
> enhancements thereof and (ii) the Loan Database
> transferred from FMER to TERI pursuant to Section 2.1
> of this Agreement shall remain subject to sections 2.01
> (Grant), 2.02 (FMER Restrictions) and 2.03 (TERI
> Restrictions) of such Database Agreement and any and

>     all additional terms of the Database Agreement that
>     pursuant to section 10.01 of the Database Agreement
>     survive termination of such agreement and remain in
>     full force and effect.

*Id.* § 2.1.  Section 3.13 provides that Article II, which includes § 2.1, "shall survive termination of this Agreement."

Over two years later, on October 29, 2010, the Bankruptcy Court approved a Reorganization Plan for TERI to emerge from bankruptcy proceedings and continue operations.

### C.  *The Database Dispute*

On October 7, 2010, prior to approval of the Reorganization Plan, FMC, TERI, and the Official Committee of Unsecured Creditors entered into a joint motion for approval of a stipulation resolving FMC's claims against TERI.  The motion noted that a "Database Dispute" between FMC and TERI remained unresolved.  In an October 18, 2010 hearing regarding the stipulation and other matters before the Bankruptcy Court, TERI referenced the Database Dispute and TERI's intention to file a motion for the resolution of the issue.

In summary, the Database Dispute concerns whether the TSA imposes a permanent restriction on TERI's use of the Loan Database, rather than the two-year restriction described in the Database Agreement.  FMC argues that §§ 2.1 and 3.13 of the TSA permanently limit TERI's use of the database to the "Retained Uses" described in the Database Agreement at § 2.03.  TERI disputes this interpretation, arguing that the TSA did not

permanently restrict its use of the Loan Database but rather confirmed the two-year post-termination survival of § 2.03 found in § 10.01 of the Database Agreement.

On November 2, 2010, TERI filed a "Motion for Interpretation of Order" requesting that the Bankruptcy Court interpret its June 2008 Order approving the TSA, in order "to preclude the First Marblehead Entities from asserting that restrictions on TERI's use of Data and TERI's obligations to indemnify the First Marblehead Entities have not expired and that the Court otherwise enforce the Contracts Order." FMC objected to the motion, disputing TERI's interpretation and arguing that the Bankruptcy Court lacked subject matter jurisdiction because it had already issued its confirmation order for the reorganization plan.

On December 14, 2010, the Bankruptcy Court issued a Memorandum of Law addressing TERI's motion. As to jurisdiction, it found that it had subject matter jurisdiction over the motion because it retained jurisdiction over the interpretation of the TSA through its June 2008 Order. As to the merits, it concluded that, under the plain reading of the TSA, § 2.1 incorporates the Database Agreement's two-year survival of the use restrictions and did not make such restrictions permanent.

## II.   STANDARD OF REVIEW

Appellate review of conclusions of law by a bankruptcy Court are *de novo*. *See Stornawaye Fin. Corp. v. Hill* (*In re Hill*), 562 F.3d 29, 32 (1st Cir. 2009) (noting that the Bankruptcy appellate

well as a requirement in the TSA that it issue an order of approval; thus, here the approval forms both the basis and the background for the Bankruptcy Court's jurisdiction.

In addition to the June 2008 Order's plain language, the Bankruptcy Court considered the context and language of the June 2008 Order, as well as the Court's and parties' understanding at the time. The Bankruptcy Court's approach is consistent with *Kokkonen* and its application in this Circuit. *See F.A.C.*, 449 F.3d at 190; *Municipality of San Juan v. Rullan*, 318 F.3d 26, 31 (1st Cir. 2003) (finding the "mutual consent of the parties" relevant to determination whether a district court retains jurisdiction over an action). In particular, and unlike the order of the district court in *Kokkonen*, the June 2008 Order explicitly referenced the TSA and retained jurisdiction.

I find that the Bankruptcy Court's interpretation is not at odds with *Kokkonen*; it did not assert inherent power to interpret the TSA, but rather explained that it had retained jurisdiction in the June 2008 Order. Even if I were somehow to find the June 2008 Order somehow did not plainly incorporate the terms of the TSA or retain jurisdiction over that agreement, I would defer to the Bankruptcy Court's reasonable interpretation of its own Order that in fact it did so.

### B. *Interpretation of the TSA*

Having found that the Bankruptcy Court had subject matter jurisdiction over the interpretation of the TSA, I now turn to

19

the merits of the interpretation itself. Under Massachusetts law a "court interprets a contract that is free from ambiguity according to its plain meaning." *S. Union Co. V. Dep't of Pub. Utils*, 941 N.E.2d 633, 640 (Mass. 2011). A contract term "is ambiguous 'only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.'" *Id.* (quoting *Citation Ins. Co. v. Gomez*, 688 N.E.2d 951, 953 (Mass. 1998)). I agree with the Bankruptcy Court that the TSA unambiguously incorporates the two-year limit on the Data Use Restrictions and other Surviving Obligations.

Section 2.1 of the TSA obligates FMC to transfer the Loan Database in its possession to TERI, grants FMC certain rights in the Delivered Database, restricts TERI's use of the Loan Database, and provides for certain terms in the Database Agreement. The interaction between the TSA and the incorporated terms in the Database Agreement requires a close reading of the two agreements.

As an initial matter, although FMC claims that the distinction between the "Loan Database" and the "Delivered Database" is immaterial to the instant dispute, that position does not comport with the language of TSA § 2.1. The first paragraph of § 2.1 requires FMC to deliver to TERI the "Loan Database (as defined in the Database Agreement," while § 2.1(I) confers to FMC the rights to the "Delivered Database (as defined in the Database Agreement)." Section 2.1(ii) states that the

"*Loan Database transferred from FMER to TERI* shall remain subject to [§§ 2.01, 2.02, and 2.03] of such Database Agreement and any and all additional terms of the Database Agreement that pursuant to § 10.01 of the Database Agreement survive termination of such agreement and remain in full force and effect." (emphasis added.)  The unambiguous reading of § 2.1 is that the provisions of the Database Agreement apply to the Loan Database transferred from FMC to TERI, but not to the *Delivered Database* retained by FMC.

The distinction between the two databases, with respect to the survivability of the Database Agreement terms, comports with the apparent understanding of both parties that FMC's rights to the Delivered Database are permanent while the restrictions on the use of the Loan Database are temporary.  Due to inartful drafting, this interpretation may render the reference to § 2.02 of the Database Agreement superfluous because that term only restricts FMC's use of the Delivered Database and does not concern the Loan Database.  However, the only reasonable reading is that FMC received all rights to the Delivered Database, while the Loan Database remained subject to provisions of the Database Agreement.

Given this construction of § 2.1 of the TSA, I now turn to the question of how long the restrictions incorporated in § 2.1(ii) survive.  FMC's position is that the plain meaning of the reference to § 10.01 merely incorporates the "Surviving

21

Obligations" and not the two-year time limit. This argument fails for at least three reasons.

First, although the reference to § 10.01 within § 2.1 is vague and, standing alone, may not clearly incorporate both the referenced surviving obligations as well as the two-year time limit on those obligations, a close examination of the two agreements reveals that the only reasonable understanding is that the two-year time limit applies to the surviving obligations. Section 2.1 (ii) provides that, in addition to §§ 2.01, 2.02, and 2.03, "any and all additional terms of the Database Agreement that pursuant to section 10.01 of the Database Agreement survive termination of such agreement and remain in full force and effect." It may be possible through a strained reading to treat this sentence as merely referencing the "Surviving Obligations" subject to § 10.01 and providing that they survive indefinitely. However, as the Bankruptcy Court pointed out, § 10.01 does not itself define which provisions survive termination. "Surviving Obligations" are defined in Article I, while § 10.01 explains that they survive for two years. As a result, a reference to the definition of "Surviving Obligations" would be more appropriate if the two-year limit was not being incorporated. Further, regardless of whether § 2.1 incorporates the two-year time limit directly, one of the "Surviving Obligations" is Article X, which includes § 10.01, and to give § 10.01 "full force and effect,"

the "Surviving Obligations" may only last for two years after the termination of the Database Agreement.

Second, although FMC argues that the two-year time limit would render § 3.13 superfluous, § 3.13 has meaning and effect even in light of the incorporation of the two-year time limit. Section 3.13 refers to the entire Article II, which includes those provisions of § 2.1 not subject to § 10.01, i.e., the first paragraph and § 2.1(I), as well as § 2.2. Further, even if the two-year limit applied to the entirety of Article II, nothing in § 3.13 requires that the provisions survive indefinitely, and so the two-year limitation in § 10.01 would be consistent with § 3.13.

Third, the TSA adopts the definition of "Loan Database" set out in the Database Agreement, which provides that the Loan Database:

> consists of any and all data now or hereafter obtained, generated, recorded, or otherwise received by TERI in connection with its business as a loan guarantor, including, without limitation, borrower data such as credit scores and other credit information, loan payment histories and statistics, default and recovery data, data regarding schools attended by borrowers and students whose education was financed with TERI-guaranteed loans, and underwriting criteria.

Database Agreement, art. I. Under this definition, and FMC's assertion that TERI's use of the Loan Database is restricted for all time, TERI would not be able to sell or transfer data to a third party even if it were to create a completely new database of information related to its loan guarantee business. The plain

reading of the TSA does not contemplate such a perpetual constriction of TERI's future activities.

### IV. CONCLUSION

For the reasons outlined above, I conclude that, acting within its subject matter jurisdiction, the Bankruptcy Court properly ruled that the Surviving Obligations in the Database Agreement, incorporated by reference in the TSA, do not extend beyond two years following the termination of the Database Agreement. As a result, I AFFIRM the Bankruptcy Court's Order of December 14, 2010.

/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE