STATE OF MAINE                 SUPERIOR COURT
                               Civil Action
CUMBERLAND, ss.            Docket No. PORDC-CV-15-324


NATIONAL COLLEGIATE STUDENT   )
LOAN TRUST 2006-3,          )
                         )
           Plaintiff    )
                         )
V.                       )
                         )
SARAH THURLOW, a/k/a       )
SARAH N. COFFEY, ET AL.,   )
                         )
          Defendants   )


      DEPOSITION of NATIONAL COLLEGIATE STUDENT LOAN

TRUST 2006-3 by BRADLEY LUKE, taken pursuant to notice

dated June 1, 2017, at the law offices of Troubh Heisler

at 511 Congress Street, Portland, Maine, on June 16,

2017, commencing at 10:05 a.m., before Claudette G.

Mason, RMR, CRR, a Notary Public in and for the State of

Maine.


APPEARANCES:

For the Plaintiff:      BRYAN C. SHARTLE, ESQ.
                      MICHAEL D. ALLTMONT, ESQ.
                      KATE E. CONLEY, ESQ.

For the Defendants:     CYNTHIA A. DILL, ESQ.
                      WILLIAM K. MCKINLEY, ESQ.


              THE REPORTING GROUP
              Mason & Lockhart

<u>INDEX</u>

Deponent:  BRADLEY LUKE

Examination by:                                      Page

  Ms. Dill                                          3


<u>EXHIBITS</u>

Number            Description                       Page

1        Second Amended Notice of Deposition Re: 29
           Holiday
2        Cummins Affidavit, 1/9/16                 30
3        Exhibit A/Note Disclosure Statement,      43
           Loan Request/Credit Agreement
4        A. Holiday Affidavit, 6/2/16              47
5        Exhibit A/U.S. Bank Authorization         52
6        Exhibit B/Loan Request/Credit Agreement   52
7        Exhibit C/Chain of Ownership Docs         61
8        Exhibit D/Loan Financial Activity         80
9        Exhibit E/Deferment/Forbearance Summary   98
10       Exhibit F/Repayment Schedule Summary      100
11       Exhibit G/Loan Payment History Report     111
12       Loan Request/Credit Agreement Sig Page    118
13       Second Amended Notice of Deposition       155
           Re: Cummins
14       Cummins Affidavit                         --
15       Exhibit A/Credit Agreement                160
16       10/1/14 Letter, Horton to Thurlow         148
17       10/1/14 Letter, Horton to Thurlow,        148
           with Handwritten Notes
18       Credit Agreement, 12/7/06                 158
19       5/5/17 Financial Activity Summary         132

THE REPORTING GROUP
Mason & Lockhart

```
 1
 2                     (Deposition Exhibit Nos. 1-19 were marked.)
 3   BRADLEY LUKE, having been duly sworn by the Notary
 4      Public, was examined and testified as follows:
 5                            EXAMINATION
 6   BY MS. DILL:
 7   Q.   Good morning.  My name is Cynthia Dill.
 8              Would you please state your name for the
 9        record?
10   A.   Bradley Luke.
11   Q.   And what is your position, Mr. Luke?
12   A.   Senior litigation paralegal.
13   Q.   For which company?
14   A.   Transworld Systems, Incorporated.
15   Q.   A senior litigation paralegal?
16   A.   Yes, ma'am.
17   Q.   How long have you had that position?
18   A.   It's been about a year and a half now.  I believe
19        it was October of 2015.
20   Q.   Have you worked in the same capacity, senior
21        litigation paralegal, from 2015 to the present?
22   A.   From October 2015 to the present, yes, ma'am.
23   Q.   And Transworld Systems is your employer?
24   A.   Yes, ma'am.
25   Q.   What did you do prior to October of 2015?
```

THE REPORTING GROUP
Mason & Lockhart

```
 1    A.   I worked as a legal compliance manager.

 2    Q.   For whom?

 3    A.   Transworld Systems, Incorporated.

 4    Q.   How long have you worked for Transworld Systems,

 5         Incorporated?

 6    A.   Well, Transworld Systems, Incorporated, since

 7         November 1 of 2014.  Prior to that was a

 8         predecessor company, NCO Financial Systems,

 9         Incorporated.  And I have been employed with or I

10         was employed with them as of January of 2010.

11    Q.   So January of 2010 until 2014 you worked for NCO

12         Financial Systems?

13    A.   Yes, ma'am.

14    Q.   Is that what you said?

15    A.   November 1, 2014.

16    Q.   When you first started at Transworld in 2014,

17         what was your job?

18    A.   Legal compliance manager.

19    Q.   And at NCO Financial System between January of

20         2010 and November of 2014, what was your

21         position?

22    A.   I started as a litigation specialist and then

23         transitioned to a senior litigation specialist.

24         I don't recall the exact dates, but about a year

25         as litigation specialist and then a senior
```

```
 1              litigation specialist.  And then I moved to the
 2              legal compliance manager in September of '14.
 3         Q.   And was legal compliance manager the last
 4              position you had for NCO Financial System?
 5         A.   Yes, ma'am.
 6         Q.   When you transitioned from being a legal
 7              compliance manager for NCO Financial Systems to
 8              being the legal compliance manager for
 9              Transworld, did your duties change?
10         A.   No, ma'am.
11         Q.   Did -- tell me more about NCO Systems.
12                   MR. SHARTLE:  Object to the form.
13         A.   Can you rephrase the question, please.
14         Q.   Is NCO Systems a subsidiary of Transworld
15              Systems?
16                   MR. SHARTLE:  Objection, lack of time
17              frame.
18         A.   No, ma'am, they're not.
19         Q.   Who owns NCO Systems?
20                   MR. SHARTLE:  Objection.  No basis of
21              knowledge.
22                   MS. DILL:  Objection -- we don't do
23              speaking objections in Maine.  So you can
24              object for the record, and that's fine.
25                   MR. SHARTLE:  Okay.  Objection.
```

1    A.    Can you repeat the question, please?

2    Q.    Who owned NCO Systems when you were employed

3          there as the legal compliance manager and senior

4          litigation specialist and litigation specialist

5          from 2010 to 2014?

6                MR. SHARTLE:  Object to the form.

7    A.    NCO Financial Systems at the -- at some point

8          during my employment was owned by a company

9          called EGS Financial.  I don't know the exact

10         date that they became owner of NCO.

11   Q.    How did NCO Systems transform into or become

12         Transworld Systems?

13               MR. SHARTLE:  Objection, outside the

14         scope of the notice.

15   A.    NCO Financial Systems was owned by EGS.  EGS

16         decided to sell a portion of the business,

17         including certain portions of NCO's business,

18         under the name of Transworld Systems.

19   Q.    Is Transworld Systems a publicly traded company?

20   A.    I do not know.

21   Q.    Prior to your employment at NCO Systems, where

22         did you work?

23   A.    Axiant, LLC.

24              A X I A N T.

25   Q.    What kind of company is that?

                    THE REPORTING GROUP
                     Mason & Lockhart

```
 1    A.   They were in the business of debt collection and
 2         network services.
 3    Q.   What was your position at Axiant, LLC?
 4    A.   I don't recall.
 5    Q.   How long did you work there?
 6    A.   I worked there for almost a year and a half.
 7    Q.   And before that?
 8    A.   Just remedial part-time jobs.  I was also going
 9         to school.
10    Q.   Where did you go to school?
11    A.   Most currently, Frederick Community College in
12         Frederick, Maryland.  Previous to that was
13         Montana Tech University in Butte, Montana.
14    Q.   Do you have a degree?
15    A.   No, ma'am.
16    Q.   Did you graduate from college?
17    A.   No, ma'am.
18    Q.   Have you ever had your deposition taken before?
19    A.   Yes, ma'am.
20    Q.   How many times?
21    A.   I don't recall specifically.
22    Q.   More than 10?
23    A.   Yes, ma'am.
24    Q.   More than 50?
25    A.   No, ma'am.
```

```
 1    Q.   When is the first time that you had your
 2         deposition taken?
 3    A.   2013.
 4    Q.   Was that in your capacity as the Transworld
 5         Systems legal compliance manager?
 6    A.   Yes, ma'am.
 7              No, that was -- I'm sorry.  I think you said
 8         Transworld Systems.  It was NCO Financial
 9         Systems' legal compliance manager.
10    Q.   And how many times have you been deposed as an
11         employee of Transworld Systems?
12    A.   I don't recall.
13    Q.   But less than 50?
14    A.   Yes, ma'am.
15    Q.   When is the last time you were deposed prior to
16         today?
17    A.   15 days ago maybe.
18    Q.   Where was that?
19    A.   San Diego, California.
20    Q.   In what capacity were you deposed?
21    A.   As the senior litigation paralegal of Transworld
22         Systems.
23    Q.   Was Transworld Systems a defendant or a plaintiff
24         in that case?
25    A.   Neither.  It was in their capacity as servicer
```

```
 1           for a National Collegiate Student Loan Trust
 2           entity.
 3     Q.    Were you the 30(b)(6) designated witness in that
 4           deposition?
 5              MR. SHARTLE:  Objection, outside the
 6           scope of the notice.
 7     A.    Yes, ma'am, I was.
 8     Q.    Do you recall the name of the parties other than
 9           National Collegiate Student Loan and Transworld
10           Systems?
11     A.    Just the last names of the defendants.
12     Q.    What is the last name of the defendants?
13     A.    One was Mata, M A T A; and it was Macready,
14           M A C R E A D Y, I believe.
15     Q.    Do you know if that case was pending in state or
16           federal court?
17              MR. SHARTLE:  Objection.
18     A.    State.
19              MR. SHARTLE:  All this line of question
20           is outside the scope of the notice.
21     BY MS. DILL:
22     Q.    Describe for me, please, the duties of your job
23           as senior litigation paralegal for Transworld
24           Systems?
25     A.    I assist with incoming litigation either against
```

1      the company Transworld Systems or against one

2      of the trust entities, review account records,

3      work with outside counsel and in-house counsel on

4      various litigation matters.

5   Q. In your work, is your job mostly connected with

6      Transworld Systems in litigation to collect debts

7      or defending against suits brought against

8      Transworld?

9   A. I would say it's about an equal split.

10  Q. And do you serve as the senior litigation

11     specialist in both capacities, both defending and

12     prosecuting collection cases?

13  A. Yes, ma'am.  Senior litigation paralegal.

14  Q. How many senior litigation paralegals are there

15     for Transworld?

16  A. Just one.

17  Q. And what department do you work in?

18  A. The legal and compliance department.

19  Q. Where is your office?

20  A. My personal office is located in Norcross,

21     Georgia.

22  Q. The legal and compliance department of Transworld

23     Systems --

24  A. Yes.

25  Q. -- is located in Norcross, Georgia?

```
 1    A.   Well, we have employees in various locations that

 2         are part of that department.

 3    Q.   How many employees make up the legal and

 4         compliance department?

 5    A.   I'm not sure.

 6    Q.   How many employees work with you in the Norcross,

 7         Georgia, office?

 8    A.   There's -- now, there's two other members.

 9    Q.   How many other offices are there -- legal and

10         compliance department offices for Transworld

11         Systems that you're aware of?

12    A.   Well, there's no actual offices for just that

13         department.  There's employees that work in that

14         department in various offices that make part of

15         that office.  I'm uncertain how many actual

16         offices house members of my department.

17    Q.   Can you give me some sense of how many offices

18         Transworld Systems has around the country?

19    A.   I'm not sure.

20    Q.   What's the closest Transworld Systems office to

21         where you are right now in Portland, Maine?

22    A.   To my knowledge -- I can't speculate.  I don't

23         have a map in front of me.  I don't know the mile

24         distances.

25    Q.   Okay.  That's fair.  In your office in Norcross,
```

```
 1              Georgia, are there records maintained?
 2                   MR. SHARTLE:  Object to the form.
 3     A.   Can you clarify that question, please.
 4     Q.   What records do you have at your disposal in the
 5          Norcross, Georgia, office?
 6                   MR. SHARTLE:  Object to the form.
 7     A.   I'm still not understanding.
 8     Q.   How big is the office in Norcross, Georgia?
 9                   MR. SHARTLE:  Object to the form.
10     A.   I believe we have about 50 to 70 employees there.
11     Q.   And did you say two plus yourself work in legal
12          and compliance?
13     A.   Yes, ma'am.  Out of that office.
14     Q.   Who is your supervisor?
15     A.   Jonathan Thompson.
16     Q.   What's his position?
17     A.   Chief compliance officer.
18     Q.   So when you say you assist with litigation, what
19          actually do you do?
20     A.   I review legal complaints, account notes in
21          reference to allegations pled.  I also look at
22          compliance of any calls or letters that were sent
23          out.  Basically a full, thorough review of any
24          subject account that's mentioned in a litigation
25          matter.
```

```
 1   Q.   And when you're doing this review, are you
 2        thumbing through a Redwell file full of papers;
 3        or is it all online?
 4   A.   These are generally electronic files.
 5   Q.   Okay.  So what system do you have at your
 6        disposal in Norcross, Georgia, to access these
 7        various records that you use to assist in the
 8        litigation for Transworld Systems?
 9   A.   We have various systems.  All our offices are
10        linked together through the internet and servers
11        so we have access to our legal -- our centralized
12        repositories that house various documents,
13        letters, call logs.  And we also have our various
14        systems of record that the account records are
15        maintained in.
16   Q.   Starting with the last category, the system of
17        record where the account records are maintained,
18        what do you call that system?
19   A.   Depending on what type of account it is, we have
20        different systems.  The two major systems are
21        FACS, F A C S, and CRS.
22   Q.   What's the second one?
23   A.   CRS.
24   Q.   What do those acronyms stand for; do you know?
25   A.   CRS is collection resource system.  I'm uncertain
```

14

```
 1          what FACS stands for or if it stands for
 2          anything.
 3     Q.   In this matter the claims brought by National
 4          Collegiate Student Loan Trust against Sarah
 5          Thurlow, now Sarah Coffey, do you know which
 6          systems were reviewed for purposes of checking
 7          her accounts?
 8     A.   So her individual account, the system of record
 9          is CRS for that account.  There's also other
10          ancillary systems used to review the account
11          records and documents, those being -- it's an
12          online database called a Media Locator, which
13          houses individual account level documents such as
14          the promissory note, payment histories, that sort
15          of thing.
16     Q.   The ancillary system Media Locator, who created
17          that?
18     A.   I don't know.
19     Q.   Do you have access to that?
20     A.   Yes, ma'am.
21     Q.   And is it -- you said that's where the documents
22          such as the promissory note is maintained?
23     A.   Yes, ma'am.  Loan level documentation.
24     Q.   Who created that system of documents; do you
25          know?
```

```
1    A.   Can you rephrase that?

2    Q.   Who entered the documents into the system?

3              MR. SHARTLE:   Object to the form.

4    A.   I'm uncertain of the individual person who

5         entered the documents.

6    Q.   Are you certain of the entity or organization

7         that did?

8    A.   It depends on what time it was.  It would have

9         been either NCO or Transworld Systems depending

10        on what time period we're talking about.

11   Q.   The time period in the National Collegiate

12        Student Loan Trust 2006-3 versus Sarah Thurlow,

13        do you know which ancillary system or -- strike

14        that.

15             Do you know whether it was Transworld Systems

16        or NCO responsible for inputting the loan

17        documents into the Media Locator?

18   A.   It would depend on what document it is and what

19        time that document was put in.  So without being

20        in front of my system, I would not be able to

21        state which document was put in by which party.

22   Q.   What decides what system of record applies to a

23        specific account?

24   A.   The client.

25   Q.   The client decides?
```

 1   A.   Well, depending on the client.  So --

 2   Q.   Who is your client?

 3   A.   We have many clients.

 4           MR. SHARTLE:  Object to the form.

 5   BY MS. DILL:

 6   Q.   In this particular case.

 7           MR. SHARTLE:  Object to the form.

 8   A.   Can you restate that?

 9   Q.   In the case of National Collegiate Student Loan

10        Trust 2006-3 versus Sarah Thurlow pending in

11        Portland District Court, who is your client?

12   A.   We're contracted by U.S. Bank National

13        Association on behalf of the plaintiff's trust

14        entity, National Collegiate Student Loan Trust

15        2006-3.

16   Q.   Whose decision was it to bring the lawsuit

17        against Sarah Thurlow, otherwise known as Sarah

18        Coffey, and Vickie McMullen?

19           MR. SHARTLE:  Object to the form.

20   A.   Can you rephrase, please.

21   Q.   What entity makes -- made the decision in this

22        case to file the collection lawsuits that are the

23        subject of this deposition?

24   A.   That would be, for this case or these two cases

25        that are at issue today, Ratchford Law Group.

1   Q.   What's the relationship between the Ratchford Law

2        Group and Transworld System?

3   A.   They're contracted by Transworld Systems as an

4        attorney law firm.

5   Q.   And Transworld gives the Ratchford Law Group

6        discretion as to whether or not to file --

7   A.   Yes, ma'am.

8   Q.   -- lawsuits?

9            On what basis does the Ratchford Law Group

10       make its decision whether or not to file a

11       lawsuit?

12  A.   I'm uncertain.

13  Q.   Are you aware of the contract between the

14       Ratchford Law Group and Transworld Systems?

15  A.   Yes, ma'am.

16  Q.   Is it an attorney-client relationship?

17           MR. SHARTLE:  Object, calls for a legal

18       conclusion.

19  A.   I'm uncertain.

20  Q.   Does the Ratchford Law Group have an interest --

21       an economic interest in the outcome of the

22       lawsuit?

23           MR. SHARTLE:  Object to the form.

24  A.   Can you rephrase that, please.

25  Q.   Does the Ratchford law firm get paid only if

18

```
 1              money is collected as a result of the lawsuit?
 2    A.   Not as a result of the lawsuit.  They get paid
 3         for money collected.  It has nothing to do
 4         whether a suit was filed or outcome of the
 5         lawsuit.
 6    Q.   Is it a contingent fee?
 7    A.   Yes, ma'am, it is.
 8    Q.   How is Transworld Systems paid?
 9    A.   We also take a percentage of payments received.
10    Q.   And are there any other organizations or people
11         who have an economic interest in the lawsuit that
12         was filed by the National Collegiate Student Loan
13         Trust against Sara Thurlow?
14              MR. SHARTLE:  Object to the form.
15    A.   Please rephrase.
16    Q.   Other than -- it sounds like if -- if National
17         Collegiate Student Loan Trust is successful in
18         collecting the money it says it is owed by my
19         clients, Ratchford Law Group is going to get some
20         of it.  Correct?
21    A.   Yes, ma'am.
22    Q.   And Transworld Systems will get some of it.
23         Correct?
24    A.   Yes, ma'am.
25    Q.   And what other organizations or people will get
```

```
 1         some of the proceeds from a successful collection

 2         lawsuit such as the one that you're talking

 3         about?

 4    A.   As stated, it has nothing to do with the

 5         successful collection lawsuit.  It's just

 6         recovery of sums owed.  But the remaining portion

 7         we remit to U.S. Bank on behalf of the trust that

 8         owns the loan, and then they will disburse it to

 9         various parties.  To whom I'm uncertain of.

10    Q.   Describe for me, please, the training that you

11         received before you were made the senior

12         litigation paralegal for Transworld Systems?

13    A.   Specific to that job capacity?

14    Q.   Yes.

15    A.   There's really no additional training.  It was

16         just a progression of prior duties.

17    Q.   Have you ever been trained as a paralegal?

18             MR. SHARTLE:  Object to the form.

19    A.   Can you rephrase that?

20    Q.   Do you have any training to be a paralegal?

21             MR. SHARTLE:  Object to the form.

22    A.   No, ma'am.

23    Q.   Have you ever taken any paralegal courses?

24    A.   No, ma'am.

25    Q.   Have you ever personally been a party to a
```

20

```
 1        lawsuit?
 2   A.   Not to my knowledge.
 3   Q.   Have you ever been arrested?
 4   A.   No, ma'am.
 5   Q.   Have you ever filed bankruptcy?
 6   A.   No, ma'am.
 7   Q.   Do any of the duties of your job as the senior
 8        paralegal -- let's see, senior litigation
 9        paralegal include receiving, applying, or
10        accounting for loan payments?
11             MR. SHARTLE:  Object to the form.
12   BY MS. DILL:
13   Q.   I can break that down, if you want.
14   A.   Yes.  Please do.
15   Q.   Does it -- as the senior litigation paralegal, do
16        you have any job duties around collecting money
17        from student loan borrowers?
18             MR. SHARTLE:  Object to the form.
19   A.   Directly, no, ma'am.
20   Q.   Do you have any responsibilities around applying
21        payments made by student borrowers to amounts
22        allegedly owed to the trust?
23             MR. SHARTLE:  Object to the form.
24   A.   No, ma'am.
25   Q.   Do you have any responsibilities for accounting
```

```
 1          in terms of the various loan transactions that

 2          come in?  Do you manage any of those accounting

 3          functions?

 4    A.    I do not manage any of those accounting

 5          functions.

 6    Q.    In this case, who was responsible for servicing

 7          the loans at issue?

 8              MR. SHARTLE:  Object to the form.

 9    A.    The original servicer for the loans was a company

10          called American Education Services.

11    Q.    Tell me about that company, as much as you know.

12    A.    They are a loan servicer owned and doing business

13          through Pennsylvania Higher Education Assistance

14          Agency.  And they service -- for these particular

15          loans, they service loans from time of

16          disbursement until the loan is defaulted and

17          charged off.

18    Q.    Are they connected in any way, as far as you

19          know, to Transworld Systems or the National

20          Collegiate Student Loan Trust?

21              MR. SHARTLE:  Object to the form,

22          connected.

23    A.    Can you clarify connected.

24    Q.    Do they have a legal relationship?

25              MR. SHARTLE:  Object to the form, calls
```

THE REPORTING GROUP
Mason & Lockhart

```
 1          for a legal conclusion.

 2    A.    Can you rephrase that?

 3    Q.    You said that AES was the servicer for this

 4          particular loan.  As servicer, was it working for

 5          Transworld Systems?

 6    A.    Not as servicer, no, ma'am.

 7    Q.    Who was AES working for when they were servicing

 8          this loan?

 9    A.    They were working for the trust.

10    Q.    Does AES continue to service loans for the trust,

11          as far as you know?

12    A.    As of today, yes.  Any current loan that has not

13          defaulted.

14    Q.    Does AES have its own system of accounting?

15    A.    Yes, ma'am.

16    Q.    Is either the FACS system or the CRS system that

17          you mentioned earlier systems used by AES?

18    A.    No, ma'am, they are not.

19    Q.    Do you have access to the AES database as the

20          senior litigation paralegal for Transworld

21          Systems?

22    A.    Yes, ma'am, I do.

23    Q.    How is it that you have access to that?

24    A.    With our relationship with AES, they have granted

25          certain individuals who work for TSI, Transworld
```

THE REPORTING GROUP
Mason & Lockhart

```
 1            Systems, on behalf of the trust access to

 2            their system through our own unique log-in

 3            credentials and have provided training on their

 4            systems of record as well as their practices and

 5            inputting records into their system and

 6            maintaining them.

 7    Q.    Okay.  So you do know then a little bit about the

 8            relationship that AES has with Transworld because

 9            you just mentioned it.  So what do you understand

10            of the relationship between AES and Transworld?

11    A.    Well, we have various relationships.  Transworld

12            is a large company, and so is AES.  Pertaining to

13            this particular loan, it's the servicing

14            relationship, the handoff between the time that

15            AES services up until default of the loan where

16            today Transworld takes over at default.  So we

17            work together in that middle period where the

18            loans are charging off.

19                And also, Transworld provides a function for

20            delinquent loans.  Once a loan goes 31 days

21            delinquent, AES will send it to Transworld

22            Systems to then send out to an agency to attempt

23            to recover and cure that delinquency.  If they're

24            a month past due, they try to bring that loan

25            current.  And Transworld will manage that process
```

24

```
 1         by placing that loan out with another third-party

 2         entity or in some cases placing it back to AES

 3         for them to attempt to cure the delinquency.

 4    Q.   Other than the records that AES provides you

 5         through your unique log-in, does Transworld

 6         System have any other records of the loan at

 7         issue?

 8              MR. SHARTLE:  Object to the form.

 9    A.   Can you please rephrase that?

10              I don't understand.

11    Q.   AES was the loan servicer through default.

12         Correct?

13    A.   Yes, ma'am.

14    Q.   And during that time generated records of the

15         account --

16    A.   Yes, ma'am.

17    Q.   -- when payments were made.  Correct?

18    A.   Yes, ma'am.

19    Q.   And at the time of default or around that time,

20         the case is then transferred to Transworld.

21         Right?

22    A.   The loan is, yes, ma'am.

23    Q.   Right.  At the time of that transfer, the

24         handoff, is -- the account history, the payments

25         made, credits, et cetera, interest accrued, is
```

THE REPORTING GROUP
Mason & Lockhart

1           that information that is transferred from AES to

2           Transworld?

3    A.     Yes, ma'am, it is.

4    Q.     Okay.  Other than the information that Transworld

5           gets about the loan from AES at the time of

6           transition, does Transworld have any other

7           independent records of the loan history; or is it

8           working on or working off the information it got

9           from AES?

10   A.     The information from AES at time of default goes

11          to Transworld to create our initial -- our

12          initial file.  And then we pick up from there on

13          the servicing with any interest accrual, payments

14          being credited, adjustments.  And we monitor and

15          service the loan from that point forward.

16   Q.     Okay.  And my question was at the point that you

17          get the information from AES, do you have any

18          other independent source of information about the

19          past history of the loan; or do you rely solely

20          on what AES gives you?

21   A.     We rely on what AES gives us.  I mean, as the --

22          as servicing the loan, they were the ones

23          responsible for maintaining the accurate loan

24          records.  So they give it to us, and we take it

25          from there.

```
 1   Q.   And AES has a -- one system of maintaining loan

 2        records -- a unique system apparently -- correct,

 3        that's different from the FACS and the CRS; is

 4        that right?

 5   A.   Yes, ma'am.

 6   Q.   What is the AES system called?

 7   A.   OC Web.  It's also referred to as Compass

 8        sometimes.

 9   Q.   How is it that loan payment information was used

10        to create records by AES?

11             MR. SHARTLE:  Object to the form.

12   A.   Can you rephrase that?

13   Q.   What -- how did AES create its records?

14             MR. SHARTLE:  Objection, outside the

15        scope of the notice.  He's here as a TSI

16        representative.

17   BY MS. DILL:

18   Q.   Do you know?

19   A.   Maybe if you rephrase it?  I'm -- I'm not

20        understanding.

21   Q.   As the senior litigation paralegal, you get word

22        or there's notice that a loan has been defaulted.

23        And, therefore, it's going to go from AES to

24        Transworld.  Right?

25   A.   Yes, ma'am.
```

```
 1    Q.   At that point when you get the AES information,

 2         does it come to you on AES Compass system?

 3              Do you go into the AES system and retrieve

 4         information and put it into Transworld System?

 5    A.   No, ma'am.  AES provides us an electronic file

 6         with information comprised from their system.

 7         And they send that to us through a secure site.

 8         And we take that information and upload it into

 9         our system.

10    Q.   So what you get from AES is a summary of their

11         file; is that right?

12              MR. SHARTLE:  Objection, mischaracterization.

13    A.   It's an electronic file that they give us that's

14         comprised of their system -- the information

15         that's contained within their system.

16    Q.   Do you have the ability to go in and make changes

17         to the documents that are produced by AES?

18    A.   No, ma'am.

19    Q.   Other than logging in and viewing the documents,

20         do you have any other responsibilities for the

21         AES file once it comes through?

22    A.   Can you rephrase that, please?

23    Q.   Do you, for instance, do anything to ensure the

24         accuracy of the AES electronic file?

25    A.   There's various systematic checks that are put in
```

THE REPORTING GROUP
Mason & Lockhart

1          place at time of the file coming over to us

2          before we import it into our system.  So if

3          there's data missing, it will be kicked out

4          in an exception file and manually reviewed.

5          Or if there's data that appears to be suspect,

6          like if an account comes over to us with a

7          balance of 1 cent, that's going to be kicked

8          out as an exception to be manually reviewed to

9          see if it's accurate and should have come over.

10             And there's other system checks in place that

11         when the account -- when the file comes over from

12         AES, that whole file gets run through these

13         various scrubs; and any exceptions get kicked

14         out.  And if there's no exceptions on some of

15         the files, those would then get put into our

16         system --  TSI system.

17    Q.   How many files do you manage?

18             MR. SHARTLE:  Object to the form.  Are

19         you asking about him or the company?

20    BY MS. DILL:

21    Q.   You personally.

22    A.   I -- I don't know.

23    Q.   How is it that you don't know?

24             MR. SHARTLE:  Objection, argumentative.

25    A.   Well, I don't know what you mean by how many

```
 1            accounts I manage.
 2    Q.   You assist in litigation.  Right?
 3    A.   Yes, ma'am.
 4    Q.   How many cases are you assisting in?
 5    A.   I'm uncertain.
 6    Q.   More than 100?
 7    A.   For the entire company, yes, ma'am.
 8    Q.   How many lawsuits do you believe Transworld
 9         Systems has authorized firms such as the
10         Ratchford group to file on behalf of the National
11         Collegiate Student Loan Trust?
12    A.   I'm uncertain.
13    Q.   How many lawsuits are you aware of involving the
14         National Collegiate Student Loan Trust?
15    A.   I don't know.
16    Q.   Okay.  I'm going to give you -- these are
17         premarked exhibits that --
18              (Discussion off the record.)
19    BY MS. DILL:
20    Q.   Okay.  First, I would like you to please look at
21         Exhibit 1 and --
22              (Discussion off the record.)
23    BY MS. DILL:
24    Q.   I have marked for identification, and I would
25         like you to please review Exhibit 1, which is the
```

30

```
 1        second amended notice of deposition.  Have you
 2        seen this document before?
 3   A.   Yes, ma'am.
 4   Q.   And are you the designated witness to testify for
 5        National Collegiate Student Loan Trust 2006-3 on
 6        the matters described in the notice?
 7   A.   Yes, ma'am.
 8   Q.   Now, I would like you to please look at
 9        Deposition Exhibit 2.  And Deposition Exhibit 2
10        is an affidavit and verification of account that
11        was filed in this case in support of a motion for
12        default.  Correct?
13   A.   This is affidavit and verification of account.  I
14        don't recall whether it was filed for a motion
15        for default or not.
16   Q.   Okay.  Do you know James Cummins?
17   A.   Yes, ma'am, I do.
18   Q.   And is he still employed by Transworld Systems?
19   A.   Yes, ma'am.
20   Q.   And what is his job?
21   A.   He's a legal case manager.
22   Q.   Does he work with you?
23   A.   He works in the same office as me.
24   Q.   In the same actual physical space?
25   A.   Yes, ma'am.
```

1   Q.   How long has he been a legal case manager; do you

2        know?

3   A.   Two years, maybe two and a half.

4   Q.   Are you his boss?

5   A.   No, ma'am.

6   Q.   Is he your boss?

7   A.   No, ma'am.

8   Q.   What is his relationship to you in terms of the

9        day-to-day job?

10  A.   I assist if any questions come up that he may

11       have reviewing an affidavit or discovery or

12       otherwise.

13  Q.   Did Mr. Cummins ever discuss with you this case

14       or the related -- when I say this case, for the

15       record I'm now talking about loans -- the -- yes,

16       both civil dockets 15-324 and 15-326, which have

17       been consolidated.

18  A.   I don't recall him discussing either of these two

19       cases with me.

20  Q.   What did you do to prepare for today's

21       deposition?

22  A.   I reviewed the notices.  I had looked through the

23       account records of both of the accounts at issue

24       for Ms. Thurlow.

25  Q.   Do you have those records with you?

32

```
 1    A.   No, ma'am.

 2    Q.   Where did you look at the account records?

 3    A.   Online through our systems, CRS, I looked through

 4         the AES system, the Compass OC.

 5    Q.   Is the AES system the same as the Compass --

 6    A.   Yes.

 7    Q.   -- OC system?

 8    A.   Yes, ma'am.

 9    Q.   So the CRS and the AES system, are those the

10         universe of systems that contain documents

11         related to this case?

12    A.   Well, those are the electronic systems for the

13         electronic files.  The actual documents are

14         maintained on the site that we talked about

15         earlier, Media Locator, which is the repository

16         of the account level documents.

17    Q.   Where is the Media Locator?

18    A.   It's an online portal that's maintained with one

19         of our servers.

20    Q.   Who maintains it?

21    A.   It's maintained by TSI.

22    Q.   How did TSI get the documents?

23    A.   Which documents in particular?

24    Q.   Well, for instance, the promissory note.

25    A.   That was transferred to either TSI or NCO.  I
```

```
 1            don't recall exactly when the transfer occurred
 2            at default by AES.
 3      Q.    By AES?
 4      A.    Yes, ma'am.
 5      Q.    So the actual physical documents -- are there any
 6            actual physical documents, pieces of paper?
 7                 MR. SHARTLE:  Object to the form.
 8      A.    For this particular loan?
 9      Q.    Yes.
10      A.    Not to my knowledge.
11      Q.    And when you say this particular --
12      A.    Not in TSI's possession.
13      Q.    And when you say in this particular case, are you
14            referring to both cases --
15      A.    Yes, ma'am.
16      Q.    -- both loans?
17      A.    I am.
18      Q.    Okay.  So there are no paper documents in TSI's
19            possession.  Do you know if there's paper
20            documents anywhere?
21      A.    The only --
22                 MR. SHARTLE:  Object to the use of the
23            term paper documents.
24      BY MS. DILL:
25      Q.    Do you know what I mean when I say paper
```

THE REPORTING GROUP
Mason & Lockhart

```
 1          documents?

 2    A.    Actual documents that main -- or that are

 3          maintained outside of an electronic system?

 4    Q.    Yes.

 5    A.    Okay.  Other than letters that were sent or other

 6          correspondence sent by Ms. -- or to Ms. Thurlow

 7          that she may have in her possession, there are no

 8          other paper documents that I'm aware of.

 9    Q.    Okay.  So when you talk about looking at

10          documents, it's always an electronic database?

11    A.    Pertaining to Ms. Thurlow's loan, yes; that is

12          correct.

13    Q.    And it's either the CRS system -- which TSI

14          created and maintains.  Correct?

15    A.    I don't know if TSI created it.

16    Q.    Okay.  But it's the TSI system?

17    A.    For these loans, yes, ma'am.

18    Q.    And the AES?

19    A.    Yes, ma'am.  Those are the electronic account

20          records that maintain the actual account.  Then

21          we have the Media Locator that has actual

22          documents that are saved in electronic format

23          such as copies of the promissory note, other

24          payment histories.  There's another system called

25          Compass -- not Compass, On Base that maintains
```

1    any copies of correspondence that we may have --

2    TSI may have received pertaining to the loan.

3  Q.  Okay.  So for those three systems of document

4    management, CRS, Compass, and Media Locator, do

5    you, as the senior litigation paralegal, have the

6    ability to change any of the documents or --

7  A.  In Media Locator, no, because those are scans of

8    actual documents.  Those are all maintained in

9    PDF or TIFF format.

10  Q.  Okay.

11  A.  CRS, yes, I can update such things as address, if

12    we get a new address, or a phone number.  I can

13    input account notes, spoke to consumer, discussed

14    whatever.  And I could update the status of the

15    account.

16    So I can make modifications within CRS.  And

17    that's dictated by each individual's log-in.  So

18    some individuals can do things that others can't.

19    AES, I have no ability; nor does any TSI

20    representative have ability to change or alter

21    any information in the AES system.  It's strictly

22    for view only.

23  Q.  Okay.  And is it fair to say that you don't

24    really know how the Media Locator documents were

25    created?

THE REPORTING GROUP
Mason & Lockhart

1              MR. SHARTLE:  Objection, mischaracterization.

2    A.   The documents weren't created.

3    Q.   They were scanned?

4    A.   They were scanned into the locator.  So --

5    Q.   When was that done; do you know?

6    A.   It depends on the documents.

7    Q.   Okay.

8    A.   The Media Locator has multiple documents.  So

9         this one, the loan charged off in April of 2012.

10        So at or around April -- usually we get the

11        documents within the month preceding, so within

12        March -- and without looking at the actual system

13        I don't know the exact date; but in March or

14        April of 2012 AES would have sent over an

15        electronic file containing scans of promissory

16        notes for loans that were charging off.  Those

17        scans would have then been identified, tagged

18        with the appropriate account number, and then

19        scanned in and stored in the Media Locator under

20        the individual account that those documents

21        pertained to.  There's other documents that we

22        get throughout the course that are scanned in at

23        later dates potentially.

24   Q.   So -- but you don't know who actually did the

25        scanning in this particular case?

37

1    A.   The individual person, no.

2    Q.   Or when?

3    A.   When, it would have been in March of 2012.

4    Q.   Okay.  You're speculating though a little bit

5         because --

6              MR. SHARTLE:  Objection, argumentative.

7    BY MS. DILL:

8    Q.   -- because that's what typically happens?

9              MR. SHARTLE:  You asked him, and he

10        answered the question.

11   BY MS. DILL:

12   Q.   Do you know for a fact that the documents were

13        transferred in March?

14   A.   In March or April, yes, ma'am.

15   Q.   Okay.  And the date of transfer is something you

16        know based on what?

17   A.   That's the business practice.

18   Q.   Okay.  So in this case, do you know -- is there

19        any evidence that the documents were transferred

20        at that time; or are you just assuming that they

21        were because that's the practice?

22             MR. SHARTLE:  Objection.  You're arguing

23        with the witness.  Asked and answered.

24   BY MS. DILL:

25   Q.   And I'm not trying to argue you.  I apologize if

```
 1          you're taking my questions as argument.
 2   A.     As stated, without looking at my system, I don't
 3          know the exact dates --
 4   Q.     Okay.
 5   A.     -- that the documents were logged in.
 6   Q.     All right.  Getting back to Exhibit 2, is there a
 7          reason why Mr. Cummins has not appeared for
 8          today's deposition given the subject matter
 9          described in the notice?
10   A.     Well, the notice actually just describes
11          Ms. Holiday's affidavit, not Mr. Cummins's.  And
12          it's a 30(b)(6) with a wider scope.  And we
13          determined through discussions --
14              MR. SHARTLE:  Don't reveal any of the
15          conversations that we have had.
16   A.     -- that I would be the witness.
17   Q.     Okay.  The affidavit and verification of account
18          that Mr. Cummins signed that you're here to
19          testify about, that is a standard form, correct,
20          that's used in many cases brought by National
21          Collegiate Student Loan Trust?
22              MR. SHARTLE:  Object to the form.
23              MS. DILL:  This is cross-examination.
24          And these --
25              MR. SHARTLE:  I know.  It's a very bad
```

                        THE REPORTING GROUP
                         Mason & Lockhart

```
 1            question, too.
 2                 MS. DILL:  Okay.
 3     BY MS. DILL:
 4     Q.   Isn't it true that the affidavit and verification
 5            of account is a form that's used often in cases
 6            brought by National Collegiate Student Loan Trust
 7            was the question?
 8     A.   This was an affidavit template that was used at
 9            the time that was in production at the time that
10            it was signed and used for this individual trust
11            entity.
12     Q.   Who created the document?
13     A.   Can you clarify that, please.
14     Q.   Exhibit 2, which is a document that was filed by
15            the National Collegiate Student Loan Trust in the
16            Portland District Court signed by Mr. Cummins,
17            who created it?
18                 MR. SHARTLE:  Object to the form.  Who
19            signed it?  Who actually authored the
20            document?  Who typed the document?
21     A.   Yes.  I'm --
22                 MR. SHARTLE:  Object to the form of the
23            question.
24     A.   I'm uncertain as to what you mean by who created
25            it.
```

```
 1   Q.   The -- you said it was a template?

 2   A.   Yes, ma'am.

 3   Q.   Who made the template?

 4   A.   Multiple parties had input on the template,

 5        including inside and outside counsel.

 6   Q.   And is your office in the county of Gwinnett?

 7   A.   Gwinnett, yes, ma'am.

 8   Q.   Gwinnett, okay.

 9             And does Mr. Cummins work in Gwinnett?

10   A.   Yes, ma'am.

11   Q.   Did Mr. Cummins stamp his name on the front?

12   A.   Yes, ma'am.

13   Q.   Did you see him do that?

14   A.   No, ma'am.

15   Q.   Did he tell you that he did that?

16   A.   No, ma'am.

17   Q.   Did you have any conversations with Mr. Cummins

18        before today's deposition about this case?

19   A.   No, ma'am.

20   Q.   How do you know then that he did stamp his name?

21   A.   The procedures that all the affiants, legal case

22        managers, follow have them being required to

23        check out affidavit batches or a batch and

24        review.  And they have -- they're the only ones

25        with the ability to stamp their name.  They
```

1        maintain their own stamps.  They're not in any

2        public area that another employee could get ahold

3        of and stamp someone else's name.

4  Q.  How many affidavits and verification of accounts

5        make up a batch; do you know?

6  A.  Currently, it's no more than 10 within a batch.

7  Q.  And how many batches are usually processed by a

8        legal case manager for TSI on a daily basis?

9  A.  Typically no more than three or four batches are

10       reviewed.  And some of those -- some of those

11       batches are less than 10.  And also some of those

12       affidavits are not signed, for various reasons.

13       So --

14  Q.  Before today's deposition, had you ever seen

15       what's been marked Deposition Exhibit 2?

16  A.  Yes, ma'am.

17  Q.  When?

18  A.  Throughout my review of the accounts in

19       preparation of today's deposition.

20  Q.  When is the first time that you saw it?

21  A.  I don't recall.

22  Q.  Was it yesterday?

23  A.  No, ma'am.

24  Q.  In the second paragraph of Deposition Exhibit 2,

25       Mr. Cummins swore that he was competent and

42

1     authorized to testify relating to this action

2     through personal knowledge of the business

3     records, including the electronic data, sent to

4     TSI that detail the education loan records.  Do

5     you know what he's referring to in that

6     paragraph?

7  A.  So that refers to both the electronic records

8     that we talked about earlier that AES sent over

9     at time of charge-off to form our initial account

10    file, including the -- and also including any

11    electronic data that we have gained throughout

12    the servicing process up until the time that he

13    reviewed this affidavit.

14 Q.  Do you know if Mr. Cummins actually did that

15    review?

16 A.  I believe he did.

17 Q.  And what are the record management practices and

18    procedures that the National Collegiate Student

19    Loan Trust requires of Transworld System?

20 A.  So they require us to keep and maintain the

21    electronic record, log any payments or

22    adjustments to the account record accurately

23    and on a timely basis, and maintain the actual

24    loan documents in electronic format with no

25    destruction policy on those documents.

```
 1   Q.   Where does this policy -- where is it
 2        memorialized?
 3   A.   It's memorialized within our contract.
 4   Q.   What contract is that?
 5   A.   The contract that we have that enacts us as
 6        servicer.
 7   Q.   The contract between Transworld Systems and
 8        National Collegiate Student Loan Trust?
 9   A.   It's between Transworld Systems and U.S. Bank.
10   Q.   Have you read the contract?
11   A.   Yes, ma'am.
12   Q.   How long is it?
13   A.   It's got multiple amendments to it.  I'm not sure
14        in total how many pages it is.
15   Q.   Now, Mr. Cummins attached to his affidavit and
16        verification of account what he said was a true
17        copy of the underlying credit agreement and
18        promissory note, which is Deposition Exhibit 3.
19        Deposition Exhibit 3 consists of a note
20        disclosure statement and one page of a loan
21        request credit agreement.  Correct?
22   A.   Yes, ma'am.
23   Q.   When Mr. Cummins accessed the electronic data to
24        append what he testifies is a true copy of the
25        underlying credit agreement and promissory note,
```

44

```
 1          which system did he use?
 2    A.    Actually, when the affidavits are prepared and
 3          taken out by the affiant, they already have the
 4          exhibit attached to it.  So he didn't personally
 5          pull the exhibit to match it up with.  It was
 6          already pulled for him.
 7    Q.    By whom?
 8    A.    By a member of the affidavit production team.
 9          And Mr. Cummins would go through the documents
10          that were attached and verify their accuracy
11          based on the account record -- the electronic
12          account record that we have both in CRS and
13          within AES.
14    Q.    So the actual figures that are included in the
15          affidavit in paragraph 6 allegedly stating the
16          amounts owed by my clients, those figures were
17          not inserted by Mr. Cummins?
18    A.    No, ma'am.
19    Q.    Who inserted those figures?
20    A.    That would have been through the merge process
21          when the template was used by the affidavit
22          production team.
23    Q.    What is the merge process used by the affidavit
24          collection -- what is the affidavit -- what team?
25    A.    Production team.
```

1    Q.   What is the merge process used by the affidavit

2         production team?

3    A.   It's a simple merge function within Word.  So

4         there's various fields, including those balance

5         fields, that are merge fields.  So they would

6         pull in the data that corresponds to that merge

7         field out of the affidavit database.

8    Q.   When the affidavit production team uses this

9         merge function, does it extract the numbers from

10        the AES database?

11   A.   No.  They're from the CRS system.  So CRS will

12        send a file to our affidavit database.  Our

13        affidavit database will then update the

14        information based on the information from CRS

15        at the time that that affidavit was requested.

16        And then when the affidavits goes to print, the

17        various fields that are within it merge to

18        include the data that was inputted into the

19        affidavit database that came from CRS.

20   Q.   And the CRS -- I'm still unclear about the -- the

21        CRS database, it has loan information that was

22        obtained independently of AES or from AES?

23   A.   Both.  So the initial record within CRS is data

24        from AES.  And then throughout time that record

25        continues to grow.

```
 1   Q.   Right.

 2   A.   If there's any additional payments made, that's

 3        put directly into CRS.

 4   Q.   Okay.  But as far as the time period that AES was

 5        the servicer of the loan, the only information

 6        about the loan for that time period was generated

 7        by AES.  Correct?

 8   A.   Yes, ma'am.

 9   Q.   And did you say it was a merge function within

10        Word?

11   A.   Yes, ma'am.

12   Q.   Like Microsoft Word?

13   A.   Yes, ma'am.

14   Q.   Is the affidavit production team located in

15        Georgia?

16   A.   Yes, ma'am.

17   Q.   In your office?

18   A.   Yes, ma'am.

19   Q.   Now, the note that appears as Exhibit 3 -- you

20        know documents that Mr. Cummins attached to his

21        affidavit, specifically the loan request and

22        credit agreement, identifies the loan program as

23        the Next Student Undergraduate Loan program.

24        Correct?

25   A.   Yes, ma'am.
```

THE REPORTING GROUP
Mason & Lockhart

1    Q.   And at the bottom of the page there is a

2         number -- some sort of identification at the

3         bottom beginning with AB.06-07.CSX1.  Do you see

4         where I'm reading?

5    A.   Yes, ma'am.

6    Q.   What is that?

7    A.   AB identifies the lender, and that's Charter One.

8         06-07 is -- relates to the program year of the

9         loan.  CSX1 means -- CXS means cosigned; 1 means

10        by one person.  10DC -- 10 means it's the first

11        iteration of this set of terms.  DC is the direct

12        to consumer program.  And then 0206 means

13        February of 2006.  And that's when these terms

14        were first put into production, as of February.

15   Q.   Who created that -- I don't know.  What would you

16        call it?

17   A.   Term code.

18   Q.   Term code, thank you.  Who created that term

19        code?

20   A.   I'm uncertain.

21   Q.   When was it created?

22   A.   I don't know.

23   Q.   Looking now at what's marked Deposition

24        Exhibit 4, which is the affidavit and

25        verification of account by Alicia Holiday

48

1       submitted to the Portland District Court, you

2       have been designated by National Collegiate

3       Student Loan Trust to testify about the subject

4       matter of this affidavit.  Are you prepared to do

5       that today?

6    A.  Yes, ma'am.

7    Q.  Who is Alicia Holiday?

8    A.  She was another legal case manager.

9    Q.  Does she work in your office in Georgia?

10   A.  Yes, ma'am.

11   Q.  Do some legal case managers such as Ms. Holiday

12      just sign affidavits for purposes of summary

13      judgment and others such as Mr. Cummins sign

14      affidavits for default judgment?

15   A.  No, ma'am.

16   Q.  Does Alicia Holiday still work for Transworld

17      Systems?

18   A.  Yes, ma'am.

19   Q.  How long has she worked there; do you know?

20   A.  I think she's been about two years also.

21   Q.  Alicia Holiday says that TSI is the designated

22      custodian of records for the defendants'

23      educational loan.  What does that mean, a

24      designated custodian of records?

25   A.  We have been designated by the trust or by U.S.

THE REPORTING GROUP
Mason & Lockhart

1          Bank on behalf of the trust to maintain the

2          records for the individual loan at issue on

3          behalf of the trust.

4    Q.    And what exactly do you do to maintain them?

5    A.    Well, we have the electronic file that we keep

6          and keep a running balance of the account,

7          interest accrual, payments, any notes.  We also

8          maintain the actual loan level documents within

9          our Media Locator that has no destruction policy.

10         So those are maintained in PDF format.

11   Q.    Does the no destruction policy only apply to

12         documents in the Media Locator?

13   A.    I'm uncertain.

14   Q.    What does TSI do to ensure the security of the

15         system?

16   A.    The Media Locator system?

17   Q.    Yes.

18   A.    Well, it's a -- it's an online portal that has

19         various electronic security in place.  I'm

20         uncertain exactly what security level it is.  But

21         in order to access it, you have to have a TSI

22         log-in with a unique password that expires

23         periodically; and you have to update your

24         password.

25   Q.    How many people have access to the database --

THE REPORTING GROUP
Mason & Lockhart

1      the three databases, AES, CRS, and the Media

2      Locator?

3  A.  TSI employees that have access to AES, I would

4      say between 10 and 20 people maybe.  CRS, I'm not

5      sure.  It would be more than 20.

6  Q.  Have you made any notes on this case in the data

7      system?

8  A.  I don't think so.

9  Q.  Were there any notes made by others?

10  A.  Yes, ma'am.

11  Q.  Do you recall what those notes said?

12  A.  Well, Mr. Cummins and Ms. Holiday both noted in

13      the account that they received an affidavit.  And

14      they executed the affidavit -- at that time they

15      each executed it.

16         Also, there's notes on the file from our

17      attorney; and any other collection agency would

18      also have notes on there.

19  Q.  When you say our attorney, are you talking about

20      the Ratchford Law Group?

21  A.  Yes, ma'am.

22  Q.  What training did Alicia Holiday have on the

23      system of record used by Transworld Systems to

24      enter and maintain loan account records?

25  A.  So she was trained when she became an employee.

```
 1        So she got her own log-in; and then she was
 2        walked through the various screens within the
 3        system, how to update those records, how to look
 4        at various things such as payments, adjustments.
 5   Q.   Do you have personal knowledge of that, or are
 6        you testifying based on your belief that there's
 7        a policy and practice in place that would have
 8        caused that to happen?
 9             MR. SHARTLE:  Objection.  Are you asking
10        him to answer the question as an individual
11        or as a representative?
12   BY MS. DILL:
13   Q.   In both capacities my expectation would be that
14        you would testify based on personal knowledge.
15        Is it your personal knowledge that Ms. Cummins --
16        excuse me, that Ms. Holiday had training on the
17        system?
18   A.   Yes, ma'am.
19   Q.   How do you know it?
20   A.   I'm actually involved in portions of the
21        training.  And she sits in my office, and I have
22        witnessed, when she was originally employed, her
23        training and assisted in various portions of it.
24   Q.   Okay.  And so the system of record that she was
25        trained on was the system that we have already
```

1       discussed?

2   A.  Yes, ma'am.

3   Q.  Does she have access to the AES --

4   A.  Yes, ma'am, she does.

5   Q.  Does she have access to Compass and the Media

6       Locator, too?

7   A.  Compass is the AES system.

8   Q.  Okay.  Right.  Thanks.

9   A.  And Media Locator, yes, ma'am.

10  Q.  And Ms. Holiday attached to her affidavit

11      several documents that I have presented to you.

12      Exhibit 5 purports to be an authorization from

13      U.S. Bank.  Correct?

14  A.  Yes, ma'am.

15  Q.  Now, Exhibit 6 is described by Ms. Holiday in her

16      affidavit as being a true copy of the loan

17      request and credit agreement.  Correct?

18  A.  Yes, ma'am.

19  Q.  And where did Ms. Holiday retrieve this true copy

20      of the original loan document from?

21  A.  Like with Mr. Cummins's affidavit, this was

22      attached by the affidavit production team.

23  Q.  Okay.  So is Ms. Holiday's job solely to sign the

24      affidavit?

25  A.  No.  Her job is to review the affidavit for

```
 1            accuracy; and if all information within the

 2            affidavit is accurate and all exhibits attached

 3            thereto are accurate, then she has the ability to

 4            sign the affidavit.

 5     Q.     And is it, I guess, your testimony that, in fact,

 6            it's an accurate statement that Exhibit 6 is a

 7            true copy of the original loan document?

 8     A.     It appears to be missing a page.

 9     Q.     What page appears to be missing?

10     A.     The last page of the terms.

11     Q.     5 of 5?

12     A.     Yes.  5 of 5 should be a disclosure -- a federal

13            disclosure.

14     Q.     Before we continue, I just want to make sure that

15            that was not a mistake by my office.  So let me

16            just make sure that --

17                 MR. SHARTLE:  Can we take -- go off the

18            record and take a break?

19                 MR. MCKINLEY:  Sure.

20                 MS. DILL:  Sure.  Take a break.  Good

21            idea.

22                    (A short recess was taken.)

23     BY MS. DILL:

24     Q.     Again, looking at Exhibit 6, which was identified

25            by Alicia Holiday to be a true copy of the loan
```

54

```
 1             agreement, can you tell from looking at the
 2             document where it was retrieved from?
 3    A.   Not by looking at it.
 4    Q.   Where do you think it was retrieved from?
 5    A.   Well, our business practice when producing an
 6             affidavit would be for the affidavit production
 7             team to pull a copy off of the Media Locator.
 8             So they would pull up the account in Media
 9             Locator, go to the document that identifies the
10             loan document, and pull that off.  And then
11             basically when they print, they do a collate
12             function where -- it's kind of offset printing;
13             so it will print the affidavit.  Then it will
14             print the documents.  Then it will print another
15             affidavit and another document.
16    Q.   And the Media Locator is a system that is owned
17             by Transworld Systems.  Correct?
18    A.   I believe so.
19    Q.   And does any other company use it?
20    A.   No, ma'am.
21    Q.   Only Transworld Systems employees have access to
22             Media Locator?
23    A.   To my knowledge, yes, ma'am.
24    Q.   And how were the loan documents transferred from
25             the owner to Transworld Systems?
```

1    A.   Well, they were transferred from AES, the
2         servicer -- the previous servicer.  And it gets
3         transferred to Transworld Systems in an
4         electronic file, basically like a zip file that
5         gets uploaded to Transworld Systems through a
6         secure site.  And then Transworld Systems goes in
7         and names those documents, and then we'll upload
8         them to the Media Locator for the individual
9         account that the documents pertain to.
10   Q.   And how do the documents get from the trusts to
11        AES?
12   A.   Well, AES gets them at time of disbursement.  So
13        before the trust owns the loan right at
14        disbursement, the either originating bank or a
15        party on the bank's behalf transfers the
16        documents to AES who then maintains them while
17        the loan is being serviced by them.
18   Q.   And in this particular case, how was the document
19        trans -- how was the loan document that
20        Ms. Coffey is alleged to have signed, how was
21        it -- how did it get from Maine to the Media
22        Locator?
23   A.   Well, Ms. Coffey faxed in the document for
24        processing.  And then --
25   Q.   Where did she fax it to?

1    A.    She faxed it to -- I am uncertain specifically.

2          It was either to Charter One or a party that

3          Charter One had a contract with to handle the

4          origination of their loans.

5    Q.    Okay.  So you don't know -- sorry.  Bear with me.

6                On one of them there was a reference to

7          Merrill Bank.  Well, it will come up.

8                You don't know in this particular case how

9          the loan went from Maine to AES, but you believe

10         it went via the lending bank?

11               MR. SHARTLE:  Object to the form.

12   A.    It was faxed to either the lending bank or

13         someone on their behalf.  The general practice

14         for these loans where the banks would contract

15         with a third party to process the incoming loan

16         applications and facilitate the disbursement of

17         the loans.  So the business practice would have

18         been for them to either mail or fax -- in this

19         case they were faxed -- to either the bank or the

20         third party on the bank's behalf that the bank

21         authorized to receive the documents.

22   Q.    And then how would it get to AES?

23   A.    So whoever received and facilitated that

24         disbursement would then send it to AES at time of

25         disbursement, will send them the electronic data

1       to create their electronic records of initial

2       accounts, and then also will send over the loan

3       documentation.

4   Q.  Electronically?

5   A.  Yes.  Well, electronically in this case since

6       they were faxed.  If they were -- in the event

7       that they were actually mailed in and had a

8       physical wet ink version, then those would have

9       been mailed to AES to maintain.

10  Q.  How do you know they were faxed in this case?

11  A.  They have the fax header on the top indicating

12      that they were faxed.  And also, if they would

13      have been mailed in, they would have had a unique

14      numerical sequence stamped on them.  And that's

15      the -- that's the way that AES logs them and

16      stores them and is able to -- it's like a card

17      catalog essentially.  And then they will pull

18      them when needed in the future.

19  Q.  And in this case, did Sarah Thurlow fax five

20      pages of loan documents?

21  A.  She did fax five pages, but she did not fax the

22      same five pages that are attached in your

23      Deposition Exhibit 6.

24  Q.  How do you know that?

25  A.  Well, Ms. Thurlow would have -- or would not fax

THE REPORTING GROUP
Mason & Lockhart

1    back the terms of the agreement.  She's only

2    obligated to fax back the signature page.  And

3    that's actually just referenced right above her

4    signature.  It says, just return this page with

5    proof of income and other information, if

6    applicable.  And it gives where to fax the

7    document to.

8        So when Ms. Thurlow and Ms. McMullen received

9    the loan packages, they would have received three

10   loan packages, one being the lender copy, which

11   is what this is as evidenced right below

12   Ms. McMullen's signature.  Then they would have

13   received a borrower copy and a cosigner copy.

14   And a borrower copy and a cosigner copy are the

15   signature page with the corresponding terms and

16   conditions.  The lender copy is just this

17   signature page.

18  Q.   And the term code that appears at the bottom of

19       Deposition Exhibit 6, who put that there?

20  A.   I'm uncertain.

21           MR. SHARTLE:  Object to the form.  What

22       are you referring to?

23           Do you want to make an exhibit

24       reference?

25           MS. DILL:  Exhibit 6, at the bottom

THE REPORTING GROUP
Mason & Lockhart

```
 1            there's a term code AB.06-07.  We discussed a

 2            similar one on another document.

 3   A.   It was the same code.  It was just on a different

 4            document.

 5   Q.   I'm looking at Bates stamped page 8 compared to

 6            Bates stamped page 16 --

 7                 MR. SHARTLE:  Objection.

 8   BY MS. DILL:

 9   Q.   -- after the term code.  And it appears that it

10            is identical.

11                 MR. SHARTLE:  And I apologize.  Just for

12            the record, you -- you -- are you referring

13            to Bates stamped documents?  That's what you

14            just said?

15                 Where are they Bates stamped?

16                 I apologize.

17                 MS. DILL:  The lower right-hand corner,

18            the deposition exhibits were Bates stamped by

19            my office just so we could better keep track

20            during the conversation.

21                 MR. SHARTLE:  Oh, 16, 15 are you talking

22            about?

23                 THE DEPONENT:  I thought she said 8, not

24            16.

25                 MR. SHARTLE:  Okay.
```

                       THE REPORTING GROUP
                        Mason & Lockhart

```
 1              Okay.  I'm sorry.
 2              MS. DILL:  That's okay.  I'm just trying
 3         to understand what all these numbers mean.
 4              MR. SHARTLE:  Yes.
 5   BY MS. DILL:
 6   Q.   And with respect to the term code that appeared
 7         on the Bates stamped page 8, you said you didn't
 8         know what it was; so I assume you don't know what
 9         it was on page 16 as well?
10   A.   No.  I identified each piece of that previously.
11   Q.   But you don't know who put it there?
12   A.   Oh, no, ma'am.
13   Q.   So it could have been AES?
14   A.   No, ma'am.
15   Q.   How -- how do you know that?
16   A.   Because this document was created prior to AES's
17         involvement.  AES doesn't get involved until the
18         loan is actually disbursed.  And the term codes
19         are put on here when the loan -- when the
20         document is created and sent to the consumers for
21         signature.
22   Q.   Okay.  You -- on page -- it's the second page of
23         Deposition Exhibit 6, which is Bates stamped
24         page 17.  On the right-hand side of the page in
25         paragraph 2 it says that the variable rate
```

```
 1          will -- and I'm summarizing now.  It says, won't
 2          exceed the rates allowed by the State of Ohio.
 3          Correct?
 4   A.     Yes, ma'am.  That's what it says.
 5   Q.     And on page 20 of Deposition Exhibit 6, which is
 6          the note disclosure statement, that was also
 7          appended to the Holiday exhibit and filed in
 8          district court, the loan program at the bottom is
 9          identified as the Next Student Undergrad Loan
10          program.  Correct?
11   A.     Yes, ma'am.
12   Q.     Now, looking at Deposition Exhibit 7, is it fair
13          to say that Deposition Exhibit 7 was presented to
14          the Court by Ms. Holiday to represent the chain
15          of ownership of the underlying loan?
16   A.     I'm sorry.  Can you repeat the question?
17   Q.     Yes.  Was the purpose of Deposition Exhibit 7
18          attached to the affidavit of Alicia Holiday to
19          present to the District Court the chain of
20          ownership of the loan?
21   A.     Yes, ma'am.
22   Q.     And what do you understand Exhibit 7 to be?
23   A.     So Exhibit 7 actually encompasses a couple
24          different documents, the first of which is a pool
25          supplement document.  And this document is
```

         1          between Charter One Bank and National Collegiate

         2          Funding with First Marblehead Corporation also in

         3          there whereby this agreements takes a pool of

         4          loans that were originated by Charter One Bank

         5          and sells, assigns, and transfers that pool of

         6          loans to National Collegiate Funding as of

         7          September 28, 2006.  And that pool of loans is

         8          identified as schedule 2, being a list of all the

         9          individual loans within the pool.

        10              And then Exhibit -- Deposition Exhibit 7,

        11          Bates No. 26 is an excerpt of the schedule 2

        12          showing Ms. Thurlow's individual loan being

        13          included within that pool.

        14     Q.   The pool supplement that has been marked

        15          Deposition Exhibit 7 also identifies note

        16          purchase agreements that it pertains to.

        17          Correct?

        18     A.   Yes, ma'am.

        19     Q.   And of the note purchase agreements that are

        20          listed on schedule 1 -- and now, I'm looking at

        21          the Bates stamped pages 24 and 25 -- identify for

        22          me, please, which note purchase agreement would

        23          include the notes that are the subject of this

        24          case?

        25     A.   This would be one, two, three, four, five, six --

1          the sixth bullet point down on Bates number 24,

2          note purchase agreement dated May 15, 2002, by

3          and between FMC and program lender for Next

4          Student.

5     Q.   Okay.  So the loan at issue was allegedly dated

6          in 2006.  Correct?

7     A.   Yes, ma'am.

8     Q.   But you're saying that the note purchase

9          agreement dated May 15, 2002, encompassed it?

10    A.   Encompassed the loan program, not the individual

11         loan.

12    Q.   The -- so the TERI guaranteed Next Student loan

13         program is --

14    A.   I actually believe those two are the same

15         agreement.

16    Q.   The loan program identified on the note is Next

17         Student Undergraduate Loan.  Is it your testimony

18         that the Next Student Undergraduate Loan program

19         is the same as the TERI Guaranteed Next Student

20         Loan program?

21    A.   It falls within the Next Student Loan program.

22         So the Next Student Loan program encompasses both

23         undergraduate and graduate loans for Next

24         Students.  So it's the Next Student Loan program,

25         and the undergraduate portion falls within it.

```
 1   Q.   On Deposition Exhibit 7 at bottom there is a date
 2        8 --
 3             MR. SHARTLE:  Bottom of what?
 4             MS. DILL:  The bottom of the page.
 5             MR. SHARTLE:  What page?
 6             MS. DILL:  Page 20 -- it's Bates stamped
 7        page 22.
 8   BY MS. DILL:
 9   Q.   And there is a date 8/22/2011 -- or let me ask
10        you that.  Is that a date?
11   A.   Yes, ma'am.
12   Q.   And what does that date relate to?
13   A.   That appears this is a filing copy that was filed
14        with the SEC.  And that date appears to be the
15        date that this individual scan of the document
16        was printed from SEC -- from the SEC.
17   Q.   Who printed it?
18   A.   I'm uncertain.
19   Q.   Who put that date there?
20   A.   That date would have been put there by the
21        printing system.
22   Q.   Whose printing system?
23   A.   I don't know.
24   Q.   Where do you think Alicia Holiday got this
25        document from?
```

                    THE REPORTING GROUP
                     Mason & Lockhart

```
 1   A.   This document saved in our system on one of our

 2        servers for the various pool supplements.

 3   Q.   Is the same document applied to every case?

 4   A.   No, ma'am.

 5   Q.   So it's your testimony that the date August 22,

 6        2011, is the date that the document was retrieved

 7        from the system?

 8             MR. SHARTLE:  Objection to form.  What

 9        system are you referring to?

10   BY MS. DILL:

11   Q.   Tell me, again, what you know about the date at

12        the bottom of Exhibit 7 Bates stamped page 22.

13   A.   That date is there from when this particular

14        document was printed from the SEC's website.

15   Q.   And I'm not trying to trip you.  I just don't

16        remember it.  Did you tell me who printed it?

17   A.   No, ma'am.

18   Q.   Do you know if it was an employee of Transworld

19        Systems?

20   A.   No, it was not.

21   Q.   How do you know that that's the date it was

22        printed?

23   A.   That was discussed back with First Marblehead in

24        or around 2012.

25   Q.   What was discussed?
```

THE REPORTING GROUP
Mason & Lockhart

1    A.   What that date was.

2    Q.   How do you know that?

3    A.   Because I was the one that had the discussion.

4    Q.   In 2012 were you the senior litigation paralegal

5         for Transworld Systems?

6    A.   No, for NCO -- yes, NCO Financial Systems.

7    Q.   And what was -- you worked for NCO Financial

8         Systems in 2012?

9    A.   Yes, ma'am.

10   Q.   And at that time you negotiated with First

11        Marblehead?

12             MR. SHARTLE:   Objection, mischaracterization.

13   BY MS. DILL:

14   Q.   You had a conversation with First Marblehead?

15   A.   Yes, ma'am.

16   Q.   And who at First Marblehead did you speak with?

17   A.   Back then was Matt Coletti.  He was their

18        in-house counsel.  He was a lawyer for them.

19   Q.   And what did you say to him?

20   A.   Oh, pertaining to this, I asked him why there was

21        a date on the bottom right of the document.  And

22        he explained to me that's when it was retrieved

23        from the SEC site.  And when it was retrieved and

24        it was printed, the printer, software, or

25        whatever he was using to print it, automatically

1      tagged a date to it.

2   Q.  If you look at the Alicia Holiday affidavit,

3      which is Exhibit 4, and paragraph 10 which

4      appears at Bates stamped page 11, it says that no

5      payment had been made since 8/22/11.  Did I read

6      that correctly?

7   A.  That's what it states.

8   Q.  So is it your testimony that it's just a

9      coincidence that the document was printed on the

10      same day that the defendant in this case

11      allegedly made her last payment?

12   A.  Yes, ma'am.

13   Q.  When you had a conversation with Mr. Coletti at

14      First Marblehead Corporation -- did I get that

15      right?

16   A.  Yes, ma'am.

17   Q.  -- what was the purpose of the conversation?

18   A.  Well, actually, we have had many conversations

19      prior to NCO's involvement as servicer, defaulted

20      loans of First Marblehead Educational Resources,

21      which was a subsidiary of First Marblehead

22      Corporation.  So throughout there was a

23      transition period when they were servicing and

24      handing it off to NCO Financial Systems.  So I

25      had, over the course of more than a year,

68

```
 1        multiple conversations with various employees at

 2        First Marblehead pertaining to the NCSLT, the

 3        trust structures, the background because they

 4        also played portions of the origination process

 5        and the -- back to the note purchase agreement,

 6        which we just discussed.  So I had very many

 7        conversations with them just relating to the

 8        trusts.

 9   Q.   Did First Marblehead Corporation ever service

10        this loan?

11   A.   First Marblehead Education Resources serviced the

12        loan for a short period of time.  It would have

13        been serviced from April 2, 2012, to October 31,

14        2012, at which point as of November 1, 2012, they

15        transferred to NCO Financial Systems.

16   Q.   Now, with respect to schedule 2 of the pool

17        supplement that Ms. Holiday says was redacted,

18        who -- who redacted schedule 2?

19   A.   This would have been redacted by a member of our

20        media team.

21   Q.   Do you know who did it?

22   A.   No.  Not on the individual.

23   Q.   Did you say media?

24   A.   Media.

25   Q.   Who is on the media team?
```

```
 1   A.   Oh, we have got numerous employees.

 2   Q.   When did the media team redact schedule 2?

 3   A.   I can't tell by looking at the document.  It

 4        would be in our system.

 5   Q.   Do you know where the media team employee

 6        responsible for redacting schedule 2 in this case

 7        worked?

 8   A.   No, ma'am, I mean, since I don't know who

 9        redacted it.

10   Q.   Do you know how it was redacted?

11   A.   Electronically.  It's through a PDF software

12        where a black box is drawn and then printed to

13        PDF so the black box can't be moved or altered so

14        you can't see any of the data underneath it.

15   Q.   Where is the original schedule 2 located?

16   A.   It's saved on our server.

17   Q.   In which program?

18   A.   Can you please clarify that?

19   Q.   Of the systems that we have discussed for

20        maintaining electronic records that we talked

21        about, CRS, the --

22   A.   Okay.

23   Q.   -- FACS, and the Media Locator, where, if any of

24        those, is the schedule 2 maintained?

25   A.   None of those.  It's saved on our server or one
```

```
 1          of our servers.

 2    Q.    On Transworld Systems' server?

 3    A.    Yes.

 4    Q.    How did it get to Transworld Systems' server?

 5    A.    From First Marblehead.

 6    Q.    First Marblehead Corporation or First Marblehead

 7          Data Services or First Marblehead

 8          Education-something?

 9    A.    Good.  Corporation.

10    Q.    Did First Marblehead Corporation transfer the

11          original schedule 2 directly to Transworld, or

12          did it go through various parties before your

13          company got it?

14    A.    Well, it went directly to NCO.

15    Q.    And then from NCO it went to --

16    A.    Transworld.

17    Q.    And I'm still a little unclear.  Did Transworld

18          buy NCO?

19    A.    No.

20             MR. SHARTLE:  Objection.  That's outside

21          the scope of the notice.

22    A.    No.

23    Q.    How is it that Transworld then became the owner

24          of the databases and the various records?

25    A.    So as previous --
```

1              MR. SHARTLE:  Objection, calls for a

2        legal conclusion outside the scope of the

3        notice.

4    A.  As previously discussed, EGS, the parent company

5        to NCO, took portions of NCO's business along

6        with other portions of business that EGS may have

7        had ownership of and sold those portions of

8        business under the name Transworld Systems.  One

9        of those portions of business was the NCSLT, the

10       trust servicing business.

11   Q.  What do you mean under the name of Transworld

12       Systems?

13   A.  Well, Transworld Systems was another company also

14       owned by EGS.  So they took Transworld's name

15       along with their business line, added to it some

16       of NCO's business line, and sold it off as

17       Transworld Systems as a separate company.

18   Q.  So -- and who did they sell it to?

19   A.  A private equity firm.

20   Q.  Which one?

21   A.  Platinum Equity.

22   Q.  Does Platinum Equity own Transworld?

23   A.  Yes, ma'am.

24   Q.  Does anyone own Platinum Equity?

25   A.  I don't know.

                        THE REPORTING GROUP
                         Mason & Lockhart

```
 1    Q.   Where is Platinum Equity located?

 2    A.   Beverly Hills, California.

 3    Q.   And does Platinum Equity wholly own Transworld?

 4              MR. SHARTLE:  Objection, outside the

 5         scope of the notice.  Calls for a legal

 6         conclusion.

 7    A.   I'm not certain.

 8    Q.   Do you know if anyone else claims ownership of

 9         Transworld Systems?

10    A.   Not to my knowledge.

11    Q.   So getting back to the excerpt of schedule 2 --

12              MS. DILL:  And the copies didn't come

13         out very well, so I did ask to get a couple

14         of extra made.  I don't know if they -- I

15         don't know where they are, though.

16              MR. SHARTLE:  Do you mind -- actually, I

17         apologize.  I know we just took a break.  Can

18         we take one more break?

19              MS. DILL:  Okay.  Oh, sure.  No problem.

20              (A short recess was taken.)

21    BY MS. DILL:

22    Q.   Okay.  So looking at the excerpt of schedule 2 to

23         the pool supplement attached to the affidavit of

24         Alicia Holiday, who attached the supplement to

25         the Holiday affidavit?
```

1    A.   The would have been our media/affidavit

2         production team.

3    Q.   And do you know if what appears as the excerpt in

4         the pool supplement as Bates stamped page 26 is

5         an identical copy of the actual schedule 2 that

6         was attached to the pool supplement?

7    A.   It's not an identical copy.  It's formatted to

8         fit onto a page and easily read.  All the data

9         within it is an identical copy of the data

10        contained within the original schedule 2.

11   Q.   And where is the original schedule 2?

12   A.   That's saved on our servers -- TSI's servers.

13   Q.   Have you checked to confirm whether or not the

14        information, in fact, is the same, what appears

15        on page 26 and what is on the server?

16   A.   Yes, ma'am, I have.

17   Q.   And is it, in fact, identical?

18   A.   Yes, ma'am.

19   Q.   So when you looked at the original schedule 2,

20        what does it look like?

21   A.   Well, the original schedule 2 is actually -- it's

22        going to look just like this first line.  And

23        then the second line is just going to be next to

24        it.  It's just going to be one line of data as

25        opposed to it being broken down into five lines

74

1   here.

2    And it's also going to contain other loans

3   within the schedule.

4 Q. How many loans made up schedule 2?

5 A. For this trust, I'm uncertain of.

6 Q. Who created schedule 2?

7 A. Schedule 2 was created with Charter One Bank and

8   First Marblehead Corporation.

9 Q. Who put the data in this form for purposes of

10   attaching it to the Holiday affidavit?

11 A. Our media department.

12 Q. Why is the media department putting together loan

13   documents for litigation?

14 A. Part of their job function is to put together

15   loan documents upon request, regardless of what

16   the source of the request is, whether it's

17   litigation or not.

18 Q. How big is the media department at Transworld

19   Systems?

20 A. Actually, I don't know.

21 Q. Where is it located?

22 A. The -- most of the team is located in Norcross,

23   Georgia.

24 Q. How do you know that the schedule 2 that you have

25   on the Transworld Systems server is the original?

```
 1    A.   When we received it from First Marblehead, we had
 2         discussions about what the document was and what
 3         it contained.  And they made the representation
 4         that this was the -- or these were, because
 5         there's multiple schedules depending on what
 6         trust, what loan program, what lender -- that
 7         these were the original schedules.
 8    Q.   When did those discussions first take place in
 9         First Marblehead?
10    A.   On or around 2012.
11    Q.   And were you present in those discussions?
12    A.   Yes, ma'am.
13    Q.   And who else was present?
14    A.   Matt Coletti.
15    Q.   He's the lawyer, in-house counsel?
16    A.   Yes, ma'am.
17    Q.   Does he still work for First Marblehead?
18    A.   No, ma'am; she doesn't -- he does not.
19    Q.   Where does he work now?
20    A.   I don't recall.
21    Q.   Have you maintained a friendship with him?
22    A.   We're connected on LinkedIn, but we don't have
23         ongoing conversations.
24    Q.   Did he represent to you personally that
25         schedule 2 was the original schedule 2?
```

```
 1   A.   Yes, ma'am.

 2   Q.   Orally or in writing?

 3   A.   Orally.

 4   Q.   Are there any other indications of authenticity

 5        other than Mr. Coletti's representation to you

 6        orally that this, in fact, was the original

 7        schedule 2?

 8   A.   Well, the data contained within the schedule

 9        matches up with data that was -- for, like,

10        individual loans it matches up with, like, the

11        balance of the loan as of the date that the pool

12        was securitized and transferred because if this

13        was made at some point after, the balances would

14        be different due to accrued interest.

15   Q.   You don't know that though.  Right?

16             You're guessing?

17             MR. SHARTLE:  Objection.

18   BY MS. DILL:

19   Q.   Are you saying that you know it's true that

20        the amounts as presented in schedule 2 are

21        correct because you matched up every loan with

22        schedule 2?  You went through and checked?

23   A.   Not every single loan, but every loan that I have

24        looked at within schedule 2, within the various

25        schedule 2's for the various trusts.
```

THE REPORTING GROUP

Mason & Lockhart

```
 1   Q.   In this particular case when Alicia Holiday

 2        signed the affidavit, had she compared?

 3   A.   I'm uncertain.

 4             MR. SHARTLE:  Object to the form.

 5        Compared what?

 6   BY MS. DILL:

 7   Q.   I think we have already established that what is

 8        the excerpt of schedule 2 that appears on Bates

 9        stamped page 26 is not, in fact, the excerpt.

10        Right?

11             MR. SHARTLE:  Object to the form.

12   BY MS. DILL:

13   Q.   Your testimony was that it contains the

14        information, but it's been altered the way it's

15        presented.  Is that fair?

16   A.   It's been reformatted, not altered.

17   Q.   It's been reformatted.  And is it fair -- I think

18        you said -- described it in that if -- rather

19        than those blocks being stacked up, if they were

20        all just stretched out in a line, that's what we

21        would see on the computer screen?

22   A.   Yes, ma'am.

23   Q.   Okay.  Other than the computer screen, is there

24        actually a physical schedule 2 someplace, a piece

25        of paper?
```

THE REPORTING GROUP
Mason & Lockhart

1   A.   Not to my knowledge.

2   Q.   Okay.  And the schedule 2 was created by First

3        Marblehead?

4   A.   And in this case Charter One Bank.

5   Q.   And Charter One Bank.  And at the time that First

6        Marblehead resigned as the servicer -- is that

7        fair?

8   A.   That's a fair statement.

9   Q.   -- it transferred schedule 2 to NCO?

10  A.   Yes, ma'am.

11  Q.   Who transferred it to Transworld?

12  A.   Essentially.

13  Q.   Is -- when it was transferred -- when schedule 2

14       was transferred to NCO, it was essentially an

15       electronic file that you just send out on an NCO

16       data server?

17  A.   First Marblehead gave us an electronic file

18       consisting of all the schedules.

19  Q.   Okay.  And then --

20  A.   And we saved that onto our server at NCO.  And

21       then when Transworld became in place to service

22       the loan, that file containing other schedules

23       did not change.  That stayed in the same location

24       because that part of the business was wholly sold

25       to Transworld.  So there was no additional

THE REPORTING GROUP
Mason & Lockhart

```
 1        transfer.  Like, the file did not move anywhere,

 2        just the name of the owner essentially changed.

 3   Q.   The server is the same?

 4   A.   Yes, ma'am.

 5   Q.   And also attached to the Holiday affidavit as

 6        part of her deposition exhibit -- or strike that.

 7             Also attached to the Holiday affidavit as

 8        Exhibit C, which in this deposition is Exhibit 7,

 9        includes portions of a deposit and sale

10        agreement.  Correct?

11   A.   I wouldn't say it's portions of it.  It appears

12        to be the document in its totality.

13   Q.   And where on the Schedule A is the pool

14        supplement that is related to this case?

15   A.   You see the third bullet point on the Bates No.

16        33.

17   Q.   And which program?

18   A.   This is the -- they identify it here as the Next

19        Student Alternative Loan program.

20   Q.   So you're saying that the Next Student

21        Alternative Loan program is different or the same

22        as the TERI Guaranteed Next Student Loan program?

23   A.   Yes, ma'am.

24   Q.   And which student loan purchase agreement of the

25        ones that appear Bates stamped 35 and 36 and 37
```

80

 1 | relates to this case?
 2 | A.   On page Bates No. 36, the second bullet point.
 3 | Q.   And that's loans originated as Charter's Next
 4 | Student Alternative Loan program?
 5 | A.   Yes, ma'am.
 6 | Q.   So is it your testimony that the Next Student
 7 | Alternative Loan program is the same as the Next
 8 | Student -- I don't know what that other one is --
 9 | the other two that we just identified?
10 | A.   The Next Student Loan program and TERI Guaranteed
11 | Next Student.
12 | Q.   Those are all the same?
13 | A.   Yes, ma'am.
14 | Q.   Turning now to Deposition Exhibit 8, which was
15 | attached to the Holiday affidavit in support of
16 | the trust's motion for summary judgment, what is
17 | the document that appears to be Bates stamped
18 | page 39?
19 | A.   It's actually Bates stamped 39 through 43 is all
20 | the same document.  This is loan financial
21 | activity which is from an AES system.  And it's a
22 | financial accounting of the loan from the time --
23 | Q.   Okay.  I'm sorry.  I apologize for interrupting
24 | you.  But I just realized I forgot to ask you,
25 | after making the big stink of making the clear

THE REPORTING GROUP
Mason & Lockhart

```
 1          copies, what these things meant.
 2               So can we -- before we move on to that, can
 3          we go back to Bates stamped 26, which is the
 4          schedule 2.  Sorry about that.
 5    A.    That's okay.
 6               MR. SHARTLE:  I didn't -- for the
 7          record, I didn't think you were making a big
 8          stink.
 9    A.    Yes, ma'am.
10    Q.    Okay.  So what is the -- what is the box that
11          says "GUARREF" with the number 04034217 -- what
12          is that?
13    A.    That actually identifies the individual loan
14          number.  So if you look in the top left corner of
15          the note disclosure statement, that number will
16          appear there as well as on the bottom, about
17          center of the signature page of the promissory
18          note.  That number will also appear there.
19    Q.    And what's the Tier refer to?
20    A.    I don't recall actually.
21    Q.    What about Repay Type?
22    A.    That identifies what the repayment type was.  In
23          this case DP means a deferred payment, so a full
24          deferral.
25    Q.    And the box underneath that, what is the 9.5
```

```
 1        percent?
 2   A.   Can I see your cleaner copy?
 3             That's one of the boxes I couldn't read.
 4   Q.   This is hard to read, too.
 5             MR. SHARTLE:  If you want, you can have
 6        that.
 7             MS. DILL:  Oh, thanks.
 8   A.   I don't recall.
 9   Q.   What about the box to the right of it, 4A
10        percent, 2.75?
11   A.   I don't recall that one either.
12   Q.   Marketer Fee Lender, .5?
13   A.   That's how much percentage the marketer fee was.
14   Q.   Who was the marketer?
15   A.   Next Student.
16   Q.   What's Recon TOT DISB, and then it says
17        underneath 11,000?
18   A.   That's the total disbursement to include any
19        origination fee.
20   Q.   And what's the Recon Net Disbursement?
21   A.   That's just the disbursement amount, the actual
22        funds that were advanced to the consumers.
23   Q.   What is the recon prefix?  Recon what?
24             Is it -- reconciliation, is that what it is?
25   A.   Yes, ma'am.
```

1   Q.   Okay.  And the -- at the bottom, the Marketing

2        Fee Lender, is that Charter One?

3   A.   Yes, ma'am.

4   Q.   What's the DMI Reimburse; do you know?

5   A.   I don't recall.

6   Q.   Fee Lender goes to Charter One?

7   A.   Yes, ma'am.

8   Q.   What about Recon Original Fee to Bank?

9   A.   That's also to Charter One.

10  Q.   So according to schedule 2, does First Marblehead

11       make any money on this loan?

12  A.   I'm uncertain.

13  Q.   Does it appear, based on your experience as the

14       senior litigation paralegal and having been

15       involved in collections for several years, that

16       anyone other than Charter One is making money off

17       the loan?

18  A.   I'm uncertain.

19  Q.   Okay.  Now, looking at Deposition Exhibit 8 --

20  A.   Here you go.

21  Q.   Thanks.

22            You started to tell me that Deposition

23       Exhibit 8 is a document that was created by AES?

24  A.   Yes, ma'am.  These are actually screen prints

25       from AES's system of record, the Compass system.

84

```
 1           And this document, the loan financial activity,
 2           is the financial activity of the loan from the
 3           time the loan was originally disbursed all the
 4           way until the time that it was defaulted -- and
 5           the document actually goes in reverse order.  So
 6           on page 5 of 5 you will see the disbursement.
 7           And then you work your way back through time back
 8           to 1 of 5 where you see the charge-off and
 9           default of the loan.
10    Q.    When was this document created?
11    A.    Well, this was a screen print from the system.
12          And the screen print was printed on May 20 of
13          2016.
14    Q.    Was the document created -- when was the first
15          time the document -- strike that.
16                When was the document first created?
17    A.    Well, this was printed out of AES's system on
18          May 20, 2016.  The entries were input into
19          AES's system at the time that they are noted
20          to be.
21    Q.    How do you know that?
22    A.    That's from my training with AES.
23    Q.    They told you that?
24    A.    Yes, ma'am.
25    Q.    And when did you have training with AES?
```

```
 1    A.   Well, it's been ongoing training beginning in or
 2         around about October of 2012.
 3    Q.   And where does the training take place?
 4    A.   Teleconference.
 5    Q.   How many teleconferences have you had?
 6    A.   More than 50.
 7    Q.   So you're willing to swear under oath that you
 8         have personal knowledge that at the time, for
 9         instance, on July 24, 2006, an employee of AES
10         made an entry in the database regarding this
11         loan?
12    A.   Well, that's the disbursement; so that wouldn't
13         have been an individual employee.  That was when
14         the electronic data was sent over from the
15         originator and put into AES's system.  That's a
16         systematic process, not an individual employee
17         keying in that.
18    Q.   Okay.  Is it fair to say though that the
19         information that is contained in this record
20         was input by several individuals over time?
21    A.   Yes, ma'am.  At the time that each transaction
22         was noted to be.
23    Q.   Okay.  And you're relying on the transaction at
24         face value.  There is nothing --
25              MR. SHARTLE:  Object to the form.
```

THE REPORTING GROUP
Mason & Lockhart

```
 1    BY MS. DILL:

 2    Q.  Is there any way to confirm that, in fact -- for

 3        instance, that on August 22, 2011, a payment was

 4        made?

 5    A.  Yes, ma'am.  Actually, when you go into AES's

 6        system, you can pull up the individual

 7        transactions.  So you can go into transaction

 8        No. 9, and it launches the payment screen.  And

 9        it says who made the payment, how the payment was

10        made, whether it was web pay or check or whether

11        it was through a third-party agency.  It gives

12        the batch number of that payment.

13             And also, usually with multiple loans,

14        payments are allocated between the loans; so it

15        will give the total payment amount, not just the

16        amount that was applied to this individual loan.

17    Q.  And is that information that you have access to

18        as an employee of Transworld Systems?

19    A.  Yes, ma'am.

20    Q.  So the document that is Exhibit 8 in this

21        deposition, which was Exhibit D attached to the

22        Holiday affidavit, is it a summary of information

23        that's contained in the database or --

24    A.  The -- this is the financial record of the

25        account from the time it was disbursed until the
```

THE REPORTING GROUP
Mason & Lockhart

```
 1           time it was defaulted.  These are exact screen

 2           prints from AES's system.

 3    Q.     Okay.

 4    A.     If you log into AES's system and you go to their

 5           financial screen, this is exactly what you will

 6           see.

 7    Q.     Other than your ability to see it, do you have

 8           any -- could you go in and change these numbers?

 9    A.     No, ma'am.

10    Q.     And you don't know who it was at AES that put in

11           the data.  Correct?

12    A.     No, ma'am.

13    Q.     And you don't know when they did it?

14    A.     Well, they did it at the time that each

15           individual transaction was logged with the

16           exception of the system transactions where the

17           system would put those in.

18    Q.     I understand that there's dates that appear on

19           the document; but I'm saying as you sit here

20           today, do you have personal knowledge that the

21           information was put into the system on the date

22           that it's indicated?

23           MR. SHARTLE:  Objection, asked and

24           answered.  Now, you're arguing with him.

25    A.     Yes, ma'am.
```

1    Q.   How is it that you know on April 12 -- excuse me,

2         on April 4, 2012, an employee of AES, other than

3         looking at this document, entered the data into

4         the system?

5    A.   Well, based on the way their system is set up,

6         they have to -- anytime that a transaction is

7         logged, they have to note it.  They can't

8         backdate it or forward-date it.  It's dated at

9         the time that that transaction is made in the

10        system.

11             That transaction that you referenced is

12        another system transaction.

13   Q.   And you know this because an AES employee told

14        you?

15   A.   Yes, ma'am.

16   Q.   And you were trained on a telephone conference

17        about the system?

18   A.   Yes, ma'am.

19   Q.   Why was the document printed on May 20, 2016?

20   A.   It was requested.

21   Q.   By whom?

22   A.   I don't know.

23   Q.   Did anything happen in May of 2016 that you're

24        aware of with relation to this particular case

25        that would suggest why the document was printed

1       then?

2    A. I can't state with certainty without looking at

3       the actual account record.

4    Q. Now, the document at the top of the page says

5       AES/PA.  And is it fair to say that AES is

6       American Education System?

7    A. Services.

8    Q. American -- thank you.  American Education

9       Services.

10          And you are not an employee of American

11       Education Services; is that correct?

12   A. That is correct.

13   Q. And you don't have any control over their system

14       of data management.  Correct?

15   A. I have no ability to change or alter their

16       system, only view.

17   Q. Continuing to look at Deposition Exhibit 8 on

18       Bates stamped page 39, where it says loan

19       program, what's ALPLM; do you know?

20   A. It's an Alternative Loan Program.

21   Q. What does that mean?

22   A. AES services many different loans.  Alternative

23       would be their private loans.  They also service

24       federal loans, which would have a different

25       program identified.

```
 1   Q.   And to the right of the loan program entry it
 2        says own, and then there's a number, and then
 3        NCT.  What's that mean?
 4   A.   I don't recall.
 5   Q.   Do you believe that NCT refers to National
 6        Collegiate Trust?
 7   A.   I can't speculate, but that's a fair assumption.
 8   Q.   What about where it says guarantor, TERI/DTC;
 9        what's DTC?
10   A.   Direct to consumer.
11   Q.   What does that mean?
12   A.   The loan was issued directly to the consumer.
13   Q.   At the time -- does this record indicate to you
14        that it was printed by Transworld System in
15        connection with producing the Holiday affidavit?
16   A.   Yes, ma'am.
17   Q.   And would that have been in May of 2016?
18   A.   Yes, ma'am.
19   Q.   And at the time the document states that the
20        principal balance owed is zero.  Correct?
21   A.   As of November 4, 2012, it identifies principal
22        balance as zero that's owed to AES.
23   Q.   The document does not say that the principal
24        balance is owed to AES; does it?
25   A.   No, the document does not.  But the document --
```

```
 1            part of the charge-off process is AES is no

 2            longer servicing the loan; so they charge it

 3            off and wipe off the balance in their system

 4            because they're no longer servicing the loan,

 5            and they're no longer owed money.  And that

 6            charge-off balance, which is identified as

 7            $15,786.39, then gets transferred to the

 8            post-default servicer.

 9    Q.   So the $15,786.39 isn't the balance that's owed

10         on the loan is your testimony; it's the balance

11         that would be owed to AES?

12    A.   Well, that was the balance of the loan at the

13         time of charge-off that AES was servicing.

14    Q.   How do you know that?

15    A.   Can you rephrase that?

16    Q.   This is a document that was created by AES.

17         You're not an employee of AES.  You have no

18         ability to alter the document.  How is it -- why

19         do you believe that where it says principal

20         balance owed of zero, that refers to the balance

21         owed to AES and not Sarah Thurlow?

22            MR. SHARTLE:  Objection.  You have

23         already asked the witness a number of times

24         how he has personal knowledge of this, and

25         he's explained it to you multiple times.
```

```
 1   BY MS. DILL:
 2   Q.   You can answer the question.
 3   A.   So when AES charges off a loan, they no longer
 4        are servicers; so they no longer have the ability
 5        to collect on any balance owed to their client,
 6        in this case National Collegiate Student Loan
 7        Trust 2006-3.  They take the balance that's owed
 8        at that time of charge-off and then wipe it off
 9        of their system because they are not able to
10        collect on it anymore because their contractual
11        obligation on the individual loan is thereby void
12        because the loan charged off.  That balance that
13        they charged off, in this case $15,786.39, was
14        then transferred, part of the electronic file
15        that we discussed previously to the post-default
16        servicer.  In this case it would have been
17        transferred to First Marblehead Education
18        Resource.
19   Q.   What does it mean that AES charged off the loan?
20   A.   So when the loan goes, in this case, delinquent
21        for a period of time, the loan then gets
22        accelerated -- the balance gets accelerated.  So
23        any interest that's due and owing is then
24        capitalized into the owing principal to form the
25        new principal, and then the loan is then charged
```

1        off and made fully due and owing.  It's no longer

2        in the installment plan as previously -- as it

3        was previously, whereby the consumer could make

4        monthly payments.  The loan is accelerated and

5        fully due and owing immediately.

6    Q.  And who made the decision to charge off the loan

7        in April of 2012?

8    A.  These -- the decision is not made by any

9        individual person.  They're contractually laid

10       out for various instances that would rise to

11       charge off a loan.  In this case it was a period

12       of delinquency.

13   Q.  So that the terms of the contract that Sarah

14       Thurlow signed dictated when the loan would be

15       charged off.  Is that what you're saying?

16   A.  The terms do specify default, not charge-off.

17       The charge-off terms are contractually between

18       the servicer.

19   Q.  In this case who is the servicer?

20   A.  At this time it was AES.

21   Q.  And who -- who was the -- who was AES contracting

22       with?

23   A.  I'm uncertain.

24   Q.  So is -- and I'm not trying to argue.  Is it fair

25       to say you don't know who decides when a loan is

94

```
 1        charged off?
 2             MR. SHARTLE:  Objection, asked and
 3        answered.
 4   BY MS. DILL:
 5   Q.   Do you know in this particular case what
 6        organization or person decided in April of 2012
 7        to charge off $15,786.39?
 8   A.   The decision was made due to the delinquency.
 9        It's programmed.  Once it reaches a period of
10        delinquency, the loan automatically gets cued up
11        for charge-off.
12   Q.   So which system is that that cues up the
13        discharge -- or the charge-off date?
14   A.   AES.
15   Q.   Do you believe that AES system of record keeping
16        is trustworthy?
17   A.   Yes, ma'am.
18   Q.   And do you rely on representations made by AES
19        with respect to the loan transactions that you
20        are responsible for managing?
21             That was a really bad question.  Let me ask
22        it again.
23   A.   Please.
24   Q.   Is there any reason for you to doubt the
25        trustworthiness of information provided by AES?
```

```
 1    A.    No, ma'am.

 2    Q.    Also on page -- Bates stamped page 39 there was

 3          the charge-off -- well, let me ask you -- strike

 4          that.

 5                Where it says -- on the line 2 next to the

 6          date April 2, 2012, it says, $15,786.39; and then

 7          it's CR.  You're saying that CR stands for

 8          charge-off?

 9    A.    I did not say that.

10    Q.    Does CR stand for charge-off?

11    A.    No, ma'am.

12    Q.    Does CR stand for credit?

13    A.    Yes, ma'am.

14    Q.    And does it appear, based on looking on Bates

15          stamped page 39, that, in fact, there was a

16          credit of $15,786.39 on April 2, 2012?

17    A.    There is a credit adjustment, like I said, that

18          AES wipes off the balance of their account, which

19          triggers a credit.

20    Q.    So you're -- a credit adjustment, not a credit?

21                Is charge-off and credit adjustment the same

22          thing?

23    A.    The term charge-off carries other processes that

24          we discussed, such as accelerating the loan, the

25          capitalization of the interest.
```

1   Q.   Is there a different abbreviation for charge-off

2        in the AES system of record keeping?

3   A.   No.  The -- the CR means credit.  But it's the

4        transaction type, the 1030A, that means

5        charge-off.

6   Q.   And what does transaction type above that, 5003A,

7        mean?

8   A.   That's a credit of any fees that were due and

9        owing at time of charge-off.  So all those 2601A

10       that you see previous, those are all late fees

11       for failure to make payment.  So the 5003A, the

12       credit in the amount of $23.02, is the summation

13       of all those late fees.

14  Q.   And is it your testimony that on April 2, 2012,

15       the owner of the note at that time was not paid

16       $15,786.39 or some amount close to that?

17  A.   That is correct.

18  Q.   What is the code -- the transaction type 101C --

19       1010C?

20  A.   That's a payment by borrower.

21  Q.   And next to the payment by borrower there is also

22       CR.  Correct?

23  A.   Yes, ma'am.

24  Q.   And that stands for credit.  Right?

25  A.   Yes, ma'am.

```
 1    Q.   So is there any way looking at -- well, I guess
 2         it's the transaction type that differentiates the
 3         two; is that right?
 4    A.   Yes, ma'am.  Credit simply -- the CR simply means
 5         that that's just something applied to the balance
 6         that affects it downward.  When there is no
 7         credit, that affects the balance in an upward
 8         fashion.  It's a transaction type that actually
 9         tells you what that transaction is for.
10    Q.   What is transaction type 7001A?
11    A.   Those are interest capitalizations.
12    Q.   Across the top of the page of this exhibit are
13         other abbreviations including VTAM.  Do you know
14         what that means?
15    A.   No, ma'am.
16    Q.   And then there's NAGB.  Do you know what that is?
17    A.   No, ma'am.
18    Q.   TSX2D?
19    A.   No, ma'am.
20    Q.   Who performed the redaction of Exhibit 8?
21    A.   This would be a TSI employee.
22    Q.   Did you do it?
23    A.   Not to my recollection.
24    Q.   When you look at the screen, is the redaction on
25         the screen; or is it just --
```

```
 1    A.   No, ma'am.

 2    Q.   Please turn now to Deposition Exhibit 9.  And if

 3         you could, please first confirm --

 4              MR. SHARTLE:  Sorry.

 5              MS. DILL:  Yes, go ahead.

 6                  (Discussion off the record.)

 7    BY MS. DILL:

 8    Q.   Have you had a chance to look at Deposition

 9         Exhibit 9?

10    A.   Yes, ma'am.

11    Q.   And is that a record that was created by AES?

12    A.   Yes, ma'am.  This is -- like Exhibit 8, is just

13         another screen shot printed directly from AES's

14         system.

15    Q.   And do you know who created this document?

16    A.   If you're asking who printed it, no, I'm not

17         certain of.

18    Q.   Do you know who entered the data?

19    A.   AES.  Which employee, I'm not certain.

20    Q.   Do you know when it was created?

21    A.   The document was printed on May 20, 2016.  And

22         the entries within the document would have been

23         put into AES's system at the time -- actually,

24         this document doesn't identify the time.

25    Q.   So is the answer, no, you don't know when it was
```

```
 1          created?
 2   A.    Not by looking at this document.
 3   Q.    Okay.
 4              MS. DILL:  Why don't we break for lunch.
 5                  (Discussion off the record.)
 6                  (A recess was taken from 12:29 p.m.
 7                   to 1:30 p.m.)
 8   BY MS. DILL:
 9   Q.    I want to briefly return to Exhibit 8, if you
10         will.  I have just a few questions I forgot to
11         ask you.
12              And specifically, I'm looking at the pages
13         beginning with Bates stamped 39 through 43.
14   A.    Yes, ma'am.
15   Q.    And could you tell me, please, it appears to me
16         that no -- at no time was the principal balance
17         ever reduced.  Is that true?
18   A.    Yes, ma'am.  That is correct.
19   Q.    Okay.  So it's fair to say that even though
20         Ms. Coffey did make several payments, none of the
21         money that she transmitted to the trust was ever
22         applied to principal.  Correct?
23   A.    That is correct.
24   Q.    And when in this particular case -- and we're
25         talking now about the note that was dated in
```

1    July 19, 2006, for the principal amount -- well,

2    the loan amount requested was 10,000.  When was

3    this particular loan scheduled to begin

4    repayment?

5  A.  I would actually have to verify using other

6    documents.  Is that all right?

7  Q.  By all means, please do.  Yes.

8  A.  All right.  Payment initially started on March 24

9    of 2010.

10 Q.  Is it your testimony that that was when the first

11    scheduled payment was due?

12 A.  Yeah.  That was the first payment due following

13    the forbearance that the loan was entered into at

14    origination for the full -- for full deferment.

15 Q.  So you said March 23; is that correct?

16 A.  The payment was made on the 23rd; the due date

17    was actually the 24th.

18 Q.  And what did you look at to determine that?

19 A.  Well, I looked at the -- your Deposition

20    Exhibit 10, Bates No. 47 has the -- let me

21    explain the document in totality.

22      Exhibit 10 is the repayment schedule summary.

23    So this document shows the various repayment

24    schedules that could apply to the loan.  Since

25    the loan is bearing interest at a variable rate,

THE REPORTING GROUP
Mason & Lockhart

1      each year the repayment schedule gets

2      recalculated just depending on whether interest

3      went down or up to make the loan be paid off in

4      full within the term of the loan.  So that's

5      why you see so many different repayment

6      schedules.

7          And also, a repayment schedule gets

8      generated -- when it leaves forbearance or

9      deferment, a new repayment schedule gets

10     generated.

11         So this one, just looking at the documents in

12     front of me, first I looked to see if there were

13     any deferments or forbearances entered after the

14     initial deferment or forbearance.  And there was

15     one; but it wasn't entered until December -- or

16     January 1 of 2010.  And that's your Deposition

17     Exhibit 9.

18         Then I went over to your Deposition Exhibit 8

19     and looked through the payments to see when the

20     payments began.  And there was -- the first

21     payment was applied on April 24 of 2008 in the

22     amount of $130.84.  And this one looks like it

23     was just a random payment that was made.  No

24     payment was due at this time because the loan was

25     not in any type of repayment at that time.  It

THE REPORTING GROUP
Mason & Lockhart

1          was still under the deferment.

2               So then I went to the next payment when the

3          payments actually started to be made on a regular

4          basis, and that was your March 23 payment.

5               Now, I looked just before that to see whether

6          there was any late fees to identify payments were

7          due prior to that date.  There was no late fees

8          on the account prior to that date, so no payments

9          were due prior to that date.

10              So then I looked at the date March 23, 2010,

11         payment was made.  And then I went back to the

12         repayment schedule and found the repayment

13         schedule that matched that time period.  And it

14         was actually a payment schedule that was made.

15         And if you look towards the left, the third

16         column in, TG.  That means it's a graduated

17         payment schedule.  So that was --

18    Q.   I'm sorry.  Which page are you on now?

19    A.   Bates 47, your Deposition Exhibit 10.

20    Q.   Yes.

21    A.   So the TG on the third line in the transaction 9,

22         the third row in, or column in, sorry, means it's

23         a graduated payment schedule.

24              So this wasn't her full repayment amount.  It

25         was a graduated amount.  So -- and if you look on

THE REPORTING GROUP
Mason & Lockhart

| | |
|---|---|
| 1 | the one, two, three, four -- the fifth column in, |
| 2 | that 4 says it's four repayments or four |
| 3 | repayment levels.  So what that means is there's |
| 4 | four different levels in this term of varying |
| 5 | amounts.  So -- |
| 6 | Q.   Okay.  You have got to stop because I'm -- I need |
| 7 | to -- |
| 8 | A.   Okay. |
| 9 | Q.   -- unpack that a little bit. |
| 10 | A.   Okay. |
| 11 | Q.   And hold your thought.  I didn't mean to |
| 12 | interrupt, but you're just getting a little bit |
| 13 | too, too far beyond where I was going, if you |
| 14 | don't mind. |
| 15 | So just originally I was asking you when her |
| 16 | first payment was due.  And based on your |
| 17 | explanation, I understand it was due in March of |
| 18 | 2010.  Correct? |
| 19 | A.   Yes, ma'am. |
| 20 | Q.   Okay.  And you also testified that based on your |
| 21 | review of the records, no money paid by my client |
| 22 | has ever been put towards the principal amount. |
| 23 | Correct? |
| 24 | A.   That is correct. |
| 25 | Q.   And why then, if she made a random payment in |

THE REPORTING GROUP
Mason & Lockhart

```
 1              September or -- excuse me, in April of 2008 of
 2              $130, why wasn't any of that put towards
 3              principal?
 4       A.     Because there was an interest amount that was due
 5              and owing on the loan at that time, that that
 6              payment was applied to the interest bucket.
 7       Q.     Even though she had entered into a deferral?
 8       A.     Yeah.  The deferral just defers your payment
 9              obligation; it doesn't defer interest accrual.
10              So interest will still continue to accrue during
11              the deferment period.
12                  And we previously discussed the interest
13              capitalization, the 7001A.  During your deferment
14              period, the interest capitalizes at various
15              points while your loan is in deferment; but
16              interest continues to accrue.
17                  So when she made that payment, $130.84 was
18              taken off of the interest, leaving the $73.75
19              that -- that accrued less the payment made
20              between October 4, 2008, and April 24, 2008.
21       Q.     And the terms that you just described, how money
22              is applied and when payments are due and if a
23              deferral applies, are all contained in the
24              additional terms and conditions that are attached
25              to the front page of the loan agreement.  Right?
```

1    A.   The deferment period is described there, and
2         the repayment schedules are described broadly
3         there.  They're not identified exactly what the
4         amount is going to be because the repayment
5         schedule hasn't been generated yet.  Payment
6         application is not.
7    Q.   It is -- the terms -- additional terms and
8         conditions described the variable rate, how it's
9         calculated.  Right?
10   A.   Yes.
11   Q.   Okay.  So --
12             MR. SHARTLE:  He's trying to answer your
13        question by looking at the documents.
14             MS. DILL:  There is no question pending,
15        but thank you.
16             MR. SHARTLE:  No, you did ask him a
17        question.  He said he wasn't sure; he needed
18        to look.
19             You had a question to him about how they
20        applied payments if there is no interest.
21   A.   The payments are -- application method is
22        identified within these terms on paragraph E5,
23        your Bates number 18.
24   Q.   Okay.  So -- now, jumping ahead to Exhibit 9,
25        this appears to be, based on what you have said

```
 1        so far, another document that was created by AES.
 2        Correct?
 3   A.   Yes.  This is a screen shot from AES's system.
 4   Q.   And I think before the break we talked about
 5        this.  You don't know exactly when it was created
 6        or who created it, but it was in the system.
 7        Correct?
 8   A.   Yes, ma'am.  That's correct.
 9   Q.   All right.  Now, what is Exhibit 10, which was
10        attached to the Holiday affidavit as Exhibit F?
11   A.   So as briefly discussed just moments ago, this is
12        the repayment schedule summary.
13   Q.   Okay.  Let me ask you first.  This appears to be
14        redacted by hand as opposed to the other
15        documents that appeared to be redacted
16        electronically?
17   A.   Yes, ma'am.
18   Q.   Do you agree with me?
19   A.   Yes, ma'am.
20   Q.   Who redacted the information on what is
21        Deposition Exhibit 10?
22   A.   I'm uncertain.
23   Q.   Why was it redacted?
24   A.   Well, the top portion, the top two redaction
25        lines contain the social security number --
```

THE REPORTING GROUP
Mason & Lockhart

```
 1            actually, the top line contains the social
 2            security number; so the first five digits are
 3            redacted.  The second line, I'm unsure why that
 4            was manually redacted.  That's just the date and
 5            time stamp.
 6      Q.    And the date and time stamp referred to when the
 7            document was printed?
 8      A.    Correct.  Yes, ma'am.
 9      Q.    Not created?
10      A.    Correct.  Just printed.
11      Q.    Do you -- are you able to testify today as to
12            what date the document that is Deposition
13            Exhibit 10 was printed?
14      A.    No, ma'am.
15      Q.    So we don't know who redacted it or why.  Is it
16            unusual for a document such as Exhibit 10, a
17            document that was presented to the Portland
18            District Court, to have been redacted in a
19            fashion similar to what appears on 10?
20      A.    I wouldn't say it's unusual.  It happens.
21      Q.    Do you know what --
22                  MR. SHARTLE:  Are you asking the witness
23            of -- because it looks like this is actually
24            two pages of the same document.  It may help
25            us to turn over to the next page.
```

```
 1    BY MS. DILL:
 2    Q.  Does it help you by turning over to the next
 3        page -- well, it may help as far as the date.  As
 4        far as who did the redacting, do you -- are there
 5        any clues on page 48 as to who did the redacting
 6        or why?
 7    A.  Not as to who did the redacting.
 8    Q.  How about why?
 9    A.  No, ma'am.
10    Q.  On the column to the right of Deposition
11        Exhibit 10 it says owner, and then it says NCT.
12        What does that refer to?
13    A.  Refers to National Collegiate Trust.
14    Q.  And there are several National Collegiate Student
15        Trusts.  Correct?
16    A.  Yes, ma'am.
17    Q.  In fact, there is the one associated with this
18        loan, and then in the related case, another
19        trust.  Correct?
20    A.  Yes, ma'am.
21    Q.  Does AES distinguish the owners on its documents,
22        one trust from the other?
23    A.  Certain portions of the AES account record will
24        have the exact trust.  Like, if we went back to
25        your Deposition Exhibit 8, it would reference in
```

1        the top left, about five, six rows down, the bond

2        issue.  NCT 2006-3 identifies as National

3        Collegiate Student Loan Trust 2006-3 for this

4        loan.

5    Q.  Okay.  But on the schedule that we're looking at,

6        it just says National Collegiate Trust.  And

7        we're assuming it's the one associated with this

8        loan, but there is no way of knowing from this

9        document which trust they're talking about.  Is

10       that true?

11   A.  Not by just looking at the owner.  We can

12       identify which trust it is by identifying the

13       disbursement date and looking through the rest of

14       the loan records and tying it back that this loan

15       disbursed on this date belongs to this trust.

16   Q.  And was this document Exhibit 10 created for the

17       purpose of litigation?

18   A.  It was printed for the purpose of including in

19       the affidavit.  But the document itself being

20       created with the entries was not for litigation.

21       This was created and the entries added at the

22       time that they were at or near the time that they

23       were identified.

24   Q.  How do you know that?

25   A.  That's from the training with AES and working

```
 1            with them on how they input their records and how

 2            their repayment schedules are actually generated.

 3                 Most of these are automatically generated, as

 4            we discussed.  Every year a new one generates.

 5            That's an automatic function in their system.

 6                 Same thing with if it comes out of a

 7            forbearance into a temporary forbearance.  At the

 8            end of that forbearance, it automatically

 9            generates and calculates what the repayment

10            schedule will be to pay off the loan and the

11            amount allotted to repay that loan.

12   Q.   Have you done anything in your capacity as the

13            senior litigation specialist to confirm that the

14            information that's represented by AES is, in

15            fact, accurate; or do you just rely on the

16            representations?

17   A.   I mean, we have confirmed and I have confirmed

18            various portions of information throughout

19            account records.  For Ms. Thurlow's loan, I have

20            not looked at anything outside of the records.

21   Q.   But in terms of your testifying now about how AES

22            manages its record management database, your -- I

23            think what you have said is you know about how

24            AES manages its record because you went to a

25            training; and they told you.  Correct?
```

```
 1   A.   I was trained on it.

 2   Q.   Right.  So you were trained on it, and they told

 3        you how it works?

 4   A.   Yes, ma'am.

 5   Q.   Okay.  And other than that, have you -- do you

 6        have access to how they create documents?

 7             MR. SHARTLE:  Object to the form.

 8   BY MS. DILL:

 9   Q.   Do you have any input on how the documents

10        themselves are styled?

11   A.   No, ma'am.

12   Q.   So other than being able to look at the AES

13        documents, can you do anything else with them

14        other than look at them and print them?

15             MR. SHARTLE:  Objection.  Object to the

16        form.

17   A.   No, ma'am.

18   Q.   Okay.  Now, if you could, please, turn your

19        attention to Deposition Exhibit 11.  What is

20        Deposition Exhibit 11?

21   A.   This is the loan payment history report.  So this

22        is the financial record of the account from where

23        AES left off at charge-off through the time that

24        this is printed out of -- well, at this time that

25        this was printed, it was out of the TSI system.
```

```
 1    Q.   And who created this record?

 2    A.   This is a system record.

 3    Q.   Which system?

 4    A.   TSI through the CRS system.

 5    Q.   When was the document created?

 6    A.   This document was printed on May 19 of 2006, and

 7         it was printed from information out of CRS, TSI

 8         system.

 9    Q.   So my question was when was the document created.

10         Is there a distinction in your mind between it

11         being created and printing?

12    A.   Yes.

13    Q.   Is this a document that was produced for the

14         purposes of litigation?

15              MR. SHARTLE:  Object to the form.

16    A.   I'm uncertain.

17    Q.   If the case had never -- if the loan -- strike

18         that.

19              If the loan had not gone into default, would

20         this record exist?

21    A.   No, ma'am.

22    Q.   This is a record that Transworld Systems created.

23         Right?

24    A.   Yes.

25    Q.   Based on information transmitted by AES?
```

1    A.   Partially.

2    Q.   Okay.  Why don't we just go through it.  The

3         interest rate is identified on this document as

4         6.19 percent.  Correct?

5    A.   Yes, ma'am.

6    Q.   And that's different than the interest rate that

7         appears on the note disclosure agreement.  Right?

8    A.   Yes, ma'am.

9    Q.   Why is that?

10   A.   Well, the interest rate on the note disclosure

11        statement is actually an estimate at the time the

12        note disclosure statement was given, which was

13        back in 2006.  And it was given for disclosure

14        purposes pursuant to various federal rules.

15             The interest rate identified on the loan

16        payment history report would be the rate that's

17        applicable on the loan as of the date of the

18        report, which is May 19 of 2016.  And we

19        discussed previously the variable nature of the

20        rate.

21   Q.   And who calculated that rate?

22   A.   That rate is a system calculation based on the

23        margin, plus the applicable rate at the time that

24        affects the loan.

25   Q.   Does the transaction history include payments

                    THE REPORTING GROUP
                      Mason & Lockhart

```
 1            that were made?

 2   A.   It would if there were payments made.  There is

 3        no payments made to this loan following the

 4        charge-off of it.

 5   Q.   And the charge-off was?

 6   A.   April 2 of 2012.

 7   Q.   So if -- if Sarah Thurlow had made a payment

 8        between August -- or, excuse me -- yes,

 9        August 22, 2011, and the date that this

10        document was printed on May 19, 2016, would

11        it show up?

12   A.   Well, it depends.  So going back to August 22,

13        2011, through April 2, 2012, if a payment was

14        made in that time frame, it would be on AES's

15        loan financial activity, which was your

16        Exhibit 8.  If the payment was made after April 2

17        of 2012, that payment would be identified within

18        the transaction history on the loan payment

19        history report; and it would also include the

20        information at the top portion for last payment

21        date.  And last payment amount would be updated

22        to the date that the payment was made, if one had

23        been made.

24   Q.   Does the loan payment history report include all

25        payments made towards this loan or just payments
```

```
 1          made by the borrower?
 2   A.     It would be --
 3               MR. SHARTLE:  Object to the form.
 4   A.     -- any payment made.
 5   Q.     So, for instance, if the guarantor of this loan
 6          purchased the loan, would that information appear
 7          on the loan payment history report which has been
 8          marked Deposition Exhibit 11?
 9               MR. SHARTLE:  Objection to the use of
10          the term guarantor.
11   BY MS. DILL:
12   Q.     Do you know what a guarantor is?
13   A.     Yes, ma'am.
14   Q.     And in this case, do you know who the guarantor
15          is?
16   A.     If it was --
17   Q.     Who was it?
18   A.     The Education Resource Institute.
19   Q.     Okay.  So if the Education Resource Institute had
20          made good on its guarantee, would that payment
21          show up on the loan payment history report?
22   A.     No, ma'am.  The loan payment history report would
23          never exist because TSI would never get the
24          account as servicer of those defaulted loans.
25   Q.     Why is that?
```

1    A.    Because the guarantor would have purchased the

2          loan and assumed ownership and done what they

3          needed to do or whatever they chose to do with

4          that loan.

5    Q.    So are there loans that you are responsible

6          for -- strike that.

7                In your capacity as the senior litigation

8          specialist for Transworld Systems, have you had

9          occasion to work on loans that have been

10         purchased by the Education Resource Institute?

11   A.    Can you repeat that?

12   Q.    Have you ever had any experience in any of the

13         cases that you have worked on or files that you

14         have managed with loans that have been purchased

15         by the Education Resource Institute?

16   A.    There have been a few.

17   Q.    And have they been the subject of litigation?

18   A.    Some, yes.

19   Q.    What cases are you referring to?

20               MR. SHARTLE:  Objection, outside the

21         scope of the notice.  I'll let the witness

22         answer to the extent he's got personal

23         knowledge.

24   A.    I don't recall the names of any cases.

25   Q.    In the beginning of the deposition you said you

                    THE REPORTING GROUP
                      Mason & Lockhart

1        have testified in other depositions.  Have you

2        ever testified about loans being purchased by the

3        Education Resource Institute?

4             MR. SHARTLE:  Same objection.

5  A.   I don't recall.

6  Q.   You would agree with me though that if the

7        Education Resource Institute made good on its

8        guarantee, that the title to the loan would

9        transfer from the trusts to the guarantor or some

10       other entity?

11  A.   If national -- or if the Education Resource

12       Institute paid the guarantee for the borrower,

13       they would assume ownership; and the trust would

14       no longer own the loan.

15  Q.   And do you agree with me that if the trust no

16       longer owned the loan, it couldn't sue the

17       borrower for the loan?

18  A.   That's accurate.

19  Q.   Okay.  Would you agree with me that if the trust

20       no longer owned the loan, then it could not

21       report to a credit reporting agency that the loan

22       was in default?

23  A.   If they didn't own the loan, they would not be

24       able to report.

25  Q.   Okay.  I'm going to ask you now to look at

1         Deposition Exhibit 12.  And I will represent to

2         you -- and feel free to take time to confirm

3         this -- that this is the complaint that was

4         attached to -- I mean -- excuse me.  This is the

5         loan request and credit agreement that was

6         attached to the complaint and represented to the

7         Court as a true and accurate copy of the note.

8         Would you agree with me?

9    A.   I can't necessarily agree with that.  This is a

10        copy of a credit agreement.  Whether it was

11        attached to the complaint or not I'm uncertain

12        of.

13   Q.   Would you like to take a moment to confirm with

14        your attorneys, if they have the pleadings, to

15        continue this line of questioning or --

16             MR. SHARTLE:  If you have got a

17        question, ask him.

18   BY MS. DILL:

19   Q.   Well, the -- my question is if you look at this

20        document, Exhibit 12, and you compare it with the

21        copy of the note that was attached to the Alicia

22        Holiday affidavit, which is Exhibit 6, it appears

23        that page 2 of 5 is different.  Isn't that true?

24   A.   In what sense?

25   Q.   Well, specifically I refer you to the variable

1     rate paragraph on the right-hand side of the

2     page.

3          MR. SHARTLE:  What page are we talking

4     about, Bates No. 54?

5          MS. DILL:  Yes.  Why don't we start with

6     looking at page 54.

7  BY MS. DILL:

8  Q.  And under section D, paragraph 2, it states that

9     in no event will the variable rate exceed the

10    maximum interest rate allowed by the laws of the

11    State of Rhode Island.  Correct?

12 A.  That's what page 54 says, yes, ma'am.

13 Q.  And page 17 states that in no event will the

14    variable rate exceed the minimum interest rate

15    allowed by the state -- the laws of the State of

16    Ohio.  Correct?

17 A.  That's what page 17 says.

18 Q.  Now, at the bottom of both page 54 and 17 --

19    these are the Bates stamped numbers -- that term

20    code -- that was your word not mine -- appears to

21    be identical.  Is that true?

22 A.  Yes, ma'am.

23 Q.  Which note -- which loan request and credit

24    agreement is, in fact, the true copy of the one

25    that was executed by the borrowers in this case,

```
 1              Exhibit 12 or Exhibit 6?

 2      A.    The signature pages are both the same in both

 3              of the exhibits; but the terms attached in

 4              Exhibit 6, with the exception of the missing page

 5              that we discussed previously, would be the

 6              accurate ones.  The terms that were attached in

 7              your Deposition Exhibit 12 actually belong to the

 8              RBS Citizens, Charter One program.  This was

 9              during the time that the two banks were merging;

10              so the RBS Citizens managed programs would have

11              gotten this term code that's identified in your

12              Exhibit 12, where the Charter One originated

13              programs would get the term codes that were

14              attached in Deposition Exhibit 6.

15      Q.    So is it fair to say that the -- it was the -- it

16              was the affidavit production specialist -- is

17              that right?

18                  Is that close, the affidavit production

19              specialist?

20                  The person who puts together the form

21              affidavit and attaches the documents, what do you

22              call that person?

23      A.    It's an affidavit production team.

24      Q.    Oh.

25      A.    I didn't give a specific title.
```

1    Q.   I was pretty close.

2    A.   I didn't give a specific name.

3    Q.   Okay.  All right.  So the affidavit production

4         team are the people responsible for attaching the

5         first page with the additional pages; is that

6         right?

7    A.   For the affidavit production, yeah, when it goes

8         along with the affidavit.

9    Q.   Okay.  So is it -- is it fair to say that when

10        you looked in the -- what was that third -- the

11        third database that has the documents?

12   A.   Media Locator.

13   Q.   Media Locator.  Thank you.

14   A.   Uh-huh.

15   Q.   When you looked in the Media Locator, the

16        additional terms and conditions are not part of

17        that file.  Right?

18             MR. SHARTLE:  Objection, mischaracterization.

19   A.   Generally, no.  However, they can become part of

20        that file.  That file contains all the loan level

21        documents.  So in the event an affidavit is

22        signed -- like in this case, there was multiple

23        affidavits signed.  Those are then scanned in

24        once they're signed and stored in the Media

25        Locator.

                    THE REPORTING GROUP
                     Mason & Lockhart

```
 1              So now, if I go into the Media Locator for
 2         Ms. Thurlow's loan, I can pull up the affidavit
 3         with the attachments; and then her terms and
 4         conditions would be on there.
 5    Q.   Okay.  But in this case in the Portland District
 6         Court, there's been two representations to the
 7         Court that loans that are different are true and
 8         accurate copies.  Right?
 9    A.   Well --
10              MR. SHARTLE:  Objection, calls for a
11         legal conclusion.  Only one was attached to
12         an affidavit.
13    BY MS. DILL:
14    Q.   Okay.  That's fair.
15              So the complaint that was filed stated that
16         Exhibit 12 is a true and accurate copy of the
17         complaint.  And that's not true.  Right?
18    A.   I don't know what the complaint stated.  I don't
19         recall the specific wording or in what context
20         the document was referred to within the
21         complaint.
22    Q.   You would agree with me though that the
23         attachments to the note are, in fact, different?
24              MR. SHARTLE:  Object to the form.
25    A.   The terms for Deposition Exhibit 6 and Deposition
```

123

```
 1            Exhibit 12 are different sets of terms.
 2    Q.   And how do you explain the difference?
 3              Was it human error?
 4    A.   I believe it was.
 5    Q.   And what do you think the error was?
 6    A.   I couldn't speculate.
 7    Q.   Is there a process by which the affidavit
 8         production team produces a note and then pushes
 9         a button for terms and conditions that are
10         supposed to apply; and maybe somebody pushed the
11         wrong button?
12    A.   It's a manual review.
13    Q.   What is a manual review?
14    A.   Reviewing the account for the applicable terms
15         and conditions.  It's not a button push; it's a
16         person looking at the terms, looking at the term
17         code, and finding the applicable terms associated
18         with that code, and then pulling those in
19         manually.
20    Q.   So in this case though, I think we have already
21         established that there's no paper records of this
22         loan, correct, that you have in your possession,
23         custody, or control?
24              MR. SHARTLE:  Object to the form, the
25         use of the word paper.
```

1   A.   Our records are maintained electronically.

2   Q.   Okay.  And there is no one place that has the

3       terms and conditions that were appended to the

4       actual loan application -- loan request and

5       credit agreement that Sarah Thurlow signed.

6       Correct?

7           THE DEPONENT:  Can you read that back?

8   A.   Or can you repeat it?

9   Q.   Sure.  I'll try to repeat it if you don't

10      understand.

11  A.   No.  I just lost you halfway through.

12  Q.   At the time that Sarah Thurlow signed the loan in

13      July of 2006, the piece of paper that she signed

14      and faxed, you said earlier in your testimony,

15      had the terms and conditions attached.  Right?

16  A.   Yes, ma'am.

17  Q.   And they, according to your testimony, were not

18      faxed to the lender; but are, nevertheless,

19      incorporated into the terms of the note.  Right?

20  A.   Correct.

21  Q.   And my question to you is how do you know, as you

22      sit here today, which terms and conditions go

23      with her note, the ones that are attached to the

24      complaint or the ones that are attached to the

25      Holiday affidavit?

1   A.   Well, it's the ones that were attached to the

2        Holiday affidavit.  I know that by, one, looking

3        at the term code and matching it up.  Even though

4        they're both -- on Exhibit 12 and Exhibit 6,

5        they're both the same term code.  But then

6        further in the opening paragraph of the terms, it

7        identifies the actual lending bank.  And the

8        terms that identify in Exhibit 6 in Alicia

9        Holiday's affidavit are for Charter One, where

10       the terms identified in your Deposition Exhibit

11       12 are Charter One doing business -- or -- yes,

12       doing business -- or RBS Citizens National

13       Association doing business as Charter One.

14  Q.   Where are you looking in this document for these

15       terms?

16  A.   It's the first paragraph.  So Deposition

17       Exhibit 6, Bates 17; and Deposition Exhibit 12,

18       Bates 54 in the very first paragraph where it

19       identifies the definition of lender.  It's the

20       third sentence in or the third line.

21            MR. SHARTLE:  It's literally the first

22       paragraph of both documents.

23  BY MS. DILL:

24  Q.   Okay.  But you don't know -- you don't have

25       personal knowledge what terms and conditions.

126

```
 1        You're making an assumption that these terms and
 2        conditions were attached to her loan based on a
 3        code; but you don't know for a fact.  Is that
 4        true?
 5            MR. SHARTLE:  Objection to the form and
 6        mischaracterization.
 7   A.   I do have personal knowledge of the business
 8        practice for the origination of these loans and
 9        the practice of --
10   Q.   Well, wait.  So you have -- you have personal
11        knowledge of the -- the practices and procedures
12        that were in place in 2006 when she signed this
13        loan?
14   A.   Yes, ma'am.
15   Q.   And what is that based on?
16   A.   Various agreements --
17            MR. SHARTLE:  Objection, asked and
18        answered.
19   A.   -- that lay out the way these loans are to be
20        originated as well as my training with First
21        Marblehead who assisted in the origination
22        process of these loans.
23   Q.   Do you know where she signed this loan and where
24        it was faxed from?
25   A.   Well, it was faxed from -- the document says
```

1        where it was faxed from, from fax No.

2        (207) 893-1756.  Where that fax was physically

3        located I do not know.

4    Q.  And do you know where she faxed it to?

5    A.  As previously stated, it was either to Charter

6        One or to a party on Charter One's behalf,

7        someone that they have hired to facilitate the

8        origination of loans, faxed to the fax number

9        (800) 704-9406.

10   Q.  Do you know what number that is?

11   A.  No, ma'am.

12   Q.  Okay.  So it's safe to say you don't know where

13       it was faxed from.  I agree -- I accept that you

14       have two possibilities; but you don't know which

15       one it was faxed to.  Correct?

16   A.  Yes.  I stated that.

17   Q.  Okay.  And your testimony that you're sure that

18       Exhibit 6 is, in fact, what she signed is based

19       on your experience and past practice; is that

20       right -- and the codes?

21   A.  Yes, ma'am.  That's fair.

22   Q.  Okay.  Anything else inform you as to which terms

23       and conditions she agreed to?

24   A.  No, ma'am.

25   Q.  Now, both Alicia Holiday and James Cummins we

THE REPORTING GROUP
Mason & Lockhart

1      have already established work with you in

2      Georgia.  Right?

3   A.  Yes, ma'am.  They're located in my office.

4   Q.  And Mr. Cummins in his affidavit, which is

5      Deposition Exhibit 2, on Bates stamped page 4

6      gives the principal sum together with accrued

7      interest for a total of 18,639 thousand -- excuse

8      me, $18,639.96 as of January 15, 2016.  Correct?

9   A.  Yes, ma'am.

10  Q.  Now, Ms. Holiday in her affidavit, which is

11     Deposition Exhibit 4, on page -- Bates stamped

12     page 11 in paragraph 10 says that principal sum

13     together with accrued interest for a total

14     $18,639.96 as of May 23, 2016.  Did -- is that

15     correct?

16  A.  Yes, ma'am.

17  Q.  Now, both of those can't be true.  Right?

18  A.  I don't see why not.

19  Q.  Interest on these loans accrues daily; doesn't

20     it?

21  A.  Yes, ma'am.

22  Q.  Okay.  So if there was a balance on January 15 of

23     2016, are you suggesting then that interest

24     stopped accruing at that time?

25  A.  We stopped seeking the interest that was

THE REPORTING GROUP
Mason & Lockhart

```
 1           accruing.
 2   Q.   Why is that?
 3   A.   Through the litigation to seek an amount certain
 4           and not have to go after prejudgment interest
 5           that accrues during the pendency of the case.
 6   Q.   So are you giving up any right to interest after
 7           January 15, 2016?
 8   A.   Through this litigation.  It's actually a date
 9           prior to that.  It's the date that we placed it
10           with the law firm that we stop seeking the
11           recovery of that interest.
12   Q.   When was the case placed with the law firm?
13   A.   April 10 of 2015.
14   Q.   So did interest stop accruing on April 10 of
15           2015?
16   A.   Interest continued to accrue.  We just stopped
17           seeking the recovery of it.
18   Q.   Your representation to the Court that this is the
19           amount due based on the loan documents, is it
20           your testimony that what you meant to say was
21           that that was the amount that you're seeking, not
22           that that's the amount due?
23           MR. SHARTLE:  Objection, argumentative.
24   A.   I'm not sure.
25   Q.   You know that this is a breach of contract case.
```

THE REPORTING GROUP
Mason & Lockhart

```
 1         Right?

 2    A.   Yes, ma'am.

 3    Q.   Okay.  And so presumably the breach of contract

 4         refers to the loan; is that right?

 5    A.   Yes, ma'am.

 6    Q.   And so a representation to the Court as to how

 7         much the loan amount due is usually based on the

 8         loan plus interest.  Right?

 9              MR. SHARTLE:  Objection, argumentative.

10    A.   Could be.

11    Q.   Well, you do a lot of these cases.  Right?

12              MR. SHARTLE:  Objection, argumentative.

13              Is it your position that you have to ask

14         for more than what you're entitled -- more

15         than you're willing to take?

16    BY MS. DILL:

17    Q.   Is your explanation that the difference in

18         amounts stated to be owed between Mr. Cummins and

19         Ms. Holiday is because you hired the law firm?

20              MR. SHARTLE:  Objection, argumentative.

21    A.   I'm not sure I understand the question.

22    Q.   Okay.  If you said this already, I apologize.

23         But what is the reason for not continuing to

24         calculate the accrual of interest?

25    A.   It's a business decision.
```

```
 1    Q.   Who made the business decision?

 2              MR. SHARTLE:  Objection, outside the

 3         scope of the notice.

 4    A.   Multiple parties were involved in deciding that.

 5    Q.   Were you one of them?

 6    A.   I was part of conversations.

 7    Q.   Who else was in the conversation?

 8    A.   In-house counsel.

 9              MR. SHARTLE:  Don't reveal any

10         conversations you have had with the lawyers.

11    BY MS. DILL:

12    Q.   Is in-house counsel separate from the Ratchford

13         Law Group?

14    A.   Yes, ma'am.

15    Q.   So is the amount that the National Collegiate

16         Student Loan Trust is seeking in this lawsuit an

17         amount that is not reflective of the principal

18         balance plus accrued interest?

19    A.   It's the amount --

20              MR. SHARTLE:  Objection, argumentative

21         and to the form.

22    A.   It's the amount that's representative of the

23         principal balance plus interest to a date.

24    Q.   And what date is that?

25    A.   It was April 10 of 2015.
```

```
 1   Q.   Okay.  I'm going to show you now what's been

 2        marked Deposition 19, which I haven't given you

 3        yet.

 4             Have you seen this document before?

 5             I doubt it.

 6   A.   Not this particular document.  I have seen

 7        similar letters.

 8   Q.   Would you agree with me that this --

 9             MR. SHARTLE:  Hold on a second.  Have

10        you produced this in this litigation?

11             MS. DILL:  No.

12             MR. SHARTLE:  You're going to ask the

13        witness about a document that you haven't

14        produced?

15             MS. DILL:  Yes.

16             MR. SHARTLE:  And I'll object and let

17        the witness answer to the extent he has

18        personal knowledge.  But I think any line of

19        questioning relating to a document you have

20        held onto and you want to surprise the

21        witness about it is totally improper.

22             MS. DILL:  Okay.  All right.  All set?

23             MR. SHARTLE:  All right.

24   BY MS. DILL:

25   Q.   This appears to be a financial activity summary
```

| 1 | document produced by American Education Services. |
| 2 | Would you agree with that? |
| 3 | A.   It appears to be. |
| 4 | Q.   Okay.  And we have -- we have already learned |
| 5 | that you -- it's your belief that the American |
| 6 | Education Services maintains accurate and |
| 7 | reliable records.  Correct? |
| 8 | A.   Yes, ma'am. |
| 9 | Q.   And the document states that on April 2, 2012, |
| 10 | the guarantor paid off this loan and the other |
| 11 | loan that is the subject of the two cases against |
| 12 | my client.  Do you see that? |
| 13 | MR. SHARTLE:  Objection.  Are you |
| 14 | testifying to what the document says or are |
| 15 | you going to ask the witness? |
| 16 | BY MS. DILL: |
| 17 | Q.   Do you see where the document indicates that the |
| 18 | guarantor paid off both loans in this case? |
| 19 | A.   I see where the document says guarantor pay. |
| 20 | Q.   Okay.  And can you explain what that means. |
| 21 | A.   That terminology, no, ma'am. |
| 22 | Q.   Do you know what a guarantor is? |
| 23 | A.   As previously stated, yes, ma'am. |
| 24 | Q.   And you know the guarantor in this case is TERI? |
| 25 | A.   Was TERI. |

1    Q.    Was TERI.

2          And do you know if, in fact, TERI purchased

3          this loan?

4    A.    They did not.

5    Q.    They did not.  And you -- what do you base that

6          testimony on?

7    A.    Well, I base that testimony on the fact that TERI

8          filed bankruptcy in April 2008.  And then they

9          entered into a temporary order which allowed them

10         to continue to guarantee loans so long as they

11         had money in their pledged account for each

12         individual trust.  They were not allowed to dip

13         into their general operating fund to guarantee

14         the loans.

15         And based on my training and working with

16         First Marblehead, who worked with TERI on a lot

17         of the guarantees during that interim period, the

18         pledged accounts ran dry as of late 2008,

19         beginning of 2009.  So TERI no longer guaranteed

20         any loans because they had no more money left in

21         their pledged accounts to guarantee those loans.

22         That then created a void of defaulted loans

23         which then allowed First Marblehead Education

24         Resources to be enacted as a special servicer of

25         defaulted loans which then ultimately transferred

```
 1            to NCO Financial Systems when First Marblehead
 2            Education Resources resigned in 2012.
 3    Q.    So how does that explain your belief that TERI
 4            did not purchase this loan?
 5    A.    They couldn't have.  They had no money left in
 6            their pledged account as of 2008, beginning of
 7            2009.
 8    Q.    And this is information that was relayed to you
 9            by whom?
10    A.    First Marblehead.
11    Q.    Who at First Marblehead?
12    A.    I don't remember exactly.  Matt Coletti or Jason
13            Corn.
14    Q.    So this was a conversation you had with somebody
15            at First Marblehead?
16    A.    Yes, ma'am.
17    Q.    Let's look back at the Deposition Exhibit 8 now.
18            You testified earlier that Deposition Exhibit 8,
19            page 39, the entry for August -- excuse me,
20            April 2, 2012, was a charge-off.  Correct?
21    A.    Yes, ma'am.
22    Q.    You agree with me though that the amount charged
23            off is, in fact, the exact amount that the AES
24            document, Deposition Exhibit 19, claims to have
25            paid off.  Is that correct?
```

1    A.   I mean, the document says guarantor pay.  I would

2         not say that the guarantor paid off that amount.

3    Q.   What -- why would you not say that?

4    A.   Because of my knowledge that the loan was charged

5         off and the guarantor was not in a capacity to do

6         any business of coming through as a guarantor on

7         an individual loan at that time.

8    Q.   Are there any records that you have at your

9         disposal that would confirm whether or not this

10        $15,786.39 credited on April 2, 2012, as it

11        appears to have been on Deposition Exhibit 8 is

12        not a result of TERI paying it off one way or the

13        other?

14   A.   I think the fact that we have it in our system

15        supports that TERI didn't pay it off.

16   Q.   The fact that you show the exact amount credited

17        on the same day supports the position it didn't

18        pay it off?

19   A.   No.  The fact that TSI currently has the account

20        and is servicing the account supports that TERI

21        never paid it off because had TERI paid it off,

22        the account would have never went to First

23        Marblehead originally, never went to NCO, and

24        never be at TSI as it is today.

25   Q.   You would agree with me that if TERI had paid the

THE REPORTING GROUP
Mason & Lockhart

1        loan off in April of 2012, that the National

2        Collegiate Student Loan Trust would no longer own

3        the loan.  Right?

4            MR. SHARTLE:  Objection, asked and

5        answered.

6  A.  Had TERI paid the loan off, that is correct;

7        National Collegiate Student Loan Trust 2006-3

8        would not own that loan.

9  Q.  And, therefore, the lawsuit that National

10       Collegiate Student Loan Trust 2006-3 and the

11       other one in this case would be unlawful?

12           MR. SHARTLE:  Objection, calls for a

13       legal conclusion.

14          We'll stipulate it would have been

15       improper.

16  A.  Had TERI paid off the loan, the lawsuit as

17       currently pled and captioned would be improper.

18  Q.  Now, you said you have access to the AES

19       database.  Right?

20  A.  Yes, ma'am.

21  Q.  So is this a record that you have access to?

22  A.  Through a request.  I would have to request it

23       from AES.

24  Q.  What would you call the request?

25  A.  I would ask for the correspondence document

1      number.  I mean, it looks like this is something

2      that you just requested from AES recently, and

3      they mailed to you.  So this is a new record from

4      AES.  And their records are identified -- their

5      letters are identified by correspondence doc

6      numbers, which are found in the bottom center,

7      which is a unique numerical code that identifies

8      and relates to an individual letter.

9   Q.  So specifically with respect to document --

10      excuse me, Exhibit 19, are you referring to the

11      number 00121171240000040?

12   A.  Yes, ma'am.

13   Q.  Based on your experience working with the AES

14      database, does this appear to be a document

15      that's produced in the ordinary course?

16   A.  If the financial activity or something along

17      those lines is requested from AES, yes, they

18      would send this letter out with the transactions

19      identified.  It is not something that's

20      proactively sent by AES.

21   Q.  So did First Marblehead represent to you that the

22      database that contained information used to

23      create the loan financial activity which is

24      Deposition Exhibit 8 was based on their

25      extraction of AES records and passing them onto

1          you?

2               So, in other words, did First Marblehead

3          collect all the relevant AES records, put them

4          into a database, and then pass them along to you;

5          or did the documents go direct -- the information

6          go directly from AES to Transworld Systems?

7     A.   For this particular loan the records would have

8          went from AES to First Marblehead Education

9          Resources as of April of 2012.  And then when

10         First Marblehead stepped down and NCO was put in

11         place as the special servicer in November 1 of

12         2012, those records were transferred from First

13         Marblehead to NCO.

14    Q.   I'm going to have to read the transcript to

15         remember that.

16              MR. SHARTLE:  Do you want to --

17    BY MS. DILL:

18    Q.   We're -- let's go back to Deposition Exhibit 8

19         for a minute.  There is something on here that

20         you said indicated when First Marblehead had --

21         control might not be the right legal word, but

22         had -- was supervising or -- I don't know what

23         the word is.

24              Didn't you tell me that the loan was serviced

25         for a short time by First Marblehead?

                    THE REPORTING GROUP
                     Mason & Lockhart

```
 1   A.   Yes, ma'am.

 2   Q.   And then AES --

 3   A.   AES, and then First Marblehead, and then NCO.

 4   Q.   Okay.  And how do you know that based on looking

 5        at Deposition Exhibit 8?

 6   A.   The loan charged off in April of 2012.

 7   Q.   Yes?

 8   A.   That was prior to NCO becoming servicer.  The

 9        servicer at that time for defaulted loans was

10        First Marblehead Education Resources.

11   Q.   Okay.  And so if -- if TERI had, in fact, paid

12        off the loan in April of 2012, it would have been

13        at the time that First Marblehead was the

14        servicer?

15   A.   No.  They would have paid off to AES.

16   Q.   Oh, I thought you said it was April of 2012 when

17        it went --

18   A.   Once it charged off, it went to First Marblehead

19        for servicing.  Had TERI paid it off, they would

20        have paid it off at the time of the acceleration

21        and charge-off of the loan.  So it would have

22        never went to First Marblehead.  It would have

23        went from AES to TERI.

24   Q.   And when you talked about it, it is this

25        electronic system of records.  Correct?
```

1   A.   It would be the electronic records of the

2        individual loan.

3   Q.   Okay.  Is it possible that the electronic record

4        went both to TERI and to First Marblehead?

5   A.   No.

6   Q.   How is that?

7   A.   Because at this time TERI was out of the picture

8        for a period of years.  All the loan records that

9        charged off went to First Marblehead at this

10       time.

11  Q.   And your understanding of what was going on with

12       TERI is based on your conversations with the

13       lawyer at First Marblehead and others?

14  A.   Yes, ma'am.

15  Q.   Do you have any legal training when it comes to

16       bankruptcy?

17  A.   Not formal.

18  Q.   Have you ever looked at any of the bankruptcy

19       records that relate to TERI?

20  A.   Yes, ma'am.

21  Q.   Which ones?

22  A.   I mean, I have reviewed the entire docket.  I

23       haven't read every filing, but --

24  Q.   You reviewed the entire docket?

25  A.   Yes, ma'am.

142

```
 1   Q.   And it's -- and it's still -- it's your belief
 2        that after they filed bankruptcy in 2008 and the
 3        reserves dried up, they no longer paid off any
 4        loans?
 5   A.   Once the reserves dried up, that is correct -- or
 6        not the reserves, the pledged accounts.
 7             MR. SHARTLE:  Can we take a break?
 8             MS. DILL:  Sure.
 9             MR. MCKINLEY:  Sure.
10                (A short recess was taken.)
11   BY MS. DILL:
12   Q.   Looking, again, at Deposition Exhibit 19, you
13        testified that the number at the bottom of the
14        page refers to correspondence.  And my question
15        is is the document attached to the first page
16        Bates stamped 76 and 77, is this information that
17        TSI has access to without special application?
18   A.   The information contained it has access to.  It's
19        actually -- the information other than the
20        transaction types, being numerical values, is the
21        information that's contained in the loan
22        financial activity, which we have previously
23        discussed.
24   Q.   With the exception being also that the payment on
25        April 2, 2012, in the AES documents describe it
```

```
 1        as a guarantor pay; and in the documents that
 2        were produced by TSI for this litigation,
 3        Deposition Exhibit 10 -- oh, no.  Sorry about
 4        that.
 5             Where did my payment schedule go?
 6             Oh, I'm all unorganized.
 7             MR. SHARTLE:  It's page 39, Exhibit 8.
 8             Do you want it?
 9             Here, you can use mine.
10             MS. DILL:  Sorry.
11                 (Discussion off the record.)
12   BY MS. DILL:
13   Q.   Looking at Deposition Exhibit 19 and Deposition
14        Exhibit 8, would you agree with me that the
15        difference is that the payment of $15,786.39 on
16        April 2, 2012, is described by AES as guarantor
17        pay; and on -- on Deposition Exhibit 19.  And on
18        Deposition Exhibit 8 is described, in your words,
19        as a charge-off.  Right?
20   A.   That's accurate.
21   Q.   And there's a difference between a guarantor pay
22        and a charge-off.  Right?
23   A.   Yes, ma'am.
24   Q.   So did Transworld Systems have the information
25        that's contained in Deposition Exhibit 19 with
```

```
 1            respect to the guarantor pay when it produced

 2            Deposition Exhibit 8 for purposes of this

 3            litigation?

 4    A.      No, ma'am.

 5    Q.      How do you know that?

 6    A.      As stated, we don't have the -- this document.

 7            This document actually did not exist until May 5

 8            of 2017 as dated on the letter.

 9    Q.      Okay.  But none of these documents really

10            existed, did they, before they were printed?  Is

11            that fair?

12                 MR. SHARTLE:  Objection to the form and

13            mischaracterization.

14    A.      I'm uncertain how AES produced or compiled what

15            they included in their letter.

16    Q.      You were trained on the AES system?

17    A.      Yes, ma'am.

18    Q.      And when you were trained on the AES system, did

19            they talk about how they document a loan that's

20            purchased by TERI?

21    A.      No, ma'am.

22    Q.      So they didn't train you on that or they don't do

23            it?

24                 That's a bad question.  Forget it.

25                 You have already testified you did not get
```

THE REPORTING GROUP
Mason & Lockhart

```
 1          training from AES on how it documents loans that
 2          are paid off by TERI.  Is that fair?
 3   A.     That is fair.
 4   Q.     Has anyone at TSI been trained in that regard
 5          that you're aware of?
 6   A.     No, ma'am.
 7   Q.     Is this the first time you have been made aware
 8          that this loan is represented by AES to have been
 9          purchased by TERI?
10             MR. SHARTLE:  Objection.  Are you
11          testifying to what the document says?
12             Do you know what that code means?
13   BY MS. DILL:
14   Q.     You can answer the question.
15             MR. SHARTLE:  If you understand the
16          question.
17   A.     Can you rephrase it, please.
18   Q.     Is this the first time that you have been made
19          aware that AES has a document that states on
20          April 2, 2012, guarantor pay, $15,786.39 was
21          credited to this account?
22   A.     This is the first time I'm seeing this document.
23   Q.     Is it the first time you have been made aware
24          that there's a possibility that the loan was
25          purchased by TERI?
```

THE REPORTING GROUP
Mason & Lockhart

```
 1              MR. SHARTLE:  Objection,

 2         mischaracterization of the evidence.  Assumes

 3         facts not in the record.

 4    A.   This is the first time I'm made aware that AES

 5         had a transaction of guarantor pay for that date.

 6    Q.   Have you ever seen that description of a

 7         transaction before, guarantor pay?

 8    A.   Not to my recollection.

 9    Q.   So when you have accessed the AES database for

10         purposes of preparing for today's deposition,

11         what information did you review?

12    A.   I reviewed their database, including the

13         screens that were printed out and that we have

14         discussed previously, their account notes which

15         notate any -- any correspondence, telephone

16         calls, letters being mailed out, correspondence

17         being received.

18    Q.   Would you say that you did a thorough review of

19         all of the information available that you had

20         access to with respect to this loan?

21    A.   Yes, ma'am.

22    Q.   And is it fair that the information that you

23         reviewed did not include any notations about

24         guarantor pay?

25    A.   From my review, that is -- that is fair.
```

```
 1   Q.   Now, if you had wanted to do additional research

 2        in AES and find out if TERI had bought this loan,

 3        could you have?

 4   A.   I don't think I could have reviewed anything

 5        additionally.

 6   Q.   Okay.  So you did a pretty much exhaustive search

 7        of the information available to you --

 8   A.   I believe so.

 9   Q.   -- is that fair?

10             And it did not include information about

11        guarantor or TERI being paid or purchasing the

12        loan?

13   A.   No, ma'am.

14   Q.   So when was it that the decision was made to

15        begin a lawsuit for -- two lawsuits against Sarah

16        Thurlow and Vickie McMullen?

17   A.   Well, as previously stated, the account was

18        placed in April of 2015 to Ratchford Law Group

19        which then began to attempt to collect on the

20        loan.  When they made the decision to file suit

21        I'm unaware of.

22   Q.   I'm sorry.  It was April of 2015?

23   A.   Yes, ma'am.

24   Q.   Now, prior to Ratchford Law Group, were there

25        other debt collection agencies that were hired by
```

```
 1          TSI to collect this debt?
 2    A.    Yes, ma'am.
 3    Q.    Which ones?
 4    A.    I don't recall.
 5    Q.    Was it Daggett & Parker?
 6    A.    I believe so.
 7    Q.    I'm going to direct your attention to Exhibit 16
 8          and 17.  Have you ever seen these documents
 9          before?
10    A.    I remember seeing 17 before.  I don't recall
11          seeing 16.
12    Q.    Are they documents that are contained in the TSI
13          file that you reviewed in preparation for today's
14          deposition?
15    A.    Exhibit 17 was part of the litigation file.  I
16          believe it was filed in support of a motion to
17          set aside or vacate a judgment.  16, like I said,
18          I don't think I have ever seen it.
19    Q.    Is there information in the TSI database
20          suggesting that Daggett & Parker, attorneys at
21          law, were hired to collect these debts?
22    A.    Yes, ma'am.
23    Q.    Where in your system is that information
24          maintained?
25    A.    Well, we have the legal screen, which is what we
```

1    call it in CRS, that identifies any law firms

2    that the account was placed with and timeframes

3    for which those placements occurred.

4 Q. Other than Daggett & Parker and Ratchford Group,

5    any other law firms hired to collect this debt?

6 A. Not to my knowledge.

7 Q. So is it fair to say that Daggett & Parker were

8    unsuccessful in collecting the two loans

9    allegedly made to Sarah Thurlow?

10 A. Yes, they did not recover any funds on the loan.

11    So I would say they were unsuccessful.

12 Q. And did they have a certain amount of time in

13    which to attempt to collect money?

14 A. No, ma'am.

15 Q. What are the terms of Transworld Systems hiring

16    Daggett & Parker?

17 A. Can you clarify that?

18 Q. How long did Daggett & Parker represent National

19    Collegiate Student Loan Trust 2007-1 and 2006-3?

20 A. I don't recall.

21 Q. Other than sending the letters that are

22    Deposition Exhibit 16 and 17, are you aware of

23    any other debt collection activity performed by

24    Daggett & Parker with respect to these two loans?

25 A. I'm not aware of any.

1    Q.    Why was the -- why were the loans transferred for

2          collection purposes from Daggett & Parker to the

3          Ratchford Law Group?

4    A.    I don't know.

5    Q.    Does your compensation depend in any way on the

6          amount of loan proceeds collected by TSI?

7    A.    My compensation -- personal compensation?

8    Q.    Yes.

9    A.    No, ma'am.

10   Q.    Do you know why in Deposition 16 and 17 Daggett &

11         Parker stated that the borrowers had paid a total

12         of zero towards the above claim?

13   A.    No, ma'am.

14   Q.    Would you agree with me that that's not a true

15         statement?

16   A.    If I read that to say have they ever paid

17         anything, yes; that's an incorrect statement.  I

18         could read it to say that they paid Daggett &

19         Parker zero dollars toward the claim, for which

20         that would be an accurate statement.

21              It says, according to our records -- Daggett

22         & Parker's records -- they never received a

23         payment.  So that would be accurate.

24   Q.    Did Transworld Systems ever hire EOS CCA to

25         collect these loans?

1    A.   No, ma'am.

2    Q.   Do you know what EOS CCA is?

3    A.   No, ma'am.

4    Q.   Did Transworld Systems ever hire National

5         Enterprise Systems, Inc., to collect these loans?

6    A.   I don't know.  They are one of our agencies.

7    Q.   When you prepared for today's deposition and

8         looked at the legal screen, do you recall if any

9         others were retained to collect these loans

10        besides Daggett & Parker, Ratchford Law Group,

11        and possibly National Enterprise System?

12   A.   Well, the legal screen would only be the law

13        firms.  And those were -- from my review was only

14        Daggett & Parker and Ratchford Law Group.  There

15        is a different screen that identifies traditional

16        agencies that aren't law firms.

17             I don't recall which agencies off the top of

18        my head these loans were placed with.

19   Q.   These are debt collection agencies?

20   A.   Yes, ma'am.

21   Q.   Does Transworld Systems make decisions about the

22        litigation of these loans?

23             MR. SHARTLE:  Object to the form.

24   A.   Can you clarify that, please.

25   Q.   In this case the -- well, let me ask you this.

THE REPORTING GROUP
Mason & Lockhart

1      It's true, isn't it, that these two loans that

2      Sarah Thurlow, now Sara Coffey, allegedly took

3      out were serviced together.  Right?

4   A.  I don't think I understand serviced together.

5   Q.  Well, she just made one payment; and it was

6      applied to both loans.  Right?

7   A.  She made -- the payments were applied based on

8      her direction to AES.  So she could have directed

9      AES to apply all of the payments to one

10      particular loan or to split it up evenly or pro

11      rata.  There's different options in AES for

12      payment.

13   Q.  How would she have done that?

14   A.  Well, I believe at least the most recent payments

15      were web pays, so online.  And there's different

16      radial buttons to click, or there's another

17      amount that she can actually type in an amount to

18      be applied to each loan.

19   Q.  So when I asked you if the loans were serviced

20      together, that's not a -- that's not something

21      you understand and can answer?

22   A.  I didn't understand exactly what you meant by

23      that.  They were both serviced by AES for -- from

24      disbursement until charge-off.  They charged off

25      on the same day, but they were disbursed on

THE REPORTING GROUP
Mason & Lockhart

1    different days.

2         So the first loan would have been serviced

3    independently since the second loan didn't exist.

4    But since they charged off on the same day,

5    thereafter they followed the same servicing

6    pattern by being serviced by First Marblehead

7    Education Resources and then to NCO and

8    ultimately to TSI.

9    Q.  Whose decision was it to file separate lawsuits?

10   A.  I don't know.

11   Q.  Is it Transworld Systems' custom and practice to

12       file an individual lawsuit for each individual

13       loan?

14   A.  So long as the loans are owned by different legal

15       entities, yes, ma'am.

16   Q.  And it's your testimony that in these cases,

17       15-324 and 15-326, the loans are owned by

18       different entities?

19   A.  Yes, ma'am.

20   Q.  Who do you believe owned the loans in the case

21       15-324?

22   A.  15-324 was our first loan.  So National

23       Collegiate Student Loan Trust 2006-3.

24   Q.  And who do you believe is the owner of the

25       15-326?

1   A.   National Collegiate Student Loan Trust 2007-1.

2   Q.   And those trusts are contracted with U.S. Bank

3        who then contracts with you to collect the loans?

4   A.   To service the loans -- the defaulted portion of

5        loans.

6   Q.   Do you have any interaction with the trusts in

7        your day-to-day business?

8            MR. SHARTLE:  Object to the form.

9   A.   The individual trusts, no.  I mean, they have no

10       employees.  We contract and review with their

11       servicers and trustees.

12  Q.   How many lawsuits has the Ratchford Law Group

13       been hired to file in the State of Maine?

14           MR. SHARTLE:  Object to the form and

15       outside the scope of the notice.

16  A.   I wouldn't say Ratchford Law Group is hired to

17       file suits.  They're hired to collect.  They have

18       the ability to file a suit if they deem it

19       necessary, but I would not be able to estimate

20       how many lawsuits they filed.

21  Q.   In these two cases that have not been

22       consolidated, it is your intent to prove

23       ownership of the loan.  Correct?

24  A.   Yes, ma'am.

25  Q.   And how much you believe is owed on each loan.

```
 1        Correct?
 2   A.   Yes, ma'am.
 3   Q.   Is there any evidence that you have of ownership
 4        other than the evidence you presented to the
 5        district court in the motions for summary
 6        judgment and motions for default judgment?
 7             MR. SHARTLE:  Objection.  It's going to
 8        call for a legal conclusion.
 9   A.   I don't believe we have looked at any documents
10        in support of a motion for default judgment.  But
11        the documents attached to the affidavit in
12        support of motion for summary judgment would be
13        the chain of title documents that we would rely
14        on to prove ownership.
15   Q.   And in the second case, if you look at Deposition
16        Exhibit 13, you were designated by National
17        Collegiate Student Loan Trust 2007-1 to appear
18        today to give testimony about the verification of
19        account signed by James Cummins dated January 19
20        and the exhibits and the reporting by the
21        plaintiff, which is National Collegiate Student
22        Loan Trust or its agents, of adverse credit
23        information to credit reporting agencies.  Are
24        you prepared to do that today?
25   A.   Yes, ma'am.
```

1    Q.   Okay.  So with respect to this loan that is the

2         subject of 15-326, would you agree with me that

3         the affidavit and verification of account signed

4         by James Cummins in this case is, with the

5         exception of amounts and dates, identical to the

6         one in the 15-324 case?

7    A.   Other than the amounts, the dates, and the

8         plaintiff, they appear to be identical.

9    Q.   And with respect to this matter -- by that I mean

10        the 2007-1 NCSL loan -- are there any records

11        that are not electronic with respect to this

12        loan?

13   A.   This would be similar to the first line that we

14        discussed.  All our records in TSI's possession

15        would be in electronic format.

16   Q.   And what do you know about the record management

17        practice of the trusts themselves?

18   A.   Well, the trusts delegate all record management

19        practices to either AES for the predefault

20        servicing or to, now, TSI as the post-default

21        servicing.

22   Q.   And the note that was appended to Mr. Cummins's

23        affidavit in support of the trust's motion for

24        default judgment is only the first page.

25        Correct?

1   A.   It's the signature page of the nonnegotiable

2        credit agreement along with the note disclosure

3        statement.

4   Q.   And the signature page is not the complete loan

5        document.  Correct?

6             MR. SHARTLE:  Objection.

7   A.   It's the signature page.  The loan document also

8        references and it incorporates some terms and

9        conditions as well as the note disclosure

10       statement.

11  Q.   Okay.  And the terms and conditions though are

12       not attached to the document; is that true?

13  A.   That's correct.

14  Q.   Okay.  Oh, here at the top of the page, if you

15       look at page 65 -- Bates stamped 65, this is

16       where there was a reference to Mechanics Savings

17       Bank at the top.

18  A.   Yes, ma'am.

19  Q.   Do you believe that that may have been where the

20       loan originated?

21            MR. SHARTLE:  Object to the use of the

22       form originated.

23  A.   I don't believe so.

24            MR. SHARTLE:  You're talking about the

25       reference to Mechanics Savings Bank?

                    THE REPORTING GROUP
                      Mason & Lockhart

```
 1            MS. DILL:  Uh-huh.  Yes.

 2    BY MS. DILL:

 3    Q.   Now, the terms and conditions that were attached

 4         to the nonnegotiable credit agreement that

 5         appears as Deposition Exhibit 18 on page 2 has a

 6         variable rate that can't exceed the State of

 7         Rhode Island.  Did I read that correctly?

 8    A.   Yes, ma'am.

 9    Q.   Now, how do you know if, in fact, those are the

10         terms and conditions that were agreed to by Sarah

11         Thurlow?

12    A.   I believe it's actually like the previous line we

13         just discussed.  It appears that these terms

14         aren't the ones that go to this because these

15         terms are the RBS Citizens version, not the

16         Charter One version.

17    Q.   And so, again, I'm just trying to understand

18         if -- if the -- the affiant in this case,

19         Mr. Cummins, it was not him who attached the loan

20         note agreement to his affidavit.  Right?

21            It was somebody in the affidavit production

22         team?

23    A.   Correct.  But Exhibit 18 wasn't attached to the

24         affidavit or reviewed by Mr. Cummins.

25    Q.   Right.  Right.  But the person who attached the
```

THE REPORTING GROUP
Mason & Lockhart

```
 1          loan note to the Cummins affidavit, whoever that
 2          was --
 3               MR. SHARTLE:  Are we switching from the
 4          attachment to the complaint now to a
 5          different attachment, just so the record is
 6          clear?
 7               MS. DILL:  Bear with me.
 8     BY MS. DILL:
 9     Q.   The person who attached the nonnegotiable credit
10          agreement to the Cummins affidavit which appears
11          at Bates stamped page 65, my question is is it
12          the same person who attaches the loans to the
13          complaint?
14     A.   No, ma'am.
15     Q.   Who is responsible for attaching a true copy of
16          the loan agreement to the complaint?
17     A.   I don't know about a true copy.  It's in the
18          firm's discretion on whether they attach the
19          credit agreement to the complaint or not,
20          depending on various state laws and pleading
21          requirements.
22               In this case it would have been Ratchford Law
23          Group to attach and compile the documents that is
24          your Deposition Exhibit 18.
25     Q.   And does the Ratchford Law Group get its
```

THE REPORTING GROUP
Mason & Lockhart

1        documents from Transworld Systems directly, or

2        does the Ratchford Law Group have access to the

3        AES database and the CRS database and the --

4    A.  The Media Locator.

5    Q.  -- Media Locator?

6        Thank you.

7    A.  You're welcome.

8        So at placement -- at time of placement to

9        the Ratchford Law Group, they would have

10       received -- actually, they would have received

11       what was attached to the Cummins affidavit, your

12       Deposition Exhibit 15.  They would have received

13       the signature page of the credit agreement and a

14       note disclosure statement.  They also have in

15       their possession copies of what we call the term

16       library, which is a zip file containing all the

17       terms and conditions for the loans, the various

18       programs, various program years.

19       So what it appears that they did on this case

20       is they took the documents that we gave them,

21       matched them up -- or attempted to match them up

22       with the term library and pull in the proper

23       terms.  And they -- looks like they made a

24       mistake and pulled in the RBS Citizens Charter

25       terms as opposed to just the Charter One terms.

```
 1              They pulled in the right term code and term
 2         year end for the program; they just pulled in the
 3         RBS Citizens version as opposed to the Charter
 4         One version.
 5    Q.   Is this library that you just described that has
 6         the different terms and conditions for the
 7         different lenders something that is contained
 8         within one of those databases that we have talked
 9         about?
10    A.   No, ma'am.  It's separate and apart from.  It's
11         stored just like the schedule documents that we
12         were referring to.  They're originally given to
13         NCO, stored our server.  And then from our
14         server, we then transfer copies of those terms to
15         our law firms for them to use.
16    Q.   So how does Ratchford have access to the library
17         then if you transfer the documents to them?  Does
18         Ratchford have access to your database and
19         server?
20    A.   No, ma'am.  The copies -- that term library, a
21         copy of it was electronically transferred to them
22         through a secure site for them to pull down and
23         then store on their servers.
24    Q.   So in the complaint for this matter, the 2007-1
25         National Collegiate Student Loan Trust, it states
```

```
 1           that as of June 26, the amount of $11,645.27 is
 2           due -- June 26, 2015.
 3      A.   Can you repeat that amount?
 4      Q.   As of June 26, 2015, $11,645.27.
 5      A.   Okay.
 6      Q.   Now, what was the date that you said you stopped
 7           accruing interest for purposes of collection?
 8      A.   Well, for the first case it was April -- it was
 9           in April of 2015.  This case, I don't have a
10           document in front of me to verify the actual date
11           that the account was placed to the law firm.
12      Q.   Okay.  Then let's look at the other case for a
13           minute because I'm just a little confused.
14               Give me a minute.
15               So the complaint in the case brought by
16           National Collegiate Student Loan Trust 2006-3
17           says that as of June 26, 2015, the defendants owe
18           $18,639.96, which is the amount that appears in
19           the Holiday affidavit.
20      A.   Yes, ma'am.  As well as the Cummins affidavit.
21      Q.   Right.  And your explanation for that is that --
22      A.   That was the amount that was due on the account,
23           the principal and interest, as of the time that
24           it was placed to the law firm, the law firm
25           being Ratchford Law Group, which was in April
```

THE REPORTING GROUP
Mason & Lockhart

```
 1          of 2015.
 2   Q.   And why is that again?
 3              MR. SHARTLE:  Object to the form.  Why
 4          is what?
 5   BY MS. DILL:
 6   Q.   Why is it that you would stop accruing interest
 7          on the date that the case gets referred to a law
 8          firm?
 9              MR. SHARTLE:  Objection, asked and
10          answered.
11   A.   It was a business decision just to seek an amount
12          certain instead of continuing to accrue interest
13          through --
14   Q.   Is it -- sorry.  Go ahead.
15              Isn't the reason that you wanted an amount
16          certain is because you were hoping to get a
17          default judgment?
18              MR. SHARTLE:  Objection, argumentative.
19   A.   Absolutely not.
20   Q.   No?
21   A.   No, ma'am.
22   Q.   What would be the reason why the National
23          Collegiate Student Loan Trust would just forego
24          accruing interest from the time that --
25              MR. SHARTLE:  Objection.
```

```
 1   BY MS. DILL:

 2   Q.   -- the case is transferred to the law firm?

 3            MR. SHARTLE:  Objection, asked and

 4        answered.  If you're going to continue

 5        badgering the witness, he's already answered

 6        this question multiple times.  He told you it

 7        was a business decision.

 8   A.   It was just a business decision, an internal

 9        decision made.

10   Q.   And I don't recall if you said -- were you part

11        of that decision?

12            MR. SHARTLE:  Objection, asked and

13        answered.

14   A.   I was part of the conversations.

15   Q.   So if you're successful in this case, is it your

16        testimony that the plaintiffs -- or, excuse me,

17        the defendants in this case will owe $18,639.96?

18   A.   If successful, that's what the prayer would ask

19        for for the judgment.

20   Q.   Your testimony today is that interest stopped

21        accruing when the file was transferred to the law

22        firm?

23   A.   That was not my testimony.  I said we stopped

24        seeking the recovery of that interest.  The

25        interest continues to accrue.  We're just not
```

1         seeking it.

2    Q.   Is that true in all of the collection cases that

3         you are involved with for Transworld Systems?

4    A.   When they get forwarded to a law firm, yes,

5         ma'am.

6    Q.   Has Transworld Systems been sued for

7         robo-signing?

8              MR. SHARTLE:  Objection, outside the

9         scope of the notice.  Objection to use of the

10        term robo-signing.

11   A.   I'm uncertain.

12   Q.   Do you know what robo-signing is?

13   A.   Generally speaking.

14   Q.   How would you describe robo-signing?

15   A.   Signing documents without proper validation or

16        verification of materials contained therein.

17   Q.   Do you believe that -- at the time that the

18        document that's been marked Exhibit 4 signed by

19        Alicia Holiday was signed without her confirming

20        the information contained therein?

21   A.   That is not my belief.

22   Q.   Now, is Transworld Systems -- did it file a proof

23        of claim in the TERI bankruptcy case?

24   A.   Trans --

25              MR. SHARTLE:  Objection, outside the

                    THE REPORTING GROUP
                     Mason & Lockhart

 1          scope of the notice.

 2     A.   I'm uncertain.

 3     Q.   Who was responsible for documenting when Sarah

 4          Coffey, identified as Sarah Thurlow in the

 5          complaint, made a payment?

 6               MR. SHARTLE:   Objection for lack of time

 7          frame.

 8     A.   Yes.   The responsible party would defend who the

 9          payment was made to.

10     Q.   The servicer; is that fair?

11     A.   So if you're talking about the payments that were

12          actually made, those were made to AES; and AES

13          would be responsible for logging those payments

14          in.

15               (Discussion off the record.)

16     BY MS. DILL:

17     Q.   Let's take a break; and let me just get my

18          documents in order and go through my notes and

19          see what questions I have remaining, if that's

20          okay.

21               (Discussion off the record.)

22               (A short recess was taken.)

23     BY MS. DILL:

24     Q.   I just need to -- there's four areas that I need

25          to, hopefully briefly, explore with you.

                    THE REPORTING GROUP
                     Mason & Lockhart

```
 1              Starting with the Consumer Finance Protection
 2         Bureau, are you aware of any investigation or
 3         proceedings that the Consumer Financial
 4         Protection Bureau is undergoing with respect to
 5         Transworld Systems?
 6              MR. SHARTLE:  Objection, outside the
 7         scope of the notice.  And I think this is
 8         way, way outside the scope.
 9    BY MS. DILL:
10    Q.   You may answer the question.
11    A.   I --
12              MR. SHARTLE:  I'm going to instruct the
13         witness not to -- in fact, I think that to
14         the extent there were such an investigation,
15         any discussions regarding the investigation
16         are privileged and confidential.
17    A.   I can't comment on it.
18              MR. SHARTLE:  Yes.
19    BY MS. DILL:
20    Q.   Have you been asked to produce documents for
21         purposes of any investigation by the Consumer
22         Finance Protection Bureau?
23              MR. SHARTLE:  Objection, assumes
24         evidence not in the record.
25              And, again, I think any testimony to the
```

THE REPORTING GROUP
Mason & Lockhart

1          extent there were such an investigation would

2          be privileged --

3               MS. DILL:  Well --

4               MR. SHARTLE:  -- and confidential.

5     A.   I'm not going to answer that question.

6               MR. SHARTLE:  Outside of the scope of

7          the notice, too.

8     BY MS. DILL:

9     Q.   Has Transworld Systems received a NORA from the

10         Consumer Financial Protection Bureau?

11              MR. SHARTLE:  Same objections.

12    A.   I can't answer that.

13    Q.   Have you given sworn testimony to the Consumer

14         Financial Protection Bureau in connection with

15         your job at Transworld Systems?

16              MR. SHARTLE:  Same objection.

17    A.   I can't answer that.

18    Q.   That's actually a perfectly appropriate question.

19              MR. SHARTLE:  It is?  It's within the

20         scope of your notice?

21              Okay.  Let's take it up with the judge.

22              MS. DILL:  If the basis of your

23         objection is that it's not within the scope

24         of the notice, then I --

25              MR. SHARTLE:  It's multiple objections.

                    THE REPORTING GROUP
                     Mason & Lockhart

```
 1              MS. DILL:  Okay.  But one of them is
 2        instructing the witness not to answer.  And
 3        to the extent that you're claiming a
 4        privilege, I think it's pretty obvious that
 5        there is no attorney-client privilege between
 6        this witness and the Consumer Financial
 7        Protection Bureau.  Would you agree with me?
 8              MR. SHARTLE:  We'll take it up with the
 9        judge.  It's outside the scope of your
10        notice.
11              I have let you go way, way outside most
12        of the day.  Now, you're just fishing.
13  BY MS. DILL:
14  Q.   Are you going to not answer any questions about
15        the Consumer Financial Protection Bureau
16        investigation?
17              MR. SHARTLE:  We're not acknowledging
18        that such an investigation exists.  But to
19        the extent it would, any communications, any
20        discussions relating to an investigation
21        would be privileged.
22              MS. DILL:  So we can agree we'll keep
23        the deposition open then pending --
24              MR. SHARTLE:  We're not agreeing to
25        anything.  We're agreeing that you're outside
```

```
 1          the scope of the notice, yeah.
 2              MS. DILL:  We'll keep the deposition
 3          open pending a determination by the judge of
 4          whether or not you have to answer the
 5          questions.  But in the meantime, let me move
 6          on to the next topic, which is credit
 7          reporting.
 8   BY MS. DILL:
 9   Q.   Who reports credit information on behalf of the
10        trusts to the credit reporting agencies?
11   A.   Well, currently for these two loans no one is.
12        There's no active trade lines being reported to
13        any of the credit reporting agencies.
14   Q.   What did you call them, active what?
15   A.   Trade lines.
16   Q.   Tread or trade?
17   A.   Trade.
18   Q.   What is an active trade line?
19   A.   A trade line is the information that's reported
20        to the credit reporting agencies.  Active means
21        that it's still being reported.
22   Q.   Would you agree with me that there were active
23        trade lines at some point with respect to these
24        two loans and my clients?
25   A.   Yes, ma'am.
```

```
 1   Q.   And who made the reports to the credit reporting

 2        agencies at the time that they were made?

 3   A.   Well, going back to the loan origination, they

 4        would have been reported by AES all the way

 5        through the time that it defaulted, at which

 6        point the post-default servicer would be

 7        responsible for either reporting or facilitating

 8        the reporting of that.

 9             As it relates to First Marblehead Education

10        Resources for the short time period that they

11        serviced the loan, I'm uncertain that they

12        reported or anyone on their behalf reported.  As

13        soon as it came over to NCO, the accounts were

14        then transferred to various collection agencies.

15        I don't recall which ones.  But those agencies

16        would be responsible for reporting the loan while

17        they had the account in their system.

18             Once the account was recalled, their practice

19        is to delete that trade line.  And then it

20        goes --

21   Q.   Whose practice?

22   A.   The agencies.  It's actually a contractual

23        obligation of the agencies to report while they

24        have it.  Once the account is recalled, then they

25        delete that trade line.
```

```
 1   Q.   So if in this case an adverse account was
 2        identified in September of 2016, who would have
 3        reported that to the credit reporting agencies?
 4   A.   Can you clarify what you mean by adverse account?
 5   Q.   Adverse account is a term of art used by
 6        TransUnion to describe accounts of consumers that
 7        are purported to be in default.  And if there was
 8        a report to TransUnion that the two loans that
 9        you have alleged are owned by National Collegiate
10        Student Loan Trust 2006-1 and 2007 -- the other
11        one.
12   A.   2006-3 and 2007-1.
13   Q.   Thank you.
14   A.   You're welcome.
15   Q.   If there was a report that those two loans were
16        in default in September of 2016, who would have
17        made that report?
18   A.   I can speculate.  I'm not sure I follow exactly
19        what you're asking.
20   Q.   If Sarah Thurlow -- Coffey -- Sarah Thurlow, also
21        known as Sarah Coffey, opened her credit report
22        in September of 2016 and saw two National
23        Collegiate Student Loan Trusts were identified to
24        be in default and identified as an adverse
25        account, what I'm asking you is do you know who
```

1       would have transferred that information to the

2       credit reporting agency at that time?

3   A.  I believe those trade lines would have been

4       reported by AES.

5   Q.  And what is the -- well, strike that.

6           Does Transworld Systems have a contract with

7       credit reporting agencies?

8   A.  I'm not sure if there's a contract between the

9       two.

10  Q.  Does Transworld Systems do any credit reporting?

11  A.  Yes, ma'am.

12  Q.  What is the policy around reporting to a credit

13      reporting bureau that loans are in default?

14          (There was an interruption.)

15  A.  Can you repeat that, please?

16  Q.  Is there a policy that Transworld Systems has

17      with regard to reporting defaulted loans to

18      credit reporting agencies?

19  A.  Yes, ma'am.

20  Q.  Where is that policy located?

21  A.  It's within our company policies.

22  Q.  Is it a written policy?

23  A.  Yes, ma'am.

24  Q.  Do you know -- I'll ask for it in a specific

25      document request; but just as we sit here today,

1          do you know generally what it says?

2     A.   Generally, yes.  Specifics, I don't recall.  It's

3          been awhile since I looked at that policy.

4     Q.   Would you agree with me that it would be a

5          violation of the Fair Credit Reporting Act to

6          report to a credit agency that loans were in

7          default that were not in default?

8               MR. ALLTMONT:  Objection, calls for a

9          legal conclusion.

10    A.   I would agree that it would be a potential

11         violation to report inaccurate information to a

12         credit reporting agency.

13    Q.   The -- I want to talk just briefly about the

14         relationship between U.S. Bank -- and

15         specifically, again, I would like to draw your

16         attention to Deposition Exhibit 5.  I believe you

17         described earlier that U.S. Bank contracts with

18         Transworld Systems on behalf of the trusts.  Is

19         that fair?

20    A.   Yes, ma'am.

21    Q.   And on Exhibit 5 there's another organization

22         identified, GSS Data Services, Inc.  Do you see

23         that?

24    A.   Yes, ma'am.

25    Q.   Who is that?  What is that?

175

```
 1   A.   GSS is Goal Structured Solutions Data Services,
 2        Inc.  And they are the trust administrator or the
 3        administrator for the various trusts that are
 4        identified on Deposition Exhibit 5.
 5   Q.   What is a trust administrator, as far as you
 6        know?
 7   A.   A trust administrator handles the financials for
 8        the trust along with the -- with the bondholders.
 9   Q.   Is the contract that U.S. Bank has with
10        Transworld Systems a written contract?
11   A.   Yes, ma'am.
12   Q.   And I think you said earlier that you have looked
13        at it?
14   A.   Yes, ma'am.
15   Q.   How long is it?
16   A.   I don't recall.
17   Q.   When is the last time you looked at it?
18   A.   I have referenced it within the last three weeks
19        probably.
20   Q.   For what purpose?
21   A.   I don't recall.
22   Q.   You were here in November when U.S. Bank had a
23        hearing on its motion to dismiss in another case
24        involving National Collegiate Student Loan Trust
25        and Sarah Thurlow and Vickie McMullen.  Do you
```

1          recall that?

2    A.   I believe at the time Sarah Thurlow and Vickie

3          McMullen were not actual plaintiffs, but I do

4          remember attending a hearing.

5    Q.   And what was -- in what capacity were you

6          attending the hearing at that point?

7    A.   A representative of Transworld Systems, who is

8          also a defendant in that case.

9    Q.   The -- just going over what I think you said were

10         the various sources of information regarding

11         these loans, there's the Transworld Systems

12         server that, as I understand your testimony, is

13         essentially the same server that NCO had when it

14         became the servicer of the loans.  Is that fair?

15   A.   It's multiple servers.  The server is just

16         computer equipment.

17   Q.   Right.

18   A.   There's multiple servers, and the servers that

19         were tasked with maintaining and housing the

20         electronic data and documents pertaining to the

21         National Collegiate Student Loan Trust

22         portfolios, those servers were transferred from

23         NCO to TSI.  So the server remained intact with

24         all data in it, and it just basically changed

25         ownership.

THE REPORTING GROUP
Mason & Lockhart

1    Q.   And do you know how many servers there actually

2         are?

3    A.   No, ma'am.

4    Q.   Or were?

5    A.   No, ma'am.

6    Q.   Who has access to those servers?

7    A.   Access to view the data within them?

8    Q.   Yes.

9    A.   I don't know.

10   Q.   You do?

11   A.   Yes, ma'am.

12   Q.   Ratchford -- Abrahamsen, Ratchford does?

13   A.   No, ma'am.  It would only be TSI employees that

14        would have access, and only some of those

15        employees, depending on their access level and

16        job duties.

17   Q.   Do employees of AES have access to the servers?

18   A.   Not to the TSI servers.

19   Q.   Okay.  So as far as you know, your testimony

20        today is that the only people with access to the

21        NCO/TSI servers are employees of Transworld

22        Systems?

23   A.   To my knowledge, yes, ma'am.

24   Q.   Okay.  Now, another system you mentioned was

25        FACS?

```
1    A.   Yes, ma'am.

2    Q.   And tell me, again, now that we have been

3         through so much, what that is?

4    A.   That's a collection system.

5    Q.   Managed by whom?

6    A.   TSI.

7    Q.   Is it still being used?

8    A.   Yes, ma'am.

9    Q.   Does anyone other than TSI use the FACS

10        collection system?

11   A.   Not to my knowledge.

12   Q.   Is it a proprietary thing?

13   A.   I don't know.

14   Q.   Is it software?

15   A.   Yes.

16   Q.   Is FACS different than CRS?

17   A.   Yes, ma'am.

18   Q.   Is there information that could be contained in

19        FACS that's also contained in CRS?  Is there

20        overlap of these systems?

21   A.   Not necessarily overlap; but the systems can

22        communicate through each other -- or to each

23        other through an online portal.  So FACS is the

24        collection system where TSI will collect on

25        accounts.  Some of those accounts could be
```

1      National Collegiate Student Loan Trust accounts.

2           The CRS is the servicing system where the

3      servicing is done out of.  So that's the record

4      management, the account management of where the

5      accounts are placed, when they're recalled.

6           So in the event that an NCT account is placed

7      to the TSI collection agency, that account record

8      would go through an online portal from CRS to the

9      online portal.  And then FACS would pull the

10     information from the online portal into FACS to

11     create an account in FACS where the account would

12     be collected upon.  Any information that's then

13     put into the FACS system on a nightly basis would

14     be sent to the online portal and imported back

15     into CRS.

16  Q.  What's the online portal called?

17  A.  The one that communicates between CRS and FACS is

18      E -- the letter E, forward, EASE, E A S E, all

19      one word.

20  Q.  Who has access to the FACS system?

21  A.  Various employees of TSI.

22  Q.  Anyone outside of TSI?

23  A.  I don't know.

24  Q.  What determines whether a loan is going to be

25      collected internally through the FACS system by

```
 1            TSI or outsourced to, say, Abrahamsen, Ratchford
 2            for collection?
 3    A.      Well, Ratchford Law Group is -- or Abrahamsen, as
 4            they were formally known, is a law firm.  So
 5            they're on a different -- different forward
 6            model.  So the accounts would generally go
 7            through collection agencies at first for two
 8            years.  And then if collections are unsuccessful,
 9            then it would go to a law firm.  Collection -- or
10            placement of accounts, whether to our agency
11            network or an attorney network, are dictated by
12            various market shares of agencies or firms that
13            operate within that jurisdiction.
14                 So essentially, to answer your question about
15            TSI, it's -- so there's two years of collections,
16            six months apiece, four agencies for the initial
17            when the account charges off before it gets to a
18            law firm.  So there's four different levels.  If
19            TSI operated in one of those four levels, they
20            would be assigned a market share for that level
21            along with other agencies for that market share
22            comprising 100 percent.
23                 So the accounts are, let's say, segment
24            three.  TSI -- for sake of discussion, TSI
25            operates in segment 3; and they get 10 percent of
```

181

```
 1        the accounts in segment 3.  So a group of

 2        accounts go from segment 2 to segment 3.  And

 3        those accounts get split up based on the market

 4        share.  So TSI would get 10 percent of those

 5        accounts, and the other accounts would be sent

 6        out based on the market share to those other

 7        agencies.

 8            Now, currently TSI doesn't operate in any of

 9        the segments; so they're not receiving new

10        placements of accounts.

11   Q.   Is a segment a geographic location --

12   A.   No, ma'am.

13   Q.   -- or an amount?

14            What is a segment?

15   A.   A segment for the four segments that we

16        discussed, we call them placement levels.  And

17        that's basically just time frame of delinquency.

18        So the first -- or default.  So the first segment

19        is from the date of default charge-off and six

20        months.  And then the second segment picks up

21        from month 6 through 12, and then 12 through 18,

22        18 through 24.

23   Q.   But is a segment made up of different collection

24        agencies?

25   A.   Yes, ma'am.
```

182

1    Q.   And they have, what, pitched to get the work?

2              You know, we -- Daggett & Parker, we're a

3         good collection agency; give us some money?

4              MR. ALLTMONT:  Objection to form.

5    BY MS. DILL:

6    Q.   How do these people get business?

7    A.   So, I mean, these are people that we have

8         contracted with for years.  Initially, like if a

9         new agency wanted our business, then, yes, they

10        would have to pitch us.  We would have to do an

11        audit of them, our due diligence, and set them up

12        if they were approved.

13             But all these agencies for the most part have

14        operated with us for years, and their market

15        share fluctuates based on various parameters that

16        are reviewed by the performance team.

17   Q.   What is the market share of the Ratchford Group?

18   A.   I don't know.  It would -- it depends on which

19        state because Ratchford Group operates in

20        different states.  They potentially could get

21        different market shares depending on the state.

22   Q.   And the market share is dependent on the

23        performance review?

24   A.   Performance review, compliance also.  Just a

25        general business review.

```
 1    Q.   Okay.  The CRS system, that's a system that we

 2         have talked about.  Who has access to it?

 3    A.   TSI employees.

 4    Q.   Just TSI?

 5    A.   Yes.  Some TSI.  Not all TSI employees have

 6         access to it.

 7    Q.   And what about the Media Locator?

 8    A.   TSI employees.

 9    Q.   Okay.  I think -- I think I'm done unless --

10         thank you very much.

11    A.   Thank you.

12    Q.   I hope you have safe travels home.

13    A.   Thank you.

14              MS. DILL:  Thank you.

15              MR. ALLTMONT:  Thank you.

16              MS. DILL:  Thank you.

17              (The deposition was concluded at 3:56 p.m.)

18                    -  -  -  -  -  -

19

20                    _____
                      BRADLEY LUKE

21   Subscribed and sworn to before me
     this  _____ day of  _____, 2017.
22

23   _____
             Notary Public
24

25   Case Name:        NCSLT 2006-3 v. Thurlow, et al.
     Deposition Date:     June 16, 2017
                      THE REPORTING GROUP
                       Mason & Lockhart
```

```
 1                        CERTIFICATE

 2              I, Claudette G. Mason, a Notary

 3       Public in and for the State of Maine, hereby

 4       certify that the within-named deponent was

 5       sworn to testify the truth, the whole truth and

 6       nothing but the truth, in the aforementioned

 7       cause of action.

 8              I further certify that this deposition

 9       was stenographically reported by me and later

10       reduced to print through Computer-Aided

11       Transcription, and the foregoing is a full

12       and true record of the testimony given by the

13       deponent.

14              I further certify that I am a

15       disinterested person in the event or outcome

16       of the above-named cause of action.

17              IN WITNESS WHEREOF I subscribe my hand

18          this 27th day of June, 2017.

19   Dated at Falmouth, Maine.

20

21                        /s/ Claudette G. Mason
                          Claudette G. Mason, RMR, CRR
22                        Notary Public

23   My Commission Expires
     June 9, 2019.
24

25


                    THE REPORTING GROUP
                     Mason & Lockhart
```

## $

**$11,645.27** [2] - 162:1, 162:4
**$130** [1] - 104:2
**$130.84** [2] - 101:22, 104:17
**$15,786.39** [10] - 91:7, 91:9, 92:13, 94:7, 95:6, 95:16, 96:16, 136:10, 143:15, 145:20
**$18,639.96** [4] - 128:8, 128:14, 162:18, 164:17
**$23.02** [1] - 96:12
**$73.75** [1] - 104:18

## '

**'14** [1] - 5:2

## /

**/s** [1] - 184:21

## 0

**00121171240000040** [1] - 138:11
**0206** [1] - 47:12
**04034217** [1] - 81:11
**06-07** [1] - 47:8

## 1

**1** [13] - 1:14, 2:8, 4:7, 4:15, 28:7, 29:21, 29:25, 47:9, 62:20, 68:14, 84:8, 101:16, 139:11
**1-19** [1] - 3:2
**1/9/16** [1] - 2:9
**10** [24] - 2:13, 7:22, 41:6, 41:11, 47:10, 50:4, 67:3, 100:20, 100:22, 102:19, 106:9, 106:21, 107:13, 107:16, 107:19, 108:11, 109:16, 128:12, 129:13, 129:14, 131:25, 143:3, 180:25, 181:4
**10,000** [1] - 100:2
**10/1/14** [2] - 2:17, 2:17
**100** [3] - 2:13, 29:6, 180:22
**1010C** [1] - 96:19
**101C** [1] - 96:18

**1030A** [1] - 96:4
**10:05** [1] - 1:16
**10DC** [1] - 47:10
**11** [6] - 2:14, 67:4, 111:19, 111:20, 115:8, 128:12
**11,000** [1] - 82:17
**111** [1] - 2:14
**118** [1] - 2:14
**12** [14] - 2:14, 88:1, 118:1, 118:20, 120:1, 120:7, 120:12, 122:16, 123:1, 125:4, 125:11, 125:17, 181:21
**12/7/06** [1] - 2:18
**12:29** [1] - 99:6
**13** [2] - 2:15, 155:16
**132** [1] - 2:19
**14** [1] - 2:16
**148** [2] - 2:17, 2:17
**15** [9] - 2:16, 8:17, 59:21, 63:2, 63:9, 128:8, 128:22, 129:7, 160:12
**15-324** [5] - 31:16, 153:17, 153:21, 153:22, 156:6
**15-326** [4] - 31:16, 153:17, 153:25, 156:2
**155** [1] - 2:15
**158** [1] - 2:18
**16** [12] - 1:15, 2:17, 59:6, 59:21, 59:24, 60:9, 148:7, 148:11, 148:17, 149:22, 150:10, 183:25
**160** [1] - 2:16
**17** [11] - 2:17, 60:24, 119:13, 119:17, 119:18, 125:17, 148:8, 148:10, 148:15, 149:22, 150:10
**18** [7] - 2:18, 105:23, 158:5, 158:23, 159:24, 181:21, 181:22
**18,639** [1] - 128:7
**19** [13] - 2:19, 100:1, 112:6, 113:18, 114:10, 132:2, 135:24, 138:10, 142:12, 143:13, 143:17, 143:25, 155:19

**1:30** [1] - 99:7

## 2

**2** [60] - 2:9, 30:9, 38:6, 39:14, 41:15, 41:24, 60:25, 62:8, 62:11, 68:13, 68:16, 68:18, 69:2, 69:6, 69:15, 69:24, 70:11, 72:11, 72:22, 73:5, 73:10, 73:11, 73:19, 73:21, 74:4, 74:6, 74:7, 74:24, 75:25, 76:7, 76:20, 76:22, 76:24, 77:8, 77:24, 78:2, 78:9, 78:13, 81:4, 83:10, 95:5, 95:6, 95:16, 96:14, 114:6, 114:13, 114:16, 118:23, 119:8, 128:5, 133:9, 135:20, 136:10, 142:25, 143:16, 145:20, 158:5, 181:2
**2's** [1] - 76:25
**2.75** [1] - 82:10
**20** [8] - 50:4, 50:5, 61:5, 64:6, 84:12, 84:18, 88:19, 98:21
**2002** [2] - 63:2, 63:9
**2006** [9] - 47:13, 62:7, 63:6, 85:9, 100:1, 112:6, 113:13, 124:13, 126:12
**2006-1** [1] - 172:10
**2006-3** [16] - 1:5, 1:13, 15:12, 16:10, 16:15, 30:5, 92:7, 109:2, 109:3, 137:7, 137:10, 149:19, 153:23, 162:16, 172:12, 183:25
**2007** [1] - 172:10
**2007-1** [6] - 149:19, 154:1, 155:17, 156:10, 161:24, 172:12
**2008** [8] - 101:21, 104:1, 104:20, 134:8, 134:18, 135:6, 142:2
**2009** [2] - 134:19, 135:7
**2010** [8] - 4:10, 4:11, 4:20, 6:5, 100:9, 101:16, 102:10, 103:18
**2011** [4] - 65:6, 86:3,

114:9, 114:13
**2012** [34] - 36:9, 36:14, 37:3, 65:24, 66:4, 66:8, 68:13, 68:14, 75:10, 85:2, 88:2, 90:21, 93:7, 94:6, 95:6, 95:16, 96:14, 114:6, 114:13, 114:17, 133:9, 135:2, 135:20, 136:10, 137:1, 139:9, 139:12, 140:6, 140:12, 140:16, 142:25, 143:16, 145:20
**2013** [1] - 8:3
**2014** [6] - 4:7, 4:11, 4:15, 4:16, 4:20, 6:5
**2015** [14] - 3:19, 3:21, 3:22, 3:25, 129:13, 129:15, 131:25, 147:18, 147:22, 162:2, 162:4, 162:9, 162:17, 163:1
**2016** [15] - 84:13, 84:18, 88:19, 88:23, 90:17, 98:21, 113:18, 114:10, 128:8, 128:14, 128:23, 129:7, 172:2, 172:16, 172:22
**2017** [6] - 1:14, 1:16, 144:8, 183:21, 183:25, 184:18
**2019** [1] - 184:23
**207** [1] - 127:2
**22** [6] - 64:7, 65:5, 65:12, 86:3, 114:9, 114:12
**23** [4] - 100:15, 102:4, 102:10, 128:14
**23rd** [1] - 100:16
**24** [7] - 62:21, 63:1, 85:9, 100:8, 101:21, 104:20, 181:22
**24th** [1] - 100:17
**25** [1] - 62:21
**26** [9] - 62:11, 73:4, 73:15, 77:9, 81:3, 162:1, 162:2, 162:4, 162:17
**2601A** [1] - 96:9
**27th** [1] - 184:18
**28** [1] - 62:7
**29** [1] - 2:8

## 3

**3** [8] - 2:4, 2:9, 43:18, 43:19, 46:19, 180:25, 181:1, 181:2
**30** [1] - 2:9
**30(b)(6** [2] - 9:3, 38:12
**31** [2] - 23:20, 68:13
**33** [1] - 79:16
**35** [1] - 79:25
**36** [2] - 79:25, 80:2
**37** [1] - 79:25
**39** [8] - 80:18, 80:19, 89:18, 95:2, 95:15, 99:13, 135:19, 143:7
**3:56** [1] - 183:17

## 4

**4** [10] - 2:10, 47:24, 67:3, 88:2, 90:21, 103:2, 104:20, 128:5, 128:11, 165:18
**43** [2] - 2:9, 80:19, 99:13
**47** [3] - 2:10, 100:20, 102:19
**48** [1] - 108:5
**4A** [1] - 82:9

## 5

**5** [15] - 2:11, 52:12, 53:11, 53:12, 82:12, 84:6, 84:8, 118:23, 144:7, 174:16, 174:21, 175:4
**5/5/17** [1] - 2:19
**50** [4] - 7:24, 8:13, 12:10, 85:6
**5003A** [2] - 96:6, 96:11
**511** [1] - 1:15
**52** [2] - 2:11, 2:11
**54** [5] - 119:4, 119:6, 119:12, 119:18, 125:18

## 6

**6** [20] - 2:11, 44:15, 52:15, 53:6, 53:24, 57:23, 58:19, 58:25, 60:23, 61:5, 118:22, 120:1, 120:4, 120:14, 122:25, 125:4, 125:8, 125:17, 127:18, 181:21
**6.19** [1] - 113:4

**6/2/16** [1] - 2:10
**61** [1] - 2:12
**65** [3] - 157:15, 159:11

## 7

**7** [11] - 2:12, 61:12, 61:13, 61:17, 61:22, 61:23, 62:10, 62:15, 64:1, 65:12, 79:8
**70** [1] - 12:10
**7001A** [2] - 97:10, 104:13
**704-9406** [1] - 127:9
**76** [1] - 142:16
**77** [1] - 142:16

## 8

**8** [26] - 2:12, 59:5, 59:23, 60:7, 64:2, 80:14, 83:19, 83:23, 86:20, 89:17, 97:20, 98:12, 99:9, 101:18, 108:25, 114:16, 135:17, 135:18, 136:11, 138:24, 139:18, 140:5, 143:7, 143:14, 143:18, 144:2
**8/22/11** [1] - 67:5
**8/22/2011** [1] - 64:9
**80** [1] - 2:12
**800** [1] - 127:9
**893-1756** [1] - 127:2

## 9

**9** [8] - 2:13, 86:8, 98:2, 98:9, 101:17, 102:21, 105:24, 184:23
**9.5** [1] - 81:25
**98** [1] - 2:13

## A

**a.m** [1] - 1:16
**A/Credit** [1] - 2:16
**a/k/a** [1] - 1:8
**A/Note** [1] - 2:9
**A/U.S** [1] - 2:11
**AB** [1] - 47:7
**AB.06-07** [1] - 59:1
**AB.06-07.CSX1** [1] - 47:3
**abbreviation** [1] - 96:1
**abbreviations** [1] - 97:13
**ability** [11] - 27:16,

35:6, 35:19, 35:20, 40:25, 53:3, 87:7, 89:15, 91:18, 92:4, 154:18
**able** [7] - 15:20, 57:16, 92:9, 107:11, 111:12, 117:24, 154:19
**above-named** [1] - 184:16
**Abrahamsen** [3] - 177:12, 180:1, 180:3
**absolutely** [1] - 163:19
**accelerated** [3] - 92:22, 93:4
**accelerating** [1] - 95:24
**acceleration** [1] - 140:20
**accept** [1] - 127:13
**access** [31] - 13:6, 13:11, 14:19, 22:19, 22:23, 23:1, 49:21, 49:25, 50:3, 52:3, 52:5, 54:21, 86:17, 111:6, 137:18, 137:21, 142:17, 142:18, 146:20, 160:2, 161:16, 161:18, 177:6, 177:7, 177:14, 177:15, 177:17, 177:20, 179:20, 183:2, 183:6
**accessed** [2] - 43:23, 146:9
**according** [3] - 83:10, 124:17, 150:21
**account** [74] - 10:2, 12:20, 12:24, 13:14, 13:17, 13:19, 14:8, 14:9, 14:10, 14:13, 15:23, 24:15, 24:24, 28:6, 28:11, 30:10, 30:13, 31:23, 32:2, 32:16, 34:19, 34:20, 35:13, 35:15, 36:18, 36:20, 38:17, 39:5, 42:9, 42:22, 43:16, 44:11, 44:12, 47:25, 49:6, 50:13, 50:24, 54:8, 55:9, 86:25, 89:3, 95:18, 102:8, 108:23, 110:19, 111:22, 115:24, 123:14, 134:11, 135:6, 136:19, 136:20, 136:22,

145:21, 146:14, 147:17, 149:2, 155:19, 156:3, 162:11, 162:22, 171:17, 171:18, 171:24, 172:1, 172:4, 172:5, 172:25, 179:4, 179:6, 179:7, 179:11, 180:17
**accounting** [6] - 20:10, 20:25, 21:2, 21:4, 22:14, 80:22
**accounts** [24] - 14:7, 29:1, 31:23, 41:4, 41:18, 57:2, 134:18, 134:21, 142:6, 171:13, 172:6, 178:25, 179:1, 179:5, 180:6, 180:10, 180:23, 181:1, 181:2, 181:3, 181:5, 181:10
**accrual** [4] - 25:13, 49:7, 104:9, 130:24
**accrue** [5] - 104:10, 104:16, 129:16, 163:12, 164:25
**accrued** [6] - 24:25, 76:14, 104:19, 128:6, 128:13, 131:18
**accrues** [2] - 128:19, 129:5
**accruing** [7] - 128:24, 129:1, 129:14, 162:7, 163:6, 163:24, 164:21
**accuracy** [3] - 27:24, 44:10, 53:1
**accurate** [15] - 25:23, 28:9, 53:2, 53:3, 53:6, 110:15, 117:18, 118:7, 120:6, 122:8, 122:16, 133:6, 143:20, 150:20, 150:23
**accurately** [1] - 42:22
**acknowledging** [1] - 169:17
**acronyms** [1] - 13:24
**Act** [1] - 174:5
**action** [3] - 42:1, 184:7, 184:16
**Action** [1] - 1:1
**active** [5] - 170:12, 170:14, 170:18,

170:20, 170:22
**activity** [9] - 80:21, 84:1, 84:2, 114:15, 132:25, 138:16, 138:23, 142:22, 149:23
**Activity** [2] - 2:12, 2:19
**actual** [21] - 11:12, 11:15, 30:24, 32:13, 33:5, 33:6, 34:2, 34:20, 34:21, 35:8, 36:12, 42:23, 44:14, 49:8, 73:5, 82:21, 89:3, 124:4, 125:7, 162:10, 176:3
**added** [2] - 71:15, 109:21
**additional** [8] - 19:15, 46:2, 78:25, 104:24, 105:7, 121:5, 121:16, 147:1
**additionally** [1] - 147:5
**address** [2] - 35:11, 35:12
**adjustment** [3] - 95:17, 95:20, 95:21
**adjustments** [3] - 25:14, 42:22, 51:4
**administrator** [4] - 175:2, 175:3, 175:5, 175:7
**advanced** [1] - 82:22
**adverse** [5] - 155:22, 172:1, 172:4, 172:5, 172:24
**AES** [146] - 22:3, 22:7, 22:10, 22:14, 22:17, 22:19, 22:24, 23:8, 23:10, 23:12, 23:15, 23:21, 24:2, 24:4, 24:11, 25:1, 25:5, 25:9, 25:10, 25:17, 25:20, 25:21, 26:1, 26:6, 26:10, 26:13, 26:23, 27:1, 27:2, 27:3, 27:5, 27:10, 27:17, 27:21, 27:24, 28:12, 32:4, 32:5, 32:9, 33:2, 33:3, 34:18, 35:19, 35:21, 36:14, 42:8, 44:13, 45:10, 45:22, 45:24, 46:4, 46:7, 50:1, 50:3, 52:3, 52:7, 55:1, 55:11, 55:12, 55:16, 56:9, 56:22, 56:24, 57:9, 57:15,

60:13, 60:17, 80:21, 83:23, 84:22, 84:25, 85:9, 87:10, 88:2, 88:13, 89:5, 89:22, 90:22, 90:24, 91:1, 91:11, 91:13, 91:16, 91:17, 91:21, 92:3, 92:19, 93:20, 93:21, 94:14, 94:15, 94:18, 94:25, 95:18, 96:2, 98:11, 98:19, 106:1, 108:21, 108:23, 109:25, 110:14, 110:21, 110:24, 111:12, 111:23, 112:25, 135:23, 137:18, 137:23, 138:2, 138:4, 138:13, 138:17, 138:20, 138:25, 139:3, 139:6, 139:8, 140:2, 140:3, 140:15, 140:23, 142:25, 143:16, 144:14, 144:16, 144:18, 145:1, 145:8, 145:19, 146:4, 146:9, 147:2, 152:8, 152:9, 152:11, 152:23, 156:19, 160:3, 166:12, 171:4, 173:4, 177:17
**AES's** [12] - 60:16, 83:25, 84:17, 84:19, 85:15, 86:5, 87:2, 87:4, 98:13, 98:23, 106:3, 114:14
**AES/PA** [1] - 89:5
**affects** [3] - 97:6, 97:7, 113:24
**affiant** [2] - 44:3, 158:18
**affiants** [1] - 40:21
**Affidavit** [3] - 2:9, 2:10, 2:16
**affidavit** [81] - 30:10, 30:13, 31:11, 38:11, 38:17, 39:4, 39:8, 40:23, 42:13, 43:15, 44:8, 44:15, 44:21, 44:23, 44:24, 45:1, 45:7, 45:8, 45:12, 45:13, 45:15, 45:19, 46:14, 46:21, 47:24, 48:4, 50:13, 50:14, 52:10, 52:16, 52:21, 52:22, 52:24, 52:25, 53:2, 53:4, 54:6,

54:13, 54:15, 61:18, 67:2, 72:23, 72:25, 74:10, 77:2, 79:5, 79:7, 80:15, 86:22, 90:15, 106:10, 109:19, 118:22, 120:16, 120:18, 120:21, 120:23, 121:3, 121:7, 121:8, 121:21, 122:2, 122:12, 123:7, 124:25, 125:2, 125:9, 128:4, 128:10, 155:11, 156:3, 156:23, 158:20, 158:21, 158:24, 159:1, 159:10, 160:11, 162:19, 162:20
**affidavits** [7] - 41:4, 41:12, 44:2, 45:16, 48:12, 48:14, 121:23
**aforementioned** [1] - 184:6
**agencies** [24] - 147:25, 151:6, 151:16, 151:17, 151:19, 155:23, 170:10, 170:13, 170:20, 171:2, 171:14, 171:15, 171:22, 171:23, 172:3, 173:7, 173:18, 180:7, 180:12, 180:16, 180:21, 181:7, 181:24, 182:13
**Agency** [1] - 21:14
**agency** [11] - 23:22, 50:17, 86:11, 117:21, 173:2, 174:6, 174:12, 179:7, 180:10, 182:3, 182:9
**agents** [1] - 155:22
**ago** [2] - 8:17, 106:11
**agree** [20] - 106:18, 117:6, 117:15, 117:19, 118:8, 118:9, 122:22, 127:13, 132:8, 133:2, 135:22, 136:25, 143:14, 150:14, 156:2, 169:7, 169:22, 170:22, 174:4, 174:10
**agreed** [2] - 127:23, 158:10

**agreeing** [2] - 169:24, 169:25
**agreement** [27] - 43:17, 43:21, 43:25, 46:22, 52:17, 54:1, 58:1, 62:22, 63:2, 63:9, 63:15, 68:5, 79:10, 79:24, 104:25, 113:7, 118:5, 118:10, 119:24, 124:5, 157:2, 158:4, 158:20, 159:10, 159:16, 159:19, 160:13
**Agreement** [5] - 2:10, 2:11, 2:14, 2:16, 2:18
**agreements** [4] - 62:3, 62:16, 62:19, 126:16
**ahead** [3] - 98:5, 105:24, 163:14
**ahold** [1] - 41:2
**Aided** [1] - 184:10
**AL** [1] - 1:8
**al** [1] - 183:25
**Alicia** [15] - 47:25, 48:7, 48:16, 48:21, 50:22, 53:25, 61:18, 64:24, 67:2, 72:24, 77:1, 118:21, 125:8, 127:25, 165:19
**allegations** [1] - 12:21
**alleged** [2] - 55:20, 172:9
**allegedly** [6] - 20:22, 44:15, 63:5, 67:11, 149:9, 152:2
**allocated** [1] - 86:14
**allotted** [1] - 110:11
**allowed** [6] - 61:2, 119:10, 119:15, 134:9, 134:12, 134:23
**ALLTMONT** [4] - 1:21, 174:8, 182:4, 183:15
**almost** [1] - 7:6
**ALPLM** [1] - 89:19
**alter** [3] - 35:20, 89:15, 91:18
**altered** [3] - 69:13, 77:14, 77:16
**Alternative** [5] - 79:19, 79:21, 80:4, 80:7, 89:20
**alternative** [1] - 89:22
**amended** [1] - 30:1
**Amended** [2] - 2:8,

2:15
**amendments** [1] - 43:13
**American** [7] - 21:10, 89:6, 89:8, 89:10, 133:1, 133:5
**amount** [39] - 82:21, 86:15, 86:16, 96:12, 96:16, 100:1, 100:2, 101:22, 102:24, 102:25, 103:22, 104:4, 105:4, 110:11, 114:21, 129:3, 129:19, 129:21, 129:22, 130:7, 131:15, 131:17, 131:19, 131:22, 135:22, 135:23, 136:2, 136:16, 149:12, 150:6, 152:17, 162:1, 162:3, 162:18, 162:22, 163:11, 163:15, 181:13
**amounts** [7] - 20:21, 44:16, 76:20, 103:5, 130:18, 156:5, 156:7
**ancillary** [3] - 14:10, 14:16, 15:13
**answer** [16] - 51:10, 92:2, 98:25, 105:12, 116:22, 132:17, 145:14, 152:21, 167:10, 168:5, 168:12, 168:17, 169:2, 169:14, 170:4, 180:14
**answered** [10] - 37:10, 37:23, 87:24, 94:3, 126:18, 137:5, 163:10, 164:4, 164:5, 164:13
**anytime** [1] - 88:6
**apart** [1] - 161:10
**apiece** [1] - 180:16
**apologize** [6] - 37:25, 59:11, 59:16, 72:17, 80:23, 130:22
**appear** [10] - 79:25, 81:16, 81:18, 83:13, 87:18, 95:14, 115:6, 138:14, 155:17, 156:8
**APPEARANCES** [1] - 1:20
**appeared** [3] - 38:7, 60:6, 106:15
**append** [1] - 43:24

**appended** [3] - 61:7, 124:3, 156:22
**applicable** [5] - 58:6, 113:17, 113:23, 123:14, 123:17
**application** [4] - 105:6, 105:21, 124:4, 142:17
**applications** [1] - 56:16
**applied** [11] - 65:3, 86:16, 97:5, 99:22, 101:21, 104:6, 104:22, 105:20, 152:6, 152:7, 152:18
**applies** [2] - 15:22, 104:23
**apply** [4] - 49:11, 100:24, 123:10, 152:9
**applying** [2] - 20:9, 20:20
**appropriate** [2] - 36:18, 168:18
**approved** [1] - 182:12
**April** [38] - 36:9, 36:10, 36:14, 37:14, 68:13, 88:1, 88:2, 93:7, 94:6, 95:6, 95:16, 96:14, 101:21, 104:1, 104:20, 114:6, 114:13, 114:16, 129:13, 129:14, 131:25, 133:9, 134:8, 135:20, 136:10, 137:1, 139:9, 140:6, 140:12, 140:16, 142:25, 143:16, 145:20, 147:18, 147:22, 162:8, 162:9, 162:25
**area** [1] - 41:2
**areas** [1] - 166:24
**argue** [1] - 37:25, 93:24
**arguing** [2] - 37:22, 87:24
**argument** [1] - 38:1
**argumentative** [8] - 28:24, 37:6, 129:23, 130:9, 130:12, 130:20, 131:20, 163:18
**arrested** [1] - 20:3
**art** [1] - 172:5
**aside** [1] - 148:17

**assigned** [1] - 180:20
**assigns** [1] - 62:5
**assist** [5] - 9:25, 12:18, 13:7, 29:2, 31:10
**Assistance** [1] - 21:13
**assisted** [2] - 51:23, 126:21
**assisting** [1] - 29:4
**associated** [3] - 108:17, 109:7, 123:17
**Association** [2] - 16:13, 125:13
**assume** [2] - 60:8, 117:13
**assumed** [1] - 116:2
**assumes** [2] - 146:2, 167:23
**assuming** [2] - 37:20, 109:7
**assumption** [2] - 90:7, 126:1
**attach** [2] - 159:18, 159:23
**attached** [40] - 43:15, 44:4, 44:10, 46:20, 52:10, 52:22, 53:2, 57:22, 61:18, 72:23, 72:24, 73:6, 79:5, 79:7, 80:15, 86:21, 104:24, 106:10, 118:4, 118:6, 118:11, 118:21, 120:3, 120:6, 120:14, 122:11, 124:15, 124:23, 124:24, 125:1, 126:2, 142:15, 155:11, 157:12, 158:3, 158:19, 158:23, 158:25, 159:9, 160:11
**attaches** [2] - 120:21, 159:12
**attaching** [3] - 74:10, 121:4, 159:15
**attachment** [2] - 159:4, 159:5
**attachments** [2] - 122:3, 122:23
**attempt** [4] - 23:22, 24:3, 147:19, 149:13
**attempted** [1] - 160:21
**attending** [2] - 176:4, 176:6
**attention** [3] - 111:19, 148:7, 174:16

**attorney** [6] - 17:4, 17:16, 50:17, 50:19, 169:5, 180:11
**attorney-client** [2] - 17:16, 169:5
**attorneys** [2] - 118:14, 148:20
**audit** [1] - 182:11
**August** [6] - 65:5, 86:3, 114:8, 114:9, 114:12, 135:19
**authenticity** [1] - 76:4
**authored** [1] - 39:19
**authorization** [1] - 52:12
**Authorization** [1] - 2:11
**authorized** [3] - 29:9, 42:1, 56:21
**automatic** [1] - 110:5
**automatically** [4] - 66:25, 94:10, 110:3, 110:8
**available** [2] - 146:19, 147:7
**aware** [13] - 11:11, 17:13, 29:13, 34:8, 88:24, 145:5, 145:7, 145:19, 145:23, 146:4, 149:22, 149:25, 167:2
**awhile** [1] - 174:3
**Axiant** [2] - 6:23, 7:3

**B**

**B/Loan** [1] - 2:11
**backdate** [1] - 88:8
**background** [1] - 68:3
**bad** [3] - 38:25, 94:21, 144:24
**badgering** [1] - 164:5
**balance** [25] - 28:7, 45:4, 49:6, 76:11, 90:20, 90:22, 90:24, 91:3, 91:6, 91:9, 91:10, 91:12, 91:20, 92:5, 92:7, 92:12, 92:22, 95:18, 97:5, 97:7, 99:16, 128:22, 131:18, 131:23
**balances** [1] - 76:13
**bank** [6] - 55:14, 56:10, 56:12, 56:19, 56:20, 125:7
**Bank** [20] - 2:11, 16:12, 19:7, 43:9, 49:1, 52:13, 56:7, 62:1, 62:4, 74:7,

**began** [2] - 101:20, 147:19
**begin** [2] - 100:3, 147:15
**beginning** [6] - 47:3, 85:1, 99:13, 116:25, 134:19, 135:6
**behalf** [13] - 16:13, 19:7, 23:1, 29:10, 49:1, 49:3, 55:15, 56:13, 56:20, 127:6, 170:9, 171:12, 174:18
**belief** [5] - 51:6, 133:5, 135:3, 142:1, 165:21
**belong** [1] - 120:7
**belongs** [1] - 109:15
**below** [1] - 58:11
**better** [1] - 59:19
**between** [21] - 4:19, 17:1, 17:13, 23:10, 23:14, 43:7, 43:9, 50:4, 62:1, 63:3, 86:14, 93:17, 104:20, 112:10, 114:8, 130:18, 143:21, 169:5, 173:8, 174:14, 179:17
**Beverly** [1] - 72:2
**beyond** [1] - 103:13
**big** [4] - 12:8, 74:18, 80:25, 81:7
**bit** [4] - 23:7, 37:4, 103:9, 103:12
**black** [2] - 69:12, 69:13
**blocks** [1] - 77:19
**bond** [1] - 109:1
**bondholders** [1] - 175:8
**borrower** [7] - 58:13, 58:14, 96:20, 96:21, 115:1, 117:12, 117:17
**borrowers** [4] - 20:17, 20:21, 119:25, 150:11
**boss** [2] - 31:4, 31:6
**bottom** [15] - 47:1, 47:3, 58:18, 58:25, 61:8, 64:1, 64:3, 64:4, 65:12, 66:21, 81:16, 83:1, 119:18, 138:6, 142:13
**bought** [1] - 147:2
**box** [5] - 69:12, 69:13, 81:10, 81:25, 82:9

**boxes** [1] - 82:3
**Bradley** [1] - 3:10
**BRADLEY** [4] - 1:13, 2:2, 3:3, 183:20
**breach** [2] - 129:25, 130:3
**break** [9] - 20:13, 53:18, 53:20, 72:17, 72:18, 99:4, 106:4, 142:7, 166:17
**briefly** [4] - 99:9, 106:11, 166:25, 174:13
**bring** [2] - 16:16, 23:24
**broadly** [1] - 105:2
**broken** [1] - 73:25
**brought** [5] - 10:7, 14:3, 38:20, 39:6, 162:15
**BRYAN** [1] - 1:21
**bucket** [1] - 104:6
**bullet** [2] - 63:1, 79:15, 80:2
**Bureau** [7] - 167:2, 167:4, 167:22, 168:10, 168:14, 169:7, 169:15
**bureau** [1] - 173:13
**business** [30] - 6:16, 6:17, 7:1, 21:12, 37:17, 42:2, 54:5, 56:17, 71:5, 71:6, 71:8, 71:9, 71:10, 71:15, 71:16, 78:24, 125:11, 125:12, 125:13, 126:7, 130:25, 131:1, 136:6, 154:7, 163:11, 164:7, 164:8, 182:6, 182:9, 182:25
**Butte** [1] - 7:13
**button** [3] - 123:9, 123:11, 123:15
**buttons** [1] - 152:16
**buy** [1] - 70:18
**BY** [56] - 3:6, 9:21, 16:5, 20:12, 26:17, 28:20, 29:19, 29:23, 33:24, 37:7, 37:11, 37:24, 39:3, 51:12, 53:23, 59:8, 60:5, 64:8, 65:10, 66:13, 72:21, 76:18, 77:6, 77:12, 86:1, 92:1, 94:4, 98:7, 99:8, 108:1, 111:8,

115:11, 118:18, 119:7, 122:13, 125:23, 130:16, 131:11, 132:24, 133:16, 139:17, 142:11, 143:12, 145:13, 158:2, 159:8, 163:5, 164:1, 166:16, 166:23, 167:9, 167:19, 168:8, 169:13, 170:8, 182:5

**C**

**C/Chain** [1] - 2:12
**calculate** [1] - 130:24
**calculated** [2] - 105:9, 113:21
**calculates** [1] - 110:9
**calculation** [1] - 113:22
**California** [2] - 8:19, 72:2
**capacities** [2] - 10:11, 51:13
**capacity** [9] - 3:20, 8:4, 8:20, 8:25, 19:13, 110:12, 116:7, 136:5, 176:5
**capitalization** [2] - 95:25, 104:13
**capitalizations** [1] - 97:11
**capitalized** [1] - 92:24
**capitalizes** [1] - 104:14
**captioned** [1] - 137:17
**card** [1] - 57:16
**carries** [1] - 95:23
**Case** [1] - 183:25
**case** [80] - 8:24, 9:15, 16:6, 16:9, 16:22, 16:24, 21:6, 24:20, 30:11, 30:21, 31:1, 31:13, 31:14, 32:11, 33:13, 36:25, 37:18, 40:18, 40:21, 41:8, 48:8, 48:11, 50:6, 55:18, 56:8, 56:19, 57:5, 57:10, 57:19, 62:24, 65:3, 67:10, 69:6, 77:1, 78:4, 79:14, 80:1, 81:23, 88:24, 92:6, 92:13, 92:16, 92:20, 93:11, 93:19, 94:5, 99:24, 108:18, 112:17, 115:14, 119:25,

121:22, 122:5, 123:20, 129:5, 129:12, 129:25, 133:18, 133:24, 137:11, 151:25, 153:20, 155:15, 156:4, 156:6, 158:18, 159:22, 160:19, 162:8, 162:9, 162:12, 162:15, 163:7, 164:2, 164:15, 164:17, 165:23, 172:1, 175:23, 176:8
**cases** [16] - 10:12, 16:24, 24:2, 29:4, 31:19, 33:14, 38:20, 39:5, 116:13, 116:19, 116:24, 130:11, 133:11, 153:16, 154:21, 165:2
**catalog** [1] - 57:17
**category** [1] - 13:16
**caused** [1] - 51:8
**CCA** [2] - 150:24, 151:2
**cent** [1] - 28:7
**center** [2] - 81:17, 138:6
**centralized** [1] - 13:11
**certain** [11] - 6:17, 15:6, 22:25, 72:7, 98:17, 98:19, 108:23, 129:3, 149:12, 163:12, 163:16
**certainty** [1] - 89:2
**CERTIFICATE** [1] - 184:1
**certify** [3] - 184:4, 184:8, 184:14
**cetera** [1] - 24:25
**chain** [3] - 61:14, 61:19, 155:13
**chance** [1] - 98:8
**change** [6] - 5:9, 35:6, 35:20, 78:23, 87:8, 89:15
**changed** [2] - 79:2, 176:24
**changes** [1] - 27:16
**charge** [31] - 42:9, 84:8, 91:1, 91:2, 91:6, 91:13, 92:8, 93:6, 93:11, 93:16, 93:17, 94:7, 94:11, 94:13, 95:3, 95:8,

95:10, 95:21, 95:23, 96:1, 96:5, 96:9, 111:23, 114:4, 114:5, 135:20, 140:21, 143:19, 143:22, 152:24, 181:19
**charge-off** [27] - 42:9, 84:8, 91:1, 91:6, 91:13, 92:8, 93:16, 93:17, 94:11, 94:13, 95:3, 95:8, 95:10, 95:21, 95:23, 96:1, 96:5, 96:9, 111:23, 114:4, 114:5, 135:20, 140:21, 143:19, 143:22, 152:24, 181:19
**charged** [15] - 21:17, 36:9, 92:12, 92:13, 92:19, 92:25, 93:15, 94:1, 135:22, 136:4, 140:6, 140:18, 141:9, 152:24, 153:4
**charges** [2] - 92:3, 180:17
**charging** [2] - 23:18, 36:16
**Charter** [23] - 47:7, 56:2, 56:3, 62:1, 62:4, 74:7, 78:4, 78:5, 83:2, 83:6, 83:9, 83:16, 120:8, 120:12, 125:9, 125:11, 125:13, 127:5, 127:6, 158:16, 160:24, 160:25, 161:3
**Charter's** [1] - 80:3
**check** [2] - 40:23, 86:10
**checked** [2] - 73:13, 76:22
**checking** [1] - 14:6
**checks** [2] - 27:25, 28:10
**chief** [1] - 12:17
**chose** [1] - 116:3
**Citizens** [6] - 120:8, 120:10, 125:12, 158:15, 160:24, 161:3
**civil** [1] - 31:16
**Civil** [1] - 1:1
**claim** [3] - 150:12, 150:19, 165:23
**claiming** [1] - 169:3
**claims** [3] - 14:3, 72:8,

135:24
**clarify** [7] - 12:3, 21:23, 39:13, 69:18, 149:17, 151:24, 172:4
**Claudette** [4] - 1:16, 184:2, 184:21, 184:21
**cleaner** [1] - 82:2
**clear** [2] - 80:25, 159:6
**click** [1] - 152:16
**client** [10] - 15:24, 15:25, 16:1, 16:2, 16:11, 17:16, 92:5, 103:21, 133:12, 169:5
**clients** [4] - 16:3, 18:19, 44:16, 170:24
**close** [3] - 96:16, 120:18, 121:1
**closest** [1] - 11:20
**clues** [1] - 108:5
**code** [19] - 47:17, 47:18, 47:19, 58:18, 59:1, 59:3, 59:9, 60:6, 96:18, 119:20, 120:11, 123:17, 123:18, 125:3, 125:5, 126:3, 138:7, 145:12, 161:1
**codes** [3] - 60:18, 120:13, 127:20
**COFFEY** [1] - 1:8
**Coffey** [9] - 14:5, 16:18, 55:20, 55:23, 99:20, 152:2, 166:4, 172:20, 172:21
**coincidence** [1] - 67:9
**Coletti** [4] - 66:17, 67:13, 75:14, 135:12
**Coletti's** [1] - 76:5
**collate** [1] - 54:11
**collect** [15] - 10:6, 92:5, 92:10, 139:3, 147:19, 148:1, 148:21, 149:5, 149:13, 150:25, 151:5, 151:9, 154:3, 154:17, 178:24
**collected** [5] - 18:1, 18:3, 150:6, 179:12, 179:25
**collecting** [3] - 18:18, 20:16, 149:8
**collection** [24] - 7:1, 10:12, 13:25, 16:22, 19:1, 19:5, 44:24, 50:17, 147:25,

149:23, 150:2, 151:19, 162:7, 165:2, 171:14, 178:4, 178:10, 178:24, 179:7, 180:2, 180:7, 180:9, 181:23, 182:3
**collections** [3] - 83:15, 180:8, 180:15
**College** [1] - 7:11
**college** [1] - 7:16
**COLLEGIATE** [2] - 1:4, 1:12
**Collegiate** [43] - 9:1, 9:9, 14:4, 15:11, 16:9, 16:14, 18:12, 18:17, 21:20, 29:11, 29:14, 30:5, 38:21, 39:6, 39:15, 42:18, 43:8, 48:2, 62:1, 62:6, 90:6, 92:6, 108:13, 108:14, 109:3, 109:6, 131:15, 137:2, 137:7, 137:10, 149:19, 153:23, 154:1, 155:17, 155:21, 161:25, 162:16, 163:23, 172:9, 172:23, 175:24, 176:21, 179:1
**column** [4] - 102:16, 102:22, 103:1, 108:10
**coming** [2] - 28:1, 136:6
**commencing** [1] - 1:16
**comment** [1] - 167:17
**Commission** [1] - 184:23
**communicate** [1] - 178:22
**communicates** [1] - 179:17
**communications** [1] - 169:19
**Community** [1] - 7:11
**company** [17] - 3:13, 4:8, 6:8, 6:19, 6:25, 10:1, 21:9, 21:11, 23:12, 28:19, 29:7, 54:19, 70:13, 71:4, 71:13, 71:17, 173:21
**compare** [1] - 118:20
**compared** [3] - 59:5, 77:2, 77:5

**Compass** [10] - 26:7, 27:2, 32:4, 32:5, 34:25, 35:4, 52:5, 52:7, 83:25
**compensation** [3] - 150:5, 150:7
**competent** [1] - 41:25
**compile** [1] - 159:23
**compiled** [1] - 144:14
**complaint** [15] - 118:3, 118:6, 118:11, 122:15, 122:17, 122:18, 122:21, 124:24, 159:4, 159:13, 159:16, 159:19, 161:24, 162:15, 166:5
**complaints** [1] - 12:20
**complete** [1] - 157:4
**compliance** [17] - 4:1, 4:18, 5:2, 5:3, 5:7, 5:8, 6:3, 8:5, 8:9, 10:18, 10:22, 11:4, 11:10, 12:12, 12:17, 12:22, 182:24
**comprised** [2] - 27:6, 27:14
**comprising** [1] - 180:22
**computer** [3] - 77:21, 77:23, 176:16
**Computer** [1] - 184:10
**Computer-Aided** [1] - 184:10
**concluded** [1] - 183:17
**conclusion** [8] - 17:18, 22:1, 71:2, 72:6, 122:11, 137:13, 155:8, 174:9
**conditions** [19] - 58:16, 104:24, 105:8, 121:16, 122:4, 123:9, 123:15, 124:3, 124:15, 124:22, 125:25, 126:2, 127:23, 157:9, 157:11, 158:3, 158:10, 160:17, 161:6
**conference** [1] - 88:16
**confidential** [2] - 167:16, 168:4
**confirm** [7] - 73:13, 86:2, 98:3, 110:13, 118:2, 118:13, 136:9
**confirmed** [2] - 110:17

**confirming** [1] - 165:19
**confused** [1] - 162:13
**Congress** [1] - 1:15
**CONLEY** [1] - 1:22
**connected** [5] - 10:5, 21:18, 21:22, 21:23, 75:22
**connection** [2] - 90:15, 168:14
**consisting** [1] - 78:18
**consists** [1] - 43:19
**consolidated** [2] - 31:17, 154:22
**consumer** [5] - 35:13, 47:12, 90:10, 90:12, 93:3
**Consumer** [7] - 167:1, 167:3, 167:21, 168:10, 168:13, 169:6, 169:15
**consumers** [3] - 60:20, 82:22, 172:6
**contain** [3] - 32:10, 74:2, 106:25
**contained** [17] - 27:15, 73:10, 75:3, 76:8, 85:19, 86:23, 104:23, 138:22, 142:18, 142:21, 143:25, 148:12, 161:7, 165:16, 165:20, 178:18, 178:19
**containing** [3] - 36:15, 78:22, 160:16
**contains** [3] - 77:13, 107:1, 121:20
**context** [1] - 122:19
**contingent** [1] - 18:6
**continue** [6] - 22:10, 53:14, 104:10, 118:15, 134:10, 164:4
**continued** [1] - 129:16
**continues** [3] - 45:25, 104:16, 164:25
**continuing** [3] - 89:17, 130:23, 163:12
**contract** [16] - 17:13, 43:3, 43:4, 43:5, 43:7, 43:10, 56:3, 56:14, 93:13, 129:25, 130:3, 154:10, 173:6, 173:8, 175:9, 175:10
**contracted** [4] - 16:12, 17:3, 154:2, 182:8

**contracting** [1] - 93:21
**contracts** [2] - 154:3, 174:17
**contractual** [2] - 92:10, 171:22
**contractually** [2] - 93:9, 93:17
**control** [3] - 89:13, 123:23, 139:21
**conversation** [6] - 59:20, 66:14, 67:13, 67:17, 131:7, 135:14
**conversations** [10] - 38:15, 40:17, 67:18, 68:1, 68:7, 75:23, 131:6, 131:10, 141:12, 164:14
**copies** [8] - 34:23, 35:1, 72:12, 81:1, 122:8, 160:15, 161:14, 161:20
**copy** [26] - 43:17, 43:24, 52:16, 52:19, 53:7, 53:25, 54:7, 58:10, 58:13, 58:14, 58:16, 64:13, 73:5, 73:7, 73:9, 82:2, 118:7, 118:10, 118:21, 119:24, 122:16, 159:15, 159:17, 161:21
**Corn** [1] - 135:13
**corner** [2] - 59:17, 81:14
**corporation** [1] - 70:9
**Corporation** [7] - 62:2, 67:14, 67:22, 68:9, 70:6, 70:10, 74:8
**correct** [64] - 18:20, 18:23, 24:12, 24:17, 26:2, 30:12, 34:12, 34:14, 38:19, 43:21, 46:7, 46:24, 52:13, 52:17, 54:17, 61:3, 61:10, 62:17, 63:6, 76:21, 79:10, 87:11, 89:11, 89:12, 89:14, 90:20, 96:17, 96:22, 99:18, 99:22, 99:23, 100:15, 103:18, 103:23, 103:24, 106:2, 106:7, 106:8, 107:8, 107:10, 108:15, 108:19, 110:25, 113:4, 119:11, 119:16, 123:22, 124:6,

124:20, 127:15, 128:8, 128:15, 133:7, 135:20, 135:25, 137:6, 140:25, 142:5, 154:23, 155:1, 156:25, 157:5, 157:13, 158:23
**correctly** [2] - 67:6, 158:7
**correspondence** [7] - 34:6, 35:1, 137:25, 138:5, 142:14, 146:15, 146:16
**corresponding** [1] - 58:15
**corresponds** [1] - 45:6
**cosigned** [1] - 47:9
**cosigner** [2] - 58:13, 58:14
**counsel** [7] - 10:3, 40:5, 66:18, 75:15, 131:8, 131:12
**country** [1] - 11:18
**county** [1] - 40:6
**couple** [2] - 61:23, 72:13
**course** [3] - 36:22, 67:25, 138:15
**courses** [1] - 19:23
**court** [3] - 9:16, 61:8, 155:5
**COURT** [1] - 1:1
**Court** [11] - 16:11, 39:16, 48:1, 61:14, 61:19, 107:18, 118:7, 122:6, 122:7, 129:18, 130:6
**CR** [7] - 95:7, 95:10, 95:12, 96:3, 96:22, 97:4
**create** [7] - 25:11, 26:10, 26:13, 57:1, 111:6, 138:23, 179:11
**created** [39] - 14:16, 14:24, 34:14, 34:15, 35:25, 36:2, 39:12, 39:17, 39:24, 47:15, 47:18, 47:21, 60:16, 60:20, 74:6, 74:7, 78:2, 83:23, 84:10, 84:14, 84:16, 91:16, 98:11, 98:15, 98:20, 99:1, 106:1, 106:5, 106:6, 107:9, 109:16, 109:20,

109:21, 112:1, 112:5, 112:9, 112:11, 112:22, 134:22
**credentials** [1] - 23:3
**Credit** [2] - 2:18, 174:5
**credit** [45] - 43:17, 43:21, 43:25, 46:22, 52:17, 95:12, 95:16, 95:17, 95:19, 95:20, 95:21, 96:3, 96:8, 96:12, 96:24, 97:4, 97:7, 117:21, 118:5, 118:10, 119:23, 124:5, 155:22, 155:23, 157:2, 158:4, 159:9, 159:19, 160:13, 170:6, 170:9, 170:10, 170:13, 170:20, 171:1, 172:3, 172:21, 173:2, 173:7, 173:10, 173:12, 173:18, 174:6, 174:12
**credited** [4] - 25:14, 136:10, 136:16, 145:21
**credits** [1] - 24:25
**cross** [1] - 38:23
**cross-examination** [1] - 38:23
**CRR** [2] - 1:17, 184:21
**CRS** [35] - 13:21, 13:23, 13:25, 14:9, 22:16, 26:3, 32:3, 32:9, 34:13, 35:4, 35:11, 35:16, 44:12, 45:11, 45:14, 45:19, 45:20, 45:21, 45:23, 46:3, 50:1, 50:4, 69:21, 112:4, 112:7, 149:1, 160:3, 178:16, 178:19, 179:2, 179:8, 179:15, 179:17, 183:1
**CSX1** [1] - 47:9
**cued** [1] - 94:10
**cues** [1] - 94:12
**CUMBERLAND** [1] - 1:2
**Cummins** [32] - 2:9, 2:15, 2:16, 30:16, 31:13, 38:7, 38:18, 39:16, 40:9, 40:11, 40:17, 41:25, 42:14, 43:15, 43:23, 44:9,

44:17, 46:20, 48:13, 50:12, 51:15, 127:25, 128:4, 130:18, 155:19, 156:4, 158:19, 158:24, 159:1, 159:10, 160:11, 162:20
**Cummins's** [3] - 38:11, 52:21, 156:22
**cure** [2] - 23:23, 24:3
**current** [2] - 22:12, 23:25
**custodian** [2] - 48:22, 48:24
**custody** [1] - 123:23
**custom** [1] - 153:11
**CXS** [1] - 47:9
**CYNTHIA** [1] - 1:23
**Cynthia** [1] - 3:7

**D**

**D/Loan** [1] - 2:12
**Daggett** [14] - 148:5, 148:20, 149:4, 149:7, 149:16, 149:18, 149:24, 150:2, 150:10, 150:18, 150:21, 151:10, 151:14, 182:2
**daily** [2] - 41:8, 128:19
**Data** [3] - 70:7, 174:22, 175:1
**data** [26] - 28:3, 28:5, 42:3, 42:11, 43:23, 45:6, 45:18, 45:23, 50:6, 56:25, 69:14, 73:8, 73:9, 73:24, 74:9, 76:8, 76:9, 78:16, 85:14, 87:11, 88:3, 89:14, 98:18, 176:20, 176:24, 177:7
**database** [24] - 14:12, 22:19, 34:10, 45:7, 45:10, 45:12, 45:13, 45:19, 45:21, 49:25, 85:10, 86:23, 110:22, 121:11, 137:19, 138:14, 138:22, 139:4, 146:9, 146:12, 148:19, 160:3, 161:18
**databases** [3] - 50:1, 70:24, 161:8
**date** [48] - 6:10, 36:13,

37:15, 64:1, 64:9, 64:10, 64:12, 64:14, 64:15, 64:19, 64:20, 65:5, 65:6, 65:11, 65:13, 65:21, 66:1, 66:21, 67:1, 76:11, 87:21, 88:8, 94:13, 95:6, 100:16, 102:7, 102:8, 102:9, 102:10, 107:4, 107:6, 107:12, 108:3, 109:13, 109:15, 113:17, 114:9, 114:21, 114:22, 129:8, 129:9, 131:23, 131:24, 146:5, 162:6, 162:10, 163:7, 181:19
**Date** [1] - 183:25
**dated** [8] - 1:14, 63:2, 63:5, 63:9, 88:8, 99:25, 144:8, 155:19
**Dated** [1] - 184:19
**dates** [6] - 4:24, 36:23, 38:3, 87:18, 156:5, 156:7
**day-to-day** [2] - 31:9, 154:7
**days** [3] - 8:17, 23:20, 153:1
**DC** [1] - 47:11
**debt** [6] - 7:1, 147:25, 148:1, 149:5, 149:23, 151:19
**debts** [2] - 10:6, 148:21
**December** [1] - 101:15
**decided** [2] - 6:16, 94:6
**decides** [3] - 15:22, 15:25, 93:25
**deciding** [1] - 131:4
**decision** [16] - 16:16, 16:21, 17:10, 93:6, 93:8, 94:8, 130:25, 131:1, 147:14, 147:20, 153:9, 163:11, 164:7, 164:8, 164:9, 164:11
**decisions** [1] - 151:21
**deem** [1] - 154:18
**default** [29] - 23:15, 23:16, 24:11, 24:19, 25:10, 30:12, 30:15, 33:2, 48:14, 84:9, 91:8, 92:15, 93:16, 112:19, 117:22,

155:6, 155:10, 156:20, 156:24, 163:17, 171:6, 172:7, 172:16, 172:24, 173:13, 174:7, 181:18, 181:19
**defaulted** [13] - 21:16, 22:13, 26:22, 67:19, 84:4, 87:1, 115:24, 134:22, 134:25, 140:9, 154:4, 171:5, 173:17
**defend** [1] - 166:8
**defendant** [3] - 8:23, 67:10, 176:8
**Defendants** [2] - 1:9, 1:23
**defendants** [4] - 9:11, 9:12, 162:17, 164:17
**defendants'** [1] - 48:22
**defending** [2] - 10:7, 10:11
**defer** [1] - 104:9
**deferment** [8] - 100:14, 101:9, 101:14, 102:1, 104:11, 104:13, 104:15, 105:1
**deferments** [1] - 101:13
**deferral** [4] - 81:24, 104:7, 104:8, 104:23
**deferred** [1] - 81:23
**defers** [1] - 104:8
**definition** [1] - 125:19
**degree** [1] - 7:14
**delegate** [1] - 156:18
**delete** [2] - 171:19, 171:25
**delinquency** [6] - 23:23, 24:3, 93:12, 94:8, 94:10, 181:17
**delinquent** [3] - 23:20, 23:21, 92:20
**department** [12] - 10:17, 10:18, 10:22, 11:2, 11:4, 11:10, 11:13, 11:14, 11:16, 74:11, 74:12, 74:18
**dependent** [1] - 182:22
**Deponent** [1] - 2:2
**deponent** [2] - 184:4, 184:13
**DEPONENT** [2] - 59:23, 124:7

**deposed** [3] - 8:10, 8:15, 8:20
**deposit** [1] - 79:9
**Deposition** [72] - 2:8, 2:15, 3:2, 30:9, 41:15, 41:24, 43:18, 43:19, 47:23, 57:23, 58:19, 60:23, 61:5, 61:12, 61:13, 61:17, 62:10, 62:15, 64:1, 80:14, 83:19, 83:22, 89:17, 98:2, 98:8, 100:19, 101:16, 101:18, 102:19, 106:21, 107:12, 108:10, 108:25, 111:19, 111:20, 115:8, 118:1, 120:7, 120:14, 122:25, 125:10, 125:16, 125:17, 128:5, 128:11, 132:2, 135:17, 135:18, 135:24, 136:11, 138:24, 139:18, 140:5, 142:12, 143:3, 143:13, 143:17, 143:18, 143:25, 144:2, 149:22, 150:10, 155:15, 158:5, 159:24, 160:12, 174:16, 175:4, 183:25
**deposition** [22] - 7:18, 8:2, 9:4, 16:23, 30:1, 31:21, 38:8, 40:18, 41:14, 41:19, 59:18, 79:6, 79:8, 86:21, 116:25, 146:10, 148:14, 151:7, 169:23, 170:2, 183:17, 184:8
**DEPOSITION** [1] - 1:12
**depositions** [1] - 117:1
**describe** [5] - 9:22, 19:10, 142:25, 165:14, 172:6
**described** [12] - 30:6, 38:9, 52:15, 77:18, 104:21, 105:1, 105:2, 105:8, 143:16, 143:18, 161:5, 174:17
**describes** [1] - 38:10
**Description** [1] - 2:7
**description** [1] - 146:6

**designated** [7] - 9:3, 30:4, 48:2, 48:21, 48:24, 48:25, 155:16
**destruction** [3] - 42:25, 49:9, 49:11
**detail** [1] - 42:4
**determination** [1] - 170:3
**determine** [1] - 100:18
**determined** [1] - 38:13
**determines** [1] - 179:24
**dictated** [3] - 35:17, 93:14, 180:11
**Diego** [1] - 8:19
**difference** [4] - 123:2, 130:17, 143:15, 143:21
**different** [32] - 13:20, 26:3, 59:3, 61:24, 76:14, 79:21, 89:22, 89:24, 96:1, 101:5, 103:4, 113:6, 118:23, 122:7, 122:23, 123:1, 151:15, 152:11, 152:15, 153:1, 153:14, 153:18, 159:5, 161:6, 161:7, 178:16, 180:5, 180:18, 181:23, 182:20, 182:21
**differentiates** [1] - 97:2
**digits** [1] - 107:2
**diligence** [1] - 182:11
**DILL** [87] - 1:23, 3:6, 5:22, 9:21, 16:5, 20:12, 26:17, 28:20, 29:19, 29:23, 33:24, 37:7, 37:11, 37:24, 38:23, 39:2, 39:3, 51:12, 53:20, 53:23, 58:25, 59:8, 59:17, 60:2, 60:5, 64:4, 64:6, 64:8, 65:10, 66:13, 72:12, 72:19, 72:21, 76:18, 77:6, 77:12, 82:7, 86:1, 92:1, 94:4, 98:5, 98:7, 99:4, 99:8, 105:14, 108:1, 111:8, 115:11, 118:18, 119:5, 119:7, 122:13, 125:23, 130:16, 131:11, 132:11, 132:15, 132:22, 132:24, 133:16,

139:17, 142:8, 142:11, 143:10, 143:12, 145:13, 158:1, 158:2, 159:7, 159:8, 163:5, 164:1, 166:16, 166:23, 167:9, 167:19, 168:3, 168:8, 168:22, 169:1, 169:13, 169:22, 170:2, 170:8, 182:5, 183:14, 183:16
**Dill** [2] - 2:4, 3:7
**dip** [1] - 134:12
**direct** [4] - 47:11, 90:10, 139:5, 148:7
**directed** [1] - 152:8
**direction** [1] - 152:8
**directly** [8] - 20:19, 46:3, 70:11, 70:14, 90:12, 98:13, 139:6, 160:1
**DISB** [1] - 82:16
**disburse** [1] - 19:8
**disbursed** [5] - 60:18, 84:3, 86:25, 109:15, 152:25
**Disbursement** [1] - 82:20
**disbursement** [12] - 21:16, 55:12, 55:14, 56:16, 56:24, 56:25, 82:18, 82:21, 84:6, 85:12, 109:13, 152:24
**discharge** [1] - 94:13
**disclosure** [12] - 43:20, 53:12, 53:13, 61:6, 81:15, 113:7, 113:10, 113:12, 113:13, 157:2, 157:9, 160:14
**Disclosure** [1] - 2:9
**discovery** [1] - 31:11
**discretion** [2] - 17:6, 159:18
**discuss** [1] - 31:13
**discussed** [20] - 35:13, 52:1, 59:1, 65:23, 65:25, 68:6, 69:19, 71:4, 92:15, 95:24, 104:12, 106:11, 110:4, 113:19, 120:5, 142:23, 146:14, 156:14, 158:13, 181:16
**discussing** [1] - 31:18

**discussion** [2] - 66:3, 180:24
**Discussion** [7] - 29:18, 29:22, 98:6, 99:5, 143:11, 166:15, 166:21
**discussions** [6] - 38:13, 75:2, 75:8, 75:11, 167:15, 169:20
**disinterested** [1] - 184:15
**dismiss** [1] - 175:23
**disposal** [3] - 12:4, 13:6, 136:9
**distances** [1] - 11:24
**distinction** [1] - 112:10
**distinguish** [1] - 108:21
**district** [2] - 61:8, 155:5
**District** [6] - 16:11, 39:16, 48:1, 61:19, 107:18, 122:5
**DMI** [1] - 83:4
**doc** [1] - 138:5
**docket** [2] - 141:22, 141:24
**Docket** [1] - 1:2
**dockets** [1] - 31:16
**Docs** [1] - 2:12
**document** [110] - 15:18, 15:19, 15:21, 30:2, 35:3, 39:12, 39:14, 39:20, 52:20, 53:7, 54:2, 54:9, 54:10, 54:15, 55:18, 55:19, 55:23, 58:7, 59:2, 59:4, 60:16, 60:20, 61:25, 64:15, 64:25, 65:1, 65:3, 65:6, 65:14, 66:21, 67:9, 69:3, 75:2, 79:12, 80:17, 80:20, 83:23, 84:1, 84:5, 84:10, 84:14, 84:15, 84:16, 86:20, 87:19, 88:3, 88:19, 88:25, 89:4, 90:19, 90:23, 90:25, 91:16, 91:18, 98:15, 98:21, 98:22, 98:24, 99:2, 100:21, 100:23, 106:1, 107:7, 107:12, 107:16, 107:17, 107:24, 109:9, 109:16, 109:19,

112:5, 112:6, 112:9, 112:13, 113:3, 114:10, 118:20, 122:20, 125:14, 126:25, 132:4, 132:6, 132:13, 132:19, 133:1, 133:9, 133:14, 133:17, 133:19, 135:24, 136:1, 137:25, 138:9, 138:14, 142:15, 144:6, 144:7, 144:19, 145:11, 145:19, 145:22, 157:5, 157:7, 157:12, 162:10, 165:18, 173:25
**documentation** [2] - 14:23, 57:3
**documenting** [1] - 166:3
**documents** [88] - 13:12, 14:11, 14:13, 14:21, 14:24, 15:2, 15:5, 15:17, 27:17, 27:19, 32:10, 32:13, 32:16, 32:22, 32:23, 33:5, 33:6, 33:18, 33:20, 33:23, 34:1, 34:2, 34:8, 34:10, 34:22, 35:6, 35:8, 35:24, 36:2, 36:6, 36:8, 36:11, 36:20, 36:21, 37:12, 37:19, 38:5, 42:24, 42:25, 44:9, 46:20, 49:8, 49:12, 52:11, 54:14, 54:24, 55:7, 55:9, 55:10, 55:16, 56:21, 57:20, 59:13, 61:24, 74:13, 74:15, 100:6, 101:11, 105:13, 106:15, 108:21, 111:6, 111:9, 111:13, 120:21, 121:11, 121:21, 125:22, 129:19, 139:5, 142:25, 143:1, 144:9, 145:1, 148:8, 148:12, 155:9, 155:11, 155:13, 159:23, 160:1, 160:20, 161:11, 161:17, 165:15, 166:18, 167:20, 176:20
**dollars** [1] - 150:19
**done** [6] - 36:5,

110:12, 116:2, 152:13, 179:3, 183:9
**doubt** [2] - 94:24, 132:5
**down** [7] - 20:13, 63:1, 73:25, 101:3, 109:1, 139:10, 161:22
**downward** [1] - 97:6
**DP** [1] - 81:23
**draw** [1] - 174:15
**drawn** [1] - 69:12
**dried** [2] - 142:3, 142:5
**dry** [1] - 134:18
**DTC** [1] - 90:9
**due** [23] - 23:24, 76:14, 92:23, 93:1, 93:5, 94:8, 96:8, 100:11, 100:12, 100:16, 101:24, 102:7, 102:9, 103:16, 103:17, 104:4, 104:22, 129:19, 129:22, 130:7, 162:2, 162:22, 182:11
**duly** [1] - 3:3
**during** [8] - 6:8, 24:14, 59:20, 104:10, 104:13, 120:9, 129:5, 134:17
**duties** [6] - 5:9, 9:22, 19:16, 20:7, 20:16, 177:16

# E

**E/Deferment/ Forbearance** [1] - 2:13
**ES** [1] - 105:22
**EASE** [1] - 179:18
**easily** [1] - 73:8
**economic** [2] - 17:21, 18:11
**Education** [23] - 21:10, 21:13, 68:11, 70:8, 89:6, 89:8, 89:11, 92:17, 115:18, 115:19, 116:10, 116:15, 117:3, 117:7, 117:11, 133:1, 133:6, 134:23, 135:2, 139:8, 140:10, 153:7, 171:9
**education** [1] - 42:4
**Education-something** [1] - 70:8

**Educational** [1] - 67:20
**educational** [1] - 48:23
**EGS** [6] - 6:9, 6:15, 71:4, 71:6, 71:14
**either** [15] - 9:25, 15:9, 22:16, 31:18, 32:25, 34:13, 55:14, 56:2, 56:12, 56:18, 56:19, 82:11, 127:5, 156:19, 171:7
**electronic** [34] - 13:4, 27:5, 27:13, 27:24, 32:12, 32:13, 34:3, 34:10, 34:19, 34:22, 36:15, 42:3, 42:7, 42:11, 42:21, 42:24, 43:23, 44:11, 49:5, 49:19, 55:4, 56:25, 57:1, 69:20, 78:15, 78:17, 85:14, 92:14, 140:25, 141:1, 141:3, 156:11, 156:15, 176:20
**electronically** [6] - 57:4, 57:5, 69:11, 106:16, 124:1, 161:21
**employed** [5] - 4:9, 4:10, 6:2, 30:18, 51:22
**employee** [15] - 8:11, 41:2, 50:25, 65:18, 69:5, 85:9, 85:13, 85:16, 86:18, 88:2, 88:13, 89:10, 91:17, 97:21, 98:19
**employees** [18] - 11:1, 11:3, 11:6, 11:13, 12:10, 50:3, 54:21, 68:1, 69:1, 154:10, 177:13, 177:15, 177:17, 177:21, 179:21, 183:3, 183:5, 183:8
**employer** [1] - 3:23
**employment** [2] - 6:8, 6:21
**enacted** [1] - 134:24
**enacts** [1] - 43:5
**encompassed** [2] - 63:9, 63:10
**encompasses** [2] - 61:23, 63:22
**end** [2] - 110:8, 161:2
**ensure** [2] - 27:23, 49:14

**enter** [1] - 50:24
**entered** [9] - 15:2, 15:5, 88:3, 98:18, 100:13, 101:13, 101:15, 104:7, 134:9
**Enterprise** [2] - 151:5, 151:11
**entire** [3] - 29:7, 141:22, 141:24
**entities** [3] - 10:2, 153:15, 153:18
**entitled** [1] - 130:14
**entity** [7] - 9:2, 15:6, 16:14, 16:21, 24:2, 39:11, 117:10
**entries** [4] - 84:18, 98:22, 109:20, 109:21
**entry** [3] - 85:10, 90:1, 135:19
**EOS** [2] - 150:24, 151:2
**equal** [1] - 10:9
**equipment** [1] - 176:16
**equity** [1] - 71:19
**Equity** [5] - 71:21, 71:22, 71:24, 72:1, 72:3
**error** [2] - 123:3, 123:5
**ESQ** [5] - 1:21, 1:21, 1:22, 1:23, 1:23
**essentially** [6] - 57:17, 78:12, 78:14, 79:2, 176:13, 180:14
**established** [3] - 77:7, 123:21, 128:1
**estimate** [2] - 113:11, 154:19
**et** [2] - 24:25, 183:25
**ET** [1] - 1:8
**evenly** [1] - 152:10
**event** [6] - 57:6, 119:9, 119:13, 121:21, 179:6, 184:15
**evidence** [5] - 37:19, 146:2, 155:3, 155:4, 167:24
**evidenced** [1] - 58:11
**exact** [8] - 4:24, 6:9, 36:13, 38:3, 87:1, 108:24, 135:23, 136:16
**exactly** [9] - 33:1, 49:4, 49:20, 87:5, 105:3, 106:5, 135:12, 152:22, 172:18

Examination [1] - 2:3
examination [1] - 38:23
EXAMINATION [1] - 3:5
examined [1] - 3:4
exceed [4] - 61:2, 119:9, 119:14, 158:6
exception [6] - 28:4, 28:8, 87:16, 120:4, 142:24, 156:5
exceptions [2] - 28:13, 28:14
excerpt [6] - 62:11, 72:11, 72:22, 73:3, 77:8, 77:9
excuse [9] - 51:16, 88:1, 104:1, 114:8, 118:4, 128:7, 135:19, 138:10, 164:16
executed [3] - 50:14, 50:15, 119:25
exhaustive [1] - 147:6
Exhibit [123] - 2:9, 2:11, 2:11, 2:12, 2:12, 2:13, 2:13, 2:14, 2:16, 3:2, 29:21, 29:25, 30:9, 38:6, 39:14, 41:15, 41:24, 43:18, 43:19, 46:19, 47:24, 52:12, 52:15, 53:6, 53:24, 57:23, 58:19, 58:25, 60:23, 61:5, 61:12, 61:13, 61:17, 61:22, 61:23, 62:10, 62:15, 64:1, 65:12, 67:3, 79:8, 80:14, 83:19, 83:23, 86:20, 86:21, 89:17, 97:20, 98:2, 98:9, 98:12, 99:9, 100:20, 100:22, 101:17, 101:18, 102:19, 105:24, 106:9, 106:10, 106:21, 107:13, 107:16, 108:11, 108:25, 109:16, 111:19, 111:20, 114:16, 115:8, 118:1, 118:20, 118:22, 120:1, 120:4, 120:7, 120:12, 120:14, 122:16, 122:25, 123:1, 125:4, 125:8, 125:10, 125:17, 127:18, 128:5,
128:11, 135:17, 135:18, 135:24, 136:11, 138:10, 138:24, 139:18, 140:5, 142:12, 143:3, 143:7, 143:13, 143:14, 143:17, 143:18, 143:25, 144:2, 148:7, 148:15, 149:22, 155:16, 158:5, 158:23, 159:24, 160:12, 165:18, 174:16, 174:21, 175:4
exhibit [6] - 44:4, 44:5, 58:23, 61:7, 79:6, 97:12
exhibits [5] - 29:17, 53:2, 59:18, 120:3, 155:20
EXHIBITS [1] - 2:6
exist [4] - 112:20, 115:23, 144:7, 153:3
existed [1] - 144:10
exists [1] - 169:18
expectation [1] - 51:13
experience [4] - 83:13, 116:12, 127:19, 138:13
Expires [1] - 184:23
expires [1] - 49:22
explain [4] - 100:21, 123:2, 133:20, 135:3
explained [2] - 66:22, 91:25
explanation [3] - 103:17, 130:17, 162:21
explore [1] - 166:25
extent [6] - 116:22, 132:17, 167:14, 168:1, 169:3, 169:19
extra [1] - 72:14
extract [1] - 45:9
extraction [1] - 138:25

## F

F/Repayment [1] - 2:13
face [1] - 85:24
facilitate [2] - 56:16, 127:7
facilitated [1] - 56:23
facilitating [1] - 171:7
FACS [17] - 13:21, 14:1, 22:16, 26:3,
69:23, 177:25, 178:9, 178:16, 178:19, 178:23, 179:9, 179:10, 179:11, 179:13, 179:17, 179:20, 179:25
fact [23] - 37:12, 53:5, 73:14, 73:17, 76:6, 77:9, 86:2, 95:15, 108:17, 110:15, 119:24, 122:23, 126:3, 127:18, 134:2, 134:7, 135:23, 136:14, 136:16, 136:19, 140:11, 158:9, 167:13
facts [1] - 146:3
failure [1] - 96:11
fair [26] - 11:25, 35:23, 61:12, 77:15, 77:17, 78:7, 78:8, 85:18, 89:5, 90:7, 93:24, 99:19, 120:15, 121:9, 122:14, 127:21, 144:11, 145:2, 145:3, 146:22, 146:25, 147:9, 149:7, 166:10, 174:19, 176:14
Fair [1] - 174:5
falls [2] - 63:21, 63:25
Falmouth [1] - 184:19
far [9] - 21:18, 22:11, 46:4, 103:13, 106:1, 108:3, 108:4, 175:5, 177:19
fashion [2] - 97:8, 107:19
fax [12] - 55:25, 56:18, 57:11, 57:19, 57:21, 57:25, 58:2, 58:6, 127:1, 127:2, 127:8
faxed [16] - 55:23, 56:1, 56:12, 56:19, 57:6, 57:10, 57:12, 124:14, 124:18, 126:24, 126:25, 127:1, 127:4, 127:8, 127:13, 127:15
February [2] - 47:13, 47:14
federal [4] - 9:16, 53:12, 89:24, 113:14
fee [4] - 18:6, 82:13, 82:19, 83:6
Fee [3] - 82:12, 83:2,
83:8
fees [5] - 96:8, 96:10, 96:13, 102:6, 102:7
few [2] - 99:10, 116:16
field [1] - 45:7
fields [4] - 45:4, 45:5, 45:17
fifth [1] - 103:1
figures [3] - 44:14, 44:16, 44:19
file [41] - 13:2, 16:22, 17:6, 17:10, 25:12, 27:5, 27:11, 27:13, 27:21, 27:24, 28:1, 28:4, 28:11, 28:12, 29:10, 36:15, 42:10, 45:12, 49:5, 50:16, 55:4, 78:15, 78:17, 78:22, 79:1, 92:14, 121:17, 121:20, 147:20, 148:13, 148:15, 153:9, 153:12, 154:13, 154:17, 154:18, 160:16, 164:21, 165:22
filed [13] - 18:4, 18:12, 20:5, 30:11, 30:14, 39:14, 61:7, 64:13, 122:15, 134:8, 142:2, 148:16, 154:20
files [5] - 13:4, 28:15, 28:17, 32:13, 116:13
filing [2] - 64:13, 141:23
Finance [2] - 167:1, 167:22
financial [12] - 80:20, 80:22, 84:1, 84:2, 86:24, 87:5, 111:22, 114:15, 132:25, 138:16, 138:23, 142:22
Financial [21] - 2:12, 2:19, 4:8, 4:12, 4:19, 5:4, 5:7, 6:7, 6:9, 6:15, 8:8, 66:6, 66:7, 67:24, 68:15, 135:1, 167:3, 168:10, 168:14, 169:6, 169:15
financials [1] - 175:7
fine [1] - 5:24
firm [16] - 17:4, 17:25, 71:19, 129:10, 129:12, 130:19, 162:11, 162:24,
163:8, 164:2, 164:22, 165:4, 180:4, 180:9, 180:18
firm's [1] - 159:18
firms [7] - 29:9, 149:1, 149:5, 151:13, 151:16, 161:15, 180:12
First [50] - 62:2, 65:23, 66:10, 66:14, 66:16, 67:14, 67:20, 67:21, 68:2, 68:9, 68:11, 70:5, 70:6, 70:7, 70:10, 74:8, 75:1, 75:9, 75:17, 78:2, 78:5, 78:17, 83:10, 92:17, 126:20, 134:16, 134:23, 135:1, 135:10, 135:11, 135:15, 136:22, 138:21, 139:2, 139:8, 139:10, 139:12, 139:20, 139:25, 140:3, 140:10, 140:13, 140:18, 140:22, 141:4, 141:9, 141:13, 153:6, 171:9
first [37] - 4:16, 8:1, 29:20, 41:20, 47:10, 47:14, 61:24, 73:22, 75:8, 84:14, 84:16, 98:3, 100:10, 100:12, 101:12, 101:20, 103:16, 106:13, 107:2, 121:5, 125:16, 125:18, 125:21, 142:15, 145:7, 145:18, 145:22, 145:23, 146:4, 153:2, 153:22, 156:13, 156:24, 162:8, 180:7, 181:18
fishing [1] - 169:12
fit [1] - 73:8
five [7] - 57:19, 57:21, 57:22, 62:25, 73:25, 107:2, 109:1
fluctuates [1] - 182:15
FMC [1] - 63:3
follow [2] - 40:22, 172:18
followed [1] - 153:5
following [2] - 100:12, 114:3
follows [1] - 3:4
forbearance [6] -

100:13, 101:8, 101:14, 110:7, 110:8
**forbearances** [1] - 101:13
**forego** [1] - 163:23
**foregoing** [1] - 184:11
**forget** [1] - 144:24
**forgot** [2] - 80:24, 99:10
**form** [53] - 5:12, 6:6, 12:2, 12:6, 12:9, 15:3, 16:4, 16:7, 16:19, 17:23, 18:14, 19:18, 19:21, 20:11, 20:18, 20:23, 21:8, 21:21, 21:25, 24:8, 26:11, 28:18, 33:7, 38:19, 38:22, 39:5, 39:18, 39:22, 42:9, 56:11, 58:21, 65:8, 74:9, 77:4, 77:11, 85:25, 92:24, 111:7, 111:16, 112:15, 115:3, 120:20, 122:24, 123:24, 126:5, 131:21, 144:12, 151:23, 154:8, 154:14, 157:22, 163:3, 182:4
**formal** [1] - 141:17
**formally** [1] - 180:4
**format** [5] - 34:22, 35:9, 42:24, 49:10, 156:15
**formatted** [1] - 73:7
**forward** [4] - 25:15, 88:8, 179:18, 180:5
**forward-date** [1] - 88:8
**forwarded** [1] - 165:4
**four** [11] - 41:9, 62:25, 103:1, 103:2, 103:4, 166:24, 180:16, 180:18, 180:19, 181:15
**frame** [4] - 5:17, 114:14, 166:7, 181:17
**Frederick** [2] - 7:11, 7:12
**free** [1] - 118:2
**friendship** [1] - 75:21
**front** [6] - 11:23, 15:20, 40:11, 101:12, 104:25, 162:10
**full** [8] - 12:23, 13:2, 81:23, 100:14,

101:4, 102:24, 184:11
**fully** [2] - 93:1, 93:5
**function** [7] - 23:19, 45:3, 45:9, 46:9, 54:12, 74:14, 110:5
**functions** [2] - 21:3, 21:5
**fund** [1] - 134:13
**Funding** [2] - 62:2, 62:6
**funds** [2] - 82:22, 149:10
**future** [1] - 57:18

## G

**G/Loan** [1] - 2:14
**gained** [1] - 42:11
**general** [3] - 56:13, 134:13, 182:25
**generally** [6] - 13:4, 121:19, 165:13, 174:1, 174:2, 180:6
**generated** [7] - 24:14, 46:6, 101:8, 101:10, 105:5, 110:2, 110:3
**generates** [2] - 110:4, 110:9
**geographic** [1] - 181:11
**Georgia** [11] - 10:21, 10:25, 11:7, 12:1, 12:5, 12:8, 13:6, 46:15, 48:9, 74:23, 128:2
**given** [7] - 38:8, 113:12, 113:13, 132:2, 161:12, 168:13, 184:12
**Goal** [1] - 175:1
**graduate** [2] - 7:16, 63:23
**graduated** [3] - 102:16, 102:23, 102:25
**granted** [2] - 22:24
**group** [2] - 29:10, 181:1
**Group** [25] - 16:25, 17:2, 17:5, 17:9, 17:14, 17:20, 18:19, 50:20, 131:13, 147:18, 147:24, 149:4, 150:3, 151:10, 151:14, 154:12, 154:16, 159:23, 159:25, 160:2, 160:9,

162:25, 180:3, 182:17, 182:19
**grow** [1] - 45:25
**GSS** [2] - 174:22, 175:1
**guarantee** [6] - 115:20, 117:8, 117:12, 134:10, 134:13, 134:21
**guaranteed** [2] - 63:12, 134:19
**Guaranteed** [3] - 63:19, 79:22, 80:10
**guarantees** [1] - 134:17
**guarantor** [25] - 90:8, 115:5, 115:10, 115:12, 115:14, 116:1, 117:9, 133:10, 133:18, 133:19, 133:22, 133:24, 136:1, 136:2, 136:5, 136:6, 143:1, 143:16, 143:21, 144:1, 145:20, 146:5, 146:7, 146:24, 147:11
**GUARREF** [1] - 81:11
**guess** [2] - 53:5, 97:1
**guessing** [1] - 76:16
**Gwinnett** [4] - 40:6, 40:7, 40:8, 40:9

## H

**half** [3] - 3:18, 7:6, 31:3
**halfway** [1] - 124:11
**hand** [5] - 59:17, 60:24, 106:14, 119:1, 184:17
**handing** [1] - 67:24
**handle** [1] - 56:3
**handles** [1] - 175:7
**handoff** [2] - 23:14, 24:24
**Handwritten** [1] - 2:18
**hard** [1] - 82:4
**head** [1] - 151:18
**header** [1] - 57:11
**hearing** [3] - 175:23, 176:4, 176:6
**Heisler** [1] - 1:14
**held** [1] - 132:20
**help** [3] - 107:24, 108:2, 108:3
**hereby** [1] - 184:3

**Higher** [1] - 21:13
**Hills** [1] - 72:2
**hire** [1] - 150:24, 151:4
**hired** [8] - 127:7, 130:19, 147:25, 148:21, 149:5, 154:13, 154:16, 154:17
**hiring** [1] - 149:15
**histories** [2] - 14:14, 34:24
**history** [12] - 24:24, 25:7, 25:19, 111:21, 113:16, 113:25, 114:18, 114:19, 114:24, 115:7, 115:21, 115:22
**History** [1] - 2:14
**hold** [2] - 103:11, 132:9
**Holiday** [38] - 2:8, 2:10, 47:25, 48:7, 48:11, 48:16, 48:21, 50:12, 50:22, 51:16, 52:10, 52:15, 52:19, 53:25, 61:7, 61:14, 61:18, 64:24, 67:2, 68:17, 72:24, 72:25, 74:10, 77:1, 79:5, 79:7, 80:15, 86:22, 90:15, 106:10, 118:22, 124:25, 125:2, 127:25, 128:10, 130:19, 162:19, 165:19
**Holiday's** [1] - 125:9
**holiday's** [2] - 38:11, 52:23
**home** [1] - 183:12
**hope** [1] - 183:12
**hopefully** [1] - 166:25
**hoping** [1] - 163:16
**Horton** [2] - 2:17, 2:17
**house** [7] - 10:3, 11:16, 13:12, 66:18, 75:15, 131:8, 131:12
**houses** [1] - 14:13
**housing** [1] - 176:19
**human** [1] - 123:3

## I

**idea** [1] - 53:21
**identical** [8] - 59:10, 73:5, 73:7, 73:9, 73:17, 119:21, 156:5, 156:8
**identification** [2] -

29:24, 47:2
**identified** [26] - 36:17, 53:24, 60:10, 61:9, 62:8, 63:16, 80:9, 89:25, 91:6, 105:3, 105:22, 109:23, 113:3, 113:15, 114:17, 120:11, 125:10, 138:4, 138:5, 138:19, 166:4, 172:2, 172:23, 172:24, 174:22, 175:4
**identifies** [13] - 46:22, 47:7, 54:9, 62:15, 81:13, 81:22, 90:21, 109:2, 125:7, 125:19, 138:7, 149:1, 151:15
**identify** [6] - 62:21, 79:18, 98:24, 102:6, 109:12, 125:8
**identifying** [1] - 109:12
**immediately** [1] - 93:5
**import** [1] - 28:2
**imported** [1] - 179:14
**improper** [3] - 132:21, 137:15, 137:17
**IN** [1] - 184:17
**in-house** [5] - 10:3, 66:18, 75:15, 131:8, 131:12
**inaccurate** [1] - 174:11
**Inc** [3] - 151:5, 174:22, 175:2
**include** [9] - 20:9, 45:18, 62:23, 82:18, 113:25, 114:19, 114:24, 146:23, 147:10
**included** [3] - 44:14, 62:13, 144:15
**includes** [1] - 79:9
**including** [9] - 6:17, 40:5, 42:3, 42:10, 45:4, 97:13, 109:18, 146:12
**income** [1] - 58:5
**incoming** [2] - 9:25, 56:15
**Incorporated** [5] - 3:14, 4:3, 4:5, 4:6, 4:9
**incorporated** [1] - 124:19
**incorporates** [1] -

157:8
**incorrect** [1] - 150:17
**independent** [2] - 25:7, 25:18
**independently** [2] - 45:22, 153:3
**INDEX** [1] - 2:1
**indicate** [1] - 90:13
**indicated** [2] - 87:22, 139:20
**indicates** [1] - 133:17
**indicating** [1] - 57:11
**indications** [1] - 76:4
**individual** [30] - 14:8, 14:13, 15:4, 36:20, 37:1, 39:10, 49:2, 51:10, 55:8, 62:9, 62:12, 63:10, 64:15, 68:22, 76:10, 81:13, 85:13, 85:16, 86:6, 86:16, 87:15, 92:11, 93:9, 134:12, 136:7, 138:8, 141:2, 153:12, 154:9
**individual's** [1] - 35:17
**individuals** [3] - 22:25, 35:18, 85:20
**inform** [1] - 127:22
**information** [58] - 25:1, 25:4, 25:8, 25:10, 25:17, 25:18, 26:9, 27:1, 27:4, 27:6, 27:8, 27:14, 35:21, 45:14, 45:21, 46:5, 53:1, 58:5, 73:14, 77:14, 85:19, 86:17, 86:22, 87:21, 94:25, 106:20, 110:14, 110:18, 112:7, 112:25, 114:20, 115:6, 135:8, 138:22, 139:5, 142:16, 142:18, 142:19, 142:21, 143:24, 146:11, 146:19, 146:22, 147:7, 147:10, 148:19, 148:23, 155:23, 165:20, 170:9, 170:19, 173:1, 174:11, 176:10, 178:18, 179:10, 179:12
**initial** [7] - 25:11, 25:12, 42:9, 45:23, 57:1, 101:14, 180:16

**ink** [1] - 57:8
**input** [6] - 35:13, 40:4, 84:18, 85:20, 110:1, 111:9
**inputted** [1] - 45:18
**inputting** [2] - 15:16, 23:5
**inserted** [2] - 44:17, 44:19
**inside** [1] - 40:5
**installment** [1] - 93:2
**instance** [5] - 27:23, 32:24, 85:9, 86:3, 115:5
**instances** [1] - 93:10
**instead** [1] - 163:12
**Institute** [7] - 115:18, 115:19, 116:10, 116:15, 117:3, 117:7, 117:12
**instruct** [1] - 167:12
**instructing** [1] - 169:2
**intact** [1] - 176:23
**intent** [1] - 154:22
**interaction** [1] - 154:6
**interest** [49] - 17:20, 17:21, 18:11, 24:25, 25:13, 49:7, 76:14, 92:23, 95:25, 97:11, 100:25, 101:2, 104:4, 104:6, 104:9, 104:10, 104:12, 104:14, 104:16, 104:18, 105:20, 113:3, 113:6, 113:10, 113:15, 119:10, 119:14, 128:7, 128:13, 128:19, 128:23, 128:25, 129:4, 129:6, 129:11, 129:14, 129:16, 130:8, 130:24, 131:18, 131:23, 162:7, 162:23, 163:6, 163:12, 163:24, 164:20, 164:24, 164:25
**interim** [1] - 134:17
**internal** [1] - 164:8
**internally** [1] - 179:25
**internet** [1] - 13:10
**interrupt** [1] - 103:12
**interrupting** [1] - 80:23
**interruption** [1] - 173:14
**investigation** [8] -

167:2, 167:14, 167:15, 167:21, 168:1, 169:16, 169:18, 169:20
**involved** [5] - 51:20, 60:17, 83:15, 131:4, 165:3
**involvement** [2] - 60:17, 67:19
**involving** [2] - 29:13, 175:24
**Island** [2] - 119:11, 158:7
**issue** [7] - 16:25, 21:7, 24:7, 31:23, 49:2, 63:5, 109:2
**issued** [1] - 90:12
**iteration** [1] - 47:11
**itself** [1] - 109:19

### J

**James** [4] - 30:16, 127:25, 155:19, 156:4
**January** [8] - 4:10, 4:11, 4:19, 101:16, 128:8, 128:22, 129:7, 155:19
**Jason** [1] - 135:12
**job** [13] - 4:17, 9:22, 10:5, 19:13, 20:7, 20:16, 30:20, 31:9, 52:23, 52:25, 74:14, 168:15, 177:16
**jobs** [1] - 7:8
**Jonathan** [1] - 12:15
**judge** [3] - 168:21, 169:9, 170:3
**judgment** [11] - 48:13, 48:14, 80:16, 148:17, 155:6, 155:10, 155:12, 156:24, 163:17, 164:19
**July** [3] - 85:9, 100:1, 124:13
**jumping** [1] - 105:24
**June** [9] - 1:14, 1:15, 162:1, 162:2, 162:4, 162:17, 183:25, 184:18, 184:23
**jurisdiction** [1] - 180:13

### K

**KATE** [1] - 1:22
**keep** [6] - 42:20, 49:5,

49:6, 59:19, 169:22, 170:2
**keeping** [2] - 94:15, 96:2
**keying** [1] - 85:17
**kicked** [3] - 28:3, 28:7, 28:13
**kind** [2] - 6:25, 54:12
**knowing** [1] - 109:8
**knowledge** [23] - 5:21, 11:22, 20:2, 33:10, 42:2, 51:5, 51:14, 51:15, 54:23, 72:10, 78:1, 85:8, 87:20, 91:24, 116:23, 125:25, 126:7, 126:11, 132:18, 136:4, 149:6, 177:23, 178:11
**known** [3] - 16:17, 172:21, 180:4

### L

**lack** [2] - 5:16, 166:6
**laid** [1] - 93:9
**large** [1] - 23:12
**last** [11] - 5:3, 8:15, 9:11, 9:12, 13:16, 53:10, 67:11, 114:20, 114:21, 175:17, 175:18
**late** [5] - 96:10, 96:13, 102:6, 102:7, 134:18
**launches** [1] - 86:8
**Law** [22] - 16:25, 17:1, 17:5, 17:9, 17:14, 17:20, 18:19, 50:20, 131:13, 147:18, 147:24, 150:3, 151:10, 151:14, 154:12, 154:16, 159:22, 159:25, 160:2, 160:9, 162:25, 180:3
**law** [22] - 1:14, 17:4, 17:25, 129:10, 129:12, 130:19, 148:21, 149:1, 149:5, 151:12, 151:16, 161:15, 162:11, 162:24, 163:7, 164:2, 164:21, 165:4, 180:4, 180:9, 180:18
**laws** [3] - 119:10, 119:15, 159:20
**lawsuit** [15] - 16:16, 17:11, 17:22, 18:1,

18:2, 18:5, 18:11, 19:2, 19:5, 20:1, 131:16, 137:9, 137:16, 147:15, 153:12
**lawsuits** [8] - 16:22, 17:8, 29:8, 29:13, 147:15, 153:9, 154:12, 154:20
**lawyer** [3] - 66:18, 75:15, 141:13
**lawyers** [1] - 131:10
**lay** [1] - 126:19
**learned** [1] - 133:4
**least** [1] - 152:14
**leaves** [1] - 101:8
**leaving** [1] - 104:18
**left** [6] - 81:14, 102:15, 109:1, 111:23, 134:20, 135:5
**legal** [37] - 4:1, 4:18, 5:2, 5:3, 5:6, 5:8, 6:3, 8:5, 8:9, 10:18, 10:22, 11:3, 11:9, 12:11, 12:20, 13:11, 17:17, 21:24, 22:1, 30:21, 31:1, 40:21, 41:8, 48:8, 48:11, 71:2, 72:5, 122:11, 137:13, 139:21, 141:15, 148:25, 151:8, 151:12, 153:14, 155:8, 174:9
**lender** [7] - 47:7, 58:10, 58:16, 63:3, 75:6, 124:18, 125:19
**Lender** [2] - 82:12, 83:2, 83:6
**lenders** [1] - 161:7
**lending** [3] - 56:10, 56:12, 125:7
**less** [3] - 8:13, 41:11, 104:19
**Letter** [2] - 2:17, 2:17
**letter** [5] - 138:8, 138:18, 144:8, 144:15, 179:18
**letters** [7] - 12:22, 13:13, 34:5, 132:7, 138:5, 146:16, 149:21
**level** [8] - 14:13, 14:23, 32:16, 49:8, 49:20, 121:20, 177:15, 180:20
**levels** [5] - 103:3, 103:4, 180:18, 180:19, 181:16

library [5] - 160:16, 160:22, 161:5, 161:16, 161:20
line [20] - 9:19, 71:15, 71:16, 73:22, 73:23, 73:24, 77:20, 95:5, 102:21, 107:1, 107:3, 118:15, 125:20, 132:18, 156:13, 158:12, 170:18, 170:19, 171:19, 171:25
lines [7] - 73:25, 106:25, 138:17, 170:12, 170:15, 170:23, 173:3
linked [1] - 13:10
LinkedIn [1] - 75:22
list [1] - 62:8
listed [1] - 62:20
literally [1] - 125:21
litigation [44] - 3:12, 3:15, 3:21, 4:22, 4:23, 4:25, 5:1, 6:4, 8:21, 9:23, 9:25, 10:4, 10:6, 10:10, 10:13, 10:14, 12:18, 12:24, 13:8, 19:12, 20:8, 20:15, 22:20, 26:21, 29:2, 35:5, 66:4, 74:13, 74:17, 83:14, 109:17, 109:20, 110:13, 112:14, 116:7, 116:17, 129:3, 129:8, 132:10, 143:2, 144:3, 148:15, 151:22
LLC [2] - 6:23, 7:3
LOAN [2] - 1:5, 1:12
Loan [54] - 2:10, 2:14, 9:1, 9:9, 14:4, 15:12, 16:9, 16:14, 18:12, 18:17, 21:20, 29:11, 29:14, 30:5, 38:21, 39:6, 39:15, 42:19, 43:8, 46:23, 48:3, 61:9, 63:17, 63:18, 63:20, 63:21, 63:22, 63:24, 79:19, 79:21, 79:22, 80:4, 80:7, 80:10, 89:20, 92:6, 109:3, 131:16, 137:2, 137:7, 137:10, 149:19, 153:23, 154:1, 155:17, 155:22, 161:25, 162:16, 163:23, 172:10,

172:23, 175:24, 176:21, 179:1
loan [224] - 14:23, 15:16, 19:8, 20:10, 20:17, 21:1, 21:12, 21:16, 22:4, 22:8, 22:12, 23:13, 23:15, 23:20, 23:24, 24:1, 24:6, 24:11, 24:22, 25:5, 25:7, 25:15, 25:19, 25:22, 25:23, 26:1, 26:9, 26:22, 33:8, 34:11, 35:2, 36:9, 42:4, 42:24, 43:20, 45:21, 46:5, 46:6, 46:21, 46:22, 47:9, 48:23, 49:2, 49:8, 50:24, 52:16, 52:20, 53:7, 53:25, 54:10, 54:24, 55:13, 55:17, 55:19, 56:9, 56:15, 57:2, 57:20, 58:9, 58:10, 60:18, 60:19, 61:8, 61:15, 61:20, 62:12, 63:5, 63:10, 63:11, 63:12, 63:16, 68:10, 68:12, 74:12, 74:15, 75:6, 76:11, 76:21, 76:23, 78:22, 79:24, 80:20, 80:22, 81:13, 83:11, 83:17, 84:1, 84:2, 84:3, 84:9, 85:11, 86:16, 89:18, 90:1, 90:12, 91:2, 91:4, 91:10, 91:12, 92:3, 92:11, 92:12, 92:19, 92:20, 92:21, 92:25, 93:4, 93:6, 93:11, 93:14, 93:25, 94:10, 94:19, 95:24, 100:2, 100:3, 100:13, 100:24, 100:25, 101:3, 101:4, 101:24, 104:5, 104:15, 104:25, 108:18, 109:4, 109:8, 109:14, 110:10, 110:11, 110:19, 111:21, 112:17, 112:19, 113:15, 113:17, 113:24, 114:3, 114:15, 114:18, 114:24, 114:25, 115:5, 115:6, 115:7, 115:21, 115:22, 116:2, 116:4, 117:8, 117:14, 117:16,

117:17, 117:20, 117:21, 117:23, 118:5, 119:23, 121:20, 122:2, 123:22, 124:4, 124:12, 126:2, 126:13, 126:23, 129:19, 130:4, 130:7, 130:8, 133:10, 133:11, 134:3, 135:4, 136:4, 136:7, 137:1, 137:3, 137:6, 137:8, 137:16, 138:23, 139:7, 139:24, 140:6, 140:12, 140:21, 141:2, 141:8, 142:21, 144:19, 145:8, 145:24, 146:20, 147:2, 147:12, 147:20, 149:10, 150:6, 152:10, 152:18, 153:2, 153:3, 153:13, 153:22, 154:23, 154:25, 156:1, 156:10, 156:12, 157:4, 157:7, 157:20, 158:19, 159:1, 159:16, 171:3, 171:11, 171:16, 179:24
loans [78] - 21:7, 21:9, 21:15, 22:10, 23:18, 23:20, 31:15, 33:16, 34:17, 36:16, 56:4, 56:14, 56:17, 62:4, 62:6, 62:7, 62:9, 63:23, 67:20, 74:2, 74:4, 76:10, 80:3, 86:13, 86:14, 89:22, 89:23, 89:24, 115:24, 116:5, 116:9, 116:14, 117:2, 122:7, 126:8, 126:19, 126:22, 127:8, 128:19, 133:18, 134:10, 134:14, 134:20, 134:21, 134:22, 134:25, 140:9, 142:4, 145:1, 149:8, 149:24, 150:1, 150:25, 151:5, 151:9, 151:18, 151:22, 152:1, 152:6, 152:19, 153:14, 153:17,

153:20, 154:3, 154:4, 154:5, 159:12, 160:17, 170:11, 170:24, 172:8, 172:15, 173:13, 173:17, 174:6, 176:11, 176:14
located [10] - 10:20, 10:25, 46:14, 69:15, 72:1, 74:21, 74:22, 127:3, 128:3, 173:20
location [2] - 78:23, 181:11
locations [1] - 11:1
locator [1] - 36:4
Locator [32] - 14:12, 14:16, 15:17, 32:15, 32:17, 34:21, 35:4, 35:7, 35:24, 36:8, 36:19, 49:9, 49:12, 49:16, 50:2, 52:6, 52:9, 54:7, 54:9, 54:16, 54:22, 55:8, 55:22, 69:23, 121:12, 121:13, 121:15, 121:25, 122:1, 160:4, 160:5, 183:7
log [7] - 23:2, 24:5, 35:17, 42:21, 49:22, 51:1, 87:4
log-in [5] - 23:2, 24:5, 35:17, 49:22, 51:1
logged [3] - 38:5, 87:15, 88:7
logging [2] - 27:19, 166:13
logs [2] - 13:13, 57:15
look [24] - 12:21, 29:20, 30:8, 32:2, 51:3, 67:2, 73:20, 73:22, 81:14, 89:17, 97:24, 98:8, 100:18, 102:15, 102:25, 105:18, 111:12, 111:14, 117:25, 118:19, 135:17, 155:15, 157:15, 162:12
looked [18] - 31:22, 32:3, 73:19, 76:24, 100:19, 101:12, 101:19, 102:5, 102:10, 110:20, 121:10, 121:15, 141:18, 151:8, 155:9, 174:3, 175:12, 175:17

looking [32] - 34:9, 36:12, 38:2, 47:23, 53:24, 54:1, 54:3, 59:5, 61:12, 62:20, 69:3, 72:22, 83:19, 88:3, 89:2, 95:14, 97:1, 99:2, 99:12, 101:11, 105:13, 109:5, 109:11, 109:13, 119:6, 123:16, 125:2, 125:14, 140:4, 142:12, 143:13
looks [4] - 101:22, 107:23, 138:1, 160:23
lost [1] - 124:11
lower [1] - 59:17
Luke [2] - 3:10, 3:11
LUKE [4] - 1:13, 2:2, 3:3, 183:20
lunch [1] - 99:4

## M

ma'am [240] - 3:16, 3:22, 3:24, 4:13, 5:5, 5:10, 5:18, 7:15, 7:17, 7:19, 7:23, 7:25, 8:6, 8:14, 9:7, 10:13, 12:13, 14:20, 14:23, 17:7, 17:15, 18:7, 18:21, 18:24, 19:22, 19:24, 20:4, 20:6, 20:19, 20:24, 22:6, 22:15, 22:18, 22:22, 24:13, 24:16, 24:18, 24:22, 25:3, 26:5, 26:25, 27:5, 27:18, 29:3, 29:17, 30:3, 30:7, 30:17, 30:19, 30:25, 31:5, 31:7, 32:1, 32:8, 33:4, 33:15, 34:17, 34:19, 37:14, 40:2, 40:7, 40:10, 40:12, 40:14, 40:16, 40:19, 41:16, 41:23, 43:11, 43:22, 44:18, 46:8, 46:11, 46:13, 46:16, 46:18, 46:25, 47:5, 48:6, 48:10, 48:15, 48:18, 50:10, 50:21, 51:18, 52:2, 52:4, 52:9, 52:14, 52:18, 54:20, 54:23, 60:12, 60:14, 61:4, 61:11, 61:21, 62:18, 63:7, 64:11, 65:4, 65:17,

66:9, 66:15, 67:12, 67:16, 69:8, 71:23, 73:16, 73:18, 75:12, 75:16, 75:18, 76:1, 77:22, 78:10, 79:4, 79:23, 80:5, 80:13, 81:9, 82:25, 83:3, 83:7, 83:24, 84:24, 85:21, 86:5, 86:19, 87:9, 87:12, 87:25, 88:15, 88:18, 90:16, 90:18, 94:17, 95:1, 95:11, 95:13, 96:23, 96:25, 97:4, 97:15, 97:17, 97:19, 98:1, 98:10, 98:12, 99:14, 99:18, 103:19, 106:8, 106:17, 106:19, 107:8, 107:14, 108:9, 108:16, 108:20, 111:4, 111:11, 111:17, 112:21, 113:5, 113:8, 115:13, 115:22, 119:12, 119:22, 124:16, 126:14, 127:11, 127:21, 127:24, 128:3, 128:9, 128:16, 128:21, 130:2, 130:5, 131:14, 133:8, 133:21, 133:23, 135:16, 135:21, 137:20, 138:12, 140:1, 141:14, 141:20, 141:25, 143:23, 144:4, 144:17, 144:21, 145:6, 146:21, 147:13, 147:23, 148:2, 148:22, 149:14, 150:9, 150:13, 151:1, 151:3, 151:20, 153:15, 153:19, 154:24, 155:2, 155:25, 157:18, 158:8, 159:14, 161:10, 161:20, 162:20, 163:21, 165:5, 170:25, 173:11, 173:19, 173:23, 174:20, 174:24, 175:11, 175:14, 177:3, 177:5, 177:11, 177:13, 177:23, 178:1,

178:8, 178:17, 181:12, 181:25
**Macready** [1] - 9:13
**mail** [1] - 56:18
**mailed** [5] - 57:7, 57:9, 57:13, 138:3, 146:16
**main** [1] - 34:2
**MAINE** [1] - 1:1
**Maine** [9] - 1:15, 1:18, 5:23, 11:21, 55:21, 56:9, 154:13, 184:3, 184:19
**maintain** [9] - 34:20, 41:1, 42:20, 42:23, 49:1, 49:4, 49:8, 50:24, 57:9
**maintained** [14] - 12:1, 13:15, 13:17, 14:22, 32:14, 32:18, 32:21, 34:3, 35:8, 49:10, 69:24, 75:21, 124:1, 148:24
**maintaining** [5] - 23:6, 25:23, 26:1, 69:20, 176:19
**maintains** [5] - 32:20, 34:14, 34:25, 55:16, 133:6
**major** [1] - 13:20
**manage** [5] - 21:2, 21:4, 23:25, 28:17, 29:1
**managed** [3] - 116:14, 120:10, 178:5
**management** [8] - 35:4, 42:17, 89:14, 110:22, 156:16, 156:18, 179:4
**manager** [13] - 4:1, 4:18, 5:2, 5:3, 5:7, 5:8, 6:3, 8:5, 8:9, 30:21, 31:1, 41:8, 48:8
**managers** [2] - 40:22, 48:11
**manages** [2] - 110:22, 110:24
**managing** [1] - 94:20
**manual** [2] - 123:12, 123:13
**manually** [4] - 28:4, 28:8, 107:4, 123:19
**map** [1] - 11:23
**Marblehead** [50] - 62:2, 65:23, 66:11, 66:14, 66:16, 67:14, 67:20, 67:21, 68:2, 68:9, 68:11, 70:5,

70:6, 70:7, 70:10, 74:8, 75:1, 75:9, 75:17, 78:3, 78:6, 78:17, 83:10, 92:17, 126:21, 134:16, 134:23, 135:1, 135:10, 135:11, 135:15, 136:23, 138:21, 139:2, 139:8, 139:10, 139:13, 139:20, 139:25, 140:3, 140:10, 140:13, 140:18, 140:22, 141:4, 141:9, 141:13, 153:6, 171:9
**March** [10] - 36:12, 36:13, 37:3, 37:13, 37:14, 100:8, 100:15, 102:4, 102:10, 103:17
**margin** [1] - 113:23
**marked** [8] - 3:2, 29:24, 41:15, 47:23, 62:14, 115:8, 132:2, 165:18
**market** [9] - 180:12, 180:20, 180:21, 181:3, 181:6, 182:14, 182:17, 182:21, 182:22
**marketer** [3] - 82:12, 82:13, 82:14
**Marketing** [1] - 83:1
**Maryland** [1] - 7:12
**Mason** [4] - 1:17, 184:2, 184:21, 184:21
**Mata** [1] - 9:13
**match** [2] - 44:5, 160:21
**matched** [3] - 76:21, 102:13, 160:21
**matches** [2] - 76:9, 76:10
**matching** [1] - 125:3
**materials** [1] - 165:16
**Matt** [3] - 66:17, 75:14, 135:12
**matter** [6] - 12:25, 14:3, 38:8, 48:4, 156:9, 161:24
**matters** [2] - 10:4, 30:6
**maximum** [1] - 119:10
**MCKINLEY** [3] - 1:23, 53:19, 142:9
**McMullen** [5] - 16:18,

58:8, 147:16, 175:25, 176:3
**McMullen's** [1] - 58:12
**mean** [23] - 25:21, 28:25, 33:25, 39:24, 48:23, 60:3, 69:8, 71:11, 89:21, 90:3, 90:11, 92:19, 96:7, 103:11, 110:17, 118:4, 136:1, 138:1, 141:22, 154:9, 156:9, 172:4, 182:7
**means** [17] - 47:9, 47:10, 47:12, 81:23, 96:3, 96:4, 97:4, 97:14, 100:7, 102:16, 102:22, 103:3, 133:20, 145:12, 170:20
**meant** [3] - 81:1, 129:20, 152:22
**meantime** [1] - 170:5
**Mechanics** [2] - 157:16, 157:25
**media** [9] - 68:20, 68:23, 68:24, 68:25, 69:2, 69:5, 74:11, 74:12, 74:18
**Media** [32] - 14:12, 14:16, 15:17, 32:15, 32:17, 34:21, 35:4, 35:7, 35:24, 36:8, 36:19, 49:9, 49:12, 49:16, 50:1, 52:5, 52:9, 54:7, 54:8, 54:16, 54:22, 55:8, 55:21, 69:23, 121:12, 121:13, 121:15, 121:24, 122:1, 160:4, 160:5, 183:7
**media/affidavit** [1] - 73:1
**member** [2] - 44:8, 68:19
**members** [2] - 11:8, 11:16
**memorialized** [2] - 43:2, 43:3
**mentioned** [4] - 12:24, 22:17, 23:9, 177:24
**merge** [9] - 44:20, 44:23, 45:1, 45:3, 45:5, 45:6, 45:9, 45:17, 46:9
**merging** [1] - 120:9
**Merrill** [1] - 56:7
**method** [1] - 105:21

**MICHAEL** [1] - 1:21
**Microsoft** [1] - 46:12
**middle** [1] - 23:17
**might** [1] - 139:21
**mile** [1] - 11:23
**mind** [3] - 72:16, 103:14, 112:10
**mine** [2] - 119:20, 143:9
**minimum** [1] - 119:14
**minute** [3] - 139:19, 162:13, 162:14
**mischaracterization** [7] - 27:12, 36:1, 66:12, 121:18, 126:6, 144:13, 146:2
**missing** [4] - 28:3, 53:8, 53:9, 120:4
**mistake** [2] - 53:15, 160:24
**model** [1] - 180:6
**modifications** [1] - 35:16
**moment** [1] - 118:13
**moments** [1] - 106:11
**money** [15] - 18:1, 18:3, 18:18, 20:16, 83:11, 83:16, 91:5, 99:21, 103:21, 104:21, 134:11, 134:20, 135:5, 149:13, 182:3
**monitor** [1] - 25:14
**Montana** [1] - 7:13
**month** [3] - 23:24, 36:11, 181:21
**monthly** [1] - 93:4
**months** [2] - 180:16, 181:20
**morning** [1] - 3:7
**most** [6] - 7:11, 74:22, 110:3, 152:14, 169:11, 182:13
**mostly** [1] - 10:5
**motion** [8] - 30:11, 30:14, 80:16, 148:16, 155:10, 155:12, 156:23, 175:23
**motions** [2] - 155:5, 155:6
**move** [3] - 79:1, 81:2, 170:5
**moved** [2] - 5:1, 69:13
**MR** [146] - 5:12, 5:16, 5:20, 5:25, 6:6, 6:13, 9:5, 9:17, 9:19, 12:2, 12:6, 12:9, 15:3,

16:4, 16:7, 16:19, 17:17, 17:23, 18:14, 19:18, 19:21, 20:11, 20:18, 20:23, 21:8, 21:21, 21:25, 24:8, 26:11, 26:14, 27:12, 28:18, 28:24, 33:7, 33:22, 36:1, 37:6, 37:9, 37:22, 38:14, 38:22, 38:25, 39:18, 39:22, 51:9, 53:17, 53:19, 56:11, 58:21, 59:7, 59:11, 59:21, 59:25, 60:4, 64:3, 64:5, 65:8, 66:12, 70:20, 71:1, 72:4, 72:16, 76:17, 77:4, 77:11, 81:6, 82:5, 85:25, 87:23, 91:22, 94:2, 98:4, 105:12, 105:16, 107:22, 111:7, 111:15, 112:15, 115:3, 115:9, 116:20, 117:4, 118:16, 119:3, 121:18, 122:10, 122:24, 123:24, 125:21, 126:5, 126:17, 129:23, 130:9, 130:12, 130:20, 131:2, 131:9, 131:20, 132:9, 132:12, 132:16, 132:23, 133:13, 137:4, 137:12, 139:16, 142:7, 142:9, 143:7, 144:12, 145:10, 145:15, 146:1, 151:23, 154:8, 154:14, 155:7, 157:6, 157:21, 157:24, 159:3, 163:3, 163:9, 163:18, 163:25, 164:3, 164:12, 165:8, 165:25, 166:6, 167:6, 167:12, 167:18, 167:23, 168:4, 168:6, 168:11, 168:16, 168:19, 168:25, 169:8, 169:17, 169:24, 174:8, 182:4, 183:15
**MS** [86] - 3:6, 5:22, 9:21, 16:5, 20:12, 26:17, 28:20, 29:19,

29:23, 33:24, 37:7, 37:11, 37:24, 38:23, 39:2, 39:3, 51:12, 53:20, 53:23, 58:25, 59:8, 59:17, 60:2, 60:5, 64:4, 64:6, 64:8, 65:10, 66:13, 72:12, 72:19, 72:21, 76:18, 77:6, 77:12, 82:7, 86:1, 92:1, 94:4, 98:5, 98:7, 99:4, 99:8, 105:14, 108:1, 111:8, 115:11, 118:18, 119:5, 119:7, 122:13, 125:23, 130:16, 131:11, 132:11, 132:15, 132:22, 132:24, 133:16, 139:17, 142:8, 142:11, 143:10, 143:12, 145:13, 158:1, 158:2, 159:7, 159:8, 163:5, 164:1, 166:16, 166:23, 167:9, 167:19, 168:3, 168:8, 168:22, 169:1, 169:13, 169:22, 170:2, 170:8, 182:5, 183:14, 183:16
**multiple** [13] - 36:8, 40:4, 43:13, 68:1, 75:5, 86:13, 91:25, 121:22, 131:4, 164:6, 168:25, 176:15, 176:18

**N**

**NAGB** [1] - 97:16
**Name** [1] - 183:25
**name** [14] - 3:7, 3:8, 6:18, 9:8, 9:12, 40:11, 40:20, 40:25, 41:3, 71:8, 71:11, 71:14, 79:2, 121:2
**named** [2] - 184:4, 184:16
**names** [3] - 9:11, 55:7, 116:24
**NATIONAL** [2] - 1:4, 1:12
**national** [1] - 117:11
**National** [47] - 9:1, 9:9, 14:3, 15:11, 16:9, 16:12, 16:14, 18:12, 18:16, 21:19,

29:10, 29:14, 30:5, 38:20, 39:6, 39:15, 42:18, 43:8, 48:2, 62:1, 62:6, 90:5, 92:6, 108:13, 108:14, 109:2, 109:6, 125:12, 131:15, 137:1, 137:7, 137:9, 149:18, 151:4, 151:11, 153:22, 154:1, 155:16, 155:21, 161:25, 162:16, 163:22, 172:9, 172:22, 175:24, 176:21, 179:1
**nature** [1] - 113:19
**NCO** [42] - 4:8, 4:11, 4:19, 5:4, 5:7, 5:11, 5:14, 5:19, 6:2, 6:7, 6:10, 6:11, 6:15, 6:21, 8:8, 15:9, 15:16, 32:25, 66:6, 66:7, 67:24, 68:15, 70:14, 70:15, 70:18, 71:5, 78:9, 78:14, 78:15, 78:20, 135:1, 136:23, 139:10, 139:13, 140:3, 140:8, 153:7, 161:13, 171:13, 176:13, 176:23
**NCO's** [4] - 6:17, 67:19, 71:5, 71:16
**NCO/TSI** [1] - 177:21
**NCSL** [1] - 156:10
**NCSLT** [3] - 68:2, 71:9, 183:25
**NCT** [5] - 90:3, 90:5, 108:11, 109:2, 179:6
**near** [1] - 109:22
**necessarily** [2] - 118:9, 178:21
**necessary** [1] - 154:19
**need** [3] - 103:6, 166:24
**needed** [3] - 57:18, 105:17, 116:3
**negotiated** [1] - 66:10
**Net** [1] - 82:20
**network** [3] - 7:2, 180:11
**never** [9] - 112:17, 115:23, 136:21, 136:22, 136:23, 136:24, 140:22, 150:22

**nevertheless** [1] - 124:18
**new** [7] - 35:12, 92:25, 101:9, 110:4, 138:3, 181:9, 182:9
**next** [7] - 73:23, 95:5, 96:21, 102:2, 107:25, 108:2, 170:6
**Next** [20] - 46:23, 61:9, 63:3, 63:12, 63:16, 63:18, 63:19, 63:21, 63:22, 63:23, 63:24, 79:18, 79:20, 79:22, 80:3, 80:6, 80:7, 80:10, 80:11, 82:15
**nightly** [1] - 179:13
**none** [3] - 69:25, 99:20, 144:9
**nonnegotiable** [3] - 157:1, 158:4, 159:9
**NORA** [1] - 168:9
**Norcross** [8] - 10:20, 10:25, 11:6, 11:25, 12:5, 12:8, 13:6, 74:22
**Nos** [1] - 3:2
**Notary** [5] - 1:17, 3:3, 183:23, 184:2, 184:22
**notate** [1] - 146:15
**notations** [1] - 146:23
**note** [37] - 14:14, 14:22, 32:24, 34:23, 43:18, 43:19, 43:25, 46:19, 61:6, 62:15, 62:19, 62:22, 63:2, 63:8, 63:16, 68:5, 81:15, 81:18, 88:7, 96:15, 99:25, 113:7, 113:10, 113:12, 118:7, 118:21, 119:23, 122:23, 123:8, 124:19, 124:23, 156:22, 157:2, 157:9, 158:20, 159:1, 160:14
**noted** [3] - 50:12, 84:19, 85:22
**notes** [12] - 12:20, 35:13, 36:16, 49:7, 50:6, 50:9, 50:11, 50:16, 50:18, 62:23, 146:14, 166:18
**Notes** [1] - 2:18
**nothing** [4] - 18:3, 19:4, 85:24, 184:6
**Notice** [2] - 2:8, 2:15

**notice** [24] - 1:13, 6:14, 9:6, 9:20, 26:15, 26:22, 30:1, 30:6, 38:9, 38:10, 70:21, 71:3, 72:5, 116:21, 131:3, 154:15, 165:9, 166:1, 167:7, 168:7, 168:20, 168:24, 169:10, 170:1
**notices** [1] - 31:22
**November** [7] - 4:7, 4:15, 4:20, 68:14, 90:21, 139:11, 175:22
**number** [19] - 35:12, 36:18, 47:2, 63:1, 81:11, 81:14, 81:15, 81:18, 86:12, 90:2, 91:23, 105:23, 106:25, 107:2, 127:8, 127:10, 138:1, 138:11, 142:13
**Number** [1] - 2:7
**numbers** [5] - 45:9, 60:3, 87:8, 119:19, 138:6
**numerical** [3] - 57:14, 138:7, 142:20
**numerous** [1] - 69:1

**O**

**oath** [1] - 85:7
**object** [46] - 5:12, 5:24, 6:6, 12:2, 12:6, 12:9, 15:3, 16:4, 16:7, 16:19, 17:17, 17:23, 18:14, 19:18, 19:21, 20:11, 20:18, 20:23, 21:8, 21:21, 21:25, 24:8, 26:11, 28:18, 33:7, 33:22, 38:22, 39:18, 39:22, 56:11, 58:21, 77:4, 77:11, 85:25, 111:7, 111:15, 112:15, 115:3, 122:24, 123:24, 132:16, 151:23, 154:8, 154:14, 157:21, 163:3
**objection** [61] - 5:16, 5:20, 5:22, 5:25, 6:13, 9:5, 9:17, 26:14, 27:12, 28:24, 36:1, 37:6, 37:22, 51:9, 59:7, 65:8,

66:12, 70:20, 71:1, 72:4, 76:17, 87:23, 91:22, 94:2, 111:15, 115:9, 116:20, 117:4, 121:18, 122:10, 126:5, 126:17, 129:23, 130:9, 130:12, 130:20, 131:2, 131:20, 133:13, 137:4, 137:12, 144:12, 145:10, 146:1, 155:7, 157:6, 163:9, 163:18, 163:25, 164:3, 164:12, 165:8, 165:9, 165:25, 166:6, 167:6, 167:23, 168:16, 168:23, 174:8, 182:4

**objections** [3] - 5:23, 168:11, 168:25
**obligated** [1] - 58:2
**obligation** [3] - 92:11, 104:9, 171:23
**obtained** [1] - 45:22
**obvious** [1] - 169:4
**OC** [3] - 26:7, 32:4, 32:7
**occasion** - 116:9
**occurred** [2] - 33:1, 149:3
**October** [6] - 3:19, 3:22, 3:25, 68:13, 85:2, 104:20
**OF** [1] - 1:1
**office** [17] - 10:19, 10:20, 11:7, 11:15, 11:20, 11:25, 12:5, 12:8, 12:13, 30:23, 40:6, 46:17, 48:9, 51:21, 53:15, 59:19, 128:3
**officer** [1] - 12:17
**offices** [8] - 1:14, 11:9, 11:10, 11:12, 11:14, 11:16, 11:17, 13:9
**offset** [1] - 54:12
**often** [1] - 39:5
**Ohio** [2] - 61:2, 119:16
**once** [8] - 23:20, 27:21, 94:9, 121:24, 140:18, 142:5, 171:18, 171:24
**One** [21] - 47:7, 56:2, 56:3, 62:1, 62:4, 74:7, 78:4, 78:5,

83:2, 83:6, 83:9, 83:16, 120:8, 120:12, 125:9, 125:11, 125:13, 127:6, 158:16, 160:25, 161:4
**one** [52] - 9:13, 10:1, 10:16, 13:22, 19:2, 26:1, 32:18, 36:9, 43:20, 47:10, 56:6, 58:10, 59:2, 62:25, 65:1, 66:3, 69:25, 71:8, 71:20, 72:18, 73:24, 80:8, 82:3, 82:11, 101:11, 101:15, 101:22, 103:1, 108:17, 108:22, 109:7, 110:4, 114:22, 119:24, 122:11, 124:2, 125:2, 127:15, 131:5, 136:12, 137:11, 151:6, 152:5, 152:9, 156:6, 161:8, 169:1, 170:11, 172:11, 179:17, 179:19, 180:19
**One's** [1] - 127:6
**ones** [11] - 25:22, 40:24, 79:25, 120:6, 124:23, 124:24, 125:1, 141:21, 148:3, 158:14, 171:15
**ongoing** [2] - 75:23, 85:1
**online** [12] - 13:3, 14:12, 32:3, 32:18, 49:18, 152:15, 178:23, 179:8, 179:9, 179:10, 179:14, 179:16
**open** [2] - 169:23, 170:3
**opened** [1] - 172:21
**opening** [1] - 125:6
**operate** [2] - 180:13, 181:8
**operated** [2] - 180:19, 182:14
**operates** [2] - 180:25, 182:19
**operating** [1] - 134:13
**opposed** [4] - 73:25, 106:14, 160:25, 161:3
**options** [1] - 152:11
**orally** [3] - 76:2, 76:3,

76:6
**order** [4] - 49:21, 84:5, 134:9, 166:18
**ordinary** [1] - 138:15
**organization** [3] - 15:6, 94:6, 174:21
**organizations** [2] - 18:10, 18:25
**Original** [1] - 83:8
**original** [13] - 21:9, 52:20, 53:7, 69:15, 70:11, 73:10, 73:11, 73:19, 73:21, 74:25, 75:7, 75:25, 76:6
**originally** [5] - 51:22, 84:3, 103:15, 136:23, 161:12
**originated** [6] - 62:4, 80:3, 120:12, 126:20, 157:20, 157:22
**originating** [1] - 55:14
**origination** [8] - 56:4, 68:4, 82:19, 100:14, 126:8, 126:21, 127:8, 171:3
**originator** [1] - 85:15
**otherwise** [2] - 16:17, 31:12
**outcome** [3] - 17:21, 18:4, 184:15
**outside** [23] - 6:13, 9:5, 9:20, 10:3, 26:14, 34:3, 40:5, 70:20, 71:2, 72:4, 110:20, 116:20, 131:2, 154:15, 165:8, 165:25, 167:6, 167:8, 168:6, 169:9, 169:11, 169:25, 179:22
**outsourced** [1] - 180:1
**overlap** [2] - 178:20, 178:21
**owe** [2] - 162:17, 164:17
**owed** [16] - 18:18, 19:6, 20:22, 44:16, 90:20, 90:22, 90:24, 91:5, 91:9, 91:11, 91:20, 91:21, 92:5, 92:7, 130:18, 154:25
**owing** [6] - 92:23, 92:24, 93:1, 93:5, 96:9, 104:5
**own** [12] - 22:14, 23:2, 41:1, 51:1, 71:22,

71:24, 72:3, 90:2, 117:14, 117:23, 137:2, 137:8
**owned** [12] - 6:2, 6:8, 6:15, 21:12, 54:16, 71:14, 117:16, 117:20, 153:14, 153:17, 153:20, 172:9
**owner** [8] - 6:10, 54:25, 70:23, 79:2, 96:15, 108:11, 109:11, 153:24
**owners** [1] - 108:21
**ownership** [10] - 61:15, 61:20, 71:7, 72:8, 116:2, 117:13, 154:23, 155:3, 155:14, 176:25
**Ownership** [1] - 2:12
**owns** [5] - 5:19, 19:8, 55:13

**P**

**p.m** [3] - 99:6, 99:7, 183:17
**packages** [2] - 58:9, 58:10
**page** [69] - 43:20, 47:1, 53:8, 53:9, 53:10, 58:2, 58:4, 58:15, 58:17, 59:5, 59:6, 60:7, 60:9, 60:22, 60:24, 61:5, 64:4, 64:5, 64:6, 64:7, 65:12, 67:4, 73:4, 73:8, 73:15, 77:9, 80:2, 80:18, 81:17, 84:6, 89:4, 89:18, 95:2, 95:15, 97:12, 102:18, 104:25, 107:25, 108:3, 108:5, 118:23, 119:2, 119:3, 119:6, 119:12, 119:13, 119:17, 119:18, 120:4, 121:5, 128:5, 128:11, 128:12, 135:19, 142:14, 142:15, 143:7, 156:24, 157:1, 157:4, 157:7, 157:14, 157:15, 158:5, 159:11, 160:13
**Page** [3] - 2:3, 2:7, 2:14

**pages** [9] - 43:14, 57:20, 57:21, 57:22, 62:21, 99:12, 107:24, 120:2, 121:5
**paid** [26] - 17:25, 18:2, 18:8, 96:15, 101:3, 103:21, 117:12, 133:10, 133:18, 135:25, 136:2, 136:21, 136:25, 137:6, 137:16, 140:11, 140:15, 140:19, 140:20, 142:3, 145:2, 147:11, 150:11, 150:16, 150:18
**paper** [10] - 33:6, 33:18, 33:19, 33:23, 33:25, 34:8, 77:25, 123:21, 123:25, 124:13
**papers** [1] - 13:2
**paragraph** [13] - 41:24, 42:6, 44:15, 60:25, 67:3, 105:22, 119:1, 119:8, 125:6, 125:16, 125:18, 125:22, 128:12
**paralegal** [18] - 3:12, 3:15, 3:21, 8:21, 9:23, 10:13, 19:12, 19:17, 19:20, 19:23, 20:8, 20:9, 20:15, 22:20, 26:21, 35:5, 66:4, 83:14
**paralegals** [1] - 10:14
**parameters** [1] - 182:15
**parent** [1] - 71:4
**Parker** [13] - 148:5, 148:20, 149:4, 149:7, 149:16, 149:18, 149:24, 150:2, 150:11, 150:19, 151:10, 151:14, 182:2
**Parker's** [1] - 150:22
**part** [15] - 7:8, 11:2, 11:14, 74:14, 78:24, 79:6, 91:1, 92:14, 121:16, 121:19, 131:6, 148:15, 164:10, 164:14, 182:13
**part-time** [1] - 7:8
**partially** [1] - 113:1
**particular** [20] - 16:6, 21:14, 22:4, 23:13, 32:23, 33:8, 33:11,

33:13, 36:25, 55:18, 56:8, 65:13, 77:1, 88:24, 94:5, 99:24, 100:3, 132:6, 139:7, 152:10
**parties** [5] - 9:8, 19:9, 40:4, 70:12, 131:4
**party** [10] - 15:21, 19:25, 24:1, 55:15, 56:2, 56:15, 56:20, 86:11, 127:6, 166:8
**pass** [1] - 139:4
**passing** [1] - 138:25
**password** [2] - 49:22, 49:24
**past** [3] - 23:24, 25:19, 127:19
**pattern** [1] - 153:6
**pay** [14] - 86:10, 110:10, 133:19, 136:1, 136:15, 136:18, 143:1, 143:17, 143:21, 144:1, 145:20, 146:5, 146:7, 146:24
**paying** [1] - 136:12
**payment** [59] - 14:14, 26:9, 34:24, 67:5, 67:11, 81:23, 86:3, 86:8, 86:9, 86:12, 86:15, 96:11, 96:20, 96:21, 100:8, 100:11, 100:12, 100:16, 101:21, 101:23, 101:24, 102:2, 102:4, 102:11, 102:14, 102:17, 102:23, 103:16, 103:25, 104:6, 104:8, 104:17, 104:19, 105:5, 111:21, 113:16, 114:7, 114:13, 114:16, 114:17, 114:18, 114:20, 114:21, 114:22, 114:24, 115:4, 115:7, 115:20, 115:21, 115:22, 142:24, 143:5, 143:15, 150:23, 152:5, 152:12, 166:5, 166:9
**Payment** [1] - 2:14
**payments** [31] - 18:9, 20:10, 20:21, 24:17, 24:24, 25:13, 42:21, 46:2, 49:7, 51:4, 86:14, 93:4, 99:20,

101:19, 101:20, 102:3, 102:6, 102:8, 104:22, 105:20, 105:21, 113:25, 114:2, 114:3, 114:25, 152:7, 152:9, 152:14, 166:11, 166:13
**pays** [1] - 152:15
**PDF** [4] - 35:9, 49:10, 66:8, 69:13
**pendency** [1] - 129:5
**pending** [5] - 9:15, 16:10, 105:14, 169:23, 170:3
**Pennsylvania** [1] - 21:13
**people** [8] - 18:10, 18:25, 49:25, 50:4, 121:4, 177:20, 182:6, 182:7
**percent** [2] - 82:1, 82:10, 113:4, 180:22, 180:25, 181:4
**percentage** [2] - 18:9, 82:13
**perfectly** [1] - 168:18
**performance** [3] - 182:16, 182:23, 182:24
**performed** [2] - 97:20, 149:23
**period** [17] - 15:10, 15:11, 23:17, 46:4, 46:6, 67:23, 68:12, 92:21, 93:11, 94:9, 102:13, 104:11, 104:14, 105:1, 134:17, 141:8, 171:10
**periodically** [1] - 49:23
**person** [12] - 15:4, 37:1, 47:10, 93:9, 94:6, 120:20, 120:22, 123:16, 158:25, 159:9, 159:12, 184:15
**personal** [14] - 10:20, 42:2, 51:5, 51:14, 51:15, 85:8, 87:20, 91:24, 116:22, 125:25, 126:7, 126:10, 132:18, 150:7
**personally** [4] - 19:25, 28:21, 44:4, 75:24

**pertain** [1] - 55:9
**pertained** [1] - 36:21
**pertaining** [6] - 23:12, 34:11, 35:2, 66:20, 68:2, 176:20
**pertains** [1] - 62:16
**phone** [1] - 35:12
**physical** [5] - 30:24, 33:5, 33:6, 57:8, 77:24
**physically** [1] - 127:2
**pick** [1] - 25:12
**picks** [1] - 181:20
**picture** [1] - 141:7
**piece** [3] - 60:10, 77:24, 124:13
**pieces** [1] - 33:6
**pitch** [1] - 182:10
**pitched** [1] - 182:1
**place** [10] - 28:1, 28:10, 49:19, 51:7, 75:8, 78:21, 85:3, 124:2, 126:12, 139:11
**placed** [9] - 129:9, 129:12, 147:18, 149:2, 151:18, 162:11, 162:24, 179:5, 179:6
**placement** [4] - 160:8, 180:10, 181:16
**placements** [2] - 149:3, 181:10
**placing** [2] - 24:1, 24:2
**Plaintiff** [2] - 1:6, 1:21
**plaintiff** [3] - 8:23, 155:21, 156:8
**plaintiff's** [1] - 16:13
**plaintiffs** [2] - 164:16, 176:3
**plan** [1] - 93:2
**Platinum** [5] - 71:21, 71:22, 71:24, 72:1, 72:3
**played** [1] - 68:4
**pleading** [1] - 159:20
**pleadings** [1] - 118:14
**pled** [2] - 12:21, 137:17
**pledged** [5] - 134:11, 134:18, 134:21, 135:6, 142:6
**plus** [5] - 12:11, 113:23, 130:8, 131:18, 131:23
**point** [12] - 6:7, 25:15, 25:16, 27:1, 63:1,

68:14, 76:13, 79:15, 80:2, 170:23, 171:6, 176:6
**points** [1] - 104:15
**policies** [1] - 173:21
**policy** [10] - 42:25, 43:1, 49:9, 49:11, 51:7, 173:12, 173:16, 173:20, 173:22, 174:3
**pool** [14] - 61:24, 62:3, 62:5, 62:7, 62:9, 62:13, 62:14, 65:2, 68:16, 72:23, 73:4, 73:6, 76:11, 79:13
**PORDC-CV-15-324** [1] - 1:2
**portal** [8] - 32:18, 49:18, 178:23, 179:8, 179:9, 179:10, 179:14, 179:16
**portfolios** [1] - 176:22
**portion** [6] - 6:16, 19:6, 63:25, 106:24, 114:20, 154:4
**portions** [12] - 6:17, 51:20, 51:23, 68:4, 71:5, 71:6, 71:7, 71:9, 79:9, 79:11, 108:23, 110:18
**Portland** [7] - 1:15, 11:21, 16:11, 39:16, 48:1, 107:17, 122:5
**position** [8] - 3:11, 3:17, 4:21, 5:4, 7:3, 12:16, 130:13, 136:17
**possession** [6] - 33:12, 33:19, 34:7, 123:22, 156:14, 160:15
**possibilities** [1] - 127:14
**possibility** [1] - 145:24
**possible** [1] - 141:3
**possibly** [1] - 151:11
**post** [4] - 91:8, 92:15, 156:20, 171:6
**post-default** [4] - 91:8, 92:15, 156:20, 171:6
**potential** [1] - 174:10
**potentially** [2] - 36:23, 182:20
**practice** [13] - 37:17, 37:21, 51:7, 54:5,

56:13, 56:17, 126:8, 126:9, 127:19, 153:11, 156:17, 171:18, 171:21
**practices** [4] - 23:4, 42:17, 126:11, 156:19
**prayer** [1] - 164:18
**preceding** [1] - 36:11
**predecessor** [1] - 4:8
**predefault** [1] - 156:19
**prefix** [1] - 82:23
**prejudgment** [1] - 129:4
**premarked** [1] - 29:17
**preparation** [2] - 41:19, 148:13
**prepare** [1] - 31:20
**prepared** [4] - 44:2, 48:4, 151:7, 155:24
**preparing** [1] - 146:10
**present** [5] - 3:21, 3:22, 61:19, 75:11, 75:13
**presented** [6] - 52:11, 61:13, 76:20, 77:15, 107:17, 154:4
**presumably** [1] - 130:3
**pretty** [3] - 121:1, 147:6, 169:4
**previous** [5] - 7:12, 55:2, 70:25, 96:10, 158:12
**previously** [13] - 60:10, 71:4, 92:15, 93:2, 93:3, 104:12, 113:19, 120:5, 127:5, 133:23, 142:22, 146:14, 147:17
**principal** [16] - 90:20, 90:21, 90:23, 91:19, 92:24, 92:25, 99:16, 99:22, 100:1, 103:22, 104:3, 128:6, 128:12, 131:17, 131:23, 162:23
**print** [10] - 45:16, 54:11, 54:13, 54:14, 66:25, 84:11, 84:12, 111:14, 184:10
**printed** [27] - 64:16, 64:17, 65:14, 65:16, 65:22, 66:24, 67:9, 69:12, 84:12, 84:17, 88:19, 88:25, 90:14,

98:13, 98:16, 98:21, 107:7, 107:10, 107:13, 109:18, 111:24, 111:25, 112:6, 112:7, 114:10, 144:10, 146:13
**printer** [1] - 66:24
**printing** [4] - 54:12, 64:21, 64:22, 112:11
**prints** [2] - 83:24, 87:2
**private** [2] - 71:19, 89:23
**privilege** [2] - 169:4, 169:5
**privileged** [3] - 167:16, 168:2, 169:21
**pro** [1] - 152:10
**proactively** [1] - 138:20
**problem** [1] - 72:19
**procedures** [3] - 40:21, 42:18, 126:11
**proceedings** [1] - 167:3
**proceeds** [2] - 19:1, 150:6
**process** [11] - 23:25, 42:12, 44:20, 44:23, 45:1, 56:15, 68:4, 85:16, 91:1, 123:7, 126:22
**processed** [1] - 41:7
**processes** [1] - 95:23
**processing** [1] - 55:24
**produce** [1] - 167:20
**produced** [9] - 27:17, 112:13, 132:10, 132:14, 133:1, 138:15, 143:2, 144:1, 144:14
**produces** [1] - 123:8
**producing** [2] - 54:5, 90:15
**production** [18] - 39:9, 44:8, 44:22, 44:25, 45:2, 45:8, 46:14, 47:14, 52:22, 54:6, 73:2, 120:16, 120:18, 120:23, 121:3, 121:7, 123:8, 158:21
**Program** [1] - 89:20
**program** [30] - 46:22, 46:23, 47:8, 47:12, 61:8, 61:10, 63:3, 63:10, 63:13, 63:16,

63:18, 63:20, 63:21, 63:22, 63:24, 69:17, 75:6, 79:17, 79:19, 79:21, 79:22, 80:4, 80:7, 80:10, 89:19, 89:25, 90:1, 120:8, 160:18, 161:2
**programmed** [1] - 94:9
**programs** [3] - 120:10, 120:13, 160:18
**progression** [1] - 19:16
**promissory** [8] - 14:14, 14:22, 32:24, 34:23, 36:15, 43:18, 43:25, 81:17
**proof** [2] - 58:5, 165:22
**proper** [2] - 160:22, 165:15
**proprietary** [1] - 178:12
**prosecuting** [1] - 10:12
**Protection** [7] - 167:1, 167:4, 167:22, 168:10, 168:14, 169:7, 169:15
**prove** [1] - 154:22, 155:14
**provided** [2] - 23:3, 94:25
**provides** [3] - 23:19, 24:4, 27:5
**public** [1] - 41:2
**Public** [5] - 1:17, 3:4, 183:23, 184:3, 184:22
**publicly** [1] - 6:19
**pull** [11] - 44:5, 45:6, 54:7, 54:8, 54:10, 57:17, 86:6, 122:2, 160:22, 161:22, 179:9
**pulled** [4] - 44:6, 160:24, 161:1, 161:2
**pulling** [1] - 123:18
**purchase** [8] - 62:16, 62:19, 62:22, 63:2, 63:8, 68:5, 79:24, 135:4
**purchased** [9] - 115:6, 116:1, 116:10, 116:14, 117:2, 134:2, 144:20, 145:9, 145:25
**purchasing** [1] -

147:11
**purported** [1] - 172:7
**purports** [1] - 52:12
**purpose** [5] - 61:17, 67:17, 109:17, 109:18, 175:20
**purposes** [10] - 14:6, 48:12, 74:9, 112:14, 113:14, 144:2, 146:10, 150:2, 162:7, 167:21
**pursuant** [2] - 1:13, 113:14
**push** [1] - 123:15
**pushed** [1] - 123:10
**pushes** [1] - 123:8
**put** [24] - 15:19, 15:21, 27:4, 27:25, 28:15, 46:3, 47:14, 58:19, 60:11, 60:19, 64:19, 64:20, 74:9, 74:14, 85:15, 87:10, 87:17, 87:21, 98:23, 103:22, 104:2, 139:3, 139:10, 179:13
**puts** [1] - 120:20
**putting** [1] - 74:12

## Q

**questioning** [2] - 118:15, 132:19
**questions** [6] - 31:10, 38:1, 99:10, 166:19, 169:14, 170:5

## R

**radial** [1] - 152:16
**ran** [1] - 134:18
**random** [2] - 101:23, 103:25
**rata** [1] - 152:11
**Ratchford** [32] - 16:25, 17:1, 17:5, 17:9, 17:14, 17:20, 17:25, 18:19, 29:10, 50:20, 131:12, 147:18, 147:24, 149:4, 150:3, 151:10, 151:14, 154:12, 154:16, 159:22, 159:25, 160:2, 160:9, 161:16, 161:18, 162:25, 177:12, 180:1, 180:3, 182:17, 182:19

**rate** [18] - 60:25, 100:25, 105:8, 113:3, 113:6, 113:10, 113:15, 113:16, 113:20, 113:21, 113:22, 113:23, 119:1, 119:9, 119:10, 119:14, 158:6
**rates** [1] - 61:2
**rather** [1] - 77:18
**RBS** [6] - 120:8, 120:10, 125:12, 158:15, 160:24, 161:3
**Re** [2] - 2:8, 2:15
**reaches** [1] - 94:9
**read** [11] - 43:10, 67:5, 73:8, 82:3, 82:4, 124:7, 139:14, 141:23, 150:16, 150:18, 158:7
**reading** [1] - 47:4
**realized** [1] - 80:24
**really** [4] - 19:15, 35:24, 94:21, 144:9
**reason** [5] - 38:7, 94:24, 130:23, 163:15, 163:22
**reasons** [1] - 41:12
**recalculated** [1] - 101:2
**recalled** [3] - 171:18, 171:24, 179:5
**receive** [1] - 56:21
**received** [15] - 18:9, 19:11, 35:2, 50:13, 56:23, 58:8, 58:9, 58:13, 75:1, 146:17, 150:22, 160:10, 160:12, 168:9
**receiving** [2] - 20:9, 181:9
**recent** [1] - 152:14
**recently** [1] - 138:2
**recess** [5] - 53:22, 72:20, 99:6, 142:10, 166:22
**recollection** [2] - 97:23, 146:8
**Recon** [3] - 82:16, 82:20, 83:8
**recon** [2] - 82:23
**reconciliation** [1] - 82:24
**record** [54] - 3:9, 5:24, 13:14, 13:17, 14:8, 15:22, 23:4, 29:18,

29:22, 31:15, 42:17, 42:21, 42:22, 44:11, 44:12, 45:23, 45:24, 50:23, 51:24, 53:18, 59:12, 81:7, 83:25, 85:19, 86:24, 89:3, 90:13, 94:15, 96:2, 98:6, 98:11, 99:5, 108:23, 110:22, 110:24, 111:22, 112:1, 112:2, 112:20, 112:22, 137:21, 138:3, 141:3, 143:11, 146:3, 156:16, 156:18, 159:5, 166:15, 166:21, 167:24, 179:3, 179:7, 184:12
**records** [53] - 10:2, 12:1, 12:4, 13:7, 13:14, 13:17, 14:11, 23:5, 24:4, 24:6, 24:14, 25:7, 25:24, 26:2, 26:10, 26:13, 31:23, 31:25, 32:2, 34:20, 42:3, 42:4, 42:7, 48:22, 48:24, 49:2, 50:24, 51:3, 57:1, 69:20, 70:24, 103:21, 109:14, 110:1, 110:19, 110:20, 123:21, 124:1, 133:7, 136:8, 138:4, 138:25, 139:3, 139:7, 139:12, 140:25, 141:1, 141:8, 141:19, 150:21, 150:22, 156:10, 156:14
**recover** [2] - 23:23, 149:10
**recovery** [4] - 19:6, 129:11, 129:17, 164:24
**redact** [1] - 69:2
**redacted** [13] - 68:17, 68:18, 68:19, 69:9, 69:10, 106:14, 106:15, 106:20, 106:23, 107:3, 107:4, 107:15, 107:18
**redacting** [4] - 69:6, 108:4, 108:5, 108:7
**redaction** [3] - 97:20, 97:24, 106:24
**reduced** [2] - 99:17,

184:10
**Redwell** [1] - 13:2
**refer** [3] - 81:19, 108:12, 118:25
**reference** [6] - 12:21, 56:6, 58:24, 108:25, 157:16, 157:25
**referenced** [3] - 48:3, 88:11, 175:18
**references** [1] - 157:8
**referred** [4] - 26:7, 107:6, 122:20, 163:7
**referring** [8] - 33:14, 42:5, 58:22, 59:12, 65:9, 116:19, 138:10, 161:12
**refers** [6] - 42:7, 90:5, 91:20, 108:13, 130:4, 142:14
**reflective** [1] - 131:17
**reformatted** [2] - 77:16, 77:17
**regard** [2] - 145:4, 173:17
**regarding** [3] - 85:10, 167:15, 176:10
**regardless** [1] - 74:15
**regular** [1] - 102:3
**Reimburse** [1] - 83:4
**relate** [2] - 64:12, 141:19
**related** [4] - 31:14, 32:11, 79:14, 108:18
**relates** [4] - 47:8, 80:1, 138:8, 171:9
**relating** [4] - 42:1, 68:7, 132:19, 169:20
**relation** [1] - 88:24
**relationship** [9] - 17:1, 17:16, 21:24, 22:24, 23:8, 23:10, 23:14, 31:8, 174:14
**relationships** [1] - 23:11
**relayed** [1] - 135:8
**relevant** [1] - 139:3
**reliable** [1] - 133:7
**rely** [5] - 25:19, 25:21, 94:18, 110:15, 155:13
**relying** [1] - 85:23
**remained** [1] - 176:23
**remaining** [2] - 19:6, 166:19
**remedial** [1] - 7:8
**remember** [5] - 65:16, 135:12, 139:15, 148:10, 176:4

**remit** [1] - 19:7
**repay** [1] - 110:11
**Repay** [1] - 81:21
**repayment** [18] - 81:22, 100:4, 100:22, 100:23, 101:1, 101:5, 101:7, 101:9, 101:25, 102:12, 102:24, 103:3, 105:2, 105:4, 106:12, 110:2, 110:9
**repayments** [1] - 103:2
**repeat** [7] - 6:1, 61:16, 116:11, 124:8, 124:9, 162:3, 173:15
**rephrase** [13] - 5:13, 15:1, 16:20, 17:24, 18:15, 19:19, 22:2, 24:9, 26:12, 26:19, 27:22, 91:15, 145:17
**Report** [1] - 2:14
**report** [17] - 111:21, 113:16, 113:18, 114:19, 114:24, 115:7, 115:21, 115:22, 117:21, 117:24, 171:23, 172:8, 172:15, 172:17, 172:21, 174:6, 174:11
**reported** [9] - 170:12, 170:19, 170:21, 171:4, 171:12, 172:3, 173:4, 184:9
**reporting** [20] - 117:21, 155:20, 155:23, 170:7, 170:10, 170:13, 170:20, 171:1, 171:7, 171:8, 171:16, 172:3, 173:2, 173:7, 173:10, 173:12, 173:13, 173:17, 173:18, 174:12
**Reporting** [1] - 174:5
**reports** [2] - 170:9, 171:1
**repositories** [1] - 13:12
**repository** [1] - 32:15
**represent** [5] - 61:14, 75:24, 118:1, 138:21, 149:18
**representation** [4] - 75:3, 76:5, 129:18, 130:6

**representations** [3] - 94:18, 110:16, 122:6
**representative** [5] - 26:16, 35:20, 51:11, 131:22, 176:7
**represented** [3] - 110:14, 118:6, 145:8
**request** [12] - 43:21, 46:21, 52:17, 74:15, 74:16, 118:5, 119:23, 124:4, 137:22, 137:24, 173:25
**Request/Credit** [3] - 2:10, 2:11, 2:14
**requested** [5] - 45:15, 88:20, 100:2, 138:2, 138:17
**require** [1] - 42:20
**required** [1] - 40:22
**requirements** [1] - 159:21
**requires** [1] - 42:19
**research** [1] - 147:1
**reserves** [3] - 142:3, 142:5, 142:6
**resigned** [2] - 78:6, 135:2
**resource** [1] - 13:25
**Resource** [8] - 92:18, 115:18, 115:19, 116:10, 116:15, 117:3, 117:7, 117:11
**Resources** [8] - 67:20, 68:11, 134:24, 135:2, 139:9, 140:10, 153:7, 171:10
**respect** [12] - 60:6, 68:16, 94:19, 138:9, 144:1, 146:20, 149:24, 156:1, 156:9, 156:11, 167:4, 170:23
**responsibilities** [3] - 20:20, 20:25, 27:20
**responsible** [13] - 15:16, 21:16, 25:23, 69:6, 94:20, 116:5, 121:4, 159:15, 166:3, 166:8, 166:13, 171:7, 171:16
**rest** [1] - 109:13
**restate** [1] - 16:8
**result** [3] - 18:1, 18:2, 136:12
**retained** [1] - 151:9

**retrieve** [2] - 27:3, 52:19
**retrieved** [5] - 54:2, 54:4, 65:6, 66:22, 66:23
**return** [2] - 58:4, 99:9
**reveal** [2] - 38:14, 131:9
**reverse** [1] - 84:5
**review** [21] - 10:2, 12:20, 12:23, 13:1, 14:10, 29:25, 40:24, 41:18, 42:15, 52:25, 103:21, 123:12, 123:13, 146:11, 146:18, 146:25, 151:13, 154:10, 182:23, 182:24, 182:25
**reviewed** [14] - 14:6, 28:4, 28:8, 31:22, 41:10, 42:13, 141:22, 141:24, 146:12, 146:23, 147:4, 148:13, 158:24, 182:16
**reviewing** [2] - 31:11, 123:14
**Rhode** [2] - 119:11, 158:7
**right-hand** [3] - 59:17, 60:24, 119:1
**rise** [1] - 93:10
**RMR** [2] - 1:17, 184:21
**robo** [4] - 165:7, 165:10, 165:12, 165:14
**robo-signing** [4] - 165:7, 165:10, 165:12, 165:14
**row** [1] - 102:22
**rows** [1] - 109:1
**rules** [1] - 113:14
**run** [1] - 28:12
**running** [1] - 49:6

**S**

**safe** [2] - 127:12, 183:12
**sake** [1] - 180:24
**sale** [1] - 79:9
**San** [1] - 8:19
**Sara** [2] - 18:13, 152:2
**Sarah** [23] - 14:4, 14:5, 15:12, 16:10, 16:17, 57:19, 91:21, 93:13, 114:7, 124:5, 124:12, 147:15,

149:9, 152:2, 158:10, 166:3, 166:4, 172:20, 172:21, 175:25, 176:2
**SARAH** [2] - 1:8, 1:8
**saved** [6] - 34:22, 65:1, 69:16, 69:25, 73:12, 78:20
**Savings** [2] - 157:16, 157:25
**saw** [2] - 41:20, 172:22
**scan** [1] - 64:15
**scanned** [5] - 36:3, 36:4, 36:19, 36:22, 121:23
**scanning** [1] - 36:25
**scans** [3] - 35:7, 36:15, 36:17
**Schedule** [2] - 2:13, 79:13
**schedule** [52] - 62:8, 62:11, 62:20, 68:16, 68:18, 69:2, 69:6, 69:15, 69:24, 70:11, 72:11, 72:22, 73:5, 73:10, 73:11, 73:19, 73:21, 74:3, 74:4, 74:6, 74:7, 74:24, 75:25, 76:7, 76:8, 76:20, 76:22, 76:24, 76:25, 77:8, 77:24, 78:2, 78:9, 78:13, 81:4, 83:10, 100:22, 101:1, 101:7, 101:9, 102:12, 102:13, 102:14, 102:17, 102:23, 105:5, 106:12, 109:5, 110:10, 143:5, 161:11
**scheduled** [2] - 100:3, 100:11
**schedules** [8] - 75:5, 75:7, 78:18, 78:22, 100:24, 101:6, 105:2, 110:2
**school** [2] - 7:9, 7:10
**scope** [20] - 6:14, 9:6, 9:20, 26:15, 38:12, 70:21, 71:2, 72:5, 116:21, 131:3, 154:15, 165:9, 166:1, 167:7, 167:8, 168:6, 168:20, 168:23, 169:9, 170:1
**screen** [16] - 77:21, 77:23, 83:24, 84:11,

84:12, 86:8, 87:1, 87:5, 97:24, 97:25, 98:13, 106:3, 148:25, 151:8, 151:12, 151:15
**screens** [2] - 51:2, 146:13
**scrubs** [1] - 28:13
**search** [1] - 147:6
**SEC** [4] - 64:14, 64:16, 66:23
**SEC's** [1] - 65:14
**second** [11] - 13:22, 30:1, 41:24, 60:22, 73:23, 80:2, 107:3, 132:9, 153:3, 155:15, 181:20
**Second** [2] - 2:8, 2:15
**section** [1] - 119:8
**secure** [3] - 27:7, 55:6, 161:22
**securitized** [1] - 76:12
**security** [5] - 49:14, 49:19, 49:20, 106:25, 107:2
**see** [23] - 20:8, 28:9, 40:13, 47:3, 69:14, 77:21, 79:15, 82:2, 84:6, 84:8, 87:6, 87:7, 96:10, 101:5, 101:12, 101:19, 102:5, 128:18, 133:12, 133:17, 133:19, 166:19, 174:22
**seeing** [3] - 145:22, 148:10, 148:11
**seek** [2] - 129:3, 163:11
**seeking** [7] - 128:25, 129:10, 129:17, 129:21, 131:16, 164:24, 165:1
**segment** [11] - 180:23, 180:25, 181:1, 181:2, 181:11, 181:14, 181:15, 181:18, 181:20, 181:23
**segments** [2] - 181:9, 181:15
**sell** [2] - 6:16, 71:18
**sells** [1] - 62:5
**send** [9] - 23:21, 23:22, 27:7, 45:12, 56:24, 56:25, 57:2, 78:15, 138:18
**sending** [1] - 149:21

**senior** [22] - 3:12, 3:15, 3:20, 4:23, 4:25, 6:3, 8:21, 9:23, 10:10, 10:13, 10:14, 19:11, 20:7, 20:8, 20:15, 22:20, 26:21, 35:5, 66:4, 83:14, 110:13, 116:7
**sense** [2] - 11:17, 118:24
**sent** [11] - 12:22, 34:5, 34:6, 36:14, 42:3, 42:8, 60:20, 85:14, 138:20, 179:14, 181:5
**sentence** [1] - 125:20
**separate** [4] - 71:17, 131:12, 153:9, 161:10
**September** [6] - 5:2, 62:7, 104:1, 172:2, 172:16, 172:22
**sequence** [1] - 57:14
**serve** [1] - 10:10
**server** [16] - 69:16, 69:25, 70:2, 70:4, 73:15, 74:25, 78:16, 78:20, 79:3, 161:13, 161:14, 161:19, 176:12, 176:13, 176:15, 176:23
**servers** [16] - 13:10, 32:19, 65:2, 70:1, 73:12, 161:23, 176:15, 176:18, 176:22, 177:1, 177:6, 177:17, 177:18, 177:21
**service** [8] - 21:14, 21:15, 22:10, 25:15, 68:9, 78:21, 89:23, 154:4
**serviced** [11] - 55:17, 68:11, 68:13, 139:24, 152:3, 152:4, 152:19, 152:23, 153:2, 153:6, 171:11
**servicer** [26] - 8:25, 21:9, 21:12, 22:3, 22:4, 22:6, 24:11, 43:6, 46:5, 55:2, 67:19, 78:6, 91:8, 92:16, 93:18, 93:19, 115:24, 134:24, 139:11, 140:8, 140:9, 140:14, 166:10, 171:6, 176:14

**servicers** [2] - 92:4, 154:11
**Services** [8] - 21:10, 70:7, 89:9, 89:11, 133:1, 133:6, 174:22, 175:1
**services** [4] - 7:2, 23:15, 89:7, 89:22
**servicing** [18] - 21:6, 22:7, 23:13, 25:13, 25:22, 42:12, 67:23, 71:10, 91:2, 91:4, 91:13, 136:20, 140:19, 153:5, 156:20, 156:21, 179:2, 179:3
**set** [5] - 47:11, 88:5, 132:22, 148:17, 182:11
**sets** [1] - 123:1
**several** [5] - 52:11, 83:15, 85:20, 99:20, 108:14
**share** [7] - 180:20, 180:21, 181:4, 181:6, 182:15, 182:17, 182:22
**shares** [2] - 180:12, 182:21
**SHARTLE** [142] - 1:21, 5:12, 5:16, 5:20, 5:25, 6:6, 6:13, 9:5, 9:17, 9:19, 12:2, 12:6, 12:9, 15:3, 16:4, 16:7, 16:19, 17:17, 17:23, 18:14, 19:18, 19:21, 20:11, 20:18, 20:23, 21:8, 21:21, 21:25, 24:8, 26:11, 26:14, 27:12, 28:18, 28:24, 33:7, 33:22, 36:1, 37:6, 37:9, 37:22, 38:14, 38:22, 38:25, 39:18, 39:22, 51:9, 53:17, 56:11, 58:21, 59:7, 59:11, 59:21, 59:25, 60:4, 64:3, 64:5, 65:8, 66:12, 70:20, 71:1, 72:4, 72:16, 76:17, 77:4, 77:11, 81:6, 82:5, 85:25, 87:23, 91:22, 94:2, 98:4, 105:12, 105:16, 107:22, 111:7, 111:15, 112:15, 115:3, 115:9, 116:20, 117:4, 118:16,

119:3, 121:18, 122:10, 122:24, 123:24, 125:21, 126:5, 126:17, 129:23, 130:9, 130:12, 130:20, 131:2, 131:9, 131:20, 132:9, 132:12, 132:16, 132:23, 133:13, 137:4, 137:12, 139:16, 142:7, 143:7, 144:12, 145:10, 145:15, 146:1, 151:23, 154:8, 154:14, 155:7, 157:6, 157:21, 157:24, 159:3, 163:3, 163:9, 163:18, 163:25, 164:3, 164:12, 165:8, 165:25, 166:6, 167:6, 167:12, 167:18, 167:23, 168:4, 168:6, 168:11, 168:16, 168:19, 168:25, 169:8, 169:17, 169:24
**short** [7] - 53:22, 68:12, 72:20, 139:25, 142:10, 166:22, 171:10
**shot** [2] - 98:13, 106:3
**show** [4] - 114:11, 115:21, 132:1, 136:16
**showing** [1] - 62:12
**shows** [1] - 100:23
**side** [2] - 60:24, 119:1
**Sig** [1] - 2:14
**sign** [4] - 48:12, 48:13, 52:23, 53:4
**signature** [12] - 58:2, 58:4, 58:12, 58:15, 58:17, 60:21, 81:17, 120:2, 157:1, 157:4, 157:7, 160:13
**signed** [21] - 38:18, 39:10, 39:16, 39:19, 41:12, 55:20, 77:2, 93:14, 121:22, 121:23, 121:24, 124:5, 124:12, 124:13, 126:12, 126:23, 127:18, 155:19, 156:3, 165:18, 165:19
**signing** [5] - 165:7,

165:10, 165:12, 165:14, 165:15
**similar** [4] - 59:2, 107:19, 132:7, 156:13
**simple** [1] - 45:3
**simply** [2] - 97:4
**single** [1] - 76:23
**sit** [3] - 87:19, 124:22, 173:25
**site** [3] - 27:7, 32:14, 55:6, 66:23, 161:22
**sits** [1] - 51:21
**six** [4] - 62:25, 109:1, 180:16, 181:19
**sixth** [1] - 63:1
**social** [2] - 106:25, 107:1
**software** [3] - 66:24, 69:11, 178:14
**sold** [3] - 71:7, 71:16, 78:24
**solely** [2] - 25:19, 52:23
**Solutions** [1] - 175:1
**someone** [3] - 41:3, 56:13, 127:7
**someplace** [1] - 77:24
**sometimes** [1] - 26:8
**soon** [1] - 171:13
**sorry** [13] - 8:7, 56:5, 60:1, 61:16, 80:23, 81:4, 98:4, 102:18, 102:22, 143:3, 143:10, 147:22, 163:14
**sort** [2] - 14:14, 47:2
**sounds** [1] - 18:16
**source** [2] - 25:18, 74:16
**sources** [1] - 176:10
**space** [1] - 30:24
**speaking** [2] - 5:23, 165:13
**special** [3] - 134:24, 139:11, 142:17
**specialist** [11] - 4:22, 4:23, 4:25, 5:1, 6:4, 10:11, 110:13, 116:8, 120:16, 120:19
**specific** [6] - 15:23, 19:13, 120:25, 121:2, 122:19, 173:24
**specifically** [7] - 7:21, 46:21, 56:1, 99:12, 118:25, 138:9,

174:15
**specifics** [1] - 174:2
**specify** [1] - 93:16
**speculate** [4] - 11:22, 90:7, 123:6, 172:18
**speculating** [1] - 37:4
**split** [3] - 10:9, 152:10, 181:3
**ss** [1] - 1:2
**stacked** [1] - 77:19
**stamp** [2] - 40:11, 40:20, 40:25, 41:3, 107:5, 107:6
**stamped** [28] - 57:14, 59:5, 59:6, 59:13, 59:15, 59:18, 60:7, 60:23, 62:21, 64:6, 65:12, 67:4, 73:4, 77:9, 79:25, 80:17, 80:19, 81:3, 89:18, 95:2, 95:15, 99:13, 119:19, 128:5, 128:11, 142:16, 157:15, 159:11
**stamps** [1] - 41:1
**stand** [3] - 13:24, 95:10, 95:12
**standard** [1] - 38:19
**stands** [4] - 14:1, 95:7, 96:24
**start** [1] - 119:5
**started** [5] - 4:16, 4:22, 83:22, 100:8, 102:3
**starting** [2] - 13:16, 167:1
**STATE** [1] - 1:1
**state** [9] - 3:8, 9:15, 9:18, 15:21, 89:2, 119:15, 159:20, 182:19, 182:21
**State** [7] - 1:17, 61:2, 119:11, 119:15, 154:13, 158:6, 184:3
**statement** [13] - 43:20, 53:6, 61:6, 78:8, 81:15, 113:11, 113:12, 150:15, 150:17, 150:20, 157:3, 157:10, 160:14
**Statement** [1] - 2:9
**states** [8] - 67:7, 90:19, 119:8, 119:13, 133:9, 145:19, 161:25, 182:20
**stating** [1] - 44:15

**status** [1] - 35:14
**stayed** [1] - 78:23
**stenographically** [1] - 184:9
**stepped** [1] - 139:10
**still** [11] - 12:7, 30:18, 45:20, 48:16, 70:17, 75:17, 102:1, 104:10, 142:1, 170:21, 178:7
**stink** [2] - 80:25, 81:8
**stipulate** [1] - 137:14
**stop** [4] - 103:6, 129:10, 129:14, 163:6
**stopped** [6] - 128:24, 128:25, 129:16, 162:6, 164:20, 164:23
**store** [1] - 161:23
**stored** [4] - 36:19, 121:24, 161:11, 161:13
**stores** [1] - 57:16
**Street** [1] - 1:15
**stretched** [1] - 77:20
**strictly** [1] - 35:21
**strike** [7] - 15:13, 79:6, 84:15, 95:3, 112:17, 116:6, 173:5
**Structured** [1] - 175:1
**structures** [1] - 68:3
**student** [3] - 20:17, 20:21, 79:24
**STUDENT** [2] - 1:4, 1:12
**Student** [57] - 9:1, 9:9, 14:4, 15:12, 16:9, 16:14, 18:12, 18:17, 21:20, 29:11, 29:14, 30:5, 38:21, 39:6, 39:15, 42:18, 43:8, 46:23, 48:3, 61:9, 63:4, 63:12, 63:17, 63:18, 63:19, 63:21, 63:22, 63:24, 79:19, 79:20, 79:22, 80:4, 80:6, 80:8, 80:10, 80:11, 82:15, 92:6, 108:14, 109:3, 131:16, 137:2, 137:7, 137:10, 149:19, 153:23, 154:1, 155:17, 155:21, 161:25, 162:16, 163:23, 172:10, 172:23, 175:24, 176:21,

179:1
**Students** [1] - 63:24
**styled** [1] - 111:10
**subject** [7] - 12:24, 16:23, 38:8, 48:3, 62:23, 116:17, 133:11, 156:2
**submitted** [1] - 48:1
**subscribe** [1] - 184:17
**Subscribed** [1] - 183:21
**subsidiary** [2] - 5:14, 67:21
**successful** [5] - 18:17, 19:1, 19:5, 164:15, 164:18
**sue** [1] - 117:16
**sued** [1] - 165:6
**suggest** [1] - 88:25
**suggesting** [2] - 128:23, 148:20
**suit** [3] - 18:4, 147:20, 154:18
**suits** [2] - 10:7, 154:17
**sum** [2] - 128:6, 128:12
**summarizing** [1] - 61:1
**summary** [9] - 27:10, 48:12, 80:16, 86:22, 100:22, 106:12, 132:25, 155:5, 155:12
**Summary** [3] - 2:13, 2:13, 2:19
**summation** [1] - 96:12
**sums** [1] - 19:6
**SUPERIOR** [1] - 1:1
**supervising** [1] - 139:22
**supervisor** [1] - 12:14
**supplement** [8] - 61:25, 62:14, 68:17, 72:23, 72:24, 73:4, 73:6, 79:14
**supplements** [1] - 65:2
**support** [6] - 30:11, 80:15, 148:16, 155:10, 155:12, 156:23
**supports** [3] - 136:15, 136:17, 136:20
**supposed** [1] - 123:10
**surprise** [1] - 132:20
**suspect** [1] - 28:5
**swear** [1] - 85:7
**switching** [1] - 159:3

**swore** [1] - 41:25
**sworn** [4] - 3:3, 168:13, 183:21, 184:5
**System** [9] - 4:19, 5:4, 17:2, 24:6, 27:4, 42:19, 89:6, 90:14, 151:11
**system** [110] - 13:5, 13:16, 13:18, 13:25, 14:8, 14:16, 14:24, 15:2, 15:13, 15:20, 15:22, 22:14, 22:16, 23:2, 23:5, 26:1, 26:2, 26:6, 27:2, 27:3, 27:6, 27:9, 27:14, 27:15, 28:2, 28:10, 28:16, 32:4, 32:5, 32:7, 32:9, 34:3, 34:13, 34:16, 34:24, 35:21, 36:12, 38:2, 44:1, 45:11, 49:15, 49:16, 50:7, 50:23, 51:3, 51:17, 51:24, 51:25, 52:7, 54:16, 64:21, 64:22, 65:1, 65:7, 65:9, 69:4, 80:21, 83:25, 84:11, 84:17, 84:19, 85:15, 86:6, 87:2, 87:4, 87:16, 87:17, 87:21, 88:4, 88:5, 88:10, 88:12, 88:17, 89:13, 89:16, 91:3, 92:9, 94:12, 94:15, 96:2, 98:14, 98:23, 106:3, 106:6, 110:5, 111:25, 112:2, 112:3, 112:4, 112:8, 113:22, 136:14, 140:25, 144:16, 144:18, 148:23, 171:17, 177:24, 178:4, 178:10, 178:24, 179:2, 179:13, 179:20, 179:25, 183:1
**systematic** [2] - 27:25, 85:16
**systems** [15] - 13:9, 13:14, 13:20, 14:6, 14:10, 22:17, 23:4, 32:3, 32:10, 32:12, 35:3, 69:19, 178:20, 178:21
**Systems** [97] - 3:14, 3:23, 4:3, 4:4, 4:6, 4:8, 4:12, 5:7, 5:11, 5:14, 5:15, 5:19, 6:2,

6:7, 6:11, 6:12, 6:15, 6:18, 6:19, 6:21, 8:5, 8:8, 8:11, 8:22, 8:23, 9:10, 9:24, 10:1, 10:6, 10:23, 11:11, 11:18, 11:20, 13:8, 15:9, 15:15, 17:3, 17:14, 18:8, 18:22, 19:12, 21:19, 22:5, 22:21, 23:1, 23:22, 29:9, 30:18, 43:7, 43:9, 48:17, 50:23, 54:17, 54:21, 54:25, 55:3, 55:5, 55:6, 65:19, 66:5, 66:6, 66:8, 67:24, 68:15, 71:8, 71:12, 71:13, 71:17, 72:9, 74:19, 74:25, 86:18, 112:22, 116:8, 135:1, 139:6, 143:24, 149:15, 150:24, 151:4, 151:5, 151:21, 160:1, 165:3, 165:6, 165:22, 167:5, 168:9, 168:15, 173:6, 173:10, 173:16, 174:18, 175:10, 176:7, 176:11, 177:22
**Systems'** [4] - 8:9, 70:2, 70:4, 153:11

### T

**tagged** [2] - 36:17, 67:1
**tasked** [1] - 176:19
**team** [20] - 44:8, 44:22, 44:24, 44:25, 45:2, 45:8, 46:14, 52:22, 54:7, 68:20, 68:25, 69:2, 69:5, 73:2, 74:22, 120:23, 121:4, 123:8, 158:22, 182:16
**Tech** [1] - 7:13
**teleconference** [1] - 85:4
**teleconferences** [1] - 85:5
**telephone** [2] - 88:16, 146:15
**template** [5] - 39:8, 40:1, 40:3, 40:4, 44:21
**temporary** [2] - 110:7, 134:9

**TERI** [33] - 63:12, 63:19, 79:22, 80:10, 133:24, 133:25, 134:1, 134:2, 134:7, 134:16, 134:19, 135:3, 136:12, 136:15, 136:20, 136:21, 136:25, 137:6, 137:16, 140:11, 140:19, 140:23, 141:4, 141:7, 141:12, 141:19, 144:20, 145:2, 145:9, 145:25, 147:2, 147:11, 165:23

**TERI/DTC** [1] - 90:8

**term** [26] - 33:23, 47:17, 47:18, 58:18, 59:1, 59:9, 60:6, 60:18, 95:23, 101:4, 103:4, 115:10, 119:19, 120:11, 120:13, 123:16, 125:3, 125:5, 160:15, 160:22, 161:1, 161:20, 165:10, 172:5

**terminology** [1] - 133:21

**terms** [50] - 21:1, 31:8, 47:11, 47:13, 53:10, 58:1, 58:15, 93:13, 93:16, 93:17, 104:21, 104:24, 105:7, 105:22, 110:21, 120:3, 120:6, 121:16, 122:3, 122:25, 123:1, 123:9, 123:14, 123:16, 123:17, 124:3, 124:15, 124:19, 124:22, 125:6, 125:8, 125:10, 125:15, 125:25, 126:1, 127:22, 149:15, 157:8, 157:11, 158:3, 158:10, 158:13, 158:15, 160:17, 160:23, 160:25, 161:6, 161:14

**testified** [7] - 3:4, 103:20, 117:1, 117:2, 135:18, 142:13, 144:25

**testifies** [1] - 43:24

**testify** [7] - 30:4,

38:19, 42:1, 48:3, 51:14, 107:11, 184:5

**testifying** [4] - 51:6, 110:21, 133:14, 145:11

**testimony** [25] - 53:5, 63:17, 65:5, 67:8, 77:13, 80:6, 91:10, 96:14, 100:10, 124:14, 124:17, 127:17, 129:20, 134:6, 134:7, 153:16, 155:18, 164:16, 164:20, 164:23, 167:25, 168:13, 176:12, 177:19, 184:12

**TG** [2] - 102:16, 102:21

**THE** [2] - 59:23, 124:7

**themselves** [2] - 111:10, 156:17

**thereafter** [1] - 153:5

**thereby** [1] - 92:11

**therefore** [2] - 26:23, 137:9

**therein** [2] - 165:16, 165:20

**thereto** [1] - 53:3

**third** [12] - 24:1, 56:15, 56:20, 79:15, 86:11, 102:15, 102:21, 102:22, 121:10, 121:11, 125:20

**third-party** [2] - 24:1, 86:11

**Thompson** [1] - 12:15

**thorough** [2] - 12:23, 146:18

**thousand** [1] - 128:7

**three** [8] - 35:3, 41:9, 50:1, 58:9, 62:25, 103:1, 175:18, 180:24

**throughout** [6] - 36:22, 41:18, 42:11, 45:24, 67:22, 110:18

**thumbing** [1] - 13:2

**THURLOW** [1] - 1:8

**Thurlow** [27] - 2:17, 2:17, 14:5, 15:12, 16:10, 16:17, 18:13, 31:24, 34:6, 57:19, 57:25, 58:8, 91:21, 93:14, 114:7, 124:5, 124:12, 147:16, 149:9, 152:2, 158:11, 166:4,

172:20, 175:25, 176:2, 183:25

**Thurlow's** [4] - 34:11, 62:12, 110:19, 122:2

**Tier** [1] - 81:19

**TIFF** [1] - 35:9

**timeframes** [1] - 149:2

**timely** [1] - 42:23

**title** [3] - 117:8, 120:25, 155:13

**today** [14] - 8:16, 16:25, 22:12, 23:16, 48:5, 87:20, 107:11, 124:22, 136:24, 155:18, 155:24, 164:20, 173:25, 177:20

**today's** [8] - 31:20, 38:8, 40:18, 41:14, 41:19, 146:10, 148:13, 151:7

**together** [10] - 13:10, 23:17, 74:12, 74:14, 120:20, 128:6, 128:13, 152:3, 152:4, 152:20

**took** [5] - 71:5, 71:14, 72:17, 152:2, 160:20

**top** [12] - 57:11, 81:14, 89:4, 97:12, 106:24, 107:1, 109:1, 114:20, 151:17, 157:14, 157:17

**topic** [1] - 170:6

**TOT** [1] - 82:16

**total** [6] - 43:14, 82:18, 86:15, 128:7, 128:13, 150:11

**totality** [2] - 79:12, 100:21

**totally** [1] - 132:21

**toward** [1] - 150:19

**towards** [5] - 102:15, 103:22, 104:2, 114:25, 150:12

**track** [1] - 59:19

**trade** [10] - 170:12, 170:15, 170:16, 170:17, 170:18, 170:19, 170:23, 171:19, 171:25, 173:3

**traded** [1] - 6:19

**traditional** [1] - 151:15

**train** [1] - 144:22

**trained** [9] - 19:17, 50:25, 51:25, 88:16, 111:1, 111:2,

144:16, 144:18, 145:4

**training** [18] - 19:10, 19:15, 19:20, 23:3, 50:22, 51:16, 51:21, 51:23, 84:22, 84:25, 85:1, 85:3, 109:25, 110:25, 126:20, 134:15, 141:15, 145:1

**trans** [2] - 55:19, 165:24

**transaction** [21] - 85:21, 85:23, 86:7, 87:15, 88:6, 88:9, 88:11, 88:12, 96:4, 96:6, 96:18, 97:2, 97:8, 97:9, 97:10, 102:21, 113:25, 114:18, 142:20, 146:5, 146:7

**transactions** [5] - 21:1, 86:7, 87:16, 94:19, 138:18

**transcript** [1] - 139:14

**Transcription** [1] - 184:11

**transfer** [8] - 24:23, 33:1, 37:15, 70:10, 79:1, 117:9, 161:14, 161:17

**transferred** [26] - 24:20, 25:1, 32:25, 37:13, 37:19, 54:24, 55:1, 55:3, 68:15, 76:12, 78:9, 78:11, 78:13, 78:14, 91:7, 92:14, 92:17, 134:25, 139:12, 150:1, 161:21, 164:2, 164:21, 171:14, 173:1, 176:22

**transfers** [2] - 55:15, 62:5

**transform** [1] - 6:11

**transition** [2] - 25:6, 67:23

**transitioned** [2] - 4:23, 5:6

**transmitted** [2] - 99:21, 112:25

**TransUnion** [2] - 172:6, 172:8

**Transworld** [114] - 3:14, 3:23, 4:3, 4:4, 4:6, 4:16, 5:9, 5:14, 6:12, 6:18, 6:19, 8:4, 8:8, 8:11, 8:21, 8:23,

9:9, 9:23, 10:1, 10:6, 10:8, 10:15, 10:22, 11:10, 11:18, 11:20, 13:8, 15:9, 15:15, 17:2, 17:3, 17:5, 17:14, 18:8, 18:22, 19:12, 21:19, 22:5, 22:20, 22:25, 23:8, 23:10, 23:11, 23:16, 23:19, 23:21, 23:25, 24:5, 24:20, 25:2, 25:4, 25:6, 25:11, 26:24, 27:4, 29:8, 30:18, 42:19, 43:7, 43:9, 48:16, 50:23, 54:17, 54:21, 54:25, 55:3, 55:5, 55:6, 65:18, 66:5, 70:2, 70:4, 70:11, 70:16, 70:17, 70:23, 71:8, 71:11, 71:13, 71:17, 71:22, 72:3, 72:9, 74:18, 74:25, 78:11, 78:21, 78:25, 86:18, 90:14, 112:22, 116:8, 139:6, 143:24, 149:15, 150:24, 151:4, 151:21, 153:11, 160:1, 165:3, 165:6, 165:22, 167:5, 168:9, 168:15, 173:6, 173:10, 173:16, 174:18, 175:10, 176:7, 176:11, 177:21

**Transworld's** [1] - 71:14

**travels** [1] - 183:12

**tread** [1] - 170:16

**triggers** [1] - 95:19

**trip** [1] - 65:15

**Troubh** [1] - 1:14

**true** [26] - 39:4, 43:16, 43:24, 52:16, 52:19, 53:7, 53:25, 76:19, 99:17, 109:10, 118:7, 118:23, 119:21, 119:24, 122:7, 122:16, 122:17, 126:4, 128:17, 150:14, 152:1, 157:12, 159:15, 159:17, 165:2, 184:12

**Trust** [38] - 9:1, 14:4, 15:12, 16:10, 16:14, 18:13, 18:17, 21:20, 29:11, 29:14, 30:5,

38:21, 39:6, 39:15, 42:19, 43:8, 48:3, 90:6, 92:7, 108:13, 109:3, 109:6, 131:16, 137:2, 137:7, 137:10, 149:19, 153:23, 154:1, 155:17, 155:22, 161:25, 162:16, 163:23, 172:10, 175:24, 176:21, 179:1
**TRUST** [2] - 1:5, 1:13
**trust** [31] - 10:2, 16:13, 19:7, 20:22, 22:9, 22:10, 23:1, 39:10, 48:25, 49:1, 49:3, 55:13, 68:3, 71:10, 74:5, 75:6, 99:21, 108:19, 108:22, 108:24, 109:9, 109:12, 109:15, 117:13, 117:15, 117:19, 134:12, 175:2, 175:5, 175:7, 175:8
**trust's** [2] - 80:16, 156:23
**trustees** [1] - 154:11
**Trusts** [2] - 108:15, 172:23
**trusts** [12] - 55:10, 68:8, 76:25, 117:9, 154:2, 154:6, 154:9, 156:17, 156:18, 170:10, 174:18, 175:3
**trustworthiness** [1] - 94:25
**trustworthy** [1] - 94:16
**truth** [3] - 184:5, 184:6
**try** [2] - 23:24, 124:9
**trying** [6] - 37:25, 60:2, 65:15, 93:24, 105:12, 158:17
**TSI** [54] - 22:25, 26:15, 28:16, 32:21, 32:22, 32:25, 34:13, 34:15, 34:16, 35:2, 35:19, 41:8, 42:4, 48:21, 49:14, 49:21, 50:3, 97:21, 111:25, 112:4, 112:7, 115:23, 136:19, 136:24, 142:17, 143:2, 145:4, 148:1, 148:12, 148:19, 150:6, 153:8,

156:20, 176:23, 177:13, 177:18, 178:6, 178:9, 178:24, 179:7, 179:21, 179:22, 180:1, 180:15, 180:19, 180:24, 181:4, 181:8, 183:3, 183:4, 183:5, 183:8
**TSI's** [4] - 33:12, 33:18, 73:12, 156:14
**TSX2D** [1] - 97:18
**turn** [2] - 98:2, 107:25, 111:18
**turning** [2] - 80:14, 108:2
**two** [32] - 11:8, 12:11, 13:20, 16:24, 31:3, 31:18, 48:20, 62:25, 63:14, 80:9, 97:3, 103:1, 106:24, 107:24, 120:9, 122:6, 127:14, 133:11, 147:15, 149:8, 149:24, 152:1, 154:21, 170:11, 170:24, 172:8, 172:15, 172:22, 173:9, 180:7, 180:15
**tying** [1] - 109:14
**type** [10] - 13:19, 81:22, 96:4, 96:6, 96:18, 97:2, 97:8, 97:10, 101:25, 152:17
**Type** [1] - 81:21
**typed** [1] - 39:20
**types** [1] - 142:20
**typically** [2] - 37:8, 41:9

## U

**U.S** [10] - 16:12, 19:7, 43:9, 48:25, 52:13, 154:2, 174:14, 174:17, 175:9, 175:22
**ultimately** [2] - 134:25, 153:8
**unaware** [1] - 147:21
**uncertain** [27] - 11:15, 13:25, 15:4, 17:12, 17:19, 19:9, 29:5, 29:12, 39:24, 47:20, 49:13, 49:20, 56:1, 58:20, 64:18, 74:5, 77:3, 83:12, 83:18,

93:23, 106:22, 112:16, 118:11, 144:14, 165:11, 166:2, 171:11
**unclear** [2] - 45:20, 70:17
**under** [7] - 6:18, 36:19, 71:8, 71:11, 85:7, 102:1, 119:8
**undergoing** [1] - 167:4
**Undergrad** [1] - 61:9
**Undergraduate** [3] - 46:23, 63:17, 63:18
**undergraduate** [2] - 63:23, 63:25
**underlying** [3] - 43:17, 43:25, 61:15
**underneath** [3] - 69:14, 81:25, 82:17
**unique** [6] - 23:2, 24:5, 26:2, 49:22, 57:13, 138:7
**universe** [1] - 32:10
**University** [1] - 7:13
**unlawful** [1] - 137:11
**unless** [1] - 183:9
**unorganized** [1] - 143:6
**unpack** [1] - 103:9
**unsuccessful** [3] - 149:8, 149:11, 180:8
**unsure** [1] - 107:3
**unusual** [2] - 107:16, 107:20
**up** [35] - 11:3, 23:15, 25:12, 31:10, 41:5, 42:12, 44:5, 54:8, 56:7, 74:4, 76:9, 76:10, 76:21, 77:19, 86:6, 88:5, 94:10, 94:12, 101:3, 114:11, 115:21, 122:2, 125:3, 129:6, 142:3, 142:5, 152:10, 160:21, 168:21, 169:8, 181:3, 181:20, 181:23, 182:11
**update** [5] - 35:11, 35:14, 45:13, 49:23, 51:3
**updated** [1] - 114:21
**upload** [2] - 27:8, 55:7
**uploaded** [1] - 55:5
**upward** [1] - 97:7
**uses** [1] - 45:8

## V

**vacate** [1] - 148:17
**validation** [1] - 165:15
**value** [1] - 85:24
**values** [1] - 142:20
**variable** [8] - 60:25, 100:25, 105:8, 113:19, 118:25, 119:9, 119:14, 158:6
**various** [40] - 10:4, 11:1, 11:14, 13:7, 13:9, 13:12, 13:13, 19:9, 21:1, 23:11, 27:25, 28:13, 41:12, 45:4, 45:17, 49:19, 51:2, 51:4, 51:23, 65:2, 68:1, 70:12, 70:24, 76:24, 76:25, 93:10, 100:23, 104:14, 110:18, 113:14, 126:16, 159:20, 160:17, 160:18, 171:14, 175:3, 176:10, 179:21, 180:12, 182:15
**varying** [1] - 103:4
**verification** [10] - 30:10, 30:13, 38:17, 39:4, 41:4, 43:16, 47:25, 155:18, 156:3, 165:16
**verify** [3] - 44:10, 100:5, 162:10
**version** [5] - 57:8, 158:15, 158:16, 161:3, 161:4
**versus** [2] - 15:12, 16:10
**via** [1] - 56:10
**Vickie** [4] - 16:18, 147:16, 175:25, 176:2
**view** [3] - 35:22, 89:16, 177:7
**viewing** [1] - 27:19
**violation** [2] - 174:5, 174:11
**void** [2] - 92:11, 134:22
**VTAM** [1] - 97:13

## W

**wait** [1] - 126:10
**walked** [1] - 51:2
**Web** [1] - 26:7
**web** [2] - 86:10,

152:15
**website** [1] - 65:14
**weeks** [1] - 175:18
**welcome** [2] - 160:7, 172:14
**wet** [1] - 57:8
**whereby** [2] - 62:3, 93:3
**WHEREOF** [1] - 184:17
**whole** [2] - 28:12, 184:5
**wholly** [2] - 72:3, 78:24
**wider** [1] - 38:12
**WILLIAM** [1] - 1:23
**willing** [2] - 85:7, 130:15
**wipe** [2] - 91:3, 92:8
**wipes** [1] - 95:18
**within-named** [1] - 184:4
**witness** [15] - 9:3, 30:4, 37:23, 38:16, 91:23, 107:22, 116:21, 132:13, 132:17, 132:21, 133:15, 164:5, 167:13, 169:2, 169:6
**WITNESS** [1] - 184:17
**witnessed** [1] - 51:22
**Word** [3] - 45:3, 46:10, 46:12
**word** [6] - 26:21, 119:20, 123:25, 139:21, 139:23, 179:19
**wording** [1] - 122:19
**words** [2] - 139:2, 143:18
**works** [2] - 30:23, 111:3
**writing** [1] - 76:2
**written** [2] - 173:22, 175:10

## Y

**year** [8] - 3:18, 4:24, 7:6, 47:8, 67:25, 101:1, 110:4, 161:2
**years** [9] - 31:3, 48:20, 83:15, 141:8, 160:18, 180:8, 180:15, 182:8, 182:14
**yesterday** [1] - 41:22
**yourself** [1] - 12:11

**Z**

**zero** [5] - 90:20, 90:22, 91:20, 150:12, 150:19

**zip** [2] - 55:4, 160:16