UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

_____

JANE C. FORRESTER WINNE, et al., CIVIL ACTION

        Plaintiffs     Docket No: 1:16-cv-229-JDL


   -versus-


NATIONAL COLLEGIATE STUDENT

LOAN TRUSTS, et al.,

     Defendants
_____

Transcript of Proceedings


Pursuant to notice, the above-entitled matter came on for **Oral Argument** held before **THE HONORABLE JON D. LEVY,** United States District Court Judge, in the United States District Court, Edward T. Gignoux Courthouse, 156 Federal Street, Portland, Maine on the 1st day of August, 2017 at 10:00 a.m. as follows:


(Appearances on next page)


Dennis R. Ford
Official Court Reporter

(Prepared from manual stenography
and computer aided transcription)

                        Appearances:

For the Plaintiffs:  Cynthia A. Dill, Esquire

For Defendant National Collegiate Trusts:

                        Michael D. Alltmont, Esquire

                        Bryan C. Shartle, Esquire

For Defendant Turnstile Capital:

                        Adam J. Shub, Esquire

For Defendant U.S. Bank:

                        John J. Aromando, Esquire

For Defendant Wilmington Trust:

                        Roy Arnold, Esquire

                        Rebecca G. Klotzle, Esquire

For Defendant First Marblehead:

                        Amanda R. Lawrence, Esquire

                        John W. Van Lonkhuyzen, Esquire

```
 1              (Open court.  Parties present).

 2         THE COURT:  Good morning.  We are convening in

 3    the case of Forrester Winne versus National Collegiate

 4    Student Loan Trusts 2005-1, et al.  This is docket

 5    16-cv-229.

 6         Counsel, I would like you to note your appearances

 7    for the record and please indicate whether you'll be

 8    arguing today or not.

 9         MS. DILL:  Good morning, Your Honor.  Cynthia

10    Dill for the plaintiffs and I'm responding to the

11    motions to dismiss.

12         THE COURT:  Thank you.

13         MR. ALLTMONT:  Good morning, Your Honor.

14    Michael Alltmont for the National Collegiate Student

15    Loan Trusts arguing for the motion to dismiss.

16         MR. ARNOLD:  Your Honor, Roy Arnold on behalf

17    of Wilmington Trust Company.  I'll be arguing the

18    motion to dismiss for lack of personal jurisdiction and

19    for failure to state a claim on behalf of Wilmington

20    Trust.

21         THE COURT:  Thank you.

22         MR. VAN LONKHUYZEN:  John Van Lonkhuyzen on

23    behalf of First Marblehead Corporation, now Cognition.

24    I will not be arguing.  I'll defer to Amanda Lawrence.

25         MS. LAWRENCE:  Good morning, Your Honor.
```

1    Amanda Lawrence on behalf of First Marblehead

2    Corporation, now known as Cognition Financial

3    Corporation, and I'm going to argue.

4          THE COURT:  Thank you.

5          MR. AROMANDO:  Good morning, Your Honor.  John

6    Aromando for U.S. Bank.  I will not be arguing this

7    morning.

8          MR. SHARTLE:  Good morning, Your Honor, Brian

9    Shartle on behalf of the National Collegiate entities.

10   I will not be arguing and defer to my co-counsel, Mr.

11   Alltmont.

12         THE COURT:  Thank you.

13         MS. KLOTZLE:  Rebecca Klotzle from Curtis

14   Thaxter on behalf of Wilmington Trust Company and I

15   will not be arguing.

16         THE COURT:  Thank you.

17         MR. SHUB:  Adam Shub, Your Honor, Preti

18   Flaherty, and also for the trusts and I will not be

19   arguing today.

20         THE COURT:  Thank you.  Anyone else?

21         UNIDENTIFIED SPEAKER:  I'm not a lawyer.

22         THE COURT:  All right, and you will not be

23   arguing.  All right, we have several motions, but what

24   I would like to do is take up the motion to dismiss

25   filed by the trust first.

1         I'll hear from counsel on that.  I'll hear the

2    plaintiff's response and then finally reply and then

3    move on to Wilmington Trust's motion to dismiss.  Then

4    move on to First Marblehead's motion to dismiss and

5    then move on to the plaintiff's motion to supplement

6    the record.

7         And so with that, Mr. Alltmont, I'll hear from you

8    first.  Please step up.

9         MR. ALLTMONT:  Good morning, Your Honor.

10   Michael Alltmont on behalf of 13 of the 17 National

11   Collegiate Trusts on their motion to dismiss the second

12   amended complaint as to the 13 trusts.

13        Your Honor, the issue before the Court is not

14   terribly complicated.  The four plaintiffs have not

15   alleged any relationship whatsoever with the 13 trust

16   defendants.  They've admitted as much.

17        They have not been the subject of any lawsuits

18   filed by these 13 trusts.  They have not been the

19   subject of any collection activity by these 13 trusts.

20   They readily admit that they have no relationship

21   whatsoever with these 13 trusts.

22        What they're trying to do, Your Honor, is clump

23   them in with the four trusts whom they do have claims

24   against.  Those four trusts, they interpret a claim and

25   expect to defeat those claims at a later date.

1          The plaintiffs allege that because the 13 trusts

2     were formed in a similar manner as the four that have

3     answered because the 13 are -- were created pursuant to

4     the same program, that they have a similar name, that

5     they have similar attorneys, that they should be

6     clumped together with the other four.  That does not

7     create standing.  That does not create a case or

8     controversy for these four plaintiffs against these 13

9     trusts.

10          The law is clear.  Each plaintiff must allege a

11     case or controversy against at least one of the

12     defendants and as to these 13, the plaintiffs have not

13     done that.

14          THE COURT:  In the Plumbers' Union decision,

15     the 1st Circuit seemed to recognize the possible

16     exception -- they called it a qualification -- to that

17     principle and, that is, essentially if -- it

18     necessarily follows that if the plaintiffs establish

19     liability against the four trusts who have answered,

20     that it would establish liability against the remaining

21     13, then the plaintiffs, as representatives of the

22     class, might be permitted to proceed.

23          So the question is why, in your view, does the

24     plaintiff not meet that standard in this case?

25          MR. ALLTMONT:  Well, in Plumbers' Union, Your

1    Honor, there were three plaintiffs who brought a case

2    against eight distinct trusts.  Like in this, the eight

3    distinct trusts were formed in a similar manner, the

4    eight distinct trusts had similar names, similar

5    representation.  The three plaintiffs in that case were

6    investors who only had investments in two of the

7    trusts.

8         The court found that all of those similarities as

9    to the eight trusts -- and Plumbers' Union was a

10   class-action -- all those similarities did not absolve

11   the plaintiff -- the plaintiffs from their obligation

12   to establish a case or controversy against all of the

13   trusts and, in fact, affirmed the District Court's

14   dismissal of the six trusts for whom there was no

15   relationship with the plaintiffs.

16        So Plumbers' Union, in fact, supports our position

17   that the plaintiffs -- even if the trusts are similar

18   in nature, even if they were formed pursuant to the

19   same program, that the plaintiffs still have an

20   obligation to establish standing to establish a case or

21   controversy against each defendant.

22        THE COURT:  So is it your view that -- and

23   this also goes to the question of whether the complaint

24   states a claim against these 13 trusts -- that in the

25   absence of any specific factual allegations regarding

1       the 13 trusts, apart from their existence, that

2       Plumbers' Union can't apply here, that there's got to

3       be something more than a common name and a common

4       origin?

5               MR. ALLTMONT:  But again, Your Honor, in

6       Plumbers' Union, the court affirmed the dismissal of

7       the six trusts who were not in -- in a relationship

8       with the two plaintiffs.  The facts are almost

9       identical.

10              THE COURT:  It's true, I agree with you.  One

11      gets the sense reading Plumbers' Union though that the

12      panel in that case was somewhat limited by Circuit

13      authority, but nonetheless went ahead and acknowledged,

14      sort of volunteered, this possible exception, kind of

15      put it out there for the rest of us in the world to

16      deal with it, and my question to you is what more would

17      the plaintiff have to have alleged in the complaint to

18      bring your clients into -- under the rubric of the

19      qualification that the 1st Circuit recognized in

20      Plumbers' Union?

21              MR. ALLTMONT:  I believe that the 1st Circuit

22      was recognizing that the plaintiffs may not have -- the

23      plaintiff may not -- the named plaintiff may not have a

24      complete -- the named plaintiff may not have complete

25      similarity with all of the class members as to the

1    claims against the defendants, but could still

2    represent the class, but there was a bright-line in

3    that case which I think applies here, which is that the

4    plaintiffs still must have a claim against each of the

5    defendants.

6        In my appreciation -- my reading of Plumbers'

7    Union was that because there was no relationship

8    whatsoever with the six trust defendants, that they

9    were dismissed.  The 1st Circuit affirmed the dismissal

10   of those six trusts.

11       So while they acknowledge some exceptions, that a

12   plaintiff need not have a full similarity with all of

13   the perspective class members, that you still must have

14   standing, still must establish a case or controversy as

15   to the defendants.

16          THE COURT:  Right.  Let me challenge you on

17   that.

18       Reading from Plumbers' Union, the qualification on

19   which we reserve judgment is one where the claims of

20   the named plaintiffs necessarily give them, not just

21   their lawyers, essentially the same incentive to

22   litigate the counterpart claims of the class members

23   because establishment of the named plaintiffs' claim

24   necessarily establishes those of other class members.

25          So there the court's not talking about

1    establishing standing by the named plaintiff as against

2    these other defendants, it's establishing that they

3    have the same incentive to litigate the counterpart

4    claims of the class members.  The same incentive to

5    litigate the counterpart claims of the class members,

6    which I interpret as being something less than pure,

7    unadulterated standing; do you disagree?

8            MR. ALLTMONT:  Your Honor, I believe that the

9    incentive to litigate -- the incentive to litigate does

10   not absolve a plaintiff of their constitutional

11   requirement to establish a case or controversy against

12   a particular defendant and again, that -- that a

13   particular plaintiff may not have the exact set of

14   claims as all claim members does not disqualify them

15   from bringing a claim against a defendant whom has

16   allegedly harmed them as well as all of the class

17   members, but Plumbers' Union does stand for the

18   proposition that the named plaintiff still must have a

19   claim against each defendant.

20       It may not be exactly the same as all the class

21   members, but each plaintiff must have a claim against

22   each of the defendants in order to establish a case or

23   controversy.

24       Ultimately, the court decided that as to six of

25   the trusts with whom the plaintiffs in Plumbers' Union

1    did not have any relationship ultimately decided --

2    determined that there was no standing, that there was

3    no case or controversy as to those six and dismissed

4    the claims as to those six.

5         The circumstances are identical in this case.  The

6    four plaintiffs do not have any relationship, by their

7    own admission, with the 13 trusts who filed the instant

8    motion.  They have no claims, they have no -- they have

9    not been sued, they have not been subject to collection

10   action by any of the 13 defendants.

11        They're obligated to state a case or controversy.

12   The law is clear and I think Plumbers' Union supports

13   our motion in that the unrelated trusts for whom the

14   plaintiffs have no relationship have not been harmed,

15   do not allege to have been harmed at all, still need to

16   state a case or controversy.

17             THE COURT:  All right.  Let me ask you to turn

18   to your argument that the complaint doesn't state a

19   claim against your clients.

20        Viewing the complaint in the light most favorable

21   to the plaintiffs, I see it as alleging that your

22   clients share common ownership and management with the

23   four other trusts; that your clients have filed

24   lawsuits against Maine citizens to collect the bulk of

25   its student loans; that, according to plaintiffs, that

1    loan debt is debt to which your clients allegedly are

2    not entitled to because of the Education Resources

3    bankruptcy.  Why isn't that enough to state a claim?

4         MR. ALLTMONT:  Your Honor, it's not enough to

5    state a claim.  You have to look at the claims that the

6    plaintiff has alleged in this lawsuit.  The plaintiff

7    has alleged Fair Debt Collection Practices Act, Maine

8    Fair Debt Collection Practices Act, Maine Unfair Trade

9    Practices Act, fraud and -- fraud and breach of

10   contract.  Each one of those allegations, both the

11   statute and under common law tort, require some direct

12   relationship between the plaintiff and defendant.

13        We're at the motion to dismiss stage.  We're --

14   while plaintiff has styled this as a class-action,

15   we're at the stage where each of these four plaintiffs

16   needs to establish their claims against each of the

17   defendants.

18        In fact, that's exactly what this Court required

19   of plaintiff in its January order permitting the

20   plaintiffs to file a second amended complaint

21   contingent upon the plaintiff identifying what each of

22   the defendants has done.  There's 26 defendants in this

23   case and plaintiffs were required to identify what each

24   of the defendants have done to them.  As to the trust,

25   the plaintiffs failed to do that.

1          The plaintiffs then identified particular claims

2     against four of the trusts and those four trusts have

3     answered, but they have not identified any claims

4     against the other trusts and the allegations are

5     particularized.  The claims alleged in this complaint

6     are direct actions, not collective.

7          So plaintiff hasn't alleged any claims that are

8     collective in nature and accordingly, she must allege a

9     direct case or controversy as to each of the

10    defendants.

11         THE COURT:  And why should I not treat the

12    claim that your clients, as plaintiff says with respect

13    to the other four trusts, as a general matter what they

14    all share in common is that they are -- attempting to

15    collect student debt in Maine to which they don't have

16    title.

17         Why isn't that sort of -- that broad allegation,

18    which is particularized as to each trust, enough to

19    survive dismissal?

20         MR. ALLTMONT:  That allegation, while alleged

21    broadly, is exemplary of the problems with the first

22    draft of the second amended complaint which failed to

23    allege particular acts of harm as to each defendant.

24         The plaintiffs can allege -- the plaintiffs can

25    allege whatever they like, against whomever they like,

1      but it does not absolve them of their obligation to

2      allege particular facts as to particular defendants and

3      under Article III standing to allege a harm or an

4      alleged harm by a particular defendant and the

5      plaintiffs have not done that here.

6          They've done it as to four of the defendants, four

7      of the trusts who have answered the complaint, and I

8      expect to defeat those claims at a later date, but as

9      to these 13 trusts, they haven't alleged any harm

10     personal to them, and that's what they're required to

11     do to establish Article III standing.

12         Even on a class-action, even in a class-action,

13     they still have to have their own personal claims in

14     order to represent the class, and they just --

15             THE COURT:  You're coming back -- let me

16     interrupt -- you're coming back to standing.  But with

17     respect to stating a claim, why isn't it enough for the

18     plaintiffs to assert that 17 trusts, each of the 17

19     trusts are attempting to collect student loan debt in

20     the state of Maine for which none of them have title;

21     does that not state a claim?

22             MR. ALLTMONT:  As to each of the plaintiffs?

23     No, it doesn't.

24             THE COURT:  As to each of the defendants.

25             MR. ALLTMONT:  As to each of the defendants?

1   No, it doesn't, Your Honor.  It's overly vague.  It

2   doesn't meet the pleading standards and that's exactly

3   what they were required to do when they filed the

4   second amended complaint.

5        They maintain some of those broad allegations from

6   the original version of the second amended complaint,

7   which is objectionable.  It's exactly the reason why

8   the 13 trusts filed their motion to dismiss.

9        So no, Your Honor, I don't believe that that

10  allegation sufficiently states a claim against all of

11  the trusts, that they were required to do something

12  more, and behind that broad allegation were specific

13  allegations brought by the four plaintiffs, over the

14  course of 150 some odd paragraphs, that did state

15  claims, which are -- that did state claims against four

16  of the trusts.

17       So looking at the complaint in its entirety, they

18  have not sufficiently pled -- pursuant to Rule 8, they

19  have not sufficiently pled claims against the 13 trusts

20  who have brought the motion today.

21            THE COURT:  Thank you, Mr. Alltmont.

22            MR. ALLTMONT:  Thank you.

23            THE COURT:  Attorney Dill.

24            MS. DILL:  Thank you, Your Honor.  I'll just

25  cut to the chase.  I think the Plumbers' Union case

1    does provide an exception to the general rule, which

2    was described by Attorney Alltmont, but in this case,

3    the alignment of incentives couldn't be clearer.

4        I mean if we had a process by which we had a list

5    of the loans that are subject to the state court

6    collection activity, a deposition by the plaintiffs'

7    trustee or information from the plaintiffs' trustee as

8    to which loans were purchased by TERI, a deposition

9    perhaps of the American Education Services that

10   identified which loans were purchased by TERI, we could

11   establish that loans purchased by TERI are not properly

12   the subject of a collection action in state court.

13   That would be true for Sarah Coffey, that would be true

14   for Vickie McMullen, Karin Hills and every other

15   potential member of the class.

16       This notion that somehow every single person who

17   has been subject to the collusion that the plaintiffs

18   allege is among these defendants is ridiculous and it

19   makes Rule 23 absolutely useless.

20       So I would argue that, first, that the plaintiffs

21   have, in fact, alleged claims against -- or have a

22   relationship with the other 13 trusts by virtue of the

23   plan trustee collecting on these debts.

24       There's allegations in the complaint that Sarah

25   Coffey paid $7,500 in change, Karin Hills paid $6,000.

1    There's evidence that money collected by the plan

2    trustee went through the formula that all of these

3    defendants approved and was distributed to these

4    defendants, with the exception of Wilmington Trust.

5        So the 13 trusts have -- if you, I think, take the

6    inferences in the facts, you know, in the light most

7    favorable to plaintiffs, have plaintiffs' money in

8    their bank accounts.

9        These trusts we know are made up of Maine loans.

10   These trusts have sued Maine loan borrowers.  It's

11   reasonable to infer that Maine investors, perhaps,

12   invested in these trusts.

13       So the contacts with Maine are there, the

14   alignment of incentives is there and, most importantly,

15   or another important factor is that we don't know who

16   the trusts are.  I mean what should be obvious to Your

17   Honor is no one here is the trusts.

18       It's TSI.  TSI shows up for all the trusts.  TSI

19   was the 30(b)(6) representative of the two trusts in

20   the state court collection action.  TSI is representing

21   the trusts in this action and there's a reason for

22   that, and the reason is because the trusts are at war

23   with each other in other parts of the country trying to

24   figure out who owns what.

25       But in Maine, Maine borrowers, we know 372 as of

1      the response from the state court administrator -- I
2      think it's reasonable to infer there's been more since
3      then -- are being barraged with these lawsuits and
4      these defendants would argue that it's too inconvenient
5      for them to respond here.  We should instead go to
6      Delaware where it would be much easier for them to file
7      electronic case filings in federal court in Delaware as
8      opposed to in Maine.  That's ridiculous.
9          We have a case here and Your Honor has flexibility
10     with respect to deciding when the jurisdiction question
11     has to be answered.  It doesn't have to be answered
12     immediately.  We could do a phase of discovery as I
13     described earlier and it could be immediately
14     established whether or not there is, in fact, an
15     alignment of issues, incentives --
16               THE COURT:  I want to interrupt --
17               MS. DILL:  Please do.
18               THE COURT:  -- and take you back to something
19     which you mentioned a few moments ago.
20         I understood you to argue that because these
21     trusts are beneficiaries of the benefit two claim along
22     with the other four trusts --
23               MS. DILL:  Yes.
24               THE COURT:  -- that they're necessarily, at
25     the very least, benefiting from any money that you

1    allege was unlawfully collected by the four trusts that

2    you have evidence about.  They didn't submit a plan and

3    as creditors, they're all benefiting by virtue of, as I

4    just indicated, the allegation that at least four of

5    them engaged in unlawful collection activities in the

6    state of Maine; do I have that right?

7            MS. DILL:  No.  What I think happened, and

8    what -- you know, the complaint, I think, is -- you

9    could infer is that when Sarah Coffey and Vicky

10   McMullen settled for $7,500, that that was collection

11   activity being taken by the plan trustee.  I don't know

12   who else could have done it.

13       I mean apparently there -- there could be a lot of

14   other entities, but I think it's reasonable to infer

15   that the plan trustee, since he is the one legally

16   obligated to collect the loans, was behind the

17   collection originally of the $7,500 settlement and the

18   $6,000 settlement; that that money went into the plan

19   trust and through the formula went out to all these

20   defendants and that's why the plaintiff trustee wants

21   to get activity going because they are raking in big

22   bucks collecting all these loans that TERI purchased.

23       So these defendants know the plan trustee is

24   collecting on these loans and they know that these

25   loans were purchased by the plan trustee.  At the same

1    time, these defendants are going into Maine state

2    courts and suing student borrowers on these same loans.

3         THE COURT:  So help me understand then the

4    commonality of the individual plaintiffs' claims

5    against the four trustees who have answered and the

6    remaining 13 trusts.

7         MS. DILL:  Because if you decide that loans

8    purchased by TERI through the plan trustee are not the

9    property of the trusts, then all loans purchased by the

10   plan trustee in Maine state courts will be affected.

11      I mean the issue is so simple, right?  I mean we

12   decide what loans are subject to lawsuits, what loans

13   have been purchased by TERI, what loans are subject to

14   lawsuits by the trust and TSI and U.S. Bank and all the

15   other defendants, what loans have been purchased by

16   TERI and then we have a list of the cases that these

17   defendants have wrongfully pursued.

18      More importantly, Your Honor would have the power

19   to issue an injunction to say trusts, U.S. Bank, TSI,

20   you can no longer bring a state court collection action

21   on a loan that has been purchased by TERI.

22        THE COURT:  Let me ask you this.  Going to the

23   argument that your complaint fails to state a claim as

24   to these 13 trusts, of course you don't allege any

25   actual facts regarding these 13 trusts relative to debt

1    collection or anything other than that they are

2    essentially trusts similarly situated to those of the

3    four who have answered.  Is that enough?

4            MS. DILL:  I believe that the section in the

5    complaint that talks about the class-action makes it

6    clear that there are -- yes, there are four plaintiffs

7    and four trusts identified, but also there is an

8    allegation that there are 372 cases brought in Maine

9    state courts by these trusts, that these trusts are

10   knowingly bringing claims --

11           THE COURT:  Well, you're saying these trusts.

12   The information you provided is not specific to any of

13   the trusts; is it?

14       I can't look at what you've provided in

15   supplementation of the complaint and satisfy myself

16   that any one of these 13 specific trusts have actually

17   brought an action in the state of Maine, right?

18           MS. DILL:  Well, I think you -- I don't know

19   how else you can infer that it's these trusts.  If

20   there are only 17 trusts and there are 372 cases

21   brought by trusts in Maine --

22           THE COURT:  Um-hmm.

23           MS. DILL:  -- and we know that each one of the

24   trusts is a named plaintiff, I don't know what else you

25   could infer that it's not these trusts.  I mean of

1    course it's these trusts.  These are the trusts.

2         THE COURT:  You've established that each of

3    these 13 trusts is a named plaintiff in a collection

4    action in the state of Maine?

5         MS. DILL:  I've established that in additional

6    pleadings, not in the original complaint.

7         THE COURT:  Well, where did you establish

8    that?

9         MS. DILL:  If I may, in the plaintiffs'

10   response to the First Marblehead Corporation's motion

11   to dismiss, I provided the Court -- and it was

12   incorporated by reference in subsequent pleadings -- I

13   provided the court information from Diane Cavanaugh,

14   who is the state court person who responded to my

15   request for research.

16        She indicated in an e-mail to me that she did the

17   research and that every single trust that was

18   identified -- and it's Document 202-7 -- every single

19   trust that's identified as a defendant in this case is

20   a plaintiff in state court.

21        So they have purposefully availed themselves of

22   the laws and the protections of Maine state court

23   system and I believe that that is enough to hold them

24   to account at least for, like I said, limited discovery

25   to discern whether or not, in fact, they're suing on

1    loans they don't own.

2         THE COURT:  How would you limit the discovery?

3         MS. DILL:  I would -- I think -- like I said,

4    I think it could be quite easy.  We could notice the

5    deposition of the plan trustee, ask him to bring a list

6    of Maine loans, or loans that originated in Maine that

7    were purchased by TERI, do follow-up with Ms. Cavanaugh

8    and get the entire -- and the state court administrator

9    and get a list of the cases that are pending in Maine

10   state courts and the loans that are the subject of

11   those cases and match them up.

12        If the loan that is the subject of the state court

13   collection action brought by the trust is one that was,

14   in fact, purchased by TERI, we have an answer.

15        In addition, the American Education Services has

16   provided information to me for my four named

17   plaintiffs, which Your Honor can review in Documents

18   202-2, 202-3 and 202-4.  These are information --

19   documents that were provided by American Education

20   Services, which was the servicer for those loans, that

21   shows that the guarantor paid off the loan, and we know

22   that the guarantor was TERI and we know that if TERI

23   paid off the loan, then the trusts don't own it.

24        So if the plan to depose the plan trustee somehow

25   went south, we could simply subpoena the financial

1    activity summaries from the American Education Service

2    for these loans and find out if their loans -- if their

3    information shows that the loans that the trusts are

4    suing on were purchased by TERI.

5         That not only establishes that the trusts don't

6    own the loan, but the trust knows they don't own the

7    loans because the trusts claim that they are the

8    custodian of the AES records and they used that

9    position in their state court litigation cases.

10        They swear in affidavits that they are the

11   custodians of the American Educational Services'

12   records and that therefore they are entitled to this

13   amount, and what they failed to say to the state courts

14   is that the AES records, in fact, show that the loans

15   were purchased by TERI.

16             THE COURT:  All right.  Thank you, Attorney

17   Dill.

18             MS. DILL:  Yes.

19             THE COURT:  Attorney Alltmont, you get to

20   respond.

21             MR. ALLTMONT:  Your Honor, as a quick initial

22   matter, the statements regarding the sale of the

23   plaintiffs' loans to TERI is false.  The statement that

24   there's anything in the deposition that's related to

25   TSI alluding to such is false.  There's not been a

1    deposition of AES.

2        Plaintiff is making this allegation, which will be

3    flushed out, it will be clarified as to the four NCT

4    trusts who answered.  The allegations are absolutely

5    false.

6        Plaintiff -- plaintiffs are arguing also that

7    there's personal jurisdiction as to the 13 trusts that

8    moved to dismiss the second amended complaint as to

9    them.  The issue is not personal jurisdiction.  The

10   issue is whether or not they have standing to sue those

11   13 trusts, whether they've established or alleged a

12   case or controversy against those 13 trusts.

13       That's a completely different legal issue than

14   personal jurisdiction.  We haven't raised that.  We've

15   raised standing.  We've raised whether they've stated a

16   claim and they have not as to the 13 trusts.

17       The plaintiffs allege that the plan trust did --

18   the plan trustees did collections and distribute funds

19   to all of the defendants and that's not accurate even

20   per the allegations.  Any monies collected for a

21   particular trust went back to that trust.

22       So as to McMullen and Coffey from the referral

23   note, any monies collected would have gone back to the

24   trusts who were named in this complaint, who answered

25   the complaint, but it did not go all the way back to --

```
 1              THE COURT:  Is that fact established in the
 2       record of the case in any way?
 3              MR. ALLTMONT:  I don't believe that plaintiff
 4       even alleged that the monies went back to all of the
 5       defendants, but she stated it in her oral argument just
 6       now and I wanted to address it.
 7              THE COURT:  Okay.
 8              MR. ALLTMONT:  And furthermore, that the
 9       impact of the case against the four trusts who have
10       answered, who plaintiff at least has standing to sue,
11       may impact these other 13 trusts is irrelevant to
12       whether she has Article III standing and has alleged a
13       case or controversy against these defendants.
14           They're -- it's common, it's frequent that a case
15       is going to impact other defendants who are not named.
16       It happens every day, but that does not give her the
17       standing to sue those other defendants.  Otherwise,
18       anybody would be able to sue anybody all of the time
19       and the courts would be flooded with lawsuits.
20           The law requires that the plaintiffs allege a case
21       or controversy against each of the defendants and
22       plaintiffs have not done that in this case as to these
23       13 trusts, and therefore dismissal of the claims
24       against them is appropriate.
25              THE COURT:  Thank you, Attorney Alltmont.
```

1          MS. DILL:  Your Honor, may I just respond

2     briefly?

3          THE COURT:  Actually, Attorney Dill, I'm going

4     to ask you not to respond briefly.  We have other

5     issues to deal with today and I want to stay on track.

6     Thank you.

7        I'm going to turn now to Wilmington's motion to

8     dismiss.  Attorney Arnold.

9          MR. ARNOLD:  May it please the Court, Roy

10    Arnold from Reed Smith LLP on behalf of Wilmington

11    Trust Company.

12        The parties in this case, the plaintiffs and

13    defendants, disagree about many things, but what we do

14    know with respect to Wilmington Trust's motion to

15    dismiss for lack of personal jurisdiction is there's

16    agreement among the plaintiffs and plaintiffs' counsel

17    and Wilmington Trust on certain items, certain specific

18    important facts.

19        First, Wilmington Trust acted solely as what is

20    called an owner trustee, quote-unquote.  It's a

21    statutory trustee under Delaware corporate law,

22    specific statutory trustee role and it solely acted in

23    that respect.

24        We've presented publicly available governing

25    instruments.  That's another defined term under

1    Delaware law.  The governing instruments are the trust

2    agreement, the administration agreement, the 2009

3    special servicing agreement that Your Honor cited at

4    length in a prior hearing and motion, and the servicer

5    consent matter.  Those are Exhibits A, B, C and D of

6    Document 157, declaration of Dorri Costello of

7    Wilmington Trust.  Those publicly available documents,

8    exemplars, with respect to a particular trust, but

9    they're publicly available and they're undisputed.

10   There's no objection to those documents in the record.

11        Those governing instruments specifically delineate

12   and govern Wilmington Trust's role as statutory or

13   owner trustee with respect to the various trusts at

14   issue in this case, and what does the record show that

15   Wilmington Trust did factually, what is alleged?

16        Wilmington Trust is a Delaware charter trust

17   company.  It's principal place of business is in

18   Wilmington, Delaware.  The role of statutory or owner

19   trustee confers no ownership interest on Wilmington

20   Trust.  It's a misnomer to suggest it has any ownership

21   interest; it doesn't.

22        It isn't a beneficial owner of the trust, has no

23   offices or other locations in Maine and no receipt of

24   payment -- there was no receipt of payment in Maine.

25   So it's a very limited, statutorily defined and, by

1    agreement, ministerial role that is governed by the

2    governing instruments.

3         So let's look at the governing instruments and

4    understand what those governing instruments really say

5    about what Wilmington Trust does or doesn't do because

6    what it shows is -- because the plaintiffs in this

7    case, in seeking to exercise personal jurisdiction over

8    Wilmington Trust, where there's no alleged contact

9    directly with Maine, it's essentially alleging well, we

10   want to impute, we want to attribute the contacts of

11   other alleged servicer defendants to Wilmington Trust,

12   and the implication there is we have control and we can

13   affect the default and servicing activities of these

14   defendants.

15        The problem with that bare legal allegation of

16   agency or control, it doesn't bear out under the very

17   documents that govern the relationship between

18   Wilmington Trust and the trusts.

19        So when we look at the specific agreements, the

20   governing instruments of this relationship, first we

21   pointed Your Honor to the trust agreement, Section 802,

22   which talks about specific authority, but more

23   fundamentally, we pointed Your Honor back to the

24   special servicing agreement that Your Honor studied

25   with respect to U.S. Bank's motion.

1          Regardless of the outcome of the U.S. Bank's

2     motion, plaintiff wants to just say well, because you

3     denied the motion as to U.S. Bank, you have to deny it

4     against Wilmington Trust without even appreciating the

5     difference or even examining the distinctions between

6     the different roles.

7          So under the special servicing agreement,

8     Wilmington Trust isn't a party.  It executed the

9     document solely in its capacity as statutory trustee or

10    owner trustee, not in its individual capacity.  It

11    didn't have a role with respect to the implementation

12    or oversight of servicing the student loans.  Nowhere

13    in that agreement is Wilmington Trust directed to

14    become involved in the servicing of the loans that

15    comprise the trust assets.  The servicer consent letter

16    is consistent in that regard, Your Honor, again making

17    it clear that Wilmington Trust is executing that letter

18    solely in its capacity as trustee, not in its

19    individual capacity.

20         But the real kicker in the -- the agreement that

21    is just fatal to plaintiffs' bare conclusory

22    allegations is the administration agreement.  Just to

23    put a point on it, the administration agreement --

24    Exhibit B, Document 157 of the Dorri Costello

25    declaration -- that agreement in section 1(c)(iv), sub

1    four, specifically places the duties with respect to

2    delinquent or defaulted student loans with the

3    administrator, not the owner trustee or the statutory

4    trustee.

5         Those duties include -- the ones that don't belong

6    to Wilmington Trust -- the duty to retain and employ

7    agents to collect on such student loans and commence

8    any actions or proceedings the agency deems necessary

9    in connection with such collection efforts on such

10   student loans.  That's the administration agreement.

11        So it specifically assigns the responsibility for

12   that and we don't have that responsibility at

13   Wilmington Trust.

14        Administration agreement, section 5, also makes it

15   clear that the administrator shall not be subject to

16   the supervision of the issuer or the owner trustee with

17   respect to the manner in which it accomplishes the

18   performance of its obligations under the administration

19   agreement.  That's section 5.

20        So when you look at those agreements, those

21   agreements fatally undermine the allegations the

22   plaintiffs have made in a very conclusory manner.

23   They've done it in this group pleading, they stick

24   Wilmington Trust's name in among defendants, but the

25   problem is they don't appreciate the statutory and

1    specific agreements governing the relationship.

2         It's a very limited ministerial role and it's a

3    role that's required by the Delaware statute because a

4    trustee has to be a business or person that is either a

5    person -- resident in the state or a business that has

6    its principal place of business in the state to avail

7    itself of the Delaware statutory trust law.

8         Now, when you understand and appreciate those

9    specific governing instruments with respect to the

10   relationship, it becomes clear that Wilmington Trust

11   has not engaged in activities with respect to the state

12   of Maine, and the plaintiff has made insufficient

13   allegations.  And even more important, Your Honor, in

14   this context, as Your Honor noted in your prior

15   decision on personal jurisdiction, the fact of the

16   matter is the plaintiff bears a burden of proof here to

17   come forward with prima facie evidence to sustain a

18   burden of proof with respect to the exercise of

19   personal jurisdiction.

20        So the allegations and the lack of evidence

21   combine to compel the dismissal of Wilmington Trust

22   with respect to -- due to the lack of personal

23   jurisdiction.

24        The same issue, the same lack of involvement in

25   determining -- selecting the servicers or exercising

```
 1          oversight over them also inform the issues with respect
 2          to 12(b)(6) and the fact that Wilmington Trust did not
 3          engage in debt collection activities, and certainly
 4          there's no allegation that we regularly engaged in
 5          those activities in the state of Maine.
 6               So the issues do fit somewhat hand in glove with
 7          each other, but when you look at those underlying
 8          governing instruments and how they fit together, and
 9          how very limited and ministerial the role is of
10          Wilmington Trust, we would ask Your Honor to dismiss
11          Wilmington Trust for lack of personal jurisdiction or,
12          in the alternative, for failure to state a claim under
13          the failure -- federal and state debt collection
14          practice section.
15               THE COURT:  Thank you, Mr. Arnold.
16               MR. ARNOLD:  Thank you.
17               THE COURT:  Attorney Dill.  Attorney Dill,
18          Wilmington Trust in this case appears as the owner
19          trustee in the same arrangement under which U.S. Bank
20          appeared as the administrator.
21               The documents that were critical to my
22          determination of U.S. Bank's participation in this case
23          it seems to me to, as Mr. Arnold has just outlined it,
24          point in the direction that Wilmington does not have
25          liability in this case as you've pled it.
```

1          Why should I conclude otherwise?  The question is

2     control, right?

3          MS. DILL:  Well, first of all, the best laid

4     plans of 2007 for all these defendants blew up in 2008.

5     So these documents, while they're important -- and he's

6     probably right, I don't understand them, they're mind

7     numbingly boring -- but it seems to me they don't

8     really apply.  They do not govern the relationships

9     among these defendants.

10          THE COURT:  If the documents don't control,

11     what does?  What facts have you asserted that would

12     create any type of responsibility on the part of

13     Wilmington?

14          MS. DILL:  Well, Wilmington Trust wants to say

15     on the one hand it's the owner trustee and signed the

16     documents -- is ministerial.

17          Wilmington Trust made a lot of money off of Maine

18     students.  Every single time it formed one of these

19     trusts, it made money.  Every single time it signed one

20     of these documents, it made money.

21          Wilmington Trust -- the documents they refer to

22     says that it's in charge of signing the documents that

23     would transfer loans from the trust to TERI.

24     Wilmington Trust, I think it's reasonable to infer,

25     would also sign the documents that hired the loan

1    servicers.

2         So on the one hand, it makes money selling the

3    trusts to TERI; on the other hand, it makes more money

4    signing documents to --

5              THE COURT:  Making money doesn't create

6    liability.

7              MS. DILL:  No, but --

8              THE COURT:  What is it that you've alleged

9    that would create liability on the part of Wilmington?

10             MS. DILL:  Wilmington Trust, I allege, is

11   the -- acts for the trusts; that the trusts, in fact,

12   according to my understanding of the documents, act

13   through Wilmington Trust and they don't want to have

14   any responsibility for simultaneously acting for the

15   trusts in selling the loans to TERI and acting for the

16   trusts in collecting the loans.

17        I would like to draw your attention to

18   Document 203, which was filed as a correction to

19   Document 202, and this is the motion that was filed by

20   the plan trustee that identifies, as an attachment, all

21   of the entities that are receiving money as a result of

22   the plan trustee's correction.

23        Now, I think it's reasonable to assume that when

24   the trusts approved the bankruptcy plan, they did so

25   through Wilmington Trust, and that when the trusts do

1   everything else, they do it through Wilmington Trust

2   because Wilmington Trust acts as the owner trustee.

3       What we don't know is who are the beneficial

4   owners of the trust and it seems to me, again --

5   certainly we can let Wilmington Trust off, we can add

6   First Marblehead Corp., but if we want to really hone

7   in on the problem, the problem is is that these

8   entities have created such a mess, such a morass, it's

9   so difficult to penetrate who does what and who owns

10  what.

11      None of them claim responsibility.  They write up

12  all these fancy documents that say they don't have any

13  responsibility for anything and yet here they are,

14  they're just raking in all this money off the backs of

15  Maine students in Maine courts and all we want to do is

16  find out what's going on, you know.

17      If, in fact, Your Honor is going to order the

18  trusts and their agents to stop collecting debts they

19  don't own, it seems to me we need Wilmington Trust to

20  do it because they're the ones who act for the trust.

21      So I'm not going to dwell on this because it does

22  seem a little extenuated, but at the same time, it

23  seems to me, given the massive litigation among all

24  these defendants behind me that has transpired since

25  2007 and since 2008, flies in the face of Attorney

1    Arnold's argument that somehow we're in agreement that

2    these documents are exactly -- stripped of the

3    relationship among the parties.  That's just not true.

4         I mean nobody agrees with anything when it comes

5    to these defendants.  Nobody knows who owns what,

6    nobody knows who has responsibility.  All we do know is

7    that the plan trustee is collecting a lot of money off

8    of Maine borrowers and so are these defendants, and

9    it's a real problem and this case is, I think, a very

10   straightforward, non- -- this is in no way unfair for

11   these defendants.

12        The question really is the constitutional fairness

13   of drawing them into this case and trying to decipher

14   what roles they had and I think under the

15   constitution -- Delaware law has nothing to do with it.

16   Okay, you can't just document yourself off of -- you

17   know, insulate yourself from jurisdiction in Maine.

18        Wilmington Trust had made a lot of money off of

19   these national student loan trusts.  It's not just some

20   ministerial role like some innocent, you know,

21   scrivener down in Delaware signing documents.  They are

22   raking in the cash and they signed documents left and

23   right to do all kinds of things that are causing a lot

24   of harm and I don't believe that simply pointing to

25   documents in 2007 negates the allegations of these

1      plaintiffs, that these defendants are colluding, that

2      they know that this is a racket.

3           They know the plan trustee's collecting money,

4      they're recipients of the money.  If you look at

5      Document 203, there's a list of every single defendant

6      whose made hundred of thousands of dollars off the

7      collections by the plan trustee.  At the same time we

8      know in state court the trusts are collecting the same

9      loans.

10              THE COURT:  Thank you.

11              MS. DILL:  You're welcome.

12              THE COURT:  Attorney Arnold, any final words?

13              MR. ARNOLD:  No, Your Honor, other than to

14     point out that Attorney Dill's rhetoric is not evidence

15     and in her prior statement, she has not met her burden

16     of establishing personal jurisdiction.

17              THE COURT:  Thank you.  Attorney Lawrence, we

18     will turn to First Marblehead's motion.

19              MS. LAWRENCE:  Good morning, Your Honor.

20              THE COURT:  Good morning.

21              MS. LAWRENCE:  Amanda Lawrence on behalf of

22     First Marblehead Corporation, known as Cognition

23     Financial.  If it's all right with Your Honor, I'll

24     refer to them as either FMC or Financial -- First

25     Marblehead.

1           THE COURT:  Should the pleadings in this case

2     be amended to reflect the current name of your client?

3           MS. LAWRENCE:  I think we put in a motion to

4     reflect that, Your Honor --

5           THE COURT:  All right.

6           MS. LAWRENCE:  -- in connection with -- at the

7     same time our motion to dismiss was filed.

8           THE COURT:  All right.  Is there any objection

9     to that motion?

10          MS. DILL:  No.

11          THE COURT:  Thank you.

12          MS. LAWRENCE:  Thank you.  In our motion to

13    dismiss, we've identified three grounds for why we

14    believe the second amended complaint should be

15    dismissed; lack of personal jurisdiction, lack of

16    standing and failure to state a claim.

17          Before I get to those issues, if it would be all

18    right with the Court, I thought it might be helpful to

19    provide some background as to what my client actually

20    does.

21          THE COURT:  Go ahead.

22          MS. LAWRENCE:  First Marblehead is a Delaware

23    corporation with its principal place of business in

24    Massachusetts.  From 2002 to 2008, it was the

25    structuring advisor for the National Collegiate Student

1    Loan Trust, which essentially means that First

2    Marblehead structured and facilitated the

3    securitization of student loans.  If Your Honor's

4    interested, you can see reference to that as Exhibit A

5    to the Morel declaration on Page 5.

6        So First Marblehead did not register to do

7    business in Maine, does not have offices, employees or

8    locations in Maine and doesn't actually employ anyone

9    in Maine for any purpose.  That's the Morel declaration

10    at Paragraph 4.

11        Now, the second amended complaint makes reference

12    to two First Marblehead subsidiaries; First Marblehead

13    Education Resources, also known as FMER, and First

14    Marblehead Data Services Inc., also known as FMDS.

15        From March 1, 2009 to 2012, FMER was the special

16    servicer for the trusts, and that's the Morel

17    declaration from Paragraphs 12 and 13, but on April 13,

18    2012, FMER resigned as special servicer and U.S. Bank

19    assumed that role as of, I believe, June 2012.

20        The second amended complaint actually had missed

21    this, although to be fair, they got the entity wrong.

22    They say it's First Marblehead, not FMER, but they

23    admit at Paragraph 37 that First Marblehead resigned as

24    special servicer in 2012.

25        Now, FMDS, the other administrator, was the

1    administrator for the trusts and so First Marblehead

2    sold it in March of 2012.  This is the Morel

3    declaration at Paragraph 10.  There's also Exhibit E to

4    the Morel declaration at Page 5, which is an SEC filing

5    related to this.

6        So following the sale of FMDS, First Marblehead

7    and its affiliates did not provide any services to the

8    trust in 2012, and I think this is important because I

9    believe it makes clear, first, that First Marblehead

10   had no involvement in the complaint of debt collection

11   activity.  It was the securitizer of these trusts in

12   2002 to 2008, and none of its affiliates or

13   subsidiaries had anything to do with the trust since

14   2012, which is two to three years before the complaint

15   of debt collection activity.

16       So as I said, we made three points; the first

17   being no personal jurisdiction, and again I'll refer to

18   the Morel declaration which establishes that First

19   Marblehead doesn't employ anyone in Maine at all.

20   That's at Paragraph 4.

21       Second, that neither First Marblehead Corporation

22   or its subsidiaries have acted on behalf of the trust

23   or directed anyone to act on behalf of the trust since

24   2012.  That's the declaration at Paragraph 15.

25       And third, that First Marblehead had not entered

into any agreements with any defendants that would
allow it to direct the actions of U.S. Bank and the
actions that U.S. Bank takes on behalf of the trusts,
and that's at Paragraph 16.

Now, plaintiffs in their opposition offered a
number of exhibits and arguments to try to rebut the
Morel declaration and, in our opinion, those were not
sufficient.

First, they essentially argued that the collective
efforts by the other defendants can be imputed to First
Marblehead, and they rely upon Your Honor's prior
opinion against U.S. Bank.

First, we think the Morel declaration states
otherwise and that there isn't any evidence that
plaintiffs have proffered to rebut that declaration.
We also think Your Honor's prior opinion on U.S. Bank,
there were more facts there with respect to the
relationship between U.S. Bank and Transworld and
Turnstile, such as Transworld had to obtain U.S. Bank's
approval before negotiating and revising borrower's
payment schedule.

There are no documents or other facts that support
any sort of relationship here with respect to First
Marblehead and its ability to do anything with respect
to U.S. Bank in those collection activities.

1        Second, plaintiffs argue that specific personal

2  jurisdiction exists because of First Marblehead's

3  involvement in the loan securitization process.  Now,

4  we also believe that this allegation is not enough to

5  establish personal jurisdiction.

6        We would refer Your Honor to the <u>Countrywide</u> case

7  and its fact pattern, which we believe is very

8  analogous to the case here.  There, the court found no

9  personal jurisdiction with respect to the

10  non-defendants -- excuse me, nonresident defendant, in

11  that case Barclay's, which participated in creating of

12  offering documents like prospective supplement.

13        The court found that no personal jurisdiction

14  existed there because the defendant did not know that

15  its securities would be sold in Nevada, didn't execute

16  its contracts with Nevada or aim its activities toward

17  the plaintiffs in Nevada.

18        Similarly here, First Marblehead did not have any

19  contacts with Maine when it was securitizing student

20  loans.  Now, granted there were Maine loans that were

21  securitized, but we believe that that activity was too

22  attenuated to satisfy the related to aspects of

23  personal jurisdiction, and the complained of activity

24  here again relates to debt collection activity, not the

25  propriety of the securitization process and that

1    process occurred in 2002 to 2008.  The most relevant, I

2    think, latest securitization would be 2007, which is

3    six or seven years before the complaint of debt

4    collection activity.

5         Third, plaintiffs argue that First Marblehead and

6    its subsidiaries administered the loans and managed a

7    database that other defendants allegedly used to

8    collect the debt.  We too believe that that argument is

9    flawed.

10        As an initial matter --

11             THE COURT:  Let me interject --

12             MS. LAWRENCE:  Sure.

13             THE COURT:  -- before we get to the database.

14   I want to go back to the argument you just made and ask

15   you this.

16        If I conclude -- if I were to conclude that no, in

17   fact, your client's circumstances are more similar to

18   U.S. Bank than you'd like them to be, nonetheless does

19   your argument that its direct involvement ended in the

20   spring of 2012 really end the analysis?

21             MS. LAWRENCE:  Well, I think one correction.

22   My client was not involved in 2012.  There was

23   subsidiaries of my client.  My client was the

24   securitizer, and I do think that that is important here

25   because there aren't any allegations of vicarious

1    liability in the complaint.

2         THE COURT:  All right.  So the fact that your

3    client wasn't even involved as of 2012, I take it,

4    would end the discussion.

5         How about if I were to conclude that, in fact,

6    your client was involved until the spring of 2012; in

7    other words, that, in fact, there was some other

8    involvement by your client.  Does the lack of

9    involvement beginning in the spring of 2012 also end

10   the case?

11        MS. LAWRENCE:  I think that it does because of

12   the complaint of debt collection activity for these

13   plaintiffs occurred in -- one, I believe, was in 2014

14   or perhaps two, one was in late 2015, and I think that

15   the cases that I would refer you to, I think maybe it's

16   the -- I think that that -- there has to be a

17   relatedness to the complained of activity and -- for

18   there to be personal jurisdiction.

19        The fact that my clients have not been involved,

20   or my client and its subsidiaries have not been

21   involved in two to three years I think suggests very

22   strongly that there is not -- that does not satisfy the

23   relatedness prong.  There would need to be some action

24   that my client undertook with respect to these

25   plaintiffs that they have not alleged that they

1    undertook.

2         THE COURT:  How about the June 27th prospectus

3    that names your client as being -- as engaged with

4    these trusts in some fashion -- they didn't explain

5    what the role is -- but what's the legal significance

6    of that evidence?

7         MS. LAWRENCE:  So the prospectus again refers

8    to my client as being involved in securitization of the

9    loans, which again occurred from 2012 to 2008.  The

10   securitization of the loans doesn't really have

11   anything to do with the complaint of debt collection

12   activity, Your Honor.

13        THE COURT:  Okay.  All right, I interrupted

14   you.  Anything further?

15        MS. LAWRENCE:  I have two further points if I

16   may, Your Honor.

17        THE COURT:  Okay.

18        MS. LAWRENCE:  The two other arguments that

19   plaintiffs make, the first is that First Marblehead and

20   its subsidiaries administered the loans and managed a

21   database that other defendants used to unlawfully

22   collect debts on the loans, in addition to the fact

23   that, you know, as I said previously, there are no

24   allegations with respect to -- there are insufficient

25   allegations with respect to vicarious liability.

1          I would refer Your Honor to the De Castro case,

2     which -- from the 1st Circuit which relates --

3     basically says the parents' ownership of the sub is not

4     enough to impute personal jurisdiction on that parent.

5          But even if it was, this isn't -- in our opinion,

6     there's still -- access to a database still is

7     insufficient to impute that First Marblehead could

8     foresee being sued in Maine.  And there are, I think,

9     two cases that we rely upon that are factually

10    analogous here.

11         That's the Media3 case, in which the plaintiffs

12    had a website that people could access and did

13    access -- that case was a Massachusetts case -- where

14    it accessed them in Massachusetts and the court found

15    that even though -- this was, you know, a website that

16    was available anywhere in the country, that no one from

17    Massachusetts was directly targeted by that website and

18    therefore it wasn't sufficient to instill personal

19    jurisdiction.

20         The other case --

21              THE COURT:  Let me interrupt.  Isn't it

22    distinguishable that in this situation, we've got a

23    database that is not universally available on the Web,

24    I assume --

25              MS. LAWRENCE:  Correct, yes.

1          THE COURT:   -- so it's really proprietary

2     information that's been made available for purposes of,

3     as it turns out, specific debt collection in the state

4     of Maine in support of these defendants who are in the

5     case.

6          I mean one can imagine what additional facts might

7     be established that it really is critical or could be

8     deemed critical to the collection efforts that occurred

9     in this case; why wouldn't that be enough?

10          MS. LAWRENCE:   So I would refer Your Honor to

11     the second case I was thinking of, which is the

12     Shirokov case, which, I think, also is very factually

13     analogous here.

14          There there was -- this was a scheme that involved

15     a number of defendants who apparently were involved in

16     some -- they would send these letters to people saying

17     that they had infringed a copyright and there was this

18     scheme to get people to pay them money to settle their

19     claims when, in fact, it was alleged that they really

20     didn't have those claims.

21          One of the defendants in that case was a U.K.

22     company who basically looked for all these people who

23     infringed on this IP, identified them, and then sent

24     them to other defendants to send the collection

25     letters, which is analogous, in my opinion, to the

1    facts here.

2        And even there, you know, the argument was, as

3    Your Honor is saying, there's no way these other

4    defendants could have sent these collection letters to

5    the plaintiffs if not for this information -- not a

6    website -- but this information that another defendant

7    had collected from them, and there too the court found

8    that personal jurisdiction over that United Kingdom

9    defendant was too attenuated and remote.

10        And for Your Honor's reference, that's -- I'm

11    going to say this wrong -- Shirokov v. Dunlap, 2012 WL

12    1065578, which is a District of Massachusetts case from

13    March 27, 2012.

14        The final point I would make on personal

15    jurisdiction is that there is an argument that

16    plaintiffs made that because First Marblehead received

17    some of the money that was collected that -- through

18    the TERI bankruptcy at the same time that it knew or

19    should have known its agents were collecting debts

20    using that database, that that establishes personal

21    jurisdiction here.

22        First, I would say, First Marblehead did not have

23    agents collecting debts, which was established through

24    the Morel declaration; and second, I think receipt of

25    payments related to a bankruptcy, which was filed in

1   Massachusetts more than six years before any of the

2   payments were received, also is too attenuated.

3       It essentially would open up any unsecured

4   creditor in a bankruptcy anywhere to personal

5   jurisdiction in all 50 states, and I just can't believe

6   that that can be the law.

7       I will -- I know I've been talking for a while, so

8   I will rest on the standing issue on my papers.  I

9   believe that a lot of these facts again fail to

10  establish standing in this case.

11      And the last comment that I would make with

12  respect to the failure to state a claim is that really

13  the only -- plaintiffs essentially have conceded that

14  the Fair Debt Collection Practices Act and the Maine

15  Fair Debt Collection Practices Act is time-barred.

16      They didn't respond to that argument, and the fact

17  that my clients have not been involved since 2012,

18  which was established in the second amended complaint,

19  I think makes clear that those claims are time-barred.

20      On the Maine Unfair Trade Practices Act, we don't

21  believe that plaintiffs have pointed to a single act

22  that is unfair or deceptive and our argument would be

23  that, you know, maintenance of a database 2 to 3 years

24  before the alleged debt collection activity again is

25  too attenuated to satisfy that claim.

```
1              THE COURT:  Thank you.

2              MS. LAWRENCE:  Thank you.

3              THE COURT:  Attorney Dill.  Attorney Dill, I

4    wonder if you can begin with those last points.

5          Did you -- have you waived any argument with

6    respect to the Fair Debt Collection Practices Act and

7    the Maine Unfair Trade Practices Act --

8              MS. DILL:  No.

9              THE COURT:  -- as to this defendant?

10             MS. DILL:  No, I have not.  And speaking of

11   too attenuated, I mean these loans were taken out in

12   2004 and 2005 and now they're just being collected in

13   Maine.  I mean the shoe is on the other foot here.

14         It's the student borrowers who are suffering from

15   this delay in debt collection and the reason why First

16   Marblehead is identified as a defendant, as a debt

17   collector defendant, is because in researching and

18   investigating the claims, the Consumer Finance

19   Protection Bureau, you know, has targeted First

20   Marblehead for its debt collection activity.

21         First Marblehead has, you know, filed a Form 8K,

22   Document 202-9, that specifically identifies the letter

23   from the Consumer Financial Protection Bureau notifying

24   First Marblehead that -- and I'm summarizing -- that

25   its debt collection activity related to the National
```

1    Collegiate Student Loan Trust is the subject of their

2    potential enforcement action.

3            THE COURT:  That's so general information.  It

4    doesn't really establish anything with respect to your

5    clients; does it?

6            MS. DILL:  I think it -- well, I think its --

7    my clients have alleged in the complaint that First

8    Marblehead is a debt collector.  My clients have

9    alleged that First Marblehead is an agent and in

10   collusion with the other defendants who are, you know,

11   profiting off of fraudulent activity in Maine state

12   courts.  And I think the 8K and the information that we

13   know, that the federal government is also inquiring of

14   First Marblehead and its debt collection activities, is

15   certainly relevant to a motion to dismiss.

16           THE COURT:  Well, I didn't say it's not

17   relevant, but is it enough to assert a claim in this

18   case?  I mean this generalized information that First

19   Marblehead is within the radar of the consumer debt --

20   the consumer agency --

21           MS. DILL:  First Marblehead was the debt --

22   first of all, First Marblehead organized 8,000 or so of

23   Maine loans, all right.  So 8,000 Maine student

24   borrowers signed up for loans thanks to First

25   Marblehead and First Marblehead made a lot of money --

1          THE COURT:  But the securitization of loans is

2     not what your case is about; is it?

3          MS. DILL:  No, but they're trying to say

4     that's all they did.  First Marblehead also was the

5     special servicer for these loans.

6          THE COURT:  Until 2012.

7          MS. DILL:  Well, they say -- yes, until 2012

8     and the guarantor in the -- in Sarah Thurlow's (sic)

9     case, the guarantor apparently bought her loan in April

10    of 2012 and in the Winne case, the guarantor apparently

11    bought her loan in March of 2010 when First Marblehead

12    was the servicer.

13         THE COURT:  Okay.  Now, Attorney Lawrence

14    makes a point that you might be interchangeably

15    referring to First Marblehead as -- actually

16    subsidiaries of First Marblehead; are you?  Do you have

17    the right defendant?

18         MS. DILL:  It's really notable who is the

19    right defendant given the attempts by these defendants

20    to make it impossible to know.  I mean First Marblehead

21    Corporation is the parent company and First Marblehead

22    Education Resources is a subsidiary and First

23    Marblehead Data Services was the administrator of the

24    trusts.

25          It seems to me that if, in fact, I've identified

1     the wrong party, since First Marblehead took the

2     initiative to file a motion to change the name, then it

3     could file a motion to change the defendant.

4         I mean what are Maine student borrowers -- you

5     know, what are we supposed to do here?  All these

6     corporations make it absolutely impossible to figure

7     out what the heck they're doing on purpose.  They're

8     purposefully --

9             THE COURT:  Assuming that you've got the right

10    defendant, have you alleged any facts from which,

11    viewing the complaint in the light most favorable to

12    your clients, I can plausibly conclude that U.S. Bank,

13    Turnstile, Transworld and Abrahamsen, for that matter,

14    the law firm, were acting as agents of First Marblehead

15    Corporation?

16            MS. DILL:  Well, I think you have to accept my

17    allegations as true.

18            THE COURT:  Which allegations?

19            MS. DILL:  Well, in my response, which is

20    Document 202, I identify all of the allegations in the

21    complaint and I say in Paragraph 19 of the second

22    amended complaint, U.S. Bank, Wilmington, First

23    Marblehead and the trusts knowingly employed people in

24    Maine to collect debts in violation of federal and

25    state law.

1          And then I identified all the other allegations

2     that identified First Marblehead and include the fact

3     that First Marblehead is a debt collector, and I think

4     that that is fair since the federal government has said

5     that it is a debt collector.  And that First Marblehead

6     is acting in agency with these other defendants and in

7     collusion as part of this scheme to double-dip, reap

8     the rewards of the plan trustee and also reap the

9     rewards of debt collection activity.

10          THE COURT:  So the question is whether under

11    the pleading standards that I'm obligated to apply,

12    your characterization of U.S. Bank, Turnstile and the

13    others as being agents of First Marblehead, that's a

14    conclusion for purposes of Iqbal/Twombly; isn't it?

15    That's not enough for me to rest on that, that you say

16    that there's an agency relationship.

17          Is there anything more in your complaint that I

18    can look to and say yeah, there could be an agency

19    relationship based on these specific allegations?

20          MS. DILL:  Well, when you say in the

21    complaint, now their motion to dismiss is under

22    12(b)(6) and 12(b)(1).  So under 12(b)(6), I think

23    there's enough to -- in the allegations that there's an

24    agency relationship because I allege it and under 11 --

25    you know, Rule 11 --

1      THE COURT:  Well, you can allege there's an

2   agency relationship, but it seems to me you've got to

3   do a little more than that; don't you?  I mean you've

4   got to point to some facts that actually bears out that

5   conclusion.

6      MS. DILL:  Well, if you look at, for instance

7   -- like I said, there's a lot of litigation in all

8   this, so it's not just me saying that First Marblehead

9   is an agent.  I mean I've included in Document 202-23 a

10  memorandum of order that discusses the relationship

11  between First Marblehead Corporation and Education

12  Resources Institute.

13      There's a case, In re First Marblehead Corp.

14  Securities Litigation, it's 2009 U.S. Lexis 68423, that

15  describes the sort of convoluted relationships between

16  First Marblehead and TERI and the other defendants.

17      I mean they bought and sold information, they

18  acted as -- First Marblehead did the securitization

19  process, First Marblehead did risk management, First

20  Marblehead did all kinds of things that are described

21  in this decision, and so I think it's reasonable to

22  assume that First Marblehead, as the special servicer,

23  as the creator of this database, as the purchaser of

24  TERI, acted on behalf of the trusts in this debt

25  collection activity and that inference and those

1    allegations are supported by the fact that First

2    Marblehead issued an 8K stating that it was the subject

3    of a federal investigation for its debt collection

4    activity, and for the decisions that I included in the

5    plaintiffs' response to First Marblehead Corporation's

6    motions to dismiss.

7            THE COURT:  All right.  Anything else?

8            MS. DILL:  Would you like me to talk about

9    anything else?  Are there any other questions that I

10   can -- I think, I just want to point out that the

11   complaint alleges collusion and the complaint describes

12   a putative class of Maine state borrowers that simply

13   want to have the opportunity since they were approached

14   by First Marblehead -- First Marblehead reached into

15   Maine and through its securitization process extracted

16   over 4,000 Maine loans and bundled them up and sold

17   them to investors, who continue to make a lot of money,

18   and now hundreds of Maine students are being sued in

19   Maine and now all of these defendants say that they

20   don't have any connections with Maine.

21           And I say that given the allegations and what we

22   know to date, and given the information that's been

23   provided, that the Court not only has jurisdiction, not

24   only have the plaintiffs stated a claim, but even if

25   there's some doubt, that this Court has flexibility to

1    decide the jurisdiction question at a later date.  That

2    there could be a reasonable amount of discovery that

3    could clarify some of these issues, that it's not an

4    unfair burden on these defendants given electronic case

5    filing, given their resources compared to student

6    borrowers' resources.

7        And in terms of any argument about extenuation or

8    time period, my goodness, you can imagine these student

9    borrowers who are being sued now on debts that they

10   incurred in 2004, 2005, 2006, 2001.  I mean it's

11   difficult and it's not just difficult for these

12   defendants who have, you know, 20 good lawyers, it's

13   difficult for students.

14        THE COURT:  Let me ask you to address the

15   motion to supplement the record in this case.  The

16   deposition in this -- that you're relying upon doesn't

17   mention Wilmington at all and it does -- there is

18   testimony with respect to First Marblehead, but it's

19   all in its involvement up to 2012.

20        How else does -- well, how does this deposition

21   support your position on these motions?

22        MS. DILL:  Well, I just want to point out, in

23   case you don't know, this is Mr. Luke in the audience,

24   so he's the person whose deposition we're talking about

25   and I think it's fair for Wilmington and First

1    Marblehead to make their arguments about not having

2    notice, but with all due respect, when I noticed the

3    deposition, I had no idea that Transworld Systems was

4    going to appear as the 30(b)(6) representative of the

5    trusts.  It was a surprise to me.

6              THE COURT:  Putting aside for the moment the

7    question of whether I should -- whether it's

8    permissible under Rule 32, and I'll just tell you right

9    now that I'm -- first I want to hear from the

10   defendants -- but I lean toward the view that I am

11   permitted to consider the deposition.  My question to

12   you is why does it matter?

13             MS. DILL:  Well, I think it matters because

14   Transworld System knows that the plaintiffs' theory of

15   the case is that TERI purchased these loans and

16   therefore the trusts don't own them and therefore the

17   lawsuits are fraudulent, and nonetheless, when the

18   representative who's called to give information about

19   that has no idea, really has no idea whether TERI

20   purchased the loans.

21        Here's somebody who has no legal training who says

22   well, I know TERI didn't purchase the loans because I

23   looked at the docket and because some guys at First

24   Marblehead told me.

25             THE COURT:  Okay.  So is it your view that the

1    deposition is important at least with respect to the 13

2    trusts that seek dismissal in this case?

3              MS. DILL:  Yes and it's also important because

4    it establishes that the trusts want, on the one hand,

5    to claim in state court that they are the custodian of

6    the American Education Services' records.  They swear

7    out affidavits saying we are entitled to this amount of

8    money because these AES records that we extract from

9    the computer and print show us -- show that this amount

10   is due and what they fail to say to the state court is

11   that the same AES records show that TERI purchased the

12   loans.

13        So either they have that information at their

14   fingertips and they're willfully withholding it or they

15   don't have it, in which case they're not the custodian

16   of AES records.  They're the custodian of some subset,

17   some subset of conveniently, you know, put together

18   records that support their claims, but are not, in

19   fact, all the records.

20              THE COURT:  Thank you.

21              MS. DILL:  Thank you.  Attorney Lawrence, you

22   can respond first on the motion to supplement, please.

23              MS. LAWRENCE:  Your Honor, we don't believe

24   that we received proper notice of the deposition, but

25   at the end of the day, we think that the deposition

1    actually supports our claims because it does make

2    clear, as even alleged in the second amended complaint,

3    that First Marblehead and its subsidiaries had nothing

4    to do with the trusts after 2012.

5         So when Attorney Dill gets up and speaks about,

6    you know, all of the things that happened with respect

7    to these databases, I think it's very important to

8    remember that as of 2012, my client had nothing to do

9    with these documents.

10        Again, I know Ms. Dill thinks it's very confusing

11   to figure out who did what and what corporate forum did

12   what, but I'm basing these arguments on publicly

13   available documents, SEC filings, that explain what

14   First Marblehead did and what its subsidiaries did, and

15   First Marblehead was the securitizer.  It didn't have

16   anything to do with servicing the trust.  It didn't

17   have anything to do with administration of the trust.

18        A few other quick points if I may, Your Honor.

19   The CFPB Morel response, which Attorney Dill has

20   brought up a few times, if you look at the 8K, in

21   addition -- let me start over.

22        If you look at the 8K, it makes clear that the

23   investigation involves activities that occurred before

24   2012 or before.  So again, we think it actually

25   supports our claims that there isn't personal

1   jurisdiction, that there's failure to state a claim and

2   that there is no standing.

3       And as Your Honor said, it's an investigation into

4   generalized conduct.  It is not connected to -- there

5   are no allegations, and even from Attorney Dill, that

6   that conduct is somehow connected to the plaintiffs in

7   this case.

8       The other thing that I would say, two other quick

9   points, Attorney Dill in the first question you asked

10  her was whether or not she had waived her FTPCA -- I'm

11  sorry, Maine FTPA claims and the fact that they're

12  time-barred.  I don't see anything in her opposition

13  and I didn't hear anything today other than her saying

14  no, I didn't waive this, that actually sets forth any

15  argument in support of why her claims are valid and not

16  time-barred.

17      The fact that my client -- I know I repeat this a

18  lot -- but the fact that my client had no involvement

19  since 2012 in and of itself, I believe, establishes

20  that these claims are time-barred.

21      And the last thing I would say, her allegations of

22  agency and collusion, I don't see any facts supporting

23  that and I think that there needs to be facts

24  supporting that, and perhaps part of this is the fact

25  that there is so much group pleadings in this

1    complaint, the fact that essentially she replaced

2    defendants with debt collector defendants and then

3    alleged all of the defendants as debt collector

4    defendants, but my client doesn't know through that

5    group pleading what it is alleged to have -- who's

6    alleged to have colluded with, what this agency

7    relationship is.  There frankly aren't any facts to

8    support it.

9         THE COURT:  Thank you, Attorney Lawrence.

10   Attorney Arnold, you can respond on the motion to

11   supplement.

12        MR. ARNOLD:  Your Honor, on the motion to

13   supplement, Your Honor, you hit the nail on the head.

14   The proposed transcript to be considered doesn't

15   mention Wilmington Trust?  If anything, we also were

16   not noticed to the deposition.  Putting that procedural

17   objection aside, the fact of the matter is is that it's

18   fully consistent with what we've said.

19        Wilmington Trust acted solely as owner trustee or

20   statutory trustee and it's a very limited ministerial

21   role, and there are no questions or any information

22   pertaining to that role and there was nothing to

23   undercut that role or what we've said about that role

24   in that deposition.

25        THE COURT:  Thank you.  Attorney Alltmont, any

1     final words on the motion to supplement?

2          MR. ALLTMONT:  Yes, Your Honor.  First, it's

3     inappropriate for Attorney Dill to attempt to amend the

4     pleadings through greater briefing and the deposition

5     transcript.

6          I also want to address her allegations that the

7     deposition transcript somehow supports her claim that

8     TERI repurchased these accounts.  First off, the

9     deposition was specific as to two plaintiffs, Coffey

10    and McMullen, and Mr. Luke specifically denied those

11    claims or rejected those claims.

12         Also, as it relates to the motion to dismiss the

13    13 trust plaintiffs -- trust defendants, the deposition

14    is completely irrelevant and has no bearing on the

15    standing of the plaintiffs to assert claims against

16    those 13 trust defendants.

17         THE COURT:  Thank you.  Attorney Dill, as the

18    moving party on the motion to supplement, you get the

19    final word.  Anything else on this?  This is on the

20    motion to supplement.

21         MS. DILL:  I think the deposition transcript

22    makes clear that Mr. Luke, in his position as senior

23    litigation paralegal, travels around the country

24    representing all of the trusts and represents the

25    trusts in this case and in the state court collection

1    cases and therefore his testimony about how this

2    collection activity happens, and the databases on which

3    they rely, and, in my view, the unreliability of the

4    records that they use in state court proceedings is all

5    relevant to the trust.

6         This is a playbook on how the trusts, through TSI,

7    U.S. Bank and other defendants across the country, are

8    taking advantage of student borrowers.

9         THE COURT:  Thank you.  All right, counsel,

10   thank you for your briefs and argument.  I will take

11   this under advisement and I'll issue a written

12   decision.

13        What else is pending in this case?  Is there

14   anything else pending in this case at this time?  Any

15   motions pending at this time?  Someone remind me where

16   we're at otherwise.

17        MR. ALLTMONT:  Your Honor, there is the

18   plaintiff Winne's motion for fees recovered in the

19   offer of judgement.

20        THE COURT:  That's right, yes.

21        MR. ALLTMONT:  And there has not been

22   briefing.

23        THE COURT:  So that briefing is in progress,

24   right?

25        MR. ALLTMONT:  Yes.

1          THE COURT:  And are there any other

2     outstanding motions at this time?  So once these

3     motions and the attorneys fees question have been

4     decided, we will be ready for a case management

5     conference to schedule the case; is that fair?

6          MS. DILL:  Yes, Your Honor.

7          THE COURT:  Everyone agrees?  All right,

8     great.  Thank you all.  Have a great day.  The Court

9     will be in recess.

10         (End of proceeding).

11              **C E R T I F I C A T I O N**

12    I, Dennis Ford, Official Court Reporter for the United

13    States District Court, District of Maine, certify that

14    the foregoing is a correct transcript from the record

15    of proceedings in the above-entitled matter.

16    Dated:  August 9, 2017

17              /s/ Dennis Ford

18              Official Court Reporter

19

20

21

22

23

24

25